PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————————————

No. 04-1979

————————————

HOWARD HESS DENTAL LABORATORIES
INCORPORATED;
PHILIP GUTTIEREZ, *d/b/a Dentures Plus, on behalf
of themselves and all other similarly situated,
                                    Appellants
                    v.

DENTSPLY INTERNATIONAL, INC.

*Amended per Clerk's Order dated 4/30/04

————————————

No. 04-1980

————————————

JERSEY DENTAL LABORATORIES, f/k/a Howard
Hess Dental
Laboratories Incorporated; PHILIP GUTTIEREZ, *d/b/a
Dentures Plus, on behalf of themselves and all others
similarly situated,
                                    Appellants

v.

DENTSPLY INTERNATIONAL, INC.;
A. LEVENTHAL & SONS, INC.;
ACCUBITE DENTAL LAB, INC.; ADDIUM DENTAL
PRODUCTS;
ARNOLD DENTAL SUPPLY COMPANY;
ATLANTA DENTAL SUPPLY COMPANY;
BENCO DENTAL COMPANY; BURKHART DENTAL
SUPPLY COMPANY;
DARBY DENTAL LABORATORY SUPPLY CO., INC.;
DENTAL SUPPLIES
AND EQUIPMENT, INC.; EDENTALDIRECT.COM, INC.,
as successor to
Crutcher Dental, Inc.; HENDON DENTAL SUPPLY, INC.;
HENRY SCHEIN, INC., and its affiliates including, without
limitation, Zahn Dental Co., Inc.;
IOWA DENTAL SUPPLY CO.;
JAHN DENTAL SUPPLY COMPANY; JB DENTAL
SUPPLY CO., INC.;
JOHNSON & LUND CO., INC.; KENTUCKY DENTAL
SUPPLY COMPANY, INC.
a/k/a KDSC Liquidation Corp.; MARCUS
DENTAL SUPPLY CO;
MIDWAY DENTAL SUPPLY INC.; MOHAWK DENTAL
CO., INC.; NASHVILLE
DENTAL, INC.; NOWAK DENTAL SUPPLIES, INC.;
PATTERSON DENTAL
COMPANY, its subsidiaries, predecessors, successors,
assigns,
affiliates and related companies; PEARSON DENTAL

2

SUPPLIES, INC.;
RYKER DENTAL OF KENTUCKY, INC.; THOMPSON
DENTAL COMPANY

*Amended per Clerk's Order dated 4/30/04

————————————

On Appeal from the United States District Court
for the District of Delaware
(D.C. Civil Action Nos. 99-cv-00255 / 01-cv-00267)
District Judge: Honorable Sue L. Robinson

————————————

Argued April 7, 2005

Before: BARRY, AMBRO and
GREENBERG, Circuit Judges

(Filed September 21, 2005)

Thomas A. Dubbs, Esquire (Argued)
Richard T. Joffe, Esquire
Goodkind, Labaton, Rudoff & Sucharow
100 Park Avenue, 12th Floor
New York, NY   10017

Pamela S. Tikellis, Esquire
Robert J. Kriner, Jr. Esquire
Chimicles & Tikellis, LLP
One Rodney Square, Suite 500

3

P.O. Box 1035
Wilmington, DE   19899

      Counsel for Appellants

Richard A. Ripley, Esquire
Margaret M. Zwisler, Esquire (Argued)
Kelly A. Clement, Esquire
Eric J. McCarthy, Esquire
Charles R. Price, Esquire
Howrey, Simon, Arnold & White
1299 Pennsylvania Avenue, N.W.
Washington, D.C.   20004

Brian M. Addison, Esquire
Dentsply International, Inc.
Susquehanna Commerce Center
221 West Philadelphia Street
York, PA   17405

W. Harding Drane, Jr., Esquire
Potter Anderson & Corroon LLP
1313 North Market Street, 6th Floor
P.O. Box 951
Wilmington, DE   19899

C. Scott Reese, Esquire
Cooch & Taylor
824 Market Street Mall, Suite 1000
P.O. Box 1680
Wilmington, DE   19899

James J. Maron, Esquire
Maron Marvel & Wilks, P.A.
1300 North Broom Street
P.O. Box 288
Wilmington, DE  19899

       Counsel for Appellees

————————————

OPINION OF THE COURT

————————————

AMBRO, <u>Circuit Judge</u>

We consider consolidated appeals involving the same parties in two antitrust suits, *Howard Hess Dental Laboratories, Inc. v. Dentsply Internationl, Inc.* ("*Hess*") and *Jersey Dental Laboratories v. Dentsply International, Inc.* ("*Jersey Dental*").[1] Plaintiffs are dental laboratories who have brought these antitrust class actions on behalf of themselves and a class of similarly situated labs.  Defendant Dentsply International, Inc. ("Dentsply") markets artificial teeth used by the dental labs to make dentures.  Plaintiffs allege, among other things, an exclusive-dealing conspiracy and a retail price-fixing conspiracy among Dentsply and its dealer-middlemen.

——————————

[1]Hess Dental changed its name to "Jersey Dental" during the period between the two suits.

5

The District Court denied Plaintiffs standing to recover damages in both suits based primarily on *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), which held that indirect purchaser plaintiffs do not have statutory standing to recover damages for "passed-on" overcharges.[2]  We hold that Plaintiffs may not recover damages in *Hess* (a) under the "co-conspirator" exception to *Illinois Brick*, (b) under the "control" exception to *Illinois Brick*, (c) under a non-overcharge theory of damages, or (d) for "drop shipments."  While Plaintiffs may not recover damages under either the control exception or a lost profits theory in *Jersey Dental*, they do have statutory standing under the co-conspirator exception to pursue an action for overcharge damages (including for drop shipped teeth) caused by the alleged retail price-fixing conspiracy, although not for the alleged exclusive-dealing conspiracy.

---

[2]Section 4 of the Clayton Act provides that "any person who shall be *injured* in his business or property by reason of anything forbidden in the antitrust laws . . . shall recover threefold the damages by him sustained."  15 U.S.C. § 15(a) (emphasis added).  *Illinois Brick* determined that direct purchasers are the only parties "injured" in a manner that permits them to recover damages.  431 U.S. at 729, 735.  It thus held that indirect purchaser plaintiffs do not have statutory standing to recover damages under Section 4 of the Clayton Act. *Id*.

**Background**

Plaintiffs allege the following in one or both of the complaints.

(1) Manufacturers of artificial teeth need to distribute through dealers in order to compete effectively. Dealers are the primary source of distribution to dental labs, which use the teeth to produce dentures. Dentsply uses a network of authorized dealers.

(2) Plaintiffs have purchased Dentsply's teeth both indirectly through Dentsply's dealers and directly through "drop shipping." Drop shipping occurs when a dealer does not have certain teeth in stock or cannot fulfill a lab's order for some other reason and asks Dentsply to ship the teeth directly to a lab. When teeth are drop shipped, the dealer never has physical custody of them, but it does bill the lab for the teeth, collect payments from the lab, and pay Dentsply.

(3) Dentsply has foreclosed its competitors' access to dealers by explicitly agreeing with some dealers that they will not carry certain competing brands of teeth and by inducing other dealers not to carry those competing brands of teeth. Pursuant to its written policy called "Dealer Criterion Number 6," Dentsply threatens to terminate, and does terminate, dealers that add to their inventory teeth made by Dentsply's competitors. Thus, unless Dentsply's dealers were already selling another

7

manufacturer's teeth before Dentsply imposed its exclusive-dealing policies, its dealers cannot sell other manufacturers' teeth unless they give up the opportunity to continue to sell Dentsply's teeth. No rational dealer would be likely to make such a switch because, given Dentsply's monopoly position (it has a 75-80% market share on a revenue basis), losing the ability to sell Dentsply's teeth would hurt a dealer more than gaining the ability to sell Dentsply's competitors' teeth would help a dealer. By explicitly agreeing with some dealers that they will not carry certain competing brands of teeth and by enacting Dealer Criterion Number 6, Dentsply has foreclosured its rivals' access to adequate channels of distribution, and competition has been restricted. This has caused Dentsply's market share to increase, the price of Dentsply's and other manufacturers' teeth to increase, and the availability of rival teeth to decrease.

