# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 99-005 |
| | ) | |
| vs. | ) | |
| | ) | |
| DENTSPLY INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## **COMPLAINT**

The United States of America, acting under the direction of the Attorney General of the United States, brings this action for equitable and other relief against Dentsply International, Inc. ("Defendant") to prevent and enjoin Defendant from continuing to violate the antitrust laws by a variety of actions that unlawfully maintain its monopoly power and deny competing manufacturers of artificial teeth access to independent distributors (known in the industry as "dealers"). These dealers are a valuable and necessary means of effective distribution of artificial teeth in the United States. Specifically, Dentsply has: (1) entered into agreements and taken other actions to induce dealers not to carry certain competing lines of teeth; and (2) explicitly agreed with some dealers that the dealers will not carry certain competing lines of teeth. Among other things, Dentsply has threatened to refuse to sell teeth and other merchandise to dealers if they add certain lines of competing teeth, and on the rare occasions when a dealer has dared to offer the lines in question, has carried out its threat and terminated the dealer. As a result of this conduct, 80% of the dealer outlets in the United States that carry artificial teeth do

not carry brands that compete closely with Dentsply's premium products. For over a decade, Dentsply, the dominant manufacturer of artificial teeth in the United States, through these means has wilfully maintained a monopoly and unreasonably restrained competition in the market for prefabricated artificial teeth in the United States.

Dentsply initiated its efforts to lock up the dealers in 1987, when two competitors whose products compete closely with Dentsply's premium artificial teeth in quality and price were attempting to build a dealer network. In the intervening years, other competitors and potential competitors have been deprived of the opportunity to distribute their products efficiently. As Dentsply intended, its actions have foreclosed these rivals from selling their teeth through the large majority of outlets in the United States that carry artificial teeth, have impaired the ability of other artificial tooth manufacturers to develop or maintain an adequate dealer network, and have deterred new entrants from the market for artificial teeth.

Dentsply's actions have deprived consumers of the benefits of competition among artificial tooth manufacturers and resulted in higher prices, fewer choices, less market information, and lower quality for artificial teeth.

## I. JURISDICTION AND VENUE

1.     The United States files this Complaint under Section 4 of the Sherman Act, 15 U.S.C. § 4, as amended, and under Section 15 of the Clayton Act, 15 U.S.C. § 25, to prevent and restrain a continuing violation by Defendant of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14.

2

2.    Defendant transacts business in, and is found within, the District of Delaware, all within the meaning of 15 U.S.C. § 22.

3.    Defendant and other artificial tooth manufacturers ship teeth across state lines. Defendant receives substantial payments across state lines from the sale of artificial teeth to dealers. Other artificial tooth manufacturers are attempting to compete with Defendant to make these interstate sales. Defendant's business activities that are the subject of this Complaint are within the flow of, and substantially affect, interstate trade and commerce.

## II. DEFENDANT

4.    Defendant is a Delaware for-profit corporation and has its corporate headquarters in York, Pennsylvania. Defendant manufactures a range of dental products which are marketed, distributed, and sold world-wide. Through its Trubyte Division, Defendant manufactures and markets products used by dental laboratories to make dentures and other removable dental prosthetics. The sale of artificial teeth generates most of the revenues of the Dentsply Trubyte Division.

## III. RELEVANT MARKETS

5.    The relevant market for purposes of this action is the sale of prefabricated, artificial teeth in the United States. The relevant product--prefabricated, artificial teeth--is highly differentiated in price and quality and is commonly segmented in the industry by the

3

terms "premium," "mid-range," "economy," and "subeconomy." Premium artificial teeth offer more life-like quality, more natural shades, and greater wear resistance than less expensive teeth.

6.      Dentsply now holds, and since at least 1987, has held monopoly power in this relevant market.

## IV. DENTSPLY'S PRACTICES

### A.    *Sales and Use of Artificial Teeth*

7.      In 1996, Dentsply sold 70 to 80% of the artificial teeth used in the United States. It has held that approximate market share for at least ten years.

8.      Almost all artificial teeth sold in the United States are used by dental laboratories to make dentures. Dental laboratories are engaged in two distinct lines of business: crown and bridge work, and dentures. Crown and bridge work produces a fixed dental prosthetic device that generally does not include pre-fabricated artificial teeth. A denture, in contrast, is a removable prosthetic device comprised of pre-fabricated artificial teeth fixed in an acrylic base material to replace some or all of a person's natural teeth. Artificial teeth are the single most expensive component of a denture. Dental laboratories generally use pre-fabricated artificial teeth in making dentures.

9.      Dental laboratories distinguish among artificial teeth based upon price and quality. For example, dental laboratories pay significantly higher prices for premium teeth.

4

10.     Dentsply manufactures artificial teeth in the premium, mid-range, and economy segments. Dentsply's premium teeth are its most profitable lines and generate most of the Trubyte Division's revenue. The Dentsply Trubyte Division also manufactures other merchandise used by dental laboratories in the fabrication of dentures. Some of the Dentsply Trubyte Division's merchandise is widely used and frequently demanded by dental laboratories.

11.     A handful of companies compete with Dentsply in this country and elsewhere in the manufacture and sale of artificial teeth. Two manufacturers of premium artificial teeth, Vita Zahnfabrik ("Vita") and Ivoclar AG ("Ivoclar"), compete successfully outside the United States against Dentsply and have succeeded, in at least one country, in unseating Dentsply as the dominant brand. Vita's and Ivoclar's teeth are comparable in quality and value to Dentsply's premium teeth and, by some measures, are superior to Dentsply's premium teeth.

12.     In the 1980s, Vita and Ivoclar began exporting their artificial teeth into the United States market. Ivoclar exports its teeth through a wholly-owned subsidiary. Vita exports its teeth through Vident, a company that it partially owns. Despite their substantially greater success elsewhere in the world, Vita and Ivoclar teeth combined account for less than 10% of the artificial tooth sales by dollar in this country.

13.     Domestic artificial tooth manufacturers also compete more successfully with Dentsply outside the United States. For example, Austenal, Inc. manufactures and sells the "Myerson" premium tooth line. While the Myerson line has sold well in countries where it has better access to dealers, it has done significantly less well in the United States, where it is carried

5

by only a small number of dealers. During the last five years, Austenal has attempted without success to obtain additional dealers for the Myerson line.