(4) Furthermore, by agreement among Dentsply and its dealers, Dentsply sets the dealers' resale prices. It distributes a list of "suggested" prices for its dealers to charge dental labs. Before a dealer can charge a lower price, Dentsply must approve this "price deviation." Price deviations have been granted only when a lab has been buying, or is thinking of buying, a competitor's teeth because they are being sold for less than those of Dentsply. In those instances, Dentsply negotiates with the lab to allow it to buy teeth from the dealer at a price below Dentsply's suggested price. The dealer then agrees to the price negotiated by Dentsply.

8

(5) Dentsply's foreclosing of its competitors' access to dealers and setting of the dealers' resale prices have caused Plaintiffs to purchase Dentsply's teeth at artificially high prices and lose profits from unrealized sales of Dentsply's competitors' teeth.

## Procedural History

In 1999, Plaintiffs filed the *Hess* suit against Dentsply alleging conspiracy to monopolize, attempt to monopolize, and maintenance of monopoly in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and restraint of trade in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14. Plaintiffs asked for both damages and an injunction. Dentsply moved for summary judgment, claiming that Plaintiffs lacked standing under *Illinois Brick*. The District Court granted Dentsply's motion on Plaintiffs' damages claims. The Court reasoned that: (1) a co-conspirator exception to *Illinois Brick* did not apply because Plaintiffs had not joined Dentsply's dealers as co-defendants; (2) the control exception to *Illinois Brick* did not apply because Dentsply does not own its dealers; (3) Plaintiffs could not recover on a non-overcharge theory of damages because they had not articulated any such theory; and (4) Plaintiffs could not recover for drop shipments because they had specifically alleged that they were not direct purchasers, and even if they had alleged they were direct purchasers, they were indirect purchasers of drop shipments.

In 2001, Plaintiffs filed the *Jersey Dental* suit, this time naming as Dentsply's co-defendants twenty-six of its then twenty-eight authorized dealers. Plaintiffs made substantially the same allegations as they did in *Hess* with one key addition: they claimed they were not only indirect purchasers but also direct purchasers. As in *Hess*, Plaintiffs asked for both damages and an injunction. Dentsply moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss the claims for damages, citing *Illinois Brick*. The District Court granted the motion. The Court reasoned that: (1) Plaintiffs could not recover under a co-conspirator exception to *Illinois Brick* because the suit still implicated *Illinois Brick's* policy concerns; (2) in *Hess* it had already rejected Plaintiffs' argument that they could recover under the control exception to *Illinois Brick*; (3) Plaintiffs could not recover damages for lost profits because their complaint sought only overcharge damages and because, as Plaintiffs were indirect purchasers*, Illinois Brick* would bar recovery of lost profits anyway; and (4) in *Hess* it had already rejected Plaintiffs' argument that they could recover for drop shipped teeth.

Plaintiffs then moved for leave to amend their complaint. Among the proposed additions to the complaint were allegations that "[t]he Dealer Defendants agree wiith Dentsply and and with each other" to abide by suggested retail prices and that "the prices at which the Dealer Defendants sell to dental laboratories are controlled by Dentsply and agreed to by the Dealer Defendants." The District Court denied leave to amend because the amended pleading would not withstand a motion to dismiss.

10

It reasoned that: (1) the co-conspirator exception to *Illinois Brick* did not apply because the dealers could still sue Dentsply; (2) the control exception to *Illinois Brick* did not apply because the dealers were not subsidiaries of Dentsply; and (3) *Illinois Brick* barred recovery of lost profits damages because Plaintiffs were indirect purchasers.

Plaintiffs moved pursuant to 28 U.S.C. § 1292(b) for certification of appealability of the orders dismissing the damage claims in *Hess* and *Jersey Dental* and the order denying their motion for leave to amend in *Jersey Dental*. The District Court granted these motions and certified the following question:

> Whether, under the circumstances here, application of *Illinois Brick*, 431 U.S. 720 (1977), *McCarthy v. Recordex Service, Inc.*, 80 F.3d 842 (3d Cir. 1996), or other Third Circuit opinions dealing with *Illinois Brick*, prevents Plaintiffs from being able to recover damages against Dentsply International, Inc.

Plaintiffs then petitioned our Court for permission to appeal, pursuant to 28 U.S.C. § 1292(b), the three orders certified by the District Court. We granted the petition and consolidated the appeals. In a Section 1292(b) appeal, our review is not limited to the specific question certified by the District Court. We may "consider all grounds which might require a reversal of the order

11

appealed from." *Merican, Inc. v. Caterpillar Tractor Co.*, 713 F.2d 958, 962 n.7 (3d Cir. 1983). We "may address any issue fairly included within the certified order because it is the *order* that is appealable, and not the controlling question identified by the [D]istrict [C]ourt." *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996) (emphasis in original) (internal quotation marks omitted).[3]

## Standard of Review

As the *Hess* order partially granted Dentsply's motion for summary judgment, our review is *de novo*. *Mass. Sch. of Law at Andover, Inc. v. ABA*, 107 F.3d 1026, 1032 (3d Cir. 1997). The first *Jersey Dental* order granted Dentsply's motion to dismiss for failure to state a claim. Review of this order also merits *de novo* review. *Worldcom, Inc. v. Graphnet, Inc.*, 343 F.3d 651, 653 (3d Cir. 2003). The second *Jersey Dental* order denied Plaintiffs' motion for leave to amend the complaint on the ground that "the proposed amended complaint would not

---

[3]We note that the Government has also sued Dentsply for alleged antitrust violations. *See United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005). There we reversed the District Court's judgment in favor of Dentsply and granted injunctive relief. In so doing, we determined that Dentsply had monopoly power (*i.e.*, the power to exclude competitors) and that its exclusionary practices, particularly Dealer Criterion Number 6, had an anticompetitive effect. *Id.* at 188-97.

survive a motion to dismiss under Fed. R. Civ. P. 12 (b)(6)."
Dist. Ct. Mem. Ord. at 7 (Aug. 27, 2002). Where, as here, "the
[D]istrict [C]ourt has based its decision to deny leave to amend
on a legal conclusion that the amended pleading would not
withstand a motion to dismiss, we review such a decision *de
novo*." *Ziegler v. IBP Hog Mkt., Inc.,* 249 F.3d 509, 518 (6th
Cir. 2001). Thus we review all three orders *de novo*.

### Discussion

*Illinois Brick* lays many of the markers for our decision.
In that case, the Supreme Court established the general rule that
only direct purchasers from antitrust violators may recover
damages in antitrust suits. The plaintiffs alleged that concrete
block manufacturers conspired to fix the prices at which
concrete blocks were sold to masonry contractors. They in turn
"passed on" overcharges to the general contractors, who then
passed them on to the plaintiffs, who had purchased buildings
made from the concrete block. The plaintiffs, therefore, were
"indirect purchasers" of concrete block, which "passe[d]
through two separate levels in the chain of distribution before
reaching" them. 431 U.S. at 726.

Before the Court was whether the indirect purchaser
plaintiffs could use this pass-on theory to state a damages claim
against the alleged antitrust violators upstream. It had
previously held that an antitrust defendant could not argue that
a plaintiff who had purchased a product directly from the

13

defendant was not injured because it had passed on the illegal overcharge to its own customers. *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 494 (1968). To maintain consistency, the Court held in *Illinois Brick* that direct purchasers are the only parties "injured" in a manner that permits them to recover damages. 431 U.S. at 729, 735. The indirect purchaser plaintiffs were thus ineligible to recover damages for the passed-on overcharges.