**B.     Dentsply's Restrictive Dealing Arrangements**

14.     Dental laboratory dealers have been, and continue to be, the primary channel of distribution of artificial teeth to dental laboratories. These dental laboratory dealers stock the full array of products needed to make dentures, not just artificial teeth. Most dental laboratory dealers employ skilled sales and service people and provide a variety of services to their dental laboratory customers, including regular ordering and restocking of inventory, new product demonstrations, tooth returns and exchanges, technical know-how, and delivery services. Dental laboratory dealers generally are able to satisfy dental laboratories' need for same or next day delivery through their own sales people, a delivery service, or by maintaining walk-up tooth counters, staffed by dedicated tooth counter personnel, at the dealers' warehouses.

15.     Although some artificial tooth manufacturers sell directly to dental laboratories, both artificial tooth manufacturers and most dental laboratories prefer to work through established dental laboratory dealers located near laboratories. As a result, manufacturers of artificial teeth need to distribute through local dental laboratory dealers throughout the country in order to compete effectively.

16.     Dentsply's Trubyte Division distributes its teeth through a network of 33 independent dental laboratory dealers with over 168 outlets throughout the United States,

6

constituting approximately 80% of the outlets distributing artificial teeth and other dental laboratory products. Dentsply does not sell its Trubyte products directly to dental laboratories.

17.    The independent dealers through which Dentsply distributes its artificial teeth are the most significant and successful of the firms that distribute supplies to dental laboratories in the United States. They sell dental laboratory products other than artificial teeth made by a variety of dental product manufacturers. While manufacturers of dental products commonly engage in joint selling with the dealers and provide training in, and technical information regarding, the use of their specific products, the dealers market themselves under their own names and establish independent relationships with their laboratory customers based on their own service and price. Before Dentsply imposed its restrictive dealing arrangements in 1987, Dentsply did not restrain these independent dealers' ability to sell the artificial teeth of other manufacturers, and the dealers commonly carried at least two competing lines of artificial teeth.

18.    A number of distributors sell dental products to customers other than dental laboratories. For example, some distributors sell dental products exclusively to dentists (known as "operatory dealers") and do not compete for the business of dental laboratories. Dentists purchase a wide range of products that dental laboratories do not need or purchase, and dental laboratories for their part purchase a wide range of products that dentists generally do not need or purchase. An operatory distributor, that does not also already sell to dental laboratories, cannot quickly or easily expand into the business of distributing the broad range of products used by dental laboratories.

7

19.    Starting at least as early as 1987 and continuing through today, first Ivoclar and then Vita attempted to establish a network of dental laboratory dealers to sell and distribute their artificial teeth to dental laboratories in the United States. More recently, Austenal and other manufacturers have sought to increase their dealer networks as well.

20.    In 1987, two independent dental laboratory dealers agreed to carry Ivoclar's line. Those dealers already carried other brands of artificial teeth, including Dentsply's Trubyte brand. Dentsply reacted by threatening to terminate the dealers. One of the dealers abandoned its plans to distribute Ivoclar teeth. The other dealer, Frink Dental, located in Elk Grove, Illinois, attempted to go forward with its plans. Dentsply's highest level officials, including its Chief Executive Officer and the General Manager of its Trubyte Division, flew to Illinois to tell Frink that they would not permit Ivoclar to obtain distribution in the United States. Dentsply then cut off Frink's supply of Trubyte artificial teeth and other Trubyte merchandise. Frink continued to sell Ivoclar teeth for a time but eventually agreed to stop distributing Ivoclar teeth in return for reinstatement as a dealer of Trubyte products. Dentsply did not require Frink to drop its other, preexisting lines of competing teeth.

21.    In the 1980s, Vita placed its teeth with The Tooth Counter, an independent dealer in the Chicago area that did not carry Dentsply's teeth but did carry a number of other brands of artificial teeth. Dentsply at first rejected requests from The Tooth Counter to carry its teeth. In 1992, after Dentsply learned that The Tooth Counter was selling Vita teeth, Dentsply offered The Tooth Counter the opportunity to sell Trubyte teeth. Dentsply required The Tooth Counter

8

to agree not to carry the Vita line but permitted it to continue selling its other lines of teeth. The Tooth Counter agreed to these terms.

22.    In 1993, Dentsply imposed written "Dealer Criteria" for its Trubyte Division. These Dealer Criteria set forth various conditions for continuing as or becoming an independent dealer of Trubyte products. "Dealer Criterion Number 6" states that dealers "may not add further tooth lines to their product offering." Dentsply has actively monitored compliance with its criteria, enforced the criteria by warning dealers not to add new lines of teeth and terminating dealers that did add new lines, and entered into express agreements with some dealers to assure their partial or complete compliance with the criteria.

23.    When terminating a dealer for adding a new competing line of teeth, Dentsply refuses to sell the dealer not only its artificial teeth but also other Trubyte merchandise, some of which is frequently sought by dental laboratories from their dealers.

24.    Dentsply's dominant position in the United States necessarily means that many dental laboratories currently use Dentsply Trubyte teeth and expect their dealers to have the Trubyte line available. Thus, a dealer that is currently selling Trubyte teeth may lose a significant volume of business if it is suddenly unable to supply its laboratory customers with Trubyte teeth. Moreover, because a laboratory buys many products from its dealer, the dealer's loss of a laboratory account due to not having Trubyte teeth will likely lead it to lose significant other sales as well.

25.    The detrimental impact on dealers of losing Dentsply Trubyte teeth is aggravated by Dentsply's refusal to sell non-tooth Trubyte merchandise to dealers that add competing lines

9

of teeth. The loss of this Trubyte merchandise by itself may cause some laboratories to switch their accounts in whole or in part from the terminated dealer to another dealer.

26.    Dealers' exchange accounts with Dentsply further increase dealers' economic disincentive to add competing tooth lines. These accounts reflect credit that Dentsply owes dealers against future purchases of teeth. Laboratories buy artificial teeth on cards containing 6 or 8 teeth. The laboratories frequently do not use all the teeth on a card in making a particular denture. Dealers collect these unused teeth from the laboratories and credit the value of the returned teeth against the laboratories' future purchases. The dealers then return the teeth to Dentsply, which in turn gives the dealers credit against future purchases. The dealers' understanding with Dentsply is that a terminated dealer cannot apply its exchange account against future purchases, since it is not permitted to make additional purchases. Dentsply will not settle the exchange account of a terminated dealer for cash, but it may provide Trubyte teeth to the terminated dealer to close out the account. The cash value of that account significantly exceeds the value to the terminated dealer of any Trubyte teeth Dentsply might then give the dealer. Essentially, the terminated dealer forfeits most of the cash value of the exchange account to Dentsply.