The Court gave three policy reasons for its holding: (1) a risk of duplicative liability for defendants and potentially inconsistent adjudications could arise if courts permitted both direct and indirect purchasers to sue defendants for the same overcharge; (2) the evidentiary complexities and uncertainties involved in ascertaining the portion of the overcharge that the direct purchasers had passed on to the various levels of indirect purchasers would place too great a burden on the courts; and (3) permitting direct and indirect purchasers to sue only for the amount of the overcharge they themselves absorbed and did not pass on would cause inefficient enforcement of the antitrust laws by diluting the ultimate recovery and thus decreasing the direct purchasers' incentive to sue. *Id.* at 730-35 & n.11, n.12, 737 & n.18, 740-43 & n.23, n.27, 745.

I.    **May Plaintiffs recover damages in *Hess*?**

14

a.    **May Plaintiffs recover damages in *Hess* under a co-conspirator exception to *Illinois Brick*?**

Although the *Hess* complaint alleged that Dentsply's dealers conspired with Dentsply by agreeing to the exclusive-dealing arrangements, Plaintiffs did not name any of the dealers as co-defendants. We have rejected attempts to invoke a co-conspirator exception to *Illinois Brick's* bar on indirect purchaser standing when plaintiffs have not named the co-conspirators immediately upstream as defendants. *See McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 854 (3d Cir. 1996); *Link v. Mercedes-Benz*, 788 F.2d 918, 933 (3d Cir. 1986).

In *Link*, for example, Mercedes car owners sued Mercedes-Benz for allegedly requiring dealers to purchase parts exclusively from it. 788 F.2d at 929. Plaintiffs had purchased parts from the dealers, whom they named as co-conspirators but not as defendants. Plaintiffs claimed that *Illinois Brick* did not bar their vertical conspiracy claims because "the intervening parties in the distribution process [were] co-conspirators." *Id.* at 931.

We concluded that, unless the dealers were joined as parties, plaintiffs' suit implicated the policy concerns of *Illinois Brick* and was barred. We explained that if a jury found that Mercedes and its dealers were co-conspirators, but the dealers

15

were not parties to the suit, that determination would not have any collateral estoppel effect in a subsequent suit by a dealer against Mercedes. *Id.* at 932. Therefore, because the dealers were not named as defendants, the risk of duplicative liability identified in *Illinois Brick* remained. Similarly in *Hess*, because the dealers may also sue Dentsply, the risk of duplicative liability looms.

Plaintiffs attempt to distinguish *Hess* from *Link* by pointing to stipulations they entered into with most of Dentsply's dealers. As part of Plaintiffs' opposition to Dentsply's motion for summary judgment in *Hess*, they executed stipulations with twenty-two of Dentsply's dealers. In each stipulation, the dealer agrees "to release [Dentsply] from any and all claims for antitrust violations" set forth in the complaints in *Hess* or *United States v. Dentsply* (the Government's suit against Dentsply), and Plaintiffs agree to "refrain[] from filing suit" against that dealer for the same antitrust violations. The parties to each stipulation agree that "Dentsply is a third party beneficiary of this stipulation" and that the stipulation "may be specifically enforced by the parties hereto or by Dentsply." Plaintiffs' expert calculated that the group of dealers who executed these stipulations "represents approximately 95% of the gross sales" of Dentsply's artificial teeth. Plaintiffs argue that the stipulations give Dentsply a safe harbor from dealer suits, thus eliminating the risk of duplicative liability.

Many problems attend Plaintiffs' argument. First, while

16

in the stipulations Plaintiffs expressly agree not to sue the dealers, they *did* sue the dealers in *Jersey Dental*. Thus, the stipulations are likely unenforceable by Plaintiffs or Dentsply.[4]

Furthermore, in *Kansas v. Utilicorp United, Inc.*, 497 U.S. 199 (1990), the Supreme Court rejected the assertion that the absence of a particular *Illinois Brick* concern in an individual case would remove its bar on an indirect purchaser claim. 497 U.S. at 217. "[E]ven assuming that any economic assumptions underlying the *Illinois Brick* rule might be disproved in a specific case, we think it an unwarranted and counterproductive exercise to litigate a series of exceptions." *Id.* Thus, Plaintiffs would not necessarily have standing even if the stipulations did eliminate *Illinois Brick's* duplicative liability concern.

In addition, in *Merican* the indirect purchasers argued

---

[4]Even if Plaintiffs had not sued the dealers, Dentsply may not be able to enforce the stipulations in any event. The stipulations state that "Dentsply is a third party beneficiary of this stipulation" and that the stipulations "may be specifically enforced by the parties hereto or by Dentsply." However, "only intended beneficiaries of a contract made between two or more other parties have enforceable rights under the contract." 13 Williston on Contracts § 37:8, at 67 (Richard A. Lord ed., 4th ed. 2000) (citing Restatement (Second) of Contracts § 302). In this case, the contracting parties arguably did not intend that Dentsply benefit from the stipulations, as their purpose was to allow Plaintiffs to sue Dentsply.

17

that there was no danger of duplicative recovery because the direct purchaser had executed an affidavit that said it had not suffered injury from the policy that was alleged to violate the antitrust laws. 713 F.2d at 968. We nevertheless held that plaintiffs were barred from seeking damages under *Illinois Brick*, recognizing the remaining potential of a direct purchaser suit. *Id.* at 968-69; *see also Dickson v. Microsoft Corp.*, 309 F.3d 193, 215 (4th Cir. 2002) (applying *Illinois Brick* despite argument that "there is no danger of duplicative recovery because the [direct purchasers] apparently have elected not to sue [the defendant]." (internal quotation marks omitted)).

As our Court has expressly refused to adopt a co-conspirator exception to *Illinois Brick* absent the joinder as defendants of the alleged co-conspirators immediately upstream, Plaintiffs in *Hess* lack standing to pursue claims for monetary relief. Before the applicability of that exception may be considered, the dealers must be joined.

        **b.**    **May Plaintiffs recover damages in *Hess* under the control exception to *Illinois Brick*?**

The "control exception" to *Illinois Brick* "might" permit an indirect purchaser to sue an initial seller when the initial seller "own[s] or control[s]" the direct purchaser. *Illinois Brick*, 431 U.S. at 736 n.16. In *Hess*, Plaintiffs argued that they come within this exception because "Dentsply exerts virtual control

over its . . . dealers."  Dist. Ct. Mem. Op. at 30 (March 30, 2001).

We have applied the control exception only when the initial seller owned the direct purchaser.  *See In re Sugar Indus. Antitrust Litig.*, 579 F.2d 13, 18-19 & n.8 (3d Cir. 1978) (holding that, in certain circumstances, the "first noncontrolled purchaser" has standing to sue when it has purchased from a subsidiary of the violator); *see also Mid-West-Paper Prods. Co., v. Continental Group, Inc.*, 596 F.2d 573, 589 (3d Cir. 1979) (indicating that control exception may apply "when the parent dominates and controls the subsidiary to such an extent that the subsidiary is deemed to be an agent of the parent.").  But Dentsply does not own any interest in its dealers.

Courts that have extended the control exception beyond a parent-subsidiary relationship still require "relationships involving such functional economic or other unity between the direct purchaser and either the defendant or the indirect purchaser that there effectively has been only one sale." *Jewish Hosp. Ass'n v. Stewart Mech. Enter.*, 628 F.2d 971, 975 (6th Cir. 1980); *see also Fisher v. Wattles*, 639 F. Supp. 7, 9 (M.D. Pa. 1985) (to fall within the control exception, plaintiffs must show "such significant control" that the two companies are "virtually the same entity").  Modes of control that might qualify for the control exception include "interlocking directorates, minority stock ownership, loan agreements that subject the wholesalers to the manufacturers' operating control, [or] trust agreements."

19

*In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 605 (7th Cir. 1997) (Posner, J.).  Plaintiffs in *Hess*, however, do not allege that Dentsply exerts any of these modes of control over its dealers.