27.    Dentsply's practices have deterred dealers from adding competing lines of teeth, and no existing dealer of Dentsply's artificial teeth has added a new tooth line since Dentsply first terminated Frink in 1987.

28.    Dentsply also has blocked its competitors' access to dealers that did not previously carry Dentsply's teeth. Just as it did with The Tooth Counter, Dentsply has induced

10

dealers to drop or not add Vita's and Ivoclar's teeth by recruiting them as new dealers of Trubyte

teeth on the condition that they not sell Vita and Ivoclar teeth. Dentsply has on occasion signed

a new dealer it had previously rejected to prevent the dealer from beginning to sell a

competitor's teeth. Given Dentsply's dominant market position, these non-Trubyte dealers face

economic incentives to drop or not add competing lines of teeth and deal exclusively with

Dentsply, whenever given an opportunity to do so. Faced with the dilemma of accepting a slice

of Dentsply's dominant share of the artificial tooth market but then having to drop or refuse Vita

and Ivoclar teeth, most dealers are compelled by economic realities to add the Trubyte line and

no longer offer their customers the competing brands.

     29.     For example, Dentsply's addition of Darby Dental Supply, Inc., deprived Vita of

a potential dealer. Dentsply had previously terminated Darby because Darby sold a private-label

brand of artificial teeth. After Darby filed an antitrust lawsuit, Dentsply agreed to allow Kent, a

subsidiary of Darby, to sell Trubyte teeth. Darby continued to sell its private-label brand of teeth

but Dentsply did not permit it to sell Trubyte teeth through its Darby operations. In 1994,

Dentsply learned that Darby was considering adding the Vita line. In response, Dentsply's

Senior Vice President for North America specifically approved an "action plan" intended to

block Vita from gaining "a major distribution point." The "key issue" in Dentsply's adopting

that plan was "Vita's potential distribution system." Dentsply recognized that Vita was "having

a tough time getting teeth out to customers. One of their key weaknesses is their distribution

system." Accordingly, Dentsply decided to "threaten to cut-off Kent unless Darby agree[d]" not

to add the Vita line and to drop some lines, but not all, of its house brand. Darby agreed to these restrictive conditions.

### C.    Exclusion of Dentsply's Competitors

30.    Dentsply's refusals to deal and restrictive agreements, as well as other similar and related acts, were designed to and have thwarted Vita's and Ivoclar's attempts to build a dealer network and thus their ability to compete effectively in the United States.

31.    Dentsply's conduct has also undermined the efforts of small domestic competitors of Dentsply in the United States to maintain or recruit dental laboratory dealers. Dentsply has successfully induced some dealers to stop distributing these small manufacturers' teeth. Once a dealer drops a preexisting competing tooth line, Dealer Criterion Number 6 prevents the dealer from renewing its distribution of that line.

32.    Dentsply's lock on distribution has delayed the possible entry of a substantial foreign competitor into the domestic market and has contributed to the decision of one major United States company not to begin manufacturing and selling artificial teeth in this country.

33.    Rival manufacturers have no reasonable or effective means of combating Dentsply's lock on the national independent laboratory dealer network. Nor are rival manufacturers able to obtain effective, alternative channels of distribution. Direct sales to dental laboratories are not a reasonable or adequate substitute for the established dealers because laboratories want and need the various services dealers provide and have strong existing relationships with dealers. Nor can rival manufacturers reasonably or effectively employ larger

laboratories to serve as distributors to smaller, competing laboratories. Also, the existing dental laboratory dealers not subject to retaliation from Dentsply for adding a new line of teeth are too few and too small to serve adequately as an effective distribution network. These dealers are not likely to expand their operations, and operatory dealers that do not currently serve laboratories cannot readily expand into that multi-product laboratory business simply to take advantage of the opportunity to carry Vita's, Ivoclar's, and other manufacturers' teeth. Finally, rival manufacturers cannot profitably integrate into the distribution of artificial teeth and other dental laboratory products.

34.    Dentsply's foreclosure of its rivals' access to adequate distribution has been successful in restricting competition in the market for pre-fabricated artificial teeth for over ten years and, absent court order, is likely to continue to foreclose competition.

35.    Dentsply has refused to deal, imposed and enforced its restrictive dealing arrangements, and taken other anticompetitive actions for the purpose and with the effect of reducing or eliminating competition in the sale of artificial teeth in the United States and maintaining a monopoly in that market. Indeed, Dentsply maintains more dealers than it believes are needed to distribute its products and has added new dealers despite its overly broad distribution network in order to deprive its rivals of effective distribution. Dentsply documents reflect its intent to block its rivals' access to dealers. For example, a document captioned, "Sales/Distribution Principles of Cash Cow Business," sets out the following goals:

     \*     BLOCK COMPETITIVE DISTRIBUTION
              POINTS. DO NOT ALLOW COMPETITION TO
              ACHIEVE TOEHOLDS IN DEALERS.

      --     TIE-UP DEALERS
      --     DO NOT "FREE-UP" <u>KEY</u> PLAYERS

## V. <u>ANTICOMPETITIVE EFFECTS</u>

36.     Dentsply's refusals to deal, restrictive dealing arrangements, and other anticompetitive acts as alleged in this Complaint have effectively deprived rival tooth manufacturers of access to the vast majority of, and the most important, sales outlets for artificial teeth in the United States and, therefore, of the ability to compete effectively in the United States market for prefabricated, artificial teeth.

37.     Dentsply's exclusion of its rivals has resulted in higher prices, loss of choice, less market information, and lower quality for artificial teeth. But for Dentsply's acts, additional dental laboratory dealers would distribute Ivoclar's, Vita's, and other manufacturers' artificial teeth. But for Dentsply's acts, additional artificial tooth manufacturers would have attempted to enter the United States market. But for Dentsply's acts, prices for teeth would be lower. Moreover, laboratories would have a greater choice of teeth and more market information about competing teeth. Ultimately, but for Dentsply's acts, dentists and dental patients would have received lower-priced, higher-quality, and more-desirable dentures.