Furthermore, even assuming that Dentsply does exert some degree of control over its dealers, *Illinois Brick's* policy reasons for denying standing remain.  Nothing about Dentsply's "control" over its dealers would prevent the dealers from suing Dentsply, thus creating a risk of duplicative liability for Dentsply and potentially inconsistent judgments.  Also, if Plaintiffs wanted to recover overcharge damages, they would still have to demonstrate the portion of the overcharge dealers had passed on to them, leaving intact the evidentiary complexities and uncertainties of concern in *Illinois Brick*.  Moreover, permitting Plaintiffs to sue for damages would potentially lead to inefficient enforcement of the antitrust laws, because the ultimate recovery for the dealers would be diluted (assuming that, rather than the dealers being permitted to recover the entire overcharge, it was apportioned among the dealers and the labs), thereby decreasing the dealers' incentive to sue.

In sum, Plaintiffs do not come within the control exception because Dentsply does not own any interest in its dealers and no functional unity exists among them and Dentsply. Notwithstanding whatever lesser degree of control Dentsply may exert over its dealers, *Illinois Brick's* policy reasons for denying

20

standing apply.

### c.    May Plaintiffs recover non-overcharge damages in *Hess*?

In their opposition to summary judgment in *Hess*, Plaintiffs argued that, even if *Illinois Brick* barred them from proving overcharge damages, they might still be able to present a non-overcharge theory of damages after further discovery. The District Court rejected this claim "[b]ecause the Hess plaintiffs have failed to articulate any theory of damages that would be anything other than overcharges." Dist. Ct. Mem. Op. at 31 (March 30, 2001). We agree, and thus Plaintiffs' claim was properly dismissed at summary judgment.

### d.    May Plaintiffs recover damages based on drop shipments in *Hess*?

Plaintiffs in *Hess* claimed that, for teeth drop shipped directly from Dentsply to the labs, they were direct purchasers not subject to *Illinois Brick*. However, the *Hess* complaint limited the plaintiff class to "all dental laboratory purchasers of any Dentsply products who purchased such products *through Dentsply Dealers*." (emphasis added). Plaintiffs cannot avoid *Illinois Brick* by claiming they were direct purchasers of drop shipments when their complaint specifically alleges that they did not directly purchase from Dentsply.

Furthermore, the fact that some of the teeth are drop shipped directly from Dentsply to Plaintiffs does not affect the economic substance of the transaction. That is, the dealers still make the sale to Plaintiffs and Dentsply makes the sale to the dealers. Plaintiffs pay the dealers their usual price, the dealers take their profit, and then the dealers pay Dentsply. *See* Dist. Ct. Mem. Op. at 29 (March 30, 2001). While it is true that the dealers do not take physical possession of the teeth, this is nothing but a formal difference from the typical transactions. Thus, even as to teeth drop shipped directly from Dentsply to the labs, Plaintiffs are indirect purchasers potentially subject to *Illinois Brick*.

II.    **May Plaintiffs recover damages in *Jersey Dental*?**

a.    **May Plaintiffs recover lost profits damages caused by their lost opportunities to purchase and resell Dentsply's competitors' products?**

Plaintiffs argue that, even if they do not have standing to recover damages for overcharges they paid to dealers for Dentsply's teeth, they have standing to recover lost profits damages caused by their lost opportunities to purchase and resell

22

products of Dentsply's competitors.[5]  Plaintiffs allege that, as a result of Dentsply's exclusive-dealing, its competitors are denied adequate access to a necessary means of distribution—the dealers.    Thus Dentsply's competitors' products are not available.    Plaintiffs are theoretically correct that, "but for [Dentsply's] exclusion of more efficient rivals, purchasers would have shifted at least some of their business to the rivals." ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues* 194 (1996).

When antitrust violators cause prices to increase through monopolization, a price-fixing conspiracy, or exclusionary conduct, the harm they cause members of the distribution chain comes in two ways: (1) overcharges paid for goods actually purchased;[6] and (2) lost profits resulting from the lost

_____

[5]If Dentsply's exclusionary conduct enabled it to raise its prices, thereby reducing (at least in theory) the demand for its own products, Plaintiffs might also have claimed lost profits damages caused by their lost opportunities to purchase and resell Dentsply's products.  However, we would reject such a claim for the same reasons we reject Plaintiffs' claim for lost profits damages caused by their lost opportunities to purchase and resell Dentsply's competitors' products.

[6]Members of the distribution chain usually mitigate this harm by passing on some of the overcharge to their buyers. However, much of this harm is not actually avoided, but rather takes the form of the second type of harm—lost profits from the

opportunity to buy and resell a greater volume of goods.  Jeffrey L. Harrison, *The Lost Profits Measure of Damages in Price Enhancement Cases*, 64 Minn. L. Rev. 751, 753, 770-772 (1980) ("[T]he gross overcharge measure [of damages] ignores the impact that the enhanced price has had on the volume of the final good eventually produced."); *see also* ABA Section of Antitrust Law, *supra*, at 195 ("It is the fundamental law of demand that as the price of a product increases the amount purchased decreases.  A collusive price increase, therefore, will result in a reduction of the quantity of the good purchased.").

Thus, as some scholars see it, when antitrust plaintiffs

---

lost opportunity to buy and resell a greater volume of goods. This is because, as members of the distribution chain pass on the overcharge (*i.e.*, raise their prices), their volume of sales theoretically decreases.

Like the second type of harm, the overcharge paid minus the overcharge passed on for goods actually purchased and resold are a form of "lost profits."  The overcharge paid minus the overcharge passed on for goods actually purchased and resold is one component of the loss an antitrust violation causes to the bottom line (*i.e.*, the profits) of members of the distribution chain.  However, because *Illinois Brick* precludes indirect purchasers from recovering overcharge damages, Plaintiffs do not seek in their lost profits claim the component of their lost profits that includes the overcharge paid minus the overcharge passed on for teeth they actually purchased and resold.

24

claim that anticompetitive behavior caused prices to increase, two measures of damages could theoretically be used: (1) the overcharge (*i.e.*, the difference between the price paid for goods actually purchased and the price that would have been paid absent the illegal conduct), or (2) lost profits (*i.e.*, the overcharge paid minus the overcharge passed on for goods actually purchased and resold, plus lost profits from the lost opportunity to buy and resell a greater volume of goods). *See* Phillip E. Areeda, Herbert Hovenkamp & Roger D. Blair, *Antitrust Law* ¶ 394, at 521 (2d ed. 2000).[7]

A court might potentially use a lost profits measure of damages, as "[t]he Supreme Court has not explicitly held that any particular measure of damages is required or precluded." ABA Section of Antitrust Law, *supra*, at 184 (citing *Thomsen v. Cayser*, 243 U.S. 66 (1917)); *see also Illinois Brick*, 431 U.S. at 733 n.13, 743 n.27 (observing that even if the "pass-on [defense] were permitted . . . [and] the defendant show[ed] that as a result of the overcharge the direct purchaser increased its price by the full amount of the overcharge, the direct purchaser m[ight] still claim injury from a reduction in the volume of its sales caused by its higher prices").

---

[7]We note that Professor Areeda, who gained recognition for his scholarly work in antitrust law, is deceased, and that the treatise is now the responsibility principally of Professor Hovenkamp.

However, the standard method of measuring damages in price enhancement cases is overcharge, not lost profits. *See* ABA Section of Antitrust Law, *supra*, at 172 ("The typical measure of damages is the difference between the actual price and the presumed competitive price multiplied by the quantity purchased.  This was the calculation that the Supreme Court approved in *Chattanooga Foundry* [*& Pipe Works v. Atlanta*, 203 U.S. 390, 396 (1906)].");  *id.* at 193-94 (Where "a group of suppliers conspires to drive a more efficient competitor out of the market or, equivalently, prevent a more efficient supplier from entering the market," the excluded supplier (competitor) "would have a claim for antitrust damages based on lost profits" and "purchasers from the conspirators would also have antitrust claims because they pay higher prices as a result of the exclusionary practice."  The purchasers' damages would be based on the overcharge they paid measured by "the difference between the price actually paid and the price that would have been paid absent collusion, multiplied by the quantity."); Areeda, *supra*, ¶ 394b, at 529 (observing that "[i]n spite of the (arguably) theoretical superiority of lost profits as a measure of damages in a price-enhancement case, nearly all plaintiffs claim damages on the basis of an overcharge calculation"); Harrison, *supra*, at 755-56 ("[W]hen the specific activity at issue [is] price enhancement, courts consistently allow[] recoveries based on the gross overcharge instead of lost profits." (footnote omitted)).