38.     The lack of a substantial dealer network has frustrated other tooth manufacturers' efforts to encourage dental laboratories to use their brands of teeth and has led them to curtail their promotional efforts, because doing so would be futile without an adequate dealer network.

14

39.     Dentsply intends to refuse to deal with, and to enforce its restrictive dealing arrangements against, dealers who, in the future, add, or attempt to add, competitive lines of artificial teeth.  Dentsply's exclusionary conduct will continue to prevent rival tooth manufacturers from access to the primary distribution channels of artificial teeth, thus continuing to restrain price and quality competition for artificial teeth and to reduce consumer information and choice.  Dentsply's conduct is not justified by efficiencies or legitimate business considerations.

## VI.  FIRST CAUSE OF ACTION

(Violation of § 2 of the Sherman Act)

40.     The allegations of ¶¶ 1-39 of this Complaint are re-alleged and incorporated by reference here with the same force and effect as though said paragraphs were set forth here in full.

41.     From at least as early as 1987 and continuing at least through the filing of this Complaint, Dentsply has wilfully maintained a monopoly in the United States market for pre-fabricated artificial teeth, and abused its monopoly power in the relevant market, by explicitly agreeing with some dealers that the dealers will not carry certain lines of teeth and inducing other dealers not to carry those competing lines of teeth, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

15

## VII. SECOND CAUSE OF ACTION

(Violations of § 3 of the Clayton Act
and § 1 of the Sherman Act)

42.　　The allegations of ¶¶ 1-41 of this Complaint are re-alleged and incorporated by reference here with the same force and effect as though said paragraphs were set forth here in full.

43.　　From at least as early as 1987 and continuing at least through the filing of this Complaint, Dentsply has entered into restrictive dealing agreements with dental laboratory dealers, maintained and enforced these agreements, otherwise acted in concert with those dealers, and sold artificial teeth on the condition that those dealers not deal with rival manufacturers, thereby causing a substantial lessening of competition in the market for pre-fabricated artificial teeth sold in the United States, in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14, and unreasonably restraining trade in that market in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

44.　　Dentsply has market power in the market for pre-fabricated artificial teeth sold in the United States. Dentsply has exercised and maintained that market power through its agreements with dental laboratory dealers.

16

## VIII. **REQUEST FOR RELIEF**

WHEREFORE, the Plaintiff requests:

1.    That the Court adjudge and decree that Dentsply acted unlawfully to maintain a monopoly in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

2.    That the Court adjudge and decree that Dentsply (a) entered into unlawful restrictive dealing agreements that substantially lessen competition in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14, and (b) entered into unlawful agreements in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

3.    That Dentsply, its members, officers, directors, agents, employees, and successors, and all other persons acting or claiming to act on its behalf, be enjoined, restrained, and prohibited from, in any manner, directly or indirectly, continuing, maintaining, or renewing these agreements, or from engaging in any other combination, conspiracy, agreement, understanding, plan, program, or arrangement having the same effect as the alleged violations.

4.    That the United States recover the costs of this action.

5.    That the United States have such other relief as the nature of the case may require

and the Court may deem just and proper.

January 5, 1999

For Plaintiff:

_____/S/_____
Joel I. Klein
Assistant Attorney General

_____/S/_____
A. Douglas Melamed
Principal Deputy Assistant Attorney General

_____/S/_____
Donna Patterson
Deputy Assistant Attorney General

_____/S/_____
Rebecca P. Dick
Director, Civil Non-Merger Enforcement

_____/S/_____
Gail Kursh
Chief
Health Care Task Force

_____
David C. Jordan
Ass't. Chief
Health Care Task Force

_____/S/_____
Mark J. Botti
William E. Berlin
Jean Lin
Michael D. Farber
Attorneys
Antitrust Division
U.S. Dept. Of Justice
Liberty Place Building, Suite 400
325 7th Street, N.W.
Washington, D.C. 20530
(202) 307-0827

_____/S/_____
Richard G. Andrews
United States Attorney for the
District of Delaware

_____/S/_____
Judith M. Kinney
Assistant United States Attorney
1201 Market Street
Suite 1100
Wilmington, DE 19899
(302) 573-6277
Delaware Bar No. 3643

18

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 99-005 (SLR) |
| | ) | |
| DENTSPLY INTERNATIONAL INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT DENTSPLY INTERNATIONAL INC.'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION TO ENTER FINAL JUDGMENT

Brian M. Addison
DENTSPLY INTERNATIONAL INC.
Susquehanna Commerce Center
221 West Philadelphia Street
York, PA 17405
(717) 845-7511

Margaret M. Zwisler
Eric J. McCarthy
Charles R. Price
LATHAM & WATKINS LLP
555 Eleventh Street, N.W.
Washington, DC 20004
(202) 637-2200

William D. Johnston (No. 2123)
Christian Douglas Wright (No. 3554)
YOUNG CONAWAY STARGATT
    & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6600
cwright@ycst.com

Dated: April 6, 2006

Counsel for Defendant
DENTSPLY INTERNATIONAL INC.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... ii

NATURE AND STAGE OF PROCEEDINGS .............................................................. 1

SUMMARY OF ARGUMENT ................................................................................... 1

STATEMENT OF FACTS ........................................................................................ 2

ARGUMENT ......................................................................................................... 3

I.      THE GOVERNMENT HAS FAILED TO JUSTIFY ITS REQUEST FOR A
TEN-YEAR EXPIRATION PERIOD ............................................................... 3

      A.    This Court Is Not Bound By Antitrust Division Policy To Justify The
Requested Ten-Year Period .......................................................... 3

      B.    A Ten-Year Term Is Not Necessary To Ensure Competition In The
Distribution Of Artificial Teeth ..................................................... 5

      C.    The Government's Position That It Is Entitled To "Deference" When
Fashioning Injunctive Relief After Trial Lacks Merit ........................... 7

II.     THIS COURT SHOULD ENTER FINAL JUDGMENT WITH A FIVE-YEAR
EXPIRATION PERIOD, OR, ALTERNATIVELY, A RELAXED STANDARD
FOR MODIFICATION AFTER THE FIRST FIVE YEARS ................................... 7