Lost profits damages are disfavored, at least in part because they are more difficult to prove than overcharge

26

damages.  *See* ABA Section of Antitrust Law, *supra*, at 171 ("The overcharge measure has the virtues of conceptual simplicity . . . and relative ease of calculation."); Roger D. Blair & William H. Page, *"Speculative" Antitrust Damages*, 70 Wash. L. Rev. 423, 433-34 (1995) ("Overcharge damages . . . were recognized by the Supreme Court [in *Chattanooga Foundry*] primarily because of the difficulty of proving lost profits in price-fixing cases.  Rather than require the complex netting associated with lost profits, and thus practically deny recovery, the Court permitted plaintiffs to prove damages by showing a price enhancement."); Harrison, *supra*, at 756 ("The advantage to plaintiffs of using a gross overcharge measure is that it is less speculative and therefore easier to prove than lost profits.").

Furthermore, overcharge damages, unlike lost profits, may induce antitrust plaintiffs to make arguments that will protect rather than injure consumers.  *See* Frank H. Easterbrook, *Treble What?*, 55 Antitrust L.J. 95, 96-97, 100-01 (1986).  Judge Easterbrook argues that the overcharge to consumers, not lost profits, "should be the basis of all [antitrust] damages."  *Id.* at 101.  He reasons that

> [t]he lure of damages for lost profits induces firms to make arguments that will injure rather than protect consumers.  Profits get lost primarily from hard competition or from the elimination of monopoly. . . .  The more competitive the market, the more profits are 'lost.' . . . [Because] it is hard

> to tell competition apart from exclusion, [] we must be wary of remedies that give the victims of hard competition a strong incentive to sue.

*Id.* at 100-01.

But most importantly, Plaintiffs may not recover lost profits damages because they are indirect purchasers. The District Court concluded that "[t]he intermediate dental dealers suffer the direct harm from any lost opportunity to sell a greater volume of Dentsply products or to sell competitive product lines and profit therefrom. Any harm suffered by plaintiffs remains indirect." Dist. Ct. Mem. Op. at 24 n.9 (Dec. 19, 2001). We agree.

Even commentators who advocate *for* indirect purchaser standing and a lost profits measure of damages admit that their position is currently precluded by Supreme Court case law. As Professor Harrison concedes in his article arguing for indirect purchaser standing and a lost profits measure of damages, "[t]he *Illinois Brick* decision seems absolutely to foreclose the possibility of indirect-purchaser standing in price enhancement suits," even if the indirect purchaser plaintiffs seek lost profits as opposed to overcharge damages. *See* Harrison, *supra*, at 777; *see also Illinois Brick*, 431 U.S. at 746 ("[I]n elevating direct purchasers to a preferred position as private attorneys general, [our case law] denies recovery to those indirect purchasers who may have been actually injured by antitrust violations.").

28

Harrison also acknowledges that

> the legal precedents and policy arguments relied
> on by the [*Hanover Shoe*] Court in rejecting the
> pass-on defense do not support even the
> theoretical appropriateness of the lost profits
> measure.  In addition, the Court hinted that it was
> actually rejecting the very notion that damages
> should be apportioned among various layers of
> buyers and sellers. . . .  [T]o the extent that the
> apportionment process has been rejected by the
> Court, it would be inappropriate to infer that the
> lost profits measure has received even implicit
> approval.

*Id.* at 764-65 (footnotes omitted) (citing *Hanover Shoe*, 392 U.S.
at 489-90 & n.8, 494, 498).  Similarly, while Professors Areeda,
Hovenkamp and Blair argue that "the correct solution is to
permit damages actions based on lost profits to all
intermediaries," they concede that their position "is at variance
with the case law."  Areeda, *supra*, ¶ 346a, at 359-60.  Finally,
the ABA's Antitrust Section recognizes that "if a cartel sells to
an intermediate purchaser who resells to another, both
purchasers are likely to lose profits as a result of the price fix,"
but concedes that "[u]nder the *Illinois Brick* rule, the second
intermediate purchaser, or the indirect purchaser from the cartel,
cannot recover damages."  ABA Section of Antitrust Law,
*supra*, at 183-84.

29

If we were to hold that indirect purchaser plaintiffs could recover lost profits from their decreased volume of purchases and resales, we would be implying that (1) past indirect purchaser plaintiffs who have been denied standing based on *Illinois Brick* could have recovered if only they had framed their claim as one for lost profits rather than for overcharge damages, and (2) that the *Illinois Brick* Court—which was concerned with simplifying and controlling the costs of antitrust litigation and with conserving judicial resources—really meant that indirect purchasers do have standing to sue, but for lost profits rather than overcharge damages. We find both of these propositions untenable.

For all of these reasons, we hold that Plaintiffs do not have statutory standing to recover lost profits damages caused by their lost opportunities to purchase and resell Dentsply's competitors' products.

> **b.    May Plaintiffs recover damages caused by the alleged retail price-fixing conspiracy in *Jersey Dental* under a co-conspirator exception to *Illinois Brick*?**

In *Jersey Dental*, Plaintiffs claim that they come within the "co-conspirator exception" to *Illinois Brick* because their purchases from Dentsply's dealers were made from members of a retail price-fixing conspiracy. Other circuit courts have adopted a co-conspirator exception to *Illinois Brick* that applies

in retail price-fixing cases. *See Arizona v. Shamrock Foods Co.*, 729 F.2d 1208, 1211-12 (9th Cir. 1984) (holding that purchasers from down-stream conspirators may sue up-stream conspirators for damages and noting that "[n]umerous other courts have found *Illinois Brick* inapplicable to claims against remote sellers when the plaintiffs allege that the sellers conspired with intermediates in the distribution chain to fix the price at which the plaintiffs purchased"); *Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 631-32 (7th Cir. 2002) (Easterbrook, J.) (holding that *Illinois Brick* does not bar suits for damages by plaintiffs against an initial seller when it is alleged to have conspired in violation of the antitrust laws with the seller directly upstream from plaintiffs); *Prescription Drugs*, 123 F.3d at 604 (same); *see also Fontana Aviation, Inc. v. Cessna Aircraft Co.*, 617 F.2d 478, 481 (7th Cir. 1980) (approving co-conpirator exception in *dicta*).

Our Court has not explicitly adopted a co-conspirator exception to *Illinois Brick*. In *McCarthy*, we neither adopted nor rejected the exception because it was inapplicable to the case, but we did explain its "nature": "In order to fall within the exception, plaintiffs here would have to allege that the intermediaries immediately upstream . . . colluded with the defendants to overcharge plaintiffs . . . . Moreover, plaintiffs would be obliged to join the [intermediaries] as defendants . . . ." 80 F.3d at 855 (emphasis omitted). In our case, Plaintiffs allege that they made purchases from Dentsply's dealers (the intermediaries immediately upstream from Plaintiffs) and that

31

Dentsply and its dealers are co-conspirators. In addition, in *Jersey Dental* Plaintiffs sued not only Dentsply, but also joined as defendants twenty-six of Dentsply's then twenty-eight authorized dealers.[8] Thus, under *McCarthy*, Plaintiffs potentially qualify for the co-conspirator exception.