CONCLUSION ...................................................................................................... 9

# TABLE OF AUTHORITIES

## CASES

*Allis-Chalmers Manufacturing Co. v. White Consolidated Industries, Inc.,*
414 F.2d 506 (3d Cir. 1969)....................................................................................................7

*F. Hoffman-La Roche, Ltd. v. Empagran S.A.,*
542 U.S. 155 (2004)..............................................................................................................7

*Ford Motor Co. v. United States,*
405 U.S. 562 (1972)..............................................................................................................7

*New York v. Microsoft,*
224 F. Supp. 2d 76 (D.D.C. 2002)......................................................................................3, 5

*Oregon v. Mulkey,*
1997 WL 599410 (D. Or. June 16, 1997) ............................................................................3, 5

*United States v. Agri-Mark, Inc.,*
1981 WL 2057 (D. Vt. Apr. 1, 1981).....................................................................................4

*United States v. Delta Dental Service Plan of Arizona, Inc.,*
1995 WL 454769 (D. Ariz. May 19, 1995) ...........................................................................5

*United States v. Dentsply International Inc.,*
277 F. Supp. 2d 387 (D. Del. 2003)......................................................................................6

*United States v. E.I. du Pont de Nemours & Co.,*
366 U.S. 316 (1961).............................................................................................................7

*United States v. Microsoft Corp.,*
231 F. Supp. 2d 144 (D.D.C. 2002)...................................................................................3, 8

*United States v. Motorola, Inc.,*
1995 WL 866794 (D.D.C. July 25, 1995)..............................................................................8

*United States v. Oregon Dental Service,*
1995 WL 481363 (N.D. Cal. July 14, 1995)...........................................................................5

*United States v. Topa Equities, Ltd.,*
1995 WL 481368 (D.V.I. July 14, 1995)...........................................................................3, 5

*United States v. Western Electric Co.,*
46 F.3d 1198 (D.D.C. 1995)................................................................................................8

## RULES

Fed R. Civ. P. 60(b) ................................................................................................8

## OTHER AUTHORITIES

*United States v. Agri-Mark Inc.*, "Competitive Impact Statements and Proposed
    Consent Judgments," 45 Fed. Reg. 79,186 (Nov. 28, 1980)........................................4

*United States v. Microsoft Corp.*, "Public Comments and Response on
    Proposed Final Judgment," 2002 WL 32151978 (D.D.C. Feb. 27, 2002).................4, 6

*United States v. Topa Equities, Ltd.*, "Public Comments and Response on
    Proposed Final Judgment," 60 Fed. Reg. 28168 (May 30, 1995)............................. 3-4

United States Department of Justice, *Antitrust Division Manual* (3d ed. 1998)........ *passim*

Dentsply International Inc. ("Dentsply") respectfully submits this brief in opposition to plaintiff United States of America's (the "government") renewed motion to enter final judgment. As demonstrated more fully below, this Court should enter a final judgment that expires in five years, not ten.

## NATURE AND STAGE OF PROCEEDINGS

On January 5, 1999, the government filed a complaint against Dentsply in this Court. (D.I. 1). The government alleged that Dentsply's policy that dental products dealers who sell Dentsply's artificial teeth to dental laboratories may not sell competing tooth lines violated Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act. (*Id.*). Dentsply adopts by reference the government's summary of the proceedings that followed. (D.I. 553 at 1).

## SUMMARY OF ARGUMENT

The sole issue before the Court is whether the expiration period of the proposed final judgment should be five years, ten years, or somewhere in between. The government requests a ten-year decree, but fails to show that such an extraordinary remedy is necessary under the circumstances of this case. The government relies principally on the UNITED STATES DEPARTMENT OF JUSTICE, ANTITRUST DIVISION MANUAL (3d ed. Feb. 1998) ("DIVISION MANUAL"),[1] for support that a ten-year term is the "standard" length that the government seeks in its antitrust judgments. But the government's DIVISION MANUAL is not binding on this Court. In addition, the government has deviated from the DIVISION MANUAL on numerous occasions and argued against ten-year terms. A ten-year decree is not necessary to restore competition in the marketplace for artificial teeth where, as here, Dentsply has effectively operated under the

---

[1]  Relevant portions of the Division Manual are attached as Exhibit 1 hereto.

key terms of the proposed judgment for the past ten years – first during the government's CID investigation, and thereafter during the lawsuit. Lastly, the government's claim that "all doubts" concerning remedies should be resolved in its favor lacks a legal basis. Instead of ten years, this Court should enter a final judgment that expires in five years. Alternatively, and only if the Court enters judgment with an expiration period greater than five years, the Court should add language to Section VII(B) that permits modification after five years, even if the parties did not specifically refer to a particular event or the foreseeability of such an event in the final judgment.

## STATEMENT OF FACTS

Dentsply and the government began negotiating over terms of a final judgment in June 2005. In September 2005, the government initially moved for entry of final judgment (D.I. 541), which Dentsply opposed. (D.I. 543). With this Court's assistance, the parties agreed to stay the issuance of an injunction until the United States Supreme Court ruled on Dentsply's petition for writ of certiorari to review the Third Circuit's reversal of this Court's judgment in favor of Dentsply. The Court denied the government's motion and referred the case to Magistrate Judge Thynge to help the parties negotiate the terms of the final judgment. (D.I. 546). The parties have exhausted their efforts and agree on all terms except for the expiration date of the proposed final judgment. The government seeks a ten-year term, whereas Dentsply seeks a five-year term.

## ARGUMENT

### I.    THE GOVERNMENT HAS FAILED TO JUSTIFY ITS REQUEST FOR A TEN-YEAR EXPIRATION PERIOD

As demonstrated below, the government has failed to demonstrate why a ten-year term is necessary to cure the effects of Dentsply's exclusive dealing arrangement with its authorized dealers.

#### A.    This Court Is Not Bound By Antitrust Division Policy To Justify The Requested Ten-Year Period

Here, the government argues that a ten-year term is the "standard length sought by the United States in its antitrust judgments." (D.I. 553 at 6). Like the plaintiffs in *New York v. Microsoft*, 224 F. Supp. 2d 76, 184 (D.D.C. 2002), the government derives the "standard" argument from language included in its own DIVISION MANUAL. (*Id.*). But as that *Microsoft* court made clear, it is not "bound . . . by Plaintiffs' reliance upon Antitrust Division policy to justify the ten-year term of their proposed decree." *Microsoft*, 224 F. Supp. 2d at 184 (approving remedial decree of five years). The same holds true in this Court.