Furthermore, Professors Areeda, Hovenkamp, and Blair approve of the co-conspirator exception. They explain that

> *Illinois Brick* does not limit suits by consumers against a manufacturer who illegally contracted with its dealers to set the latter's resale price. . . . There is no problem of duplication or apportionment, because the consumer is the only party who has paid any overcharge. . . . The court simply computes the retail price that would have prevailed absent the illegal contract fixing the price. Further emphasizing that *Illinois Brick* does not apply is that a dealer challenging resale price maintenance imposed upon itself would not base its damages on an "overcharge" at all. Its

---

[8]Plaintiffs may not recover from Dentsply for teeth purchased from the two non-joined dealers under a co-conspirator exception to *Illinois Brick* because, as previously mentioned, our Court has expressly refused to adopt a co-conspirator exception when the alleged co-conspirators immediately upstream have not been joined.

> action is not based on a higher product price to itself, but rather on the constraint on its resale price; its damages would be for lost profits resulting from the reduced volume of sales.  As that case illustrates, lost profits damages for the intermediary and overcharge damages for the consumer are not in any way duplicative; they are both losses caused by the unlawful resale price maintenance.

Areeda, *supra*, ¶ 346h, at 369-70.

In fact, a recent supplement to their treatise analyzed *Jersey Dental* and concluded that the District Court "incorrectly refus[ed] to apply a co-conspirator exception to *Illinois Brick* . . . ." Areeda, *supra*, ¶ 346a, at 88 n.1 (2003 Supp.).  It reasoned that, to the extent that Dentsply imposed resale price maintenance[9] on its dealers, they

> might have their own damage action against the supplier, but if so, it would be an action for lost profits, not for an overcharge; the dealer's injury

---

[9]"Resale price maintenance"—the term used by Areeda, *et al.*—is simply another way of describing the vertical price fixing in which Plaintiffs allege Dentsply and its dealers engaged.  In resale price maintenance, the initial seller dictates the dealers' resale price.

would accrue from the profits lost by . . . lost output resulting from being required to sell at the maintained price; as a result, there was nothing to pass on . . . .

*Id.*[10]

Not only are overcharge pass-on calculations not a concern, the other two *Illinois Brick* policy justifications are also inapplicable to Plaintiffs' price-fixing conspiracy claim. First, there is no risk of duplicative liability or potentially inconsistent judgments because Plaintiffs and Dentsply's dealers would not be suing for the same injury. To the extent that Dentsply imposed resale price maintenance on the dealers, the dealers' claim against Dentsply would be for lost profits, not for an overcharge.[11] Lost profits would be caused by lost output,

---

[10]In fact, Areeda implies that even the alleged exclusive-dealing could not have caused the dealers to be overcharged. Areeda, *supra*, ¶ 346a, at 88 n.1 (2003 Supp.). This appears to be incorrect, for if the exclusive-dealing led to exclusion of Dentsply's competitors, Dentsply may have been able to overcharge its dealers.

[11]We are, of course, not saying that the dealers could prevail on any particular claim. Rather, we merely point out that if the dealers proved that Dentsply imposed resale price maintenance on them, their measure of damages would be based on the lost profits from their decreased volume of purchases and

which in turn is caused by resale price maintenance. Areeda, *supra*, ¶ 346a, at 88 n.1 (2003 Supp.). Second, permitting Plaintiffs to sue would not cause inefficient enforcement of the antitrust laws by diluting the ultimate recovery and thus decreasing direct purchasers' incentive to sue. Dealers would still recover the same amount on their hypothetical lost profits claim even if Plaintiffs recovered on their separate price-fixing claim.

Finally, we have found no precedent holding that plaintiffs, who purchase from dealers who are part of a price-fixing conspiracy with the initial seller, may not recover damages from the initial seller.

In this context, we hold that Plaintiffs in *Jersey Dental* have statutory standing to recover damages from Dentsply for its alleged price-fixing conspiracy with its dealers.

       c.      **May Plaintiffs recover damages caused by the alleged exclusive-dealing conspiracy in *Jersey Dental* under a co-conspirator exception to *Illinois Brick*?**

In *Jersey Dental*, Plaintiffs also claim that they come

---

resales. This lost profits harm is different from, and thus not duplicative of, the overcharge harm that any resale price maintenance would have caused Plaintiffs.

within the "co-conspirator exception" to *Illinois Brick* because their purchases from Dentsply's dealers were made from members of an exclusive-dealing conspiracy. Thus, we must decide whether there is—in addition to a co-conspirator exception for RPM (resale price maintenance, *i.e.*, vertical price-fixing) conspiracies—a co-conspirator exception for non-RPM conspiracies, such as exclusive-dealing or price-fixing at the manufacturer level ("the general co-conspirator exception").[12]

---

[12]We recognize that one might ask why would it not always be unprofitable for a direct purchaser to join such a non-RPM conspiracy and effectively agree to be overcharged (as input costs increase, profits decrease). Further, if economics predicts that such overcharge conspiracies will never arise, why consider adopting an exception for them?

As an initial matter, because *Jersey Dental* is at the Federal Rule of Civil Procedure 12(b)(6) stage, we must take as true Plaintiffs' allegations that Dentsply and its dealers have conspired to fix, and have fixed, the prices that dealers charge Plaintiffs and that there was an exclusive-dealing conspiracy between Dentsply and its dealers to exclude Dentsply's competitors. We may not dismiss Plaintiffs' claims because we determine the alleged facts likely did not occur.

In fact, however, we can imagine how the exclusive-dealing conspiracy, *in combination with the RPM conspiracy*, could have been profitable to the dealers. As previously mentioned, it would presumably not have been profitable for the dealers to have joined a conspiracy in which they were overcharged (the exclusive-dealing conspiracy). However, the

dealers might have joined such a conspiracy if they were compensated in some fashion. Plaintiffs argue that Dentsply conspired to fix the prices that its dealers charge. This is effectively a *horizontal* price fixing conspiracy at the dealer level (which could presumably be profitable to the dealers) that is policed by Dentsply. Thus, the RPM conspiracy could be the mechanism by which Dentsply compensates its dealers in exchange for the dealers' agreement (1) not to deal with Dentsply's competitors and (2) thus to be overcharged by Dentsply.

In addition, in *Prescription Drugs* Judge Posner rejected a similar argument that it would not have made sense economically for the wholesalers in that case to have joined what was arguably a horizontal price-fixing conspiracy at the manufacturer level. 123 F.3d at 614. He explained that "[t]he theory is that the wholesalers were the manufacturers' cats-paws. There is nothing new about the idea that a cartel might 'hire' a customer to help police the cartel." *Id*. He also implied that, because drug wholesalers appeared to be "an endangered commercial species" and the manufacturers could have cut them out altogether and sold directly to buying groups for pharmacies, it was in the wholesalers' self-interest to join the conspiracy. *Id*.

Finally, "summary judgment for a defendant is proper, even if there is some evidence of an antitrust violation, if plaintiff's theory of violation makes no economic sense." *Prescription Drugs*, 123 F.3d at 614 (citing *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S.

37

We hold that such an exception would only exist in circumstances where the middlemen would be barred from bringing a claim against their former co-conspirator—the manufacturer—because their involvement in the conspiracy was "truly complete" (*i.e.*, if the middlemen would be barred from suing by the "complete involvement defense" of a manufacturer). *See Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 140 (1968) (expressly "not decid[ing] . . . whether . . . truly complete involvement and participation in a monopolistic scheme could ever be a basis . . . for barring a plaintiff's cause of action").