Notably, the government does not cite from the preamble to the DIVISION MANUAL chapter on "Negotiating and Entering Consent Decrees," which reads: "[t]he theory behind equitable relief is that it should be fashioned to fit the particular facts of the case at issue." DIVISION MANUAL at IV-51. Indeed, the government has, on several occasions, quoted the same language *against* the "standard" ten-year term and in favor of a five-year term. *See, e.g., United States v. Topa Equities, Ltd.*, 1995 WL 481368 (D. V.I. July 14, 1995); *United States v. Microsoft Corp.*, 231 F. Supp. 2d 144 (D.D.C. 2002). In *Topa Equities*, the government defended a five-year decree. *United States v. Topa Equities, Ltd.*, "Public Comments and

Response on Proposed Final Judgment," 60 Fed. Reg. 28168 (May 30, 1995). In that case, the government alleged that Topa, a liquor wholesaler, had acquired monopoly power by entering into a series of exclusive distribution agreements with all of the major suppliers of distilled spirits in the Virgin Islands. *Id*. at 28,169. The decree sought to remedy the violation by "prohibiting Topa from taking any action to prevent its suppliers of distilled spirits from canceling their distribution arrangements with Topa and appointing new wholesalers instead." *Id*. The government argued that the "five-year duration of the proposed Final Judgment [wa]s adequate to accomplish its objective." *Id*. at 28,170.[2]

Most recently, the government again argued in *Microsoft* against a ten-year term and in favor of a five-year decree. *United States v. Microsoft Corp*., "Public Comments and Response on Proposed Final Judgment," 2002 WL 32151978, ¶¶ 410-12 (D.D.C. Feb. 27, 2002) (arguing why the DIVISION MANUAL'S guidelines should not apply). In that case, the government emphasized that a decree must be tailored to fit the circumstances of the case. *Id*. The government also stressed that it has "imposed five-year terms in *numerous* past decrees." *Id*. (emphasis added).

The government now suggests that only "on occasion," in cases involving "dynamic, volatile industries" has the United States agreed to a shorter decree. (D.I. 553 at 6-7 and n.3). But the published caselaw shows that the government repeatedly has entered into five-year decrees in antitrust cases that do not involve computers or other technological industries. *See,*

---

[2] In *United States v. Agri-Mark, Inc.*, the government offered three reasons why it agreed to a five-year restriction: (i) the "period will allow the market to adjust to the instant transaction;" and (ii) the dairy industry was constantly evolving; and (iii) "the use of the five-year restriction has precedent." *Agri-Mark*, "Competitive Impact Statements and Proposed Consent Judgments," 45 Fed. Reg. 79,186, 79,189 (Nov. 28, 1980). The parties ultimately agreed on a twenty-year decree. *United States v. Agri-Mark, Inc.*, 1981 WL 2057, *5 (D. Vt. Apr. 1, 1981).

*e.g.*, *Oregon v. Mulkey*, 1997 WL 599410 (D. Or. June 16, 1997) (commercial crab fishing); *United States v. Delta Dental Service Plan of Arizona, Inc.*, 1995 WL 454769 (D. Ariz. May 19, 1995) (dental health care); *United States v. Oregon Dental Service*, 1995 WL 481363 (N.D. Cal. July 14, 1995) (dental health care); *United States v. Topa Equities, Ltd.*, 1995 WL 481368 (D. V.I. July 14, 1995) (liquor wholesaling).

The ten-year term that the government seeks is anything but "standard." In those cases, such as this one, where the government wants a ten-year decree, it cites to the DIVISION MANUAL and argues for ten years. But as the above-cases make clear, the government runs from its DIVISION MANUAL when it seeks to deviate from the ten-year term. It cannot have it both ways. And its current position that five-year decrees are only appropriate in cases that do not involve "dynamic, volatile industries" is belied by its position in several previous antitrust cases involving stable industries such as commercial crab fishing and liquor wholesaling. Accordingly, the government has not demonstrated why it is entitled to a ten-year term as a matter of practice.

**B.    A Ten-Year Term Is Not Necessary To Ensure Competition In The Distribution Of Artificial Teeth**

"An antitrust decree should endure only so long as necessary to ensure competition." *Microsoft Corp.*, 224 F. Supp. at 184. The government offers two reasons why a ten-year term is necessary to restore competition in the marketplace for artificial teeth, neither one of which justifies implementation of the requested expiration period.

First, the government argues that "Dentsply's unlawful conduct has continued for eighteen years," and therefore a ten-year term is warranted. (D.I. at 7). But the government

rejected the soundness of the same argument in *Microsoft*. In that case, in response to public comments, the government stated:

> Some comments take the position that the length of Microsoft's anticompetitive conduct should have determined the length of the decree, but that would have provided an unreliable measuring stick for evaluating the amount of time necessary to restore competitive conditions.

*Microsoft*, 2002 WL 32151978, at ¶ 412. For the same reason, the purported length of Dentsply's unlawful conduct is an unreliable indicator of the amount of time necessary to ensure competition in the market for artificial teeth.

Second, the government argues that a ten-year expiration period "is necessary to give the market sufficient time to ameliorate Dentsply's longstanding violation." (D.I. at 7).[3] But the government's position assumes erroneously that Dentsply has enforced its exclusive dealing policy through the present. In fact, the Trubyte Division has not terminated an authorized dealer for taking on a competitive line of teeth since the early to mid-1990s, when the government launched its CID investigation of Dentsply.[4] Thus, Dentsply has effectively been operating under the key terms of the proposed decree for more than ten years. During that period, the artificial tooth market has had more than "sufficient time" to adjust to Dentsply's earlier enforcement efforts. An additional ten years would make the effective life of the injunction twenty plus years, ten years longer than "the standard length" sought by the government. (D.I.

---

[3] The government devotes a considerable number of pages to the issue of whether the proposed injunctive relief is necessary to achieve an effective remedy. (D.I. 553 at 4-6). Dentsply agrees that it does, which is why it agreed to all terms except for the expiration period.

[4] Dentsply has not even asked a dealer to comply with its exclusive dealing policy since 2001. *United States v. Dentsply International Inc.*, 277 F. Supp. 2d 387, 418 (D. Del. 2003).