### 1.    Why we adopt a "limited" general co-conspirator exception.

If there is a general co-conspirator exception, why do we limit it?  To begin, we examine whether *Illinois Brick's* policy justifications suggest we should adopt (1) a general co-conspirator exception that would permit indirect purchaser standing when the middlemen conspired with the manufacturers even if the middlemen were not barred by the complete involvement defense from suing their former co-conspirator—the manufacturer (the "unlimited exception"), or (2) an exception that would permit indirect purchaser standing

---

451, 467-69 (1992)).  Thus, there is already a mechanism in place for courts to dismiss before trial claims of a conspiracy that would make no economic sense.

only if the middlemen were barred by the complete involvement defense from suing the manufacturer (the "limited exception").[13]

   *Illinois Brick's* first policy concern—the risk of duplicative liability—cuts against the unlimited exception, but in favor of the limited exception. For example, imagine the dealers had already sued and recovered overcharges from Dentsply for the exclusive-dealing conspiracy. If there was an unlimited exception, presumably nothing would stop the labs from then suing Dentsply to recover the duplicative portion of the overcharge that the dealers had passed on to them. Even under the conditions of this case (with the labs suing first and the dealers joined), duplicative recovery is a possibility. If the labs prove Dentsply engaged in an exclusive-dealing conspiracy with the dealers, the dealers could potentially sue Dentsply for duplicative damages the conspiracy caused them. *See Link*, 788

---

[13]The Seventh Circuit is the only Court of Appeals to engage head-on the general co-conspirator exception, and it has adopted it. *See Paper Systems*, 281 F.3d at 631-32 ("The right to sue middlemen that joined the conspiracy is sometimes referred to as a co-conspirator 'exception' to *Illinois Brick*, but it would be better to recognize that *Hanover Shoe* and *Illinois Brick* allocate to the first non-conspirator in the distribution chain the right to collect 100% of the damages."); *Prescription Drugs*, 123 F.3d at 604; *Fontana Aviation*, 617 F.2d at 481. However, we do not discern an explanation by the Court why it did so or an explicit delineation of the exception's scope (*i.e.*, whether it is unlimited or limited).

F.2d at 932 n.12 (analyzing an alleged conspiracy analogous to our case and noting that, even if the dealers were joined and were co-conspirators, they could still potentially sue the manufacturer for overcharges caused by the exclusive-dealing conspiracy). However, under the limited exception, the risk of duplicative liability is alleviated because that exception is only applicable if the middlemen are barred from recovery.

*Illinois Brick's* second policy concern—avoiding the need to ascertain the portion of an overcharge that was passed on—cuts against both exceptions. Unlike vertical conspiracies involving RPM, other vertical conspiracies are designed to distort the *wholesale* market for a particular good. For example, assume that Dentsply and its dealers only engaged in an exclusive-dealing conspiracy. The effect of that conspiracy would be to deny Dentsply's competitors access to its authorized dealers. The absence of competition for these dealers' business would allow Dentsply to charge its dealers a supra-competitive price at wholesale. This overcharge would then be passed on (at least in part) to the dealers' customers, the dental laboratories. The damages that the laboratories could recover from Dentsply would thus be the treble portion of the overcharge that the dealers passed on to them.[14] Thus both exceptions, which apply

---

[14]Because Section 4 of the Clayton Act provides for damages of treble the amount a plaintiff is injured, presumably indirect purchaser plaintiffs would only be permitted to recover treble the amount of the manufacturer's overcharge that the

direct purchasers passed on to them and would not be able to recover the portion of the manufacturer's overcharge that the direct purchasers absorbed because the indirect purchasers would not have been injured by that portion. *See* 15 U.S.C. § 15(a) (Section 4 of the Clayton Act provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . shall recover threefold the damages *by him sustained*.") (emphasis added). *But see Paper Systems*, 281 F.3d at 631-32 ("The right to sue middlemen that joined the conspiracy is sometimes referred to as a co-conspirator "exception" to *Illinois Brick*, but it would be better to recognize that *Hanover Shoe* and *Illinois Brick* allocate to the first non-conspirator in the distribution chain the right to collect *100% of the damages*.") (emphasis added); *cf. Hanover Shoe*, 392 U.S. at 494 (holding that an antitrust defendant could not argue that a plaintiff who had purchased a product directly from the defendant was not injured because it had passed on the illegal overcharge to its own customers, thus creating a regime under which plaintiffs can arguably recover *more* than "threefold the damages by him sustained"). Of course, if under the limited exception (where direct purchasers are barred from recovering) indirect purchaser plaintiffs were allowed to recover the entire overcharge that the manufacturers imposed on the direct purchasers (even though the direct purchasers absorbed some of that overcharge and did not pass on that absorbed portion to the indirect purchasers), then the portion of the overcharge that was passed on from the direct purchasers to the indirect purchasers would not need to be ascertained and *Illinois Brick's* second policy justification would cut *in favor of* the

41

to conspiracies that attack the wholesale market, potentially create the problems of apportionment that underlie *Illinois Brick*.[15]

*Illinois Brick's* third policy concern—risk of inefficient enforcement of the antitrust laws because the ultimate recovery for the dealers would be diluted, thereby decreasing the dealers' incentive to sue—cuts against the unlimited exception, but in

---

limited exception.

[15]Technically speaking, there would be no need to "apportion" damages between direct and indirect purchasers under the limited exception. This is because, as we have explained, the limited exception would only permit indirect purchaser standing in circumstances where the direct purchaser would be barred from bringing suit against the manufacturer. As such, there would be no need to apportion any damages to the direct purchasing middleman.

Nevertheless, even under the limited exception, the finder of fact would be required to ascertain the amount of the overcharge that had been passed on by the middleman. After all, an antitrust plaintiff (whether he be a direct or an indirect purchaser) is only entitled to recover "threefold the damages *by him sustained*." 15 U.S.C. § 15(a) (emphasis added). Therefore, to the extent that the middleman retained (*i.e.* did not pass on to the indirect purchaser) a portion of any overcharge imposed upon him, the damages actually sustained by the indirect purchaser would be reduced by that amount.

42

favor of the limited exception. Under the unlimited exception, when middlemen were not completely involved, their recovery would be diluted and their incentive to sue would decrease (assuming that, rather than the middlemen being permitted to recover the entire overcharge, it was apportioned among the middlemen and the indirect purchasers). However, under the limited exception, when middlemen were not completely involved, their recovery would not be diluted and their incentive to sue would not decrease. As the indirect purchasers would not have standing in this instance, no recovery by them could dilute the middlemen's recovery.

Thus, all three of the *Illinois Brick* policy justifications argue against adopting the unlimited exception, while the first and the third favor adopting the limited exception and only the second (the desire to avoid ascertaining the portion of an overcharge that was passed on) cuts against it. Further, while it is true that adopting the limited exception creates the need to ascertain the portion of an overcharge that was passed on, we think the alternative, adopting no general co-conspirator exception, is less desirable. *Cf. In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1169 (3d Cir. 1993) ("[W]hile complex apportionment problems are implicated here, we do not hold that litigation must be avoided solely because it might be difficult to ascertain damages. Injured parties cannot be penalized and left without recourse because measurement of their damages is difficult."). The *Illinois Brick* Court was concerned with promoting "the longstanding policy of

43

encouraging vigorous private enforcement of the antitrust laws."
431 U.S. at 745. We are unwilling to hold that if initial sellers
and "completely involved" direct purchasers conspire, then *no*
plaintiff outside the conspiracy may sue the initial seller for
damages.

### 2.     Is there a "complete involvement" defense?

We hold that a general co-conspirator exception would
only exist if the complete involvement defense barred the
middlemen from bringing a claim against their former co-
conspirator—the manufacturer. However, our Court has not
decided where the complete involvement defense even exists.
We thus examine this question.

In *Perma Life*, the Supreme Court held that "the doctrine
of *in pari delicto* . . . is not to be recognized as a defense to an
antitrust action." 392 U.S. at 140.[16] But as previously
mentioned, the Court expressly did "not decide . . . whether . .
. truly complete involvement and participation in a monopolistic
scheme could ever be a basis . . . for barring a plaintiff's cause

---

[16]The Court explained that "[a]lthough *in pari delicto*
literally means 'of equal fault,' the doctrine has been applied .
. . in a wide variety of situations in which a plaintiff seeking
damages or equitable relief is himself involved in some of the
same sort of wrong doing." *Perma Life*, 392 U.S. at 138.