553 at 6). Such a decree would not only be unduly onerous to Dentsply, but also fail to serve a competitive purpose.

### C.   The Government's Position That It Is Entitled To "Deference" When Fashioning Injunctive Relief After Trial Lacks Merit

The government argues that, after trial, it is entitled to "particular deference" when fashioning injunctive relief to remedy an antitrust violation and that "all doubts" should be resolved in its favor. (D.I. 553 at 2, 8). Not one of the government's three cited cases, however, supports this proposition. *See F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155 (2004); *Ford Motor Co. v. United States*, 405 U.S. 562 (1972); *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316 (1961). *Empagran* involved a private antitrust class action in which the government was not even a party. That case did not go to trial. Moreover, the case concerned whether, under the Foreign Trade Antitrust Improvements Act of 1982, foreign purchasers of vitamins could pursue Sherman Act claims in a U.S. federal court. In other words, the case had nothing to do with remedies. And while *E.I. du Pont* and *Ford* did go to trial, they were Section 7 divestiture actions. Accordingly, these cases are entirely inapposite.

### II.   THIS COURT SHOULD ENTER FINAL JUDGMENT WITH A FIVE-YEAR EXPIRATION PERIOD, OR, ALTERNATIVELY, A RELAXED STANDARD FOR MODIFICATION AFTER THE FIRST FIVE YEARS

This Court has wide discretion to enter a final judgment that fits the needs of a particular case. *Allis-Chalmers Mfg. Co. v. White Consol. Industries, Inc.*, 414 F.2d 506, 526 n.32 (3d Cir. 1969). Here, the Court should enter a final judgment with a five-year expiration period because Dentsply's tooth business has changed dramatically over the past several years and Dentsply must be able to continue to change in order to compete effectively. A five-year term is a

sufficient amount of time to cure the effects of Dentsply's exclusive dealing arrangement, while at the same time allow Dentsply to stay competitive. The shortened term is even more appropriate where, as here, the antitrust violator has effectively operated under the key terms of the proposed final judgment for more than ten years. *See supra* at 6. By imposing a five-year term now, Dentsply will not have to move under Fed R. Civ. P. 60(b) to modify the terms of the final judgment. *See United States v. Western Electric Co.,* 46 F.3d 1198 (D.D.C. 1995) (modifying antitrust consent decree given developments in the telecommunications industry). Further, a five-year term will relieve this Court of the responsibility of becoming the regulating authority in the artificial tooth market. *See Microsoft,* 231 F. Supp. 2d at 195 ("absent a departure from the ten-year term, there exists a substantial risk that the decree will become highly regulatory in nature"). Thus, imposing a five-year term will preserve judicial and the parties' resources.

In the alternative, and only if the Court imposes an expiration period greater than five years, Dentsply respectfully requests that the Court add the following language after Section VII(B) of the government's proposed final judgment:

> Five years after the entry of this Final Judgment, any party to this Final Judgment may seek modification of its substantive terms and obligations, and neither the absence of specific reference to a particular event in the Final Judgment, nor the foreseeability of such an event at the time this Final Judgment was entered, shall preclude this Court's consideration of any modification request. The common law applicable to modification of final judgment is not otherwise altered.

This is the same provision that the government agreed to in *United States v. Motorola, Inc.,* 1995 WL 866794, *6 (D.D.C. July 25, 1995).

## CONCLUSION

For the foregoing reasons, this Court should deny the government's renewed motion and enter final judgment with an expiration period of five years.

Respectfully submitted,

Dated: April 6, 2006

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

William D. Johnston (No. 2123)
Christian Douglas Wright (No. 3554)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6600
cwright@ycst.com

Brian M. Addison
DENTSPLY INTERNATIONAL INC.
Susquehanna Commerce Center
221 West Philadelphia Street
York, PA 17405
(717) 845-7511

Margaret M. Zwisler
Eric J. McCarthy
Charles R. Price
LATHAM & WATKINS LLP
555 Eleventh Street, N.W
Washington, DC 20004
(202) 637-2200

Counsel for Defendant
DENTSPLY INTERNATIONAL INC.

## CERTIFICATE OF SERVICE

I, Christian Douglas Wright, Esquire, hereby certify that on April 6, 2006, I

caused to be electronically filed a true and correct copy of the foregoing document with the Clerk

of the Court using CM/ECF, which will send notification that such filing is available for viewing

and downloading to the following counsel of record:

> Colm Connolly, Esquire
> Rudolph Contreras, Esquire
> Office of the United States Attorney
> 1007 N. Orange Street, Suite 700
> Wilmington, DE 19899-2046

I further certify that on April 6, 2006, I caused a copy of the foregoing document

to be served by hand delivery on the above-listed counsel of record and on the following non-

registered participants in the manner indicated:

### BY FEDEX

> Jon B. Jacobs, Esquire
> Antitrust Division
> U.S. Department of Justice
> 1401 H Street, N.W., Suite 4000
> Washington, D.C. 20530

Christian Douglas Wright (No. 3554)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19899-0391
(302) 571-6600
cwright@ycst.com
Counsel for Defendant
DENTSPLY INTERNATIONAL, INC.

# Exhibit C

A-689

**ZAHN DENTAL COMPANY INC.**
1 HARBOR PARK DRIVE
PORT WASHINGTON, N.Y. 11050
(800) 496-9500

HESS HOWARD
13625 50TH WAY NORTH
BLDG. 3A & B
CLEARWATER, FL 34620

| CUSTOMER # | ORDER # | ORDER DATE | CUSTOMER P.O. # |
|---|---|---|---|
| 26377-000 | 1425218-001 | 9/14/92 | K1425218 |