44

of action." *Id*. Further, in concurrences, five members of the *Perma Life* Court favored barring suit by antitrust plaintiffs who were involved in a conspiracy at a high enough level.[17]

Further, every Court of Appeals that has decided the issue has held that antitrust plaintiffs who were involved in a conspiracy at a requisite level are barred from suing. *See, e.g.*, *Sullivan v. Tagliabue*, 34 F.3d 1091, 1107 (1st Cir. 1994); *Columbia Nitrogen Corp. v. Royster Co.*, 451 F.2d 3, 16 (4th Cir. 1971); *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 830 F.2d 716, 720-23 (7th Cir. 1987); *Javelin Corp. v. Uniroyal, Inc.*, 546 F.2d 276, 279 (9th Cir. 1976). *But cf. Greene v. Gen. Foods Corp.*, 517 F.2d 635, 646-47 (1975) ("seriously question[ing]" whether antitrust plaintiffs should ever be barred

---

[17]*See Perma Life*, 392 U.S. at 146 (White, J., concurring) ("I would deny recovery where plaintiff and defendant bear substantially equal responsibility for injury resulting to one of [the co-conspirators] . . . ."); *id.* at 147 (Fortas, J., concurring) (Suit should be barred when "the fault of the parties is reasonably within the same scale."); *id.* at 149 (Marshall, J., concurring) ("I would hold that where a defendant in a private antitrust suit can show that the plaintiff actively participated in the formation and implementation of an illegal scheme, and is substantially equally at fault, the plaintiff should be barred from imposing liability on the defendant."); *id.* at 153 (Harlan, J., concurring in part and dissenting in part) (Stewart, J., joining) ("[P]roperly used[, *in pari delicto*] refers to a defense that should be permitted in antitrust cases.").

from suing because of their "unclean hands").  In *Link*, our Court recognized that co-conspirators who were completely involved in a conspiracy might be barred from suing.  788 F.2d at 932.  However, we did not decide the issue because we concluded that the co-conspirators in that case were not completely involved in the conspiracy.  *Id*.

We recognize that the weight of authority favors barring suit by antitrust plaintiffs who were involved in a conspiracy at a high enough level.  We also recognize, however, the strong policy argument in favor of allowing suits by co-conspirators even when their involvement in a conspiracy was large.  The Ninth Circuit has recognized that "[t]he formulation of the 'complete involvement' defense reflects a somewhat uneasy balance between the compelling policy of enforcement of the antitrust laws and the natural desire of any court to recognize the equities as between parties."  *THI-Hawaii, Inc. v. First Commerce Fin. Corp.*, 627 F.2d 991, 995 (9th Cir. 1980).  It is notable, however, that, while the courts who have adopted the complete involvement defense have struck the "enforcement/equities balance" in favor of equities, the Supreme Court in the holdings of *Illinois Brick* and *Perma Life* struck the balance in favor of enforcement.

In *Illinois Brick*, the Court

conclude[d] that the legislative purpose in creating a group of 'private attorneys general' to

46

> enforce the antitrust laws under § 4 [of the
> Clayton Act] is better served by holding direct
> purchasers to be injured to the full extent of the
> overcharge paid by them than by attempting to
> apportion the overcharge among all that may have
> absorbed a part of it.

431 U.S. at 746 (citation and quotation marks omitted).  Thus the *Illinois Brick* Court made the balancing decision to deny (some might argue inequitably[18]) injured indirect purchasers standing to recover while granting direct purchasers the windfall of the entire overcharge in order to further efficient antitrust law enforcement.

In *Perma Life*, the Court believed that allowing the *in pari delicto* defense in an antitrust action would "threaten the effectiveness of the private action as a vital means for enforcing . . . antitrust policy."  392 U.S. at 136.  It noted that it had "often indicated the inappropriateness of invoking broad common-law

---

[18]*See* Areeda, *supra*, ¶ 346k, at 378 ("The obvious difficulty with denying damages for consumers buying from an intermediary is that they are injured, often more than the intermediary, who may also be injured but for whom the entire overcharge is a windfall.  The indirect purchaser rule awards greatly overcompensate intermediaries and greatly undercompensate consumers in the name of efficiency in the administration of the antitrust laws.").

barriers to relief where a private suit serves important public purposes." *Id.* at 138.  It concluded that

> [t]he plaintiff who reaps the reward of treble damages may be *no less morally reprehensible* than the defendant, but the law encourages his suit to further the *overriding pubic policy* in favor of competition.  A more fastidious regard for the relative moral worth of the parties would only result in seriously undermining the usefulness of the private action as a bulwark of antitrust enforcement.

*Id.* at 139 (emphases added).  Thus, the Court chose to allow the inequity of letting plaintiffs, though as "morally reprehensible" as defendants, sue in order to foster antitrust law enforcement.

We further point out that a rule prohibiting antitrust plaintiffs who were completely involved in a conspiracy to sue co-conspirators need not be absolute and could be crafted to maximize antitrust enforcement and cartel instability.  For example, the law might allow the first, but only the first, completely involved co-conspirator the right to sue its fellow co-conspirators.  This would give each co-conspirator incentive to be the first to defect from a cartel and enforce the antitrust laws because (1) each would want to be the one and only co-conspirator to gain the right to recover treble damages and (2) each would be afraid that if it did not defect, another would, and

48

it would then be liable for treble damages. Under such a rule, the incentive to defect and cartel instability would increase, and cartel breakdown and failure should become more common. Further, if potential co-conspirators knew their potential cartel had a decreased chance of succeeding, they would be less likely to form a cartel in the first place.

Regardless, as we will explain, it turns out that we need not resolve whether there is a complete involvement defense to antitrust actions in order to determine whether Plaintiffs come within a general co-conspirator exception.

### 3.    Could Plaintiffs come within a general co-conspirator exception?

If there is a general co-conspirator exception, it would only apply if the middlemen were barred from bringing a claim against their former co-conspirator—the manufacturer—because their involvement in the conspiracy was "truly complete." However, in our case, Plaintiffs could not qualify for such an exception because the District Court concluded, and Plaintiffs have conceded, that the dealers' involvement in the alleged conspiracy with Dentsply was *not* "truly complete." The District Court concluded that there was "no way to construe the facts alleged such that the dental dealers could be considered 'substantially equal' participants in the alleged conspiracy . . . or that their participation was 'voluntary in any meaningful

49

sense.'"  Dist Ct. Mem. Op. at 20-21 (Dec. 19, 2001) (citation omitted).  Further, Plaintiffs acknowledged in their brief that they "have not based any part of [their] appeal on any argument that the dealers' involvement was 'substantially equal' to Dentsply's." Appellants' Reply Br. at 23 n.16.  Thus, Plaintiffs may not recover damages caused by the exclusive-dealing conspiracy under a general co-conspirator exception to *Illinois Brick*.

### Conclusion

We thus hold that Plaintiffs may not recover damages in *Hess* (a) under the "co-conspirator" exception to *Illinois Brick*, (b) under the "control" exception to *Illinois Brick,* (c) under a non-overcharge theory of damages, or (d) for "drop shipments." In *Jersey Dental*, however, while Plaintiffs may not recover damages under the control exception or under a lost profits theory, they do have statutory standing under the co-conspirator exception to pursue an action for overcharge damages (including for drop shipped teeth) caused by the alleged retail price-fixing conspiracy, although not for the alleged exclusive-dealing conspiracy.[19]

---

[19]Plaintiffs also allege in *Jersey Dental* that—as to teeth Dentsply drop shipped to them—they were direct purchasers not subject to *Illinois Brick*.  Further, the *Jersey Dental* complaint does not have the *Hess* complaint's defect, as it specifically alleges that Plaintiffs were direct purchasers.  As we hold that

---

the *Jersey Dental* Plaintiffs have standing to recover damages from Dentsply for its alleged price-fixing conspiracy with its dealers under the co-conspirator exception to *Illinois Brick*, Plaintiffs may potentially recover on the drop-shipped teeth under that theory.

Finally, as in *Hess*, Plaintiffs in *Jersey Dental* do not come within the control exception to *Illinois Brick* because, as already noted, Dentsply does not own any interest in its dealers, there is no functional unity among Dentsply and its dealers, and all of *Illinois Brick's* policy reasons for denying standing apply.

51