SHIP TO:
HESS HOWARD
13625 50TH WAY NORTH
BLDG. 3A & B
CLEARWATER, FL 34620

TELEPHONE: 813-572-1081
TERMS: P/O

PAYMENT INFORMATION
SHIP VIA: COMMON CARRIER
PAGE: 1 1

| LOCATION | QTY. SHIP | QTY. ORD. | QTY. B/O | UNIT SIZE | DESCRIPTION | ITEM CODE | UNIT PRICE | EXTENSION | LINE # |
|---|---|---|---|---|---|---|---|---|---|
| HO-10-CS | 2 | 2 | | SET | RIGIDFLM TPW XI DEGREES ELASTIC POST (8) | 167-1530 | 10.40 | 20.80 | 4.00 |
| HO-10-CS | 2 | 2 | | SET | RIGIDFLM TPW ANGLINE ELASTIC POST (8) | 167-2362 | 10.40 | 20.80 | 2.00 |
| HO-10-CS | 1 | 1 | | SET | RIGIDFLM TPW ANTERIORS (4) | 167-4324 | 20.70 | 20.70 | 3.00 |
| HO-10-CS | 4 | 4 | | EACH | RIGIDFLM TPW ANTERIORS | 167-4948 | 3.70 | 14.80 | 5.00 |
| HO-10-CS | 1 | 1 | | SET | DENTSPLY RIDGELOK TPW ANTERIORS PLAS (4) | 167-8205 | 22.48 | 22.48 | 1.00 |

TAX EXEMPT *

SUBTOTAL  99.78

FREIGHT CHARGES  3.25

**TOTAL  103.03**

PLEASE REMIT PAYMENT TO ZAHN DENTAL  PO BOX 1048 PORT WASHINGTON, NY 11050

ZAHN INTRODUCES ITS NEW 800 NUMBER TO BETTER SERVE YOUR NEEDS

800-496-9500 (US & CANADA)

CHECKED BY _____

HH  40692

# ZAHN DENTAL COMPANY, INC.

5 HARBOR PARK DRIVE
PORT WASHINGTON, N.Y. 11050
(800) 496-9500

HOWARD HESS DENTAL LAB INC
13625  50TH WAY NORTH
BLDG. 3A & B
CLEARWATER, FL 34620

| CUSTOMER # | ORDER # | ORDER DATE | CUSTOMER P.O. # |
|---|---|---|---|
| Y0373-000 | 1598951-001 | 11/03/95 | 1598951 |

**PAYMENT INFORMATION**

Sold To / Ship To:
HOWARD HESS DENTAL LAB INC
13625  50TH WAY NORTH
BLDG. 3A & B
CLEARWATER, FL 34620

1598951

| TELEPHONE | SALESPERSON | TERMS |
|---|---|---|
| 813-572-1081 | 13280 | P/D |

| SHIP VIA |
|---|
| COMMON COURIER |

| PAGE |
|---|
| 1/ 1 |

| LOCATION | QTY. SHP | QTY. OPN. | QTY. BO | UNIT SIZE | CHECKED BY | DESCRIPTION | ITEM CODE | UNIT PRICE | EXTENSION | LINE # |
|---|---|---|---|---|---|---|---|---|---|---|
| 0-L0-CS | 4 | 4 | | SET | | BIOFORM IFN MONOLINE PLASTIC POST (8) | 167-2520 | 10.80 | 43.20 | 3.00 |
| 0-L0-CS | 2 | 2 | | SET | | BIOFORM IFN ANTERIORS 141 E S | 167-1326 | 21.66 | 43.32 | 2.00 |
| 0-L0-CS | 2 | 2 | | SET | | DENTSPLY BIOBLEND IFN ANTERIORS PLAS (6) | 167-0205 | 23.70 | 47.40 | 1.00 |
| | | | | | | SUBTOTAL | | | 133.92 | |
| | | | | | | TAX EXEMPT # | | | | |
| | | | | | | FREIGHT CHARGES | | | | |
| | | | | | | ***TOTAL | | | 133.92 | |

1.5% INTEREST/MONTH WILL BE CHARGED IF BALANCE DUE STILL OPEN AFTER 30 DAYS

PLEASE REMIT PAYMENT TO ZAHN DENTAL  PO BOX 1048 PORT WASHINGTON, NY 11050

INVOICE

HH 16529

# Exhibit D



More than Search ... it's Research

# DENTSPLY International Inc. Reports on Status of Antitrust Case Decision.

FREE ARTICLE  | From: Business Wire  | Date: May 23, 2005



YORK, Pa. -- DENTSPLY International Inc. (Nasdaq:XRAY) today announced that the Third Circuit Court of Appeals issued its decision denying the Company's petition for a rehearing in the antitrust case brought by the U.S. Department of Justice against DENTSPLY's Trubyte division's tooth distribution policy. Following the decision in February, in which a panel of three Third Circuit judges reversed the decision of the District Court which had ruled in DENTSPLY's favor, the Company filed a petition for rehearing of the case by the Third Circuit Court of Appeals. The Company disagrees with the decision of the Third Circuit and is evaluating its option for filing a petition for an appeal to the U.S. Supreme Court. If the decision of the Third Circuit stands, DENTSPLY's Trubyte division will no longer be able to require dealers that carry its tooth lines to not carry competitive tooth lines.

Gerald K. Kunkle, Jr., Chairman and Chief Executive Officer of DENTSPLY International Inc., stated, "We are obviously disappointed with the decision of the Court. We don't expect this decision to have a significant impact on our sales of artificial teeth in the United States or on DENTSPLY's overall sales, as the sale of artificial teeth in the U.S. represents less than two and one half percent of our total Company sales. In addition to the legal option under review, we are also evaluating various alternative marketing strategies available to us to ensure that we remain well positioned in this segment of the dental market. We continue to be optimistic about the outlook for 2005 and look forward to another successful year."

DENTSPLY designs, develops, manufactures and markets a broad range of products for the dental market. The Company believes that it is the world's leading manufacturer and distributor of dental prosthetics, precious metal dental alloys, dental ceramics, endodontic instruments and materials, prophylaxis paste, dental sealants, ultrasonic scalers, and crown and bridge materials; the leading United States manufacturer and distributor of dental handpieces, dental x-ray film holders, film mounts and bone substitute/grafting materials; and a leading worldwide manufacturer or distributor of dental injectible anesthetics, impression materials, orthodontic appliances, dental cutting instruments and dental implants. The Company distributes its dental products in over 120 countries under some of the most well established brand names in the industry.

DENTSPLY is committed to the development of innovative, high quality, cost-effective new products for the dental market.

COPYRIGHT 2005 Business Wire
This material is published under license from the publisher through the Gale Group, Farmington Hills, Michigan.  All inquiries regarding rights should be directed to the Gale Group.
For permission to reuse this article, contact Copyright Clearance Center.

HighBeam™ Research, Inc. © Copyright 2006. All rights reserved.
www.highbeam.com