**Exhibit B**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 99-005 (SLR) |
| | ) | |
| vs. | ) | |
| | ) | |
| DENTSPLY INTERNATIONAL, INC., | ) | **FILED UNDER SEAL** |
| | ) | |
| Defendant. | ) | |
| | ) | |

**UNITED STATES' BRIEF IN SUPPORT
OF ITS PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Dated: July 19, 2002

COUNSEL FOR PLAINTIFF
UNITED STATES OF AMERICA
COLM F. CONNOLLY
UNITED STATES ATTORNEY

Paulette K. Nash
Assistant United States Attorney
1201 Market Street, Suite 1100
Wilmington, DE 19801
(302) 573-6277

William E. Berlin
Jon B. Jacobs
Sanford M. Adler
Frederick S. Young
Steven Kramer
N. Christopher Hardee
Bennett J. Matelson
United States Department of Justice
Antitrust Division
1401 H Street, N.W., Suite 4000
Washington, D.C. 20530
(202) 616-5938

**REDACTED**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................. iv

SUMMARY OF ARGUMENT ................................................ 1

ARGUMENT ............................................................. 5

I.   Dentsply Has Violated Section 2 Of The Sherman Act By Unlawfully
     Maintaining Its Monopoly Power In The Artificial Tooth Market. ............... 5

     A.   Dentsply Has Monopoly Power In The Market For
          Prefabricated Artificial Teeth. ..................................... 6

          1.   Dentsply's High Market Share And The Barrier To Entry
               And Expansion It Has Imposed Establish That Dentsply
               Has Monopoly Power. ...................................... 7

          2.   Direct Evidence Of Dentsply's Control Over Prices And
               Competition Establishes Dentsply's Monopoly Power. ........... 13

     B.   Dentsply Has Wilfully Maintained Its Monopoly Power Through
          Anticompetitive Conduct. ...................................... 17

          1.   Dentsply's Exclusive Dealing Arrangements Are Anticompetitive
               Because They Have Foreclosed Access To 78%-87% Of Dental
               Laboratory Dealer Outlets In The United States. ................. 19

               a.   Dental Laboratory Dealers Are Important To Laboratories and
                    Suppliers .. ...................................... 22

               b.   Other Distribution Channels Are Not Viable
                    Alternatives To Laboratory Dealer Distribution.. ......... 26

               c.   The At-Will Nature Of Dentsply's Dealer Criteria
                    Does Not Mitigate The Exclusionary Effect.. ............ 32

          2.   Dentsply's Exclusive Agreements Have Caused Substantial
               Anticompetitive Effects. ................................... 34

               a.   Frustration Of Consumer Preferences ................. 35

                 b.      Supracompetitive Prices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

         3.        Dentsply's Exclusionary Intent Confirms The
                   Anticompetitive Nature Of Its Conduct . . . . . . . . . . . . . . . . . . . . . 39

II.     Dentsply Has Violated Section 1 Of The Sherman Act And
       Section 3 Of The Clayton Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

       A.     Dentsply's Exclusionary Agreements With Artificial Tooth
            Dealers Are Agreements Within The Meaning Of Sections 1 And 3. . . . . . . 43

       B.     Dentsply's Exclusive Dealing Agreements Have Unreasonably
            Restrained Competition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

III.    Dentsply's Alleged Business Justifications Are Insufficient to To Justify Its
       Exclusionary Conduct And Are Outweighed By The Substantial
       Anticompetitive Effects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

       A.     Dentsply Has The Burden Of Showing That Its Exclusionary Conduct
            Promotes A Sufficiently Procompetitive Objective . . . . . . . . . . . . . . . . . . 49

           1.       Dentsply Has Failed To Demonstrate That Its Alleged Business
               Justifications Are Nonpretextual . . . . . . . . . . . . . . . . . . . . . . . . . 50

           2.       Dentsply Has Failed To Demonstrate That Its Alleged Business
               Justifications Are Procompetitive . . . . . . . . . . . . . . . . . . . . . . . . . 53

                   a.      Dr. Marvel's Free-riding Theory Does Not Apply
                         To The Artificial Tooth Market And Is Unsupported
                         By The Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

                   b.      Dentsply's Business Justification Theory is Inconsistent
                         With Its Overall Conduct In Both The Artificial Tooth And
                         Dental Laboratory Product Markets . . . . . . . . . . . . . . . . . . . 58

       B.     The Evidence Establishes That Dentsply's Exclusionary Arrangements Are
            Overbroad And Not Reasonably Necessary To Achieve The Stated Objective
            Of Protecting Its Promotions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

       C.     The Substantial Evidence Of Anticompetitive Effects Outweighs Any
           Procompetitive Benefit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

**CONCLUSION**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

## TABLE OF AUTHORITIES

<u>Cases</u>

3M v. Appleton Papers, Inc.,
35 F. Supp. 2d 1138 (D. Minn. 1999) ................................... 18

A.D. Bedell Wholesale Co. v. Philip Morris, Inc.,
263 F.3d 249 (3d Cir. 2001) .......................................... 11

Advo, Inc. v. Philadelphia Newspapers, Inc.,
51 F.3d 1191 (3d Cir. 1995) .......................................... 13

Allen-Myland v. Int'l Bus. Machs. Corp.,
33 F.3d 194 (3d Cir. 1994) ........................................... 9

Alvord-Polk, Inc. v. F. Schumacher & Co.,
37 F.3d 996 (3d Cir. 1994) .................................... 45, 52, 54

Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery,
Inc., 185 F.3d 606 (6th Cir. 1999) ...................................... 9

Am. Motor Inns, Inc. v. Holiday Inns, Inc.,
521 F.2d 1230 (3d Cir. 1975) ................................. 21, 22, 34

Am. Tobacco Co. v. United States,
328 U.S. 781 (1946) ................................................. 9

Andrx Pharm., Inc. v. Biovail Corp. Int'l,
256 F.3d 799 (D.C. Cir. 2001) ................................ 14, 17, 37

Angelico v. Lehigh Valley Hosp., Inc.,
184 F.3d 268 (3d Cir. 1999) ...................................... 44, 48

Arthur S. Lagenderfer, Inc. v. S.E. Johnson Co.,
917 F.2d 1413 (6th Cir. 1990) ......................................... 9

Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,
472 U.S. 585 (1985) .......................................... 18, 40, 54

Bailey v. Allgas, Inc.,
284 F.3d 1237 (11th Cir. 2002) ..................................... 13

Baker's Carpet Gallery, Inc. v. Mohawk Indus., Inc.,
    942 F. Supp. 1464 (N.D. Ga. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Barr Lab., Inc. v. Abbott Lab.,
    978 F.2d 98 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 48

Barry Wright Corp. v. ITT Grinnell Corp.,
    724 F.2d. 227 (1st Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Big Apple BMW, Inc. v. BMW of N. Am., Inc.,
    974 F.2d 1358 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Broadway Delivery Corp. v. United Parcel Service of Am. Inc.,
    651 F.2d 122 (2d Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Brokers' Assistant, Inc. v. Williams Real Estate Co.,
    646 F. Supp. 1110 (S.D.N.Y. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Byars v. Bluff City News Co.,
    609 F.2d 843 (6th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Cal. Computer Prods., Inc. v. IBM Corp.,
    613 F.2d 727 (9th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

Cargill v. Monfort of Colo., Inc.,
    479 U.S. 104 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

CDC Technologies, Inc. v. IDEXX Laboratories, Inc.,
    186 F.3d 74 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Chicago Bd. of Trade v. United States,
    246 U.S. 231 (1918) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Coastal Fuels of Puerto Rico, Inc. v. Carribean Petroleum Corp.,
    79 F.3d 182 (1st Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Cont'l T.V., Inc. v. GTE Sylvania Inc.,
    433 U.S. 36 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Colo. Interstate Gas Co. v. Natural Gas Pipeline Co. Of Am.,
    885 F.2d 683 (10th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 16

Conwood Co. L.P. v. United States Tobacco Co.,
  290 F.3d 768 (6th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Copperweld Corp. v. Independence Tube Corp.,
  467 U.S. 752 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Dentsply Int'l, Inc. v. Antitrust Division of the U.S. Dep't of Justice,
  No. 98-693 (D. Del.) (Filed Dec. 10, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Donahue v. Consolidated Rail Corp.,
  224 F.3d 226 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Eastman Kodak Co. v. Image Technical Servs., Inc.,
  504 U.S. 451 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Elcock v. KMart Corp.,
  233 F.3d 734 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 55

Fineman v. Armstrong World Indus., Inc.,
  980 F.2d 171 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Flegal v. Christian Hosp.,
  4 F.3d 682 (8th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 58

Fraser v. Major League Soccer, L.L.C.,
  284 F.3d 47 (1st Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 44

FTC v. H.J. Heinz Co.,
  246 F.3d 708 (D.C. Cir 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

FTC v. Ind. Fed'n of Dentists,
  476 U.S. 447 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 56

Graphic Prods. Distribs., Inc. v. ITEK Corp.,
  717 F.2d 1560 (11th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Houser v. Fox Theatres Mgmt. Corp.,
  845 F.2d 1225 (3d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9

Hughes v. United States,
  263 F.3d 272 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

In re High Fructose Corn Syrup Antitrust Litig.,
    ---F.3d --- 2002 WL 1315285 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

In re Lower Lake Erie Iron Ore Antitrust Litig.,
    998 F.2d 1144 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Int'l Boxing Club v. United States,
    358 U.S. 242 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Kohler v. Briggs & Stratton Corp.,
    1986-1 Trade Cas. (CCH) ¶67,047 (E.D. Wis. 1986) . . . . . . . . . . . . . . . . . . . . . . . 22

Law v. NCAA,
    134 F.3d 1010 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Lorain Journal Co. v. United States,
    342 U.S. 143 (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 22, 34

Monsanto Co. v. Spray-Rite Serv. Corp.,
    465 U.S. 752 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 46, 47

Maple Flooring Mfrs Ass'n v. United States,
    268 U.S. 563 (1925) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Mid-Texas Communications Sys., Inc. v. AT&T,
    615 F.2d 1372 (5th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

NCAA v. Bd. of Regents,
    468 U.S. 85 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Oahu Gas Serv., Inc. v. Pac. Res., Inc.,
    838 F.2d 360 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.,
    883 F.2d 1101 (1st Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Oltz v. St. Peter's Cmty. Hosp.,
    656 F. Supp. 760 (D. Mont. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Omega Envtl., Inc. v. Gilbarco Inc.,
    127 F.3d 1157 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Orson, Inc. v. Miramax Film Corp.,
      79 F.3d 1358 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 44

Pa. Dental Ass'n v. Med. Serv. Ass'n of Pa.,
      745 F.2d 248 (3d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

PepsiCo, Inc. v. Coca-Cola Co.,
      1998-2 Trade Cas. (CCH) ¶ 72,257 (S.D.N.Y. Aug. 27, 1998) . . . . . . . . . . . . . . . 35

Reazin v. Blue Cross & Blue Shield of Kansas, Inc.,
      899 F.2d 951 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Rebel Oil Co. v. Atl. Richfield Co.,
      51 F.3d 1421 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 13, 15

Re/Max Int'l Inc. v. Realty One, Inc.,
      173 F.3d 995 (6th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 15, 36

Roland Mach. Co. v. Dresser Indus., Inc.,
      749 F.2d 380 (7th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Rothery Storage & Van Co. v. Atlas Van Lines,
      792 F.2d 210 (D.C. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Ryko Mfg. Co. v. Eden Servs.,
      823 F.2d 1215 (8th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 22

Standard Oil Co. v. United States,
      221 U.S. 1 (1911) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

Stitt Spark Plug Co. v. Champion Spark Plug Co.,
      840 F.2d 1253 (5th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Tampa Elec. Co. v. Nashville Coal Co.,
      365 U.S. 320 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Tarrant Serv. Agency, Inc. v. Am. Standard,
      12 F.3d 609 (6th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.,
      959 F.2d 468 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Tunis Bros. Co. v. Ford Motor Co.,
   952 F.2d 715 (3d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 48

United States v. Brown Univ.,
   5 F.3d 658 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

United States v. Dairymen, Inc.,
   1983-2 Trade Cas. (CCH) ¶ 65,651 (W.D. Ky. June 9, 1983) . . . . . . . . . . . 20, 22, 35

United States v. Dentsply Int'l, Inc.,
   2001 WL 624807 (D. Del. March 30, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 22, 30

United States v. Dodd,
   225 F.3d 340 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

United States v. E.I. duPont de Nemours & Co.,
   351 U.S. 377 (1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

United States v. General Motors Corp.,
   384 U.S. 127 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

United States v. Griffith,
   334 U.S. 100 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

United States v. Grinnell Corp.,
   384 U.S. 563 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

United States v. Microsoft Corp.,
   253 F.3d 34 (D.C. Cir 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

United States v. Parke, Davis & Co.,
   362 U.S. 29 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 46, 47

United States v. VISA U.S.A., Inc.,
   163 F. Supp. 2d 322 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 35, 36

Weiss v. New York Hosp.,
   745 F.2d 786 (3d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Woods Exploration v. ALCOA,
   438 F.2d 1286 (5th Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## Other Authorities

11 Herbert Hovenkamp, Antitrust Law (1998) .................................. 21

3 P. Areeda & D. Turner, Antitrust Law (1978) ............................... 19

P. Areeda & L. Kaplow, Antitrust Analysis (4th ed. 1988) ................... 14

II P Areeda & H. Hovenkamp, Antitrust Law (2002) .......................... 10

## SUMMARY OF ARGUMENT

For at least the past 14 years, Dentsply has used its monopoly power to erect a barrier to effective entry, expansion and competition in the United States market for artificial teeth. Dentsply has repeatedly blocked its competitors from developing networks of dental laboratory dealers necessary to compete effectively in the market. Over that time period, many dealers that are selling Dentsply's Trubyte teeth sought to supplement their product lines by adding competing tooth brands, often directly in response to the requests of their dental lab customers. And competing tooth suppliers wanted to sell their teeth through those dealers to become more effective competitors to Dentsply.

Dentsply does not seriously dispute that it has a dominant 75%-80% market share which has persisted for years. The barrier to effective entry and expansion imposed by Dentsply's exclusionary conduct makes its monopoly power secure. Under Supreme Court and Third Circuit precedent, Dentsply's very high market share, supported by the barrier to effective competition its exclusionary conduct has erected, is sufficient to establish monopoly power. And the direct evidence of actual anticompetitive effects too is sufficient by itself to establish that Dentsply is a monopolist. Dentsply's control over marketwide prices under its pricing umbrella clearly shows the existence of its monopoly power.

The record shows conclusively, and Dentsply concedes, that in the absence of its exclusionary conduct: (1) dealers would add competing brands of teeth to their product offerings; (2) prices will fall; (3) Dentsply would lose market share, as labs begin buying more of those competing brands when they become available through dealers; and (4) competition will increase, as Dentsply tries to regain its lost market share and its rivals increase their

promotional activity. The United States is unaware of any case in which direct evidence of effects such as these, once proven, have not been condemned by the federal courts. Greater competition, lower prices, improved consumer choice are fundamental goals of the antitrust laws.

Anticompetitive effects are similarly established by presumption through the evidence of market structure and substantial degree of market foreclosure -- 78% to 87% of dental laboratory dealer outlets in the United States. Dentsply's exclusionary conduct is anticompetitive because it has excluded rivals from these dealers, the most effective channel for distributing artificial teeth in the United States. Other channels of distribution such as direct sales, operatory dealers, and distributing laboratories, are not viable and effective alternatives. Dentsply's monopoly power and high market share, the importance of dealers to effective competition, and the widespread, pervasive and longstanding foreclosure of rivals from those dealers give rise to a strong presumption of anticompetitive effects.

So far in this matter, Dentsply has responded to this two-pronged approach to proving anticompetitive effects by arguing only that the presumption does not arise. Dentsply has argued, citing various cases which have rejected that presumption in their particular factual circumstances, that dealers are not important, alternatives are available, or that dealers could choose to add rivals' tooth lines because they are not bound by long-term contracts. These arguments ignore the direct evidence of effects and monopoly power and are simply nonresponsive to a violation predicated on a showing of actual effects or monopoly power.

Nonetheless, even absent monopoly power and actual effects, Dentsply's three arguments against a presumption of effects are not well grounded.

-2-

1.     Dealers are the most effective channel for distributing artificial teeth in the United States. They provide important services and benefits to both laboratories and artificial tooth suppliers.

2.     The fact that Dentsply has not foreclosed *every* dealer and *every* potential avenue of distributing artificial teeth in the United States, including direct distribution of teeth outside the dealer channel altogether, does not make its exclusionary conduct lawful. Complete 100% foreclosure is not required for exclusionary conduct to be anticompetitive.

3.     A defense predicated on the absence of long-term contracts ignores the facts of this case. To prevent dealers selling Trubyte teeth from carrying rival brands of teeth, Dentsply has imposed an "all-or-nothing" choice on those dealers: if they add a competing brand, they lose all of their Trubyte tooth business. Because Dentsply's market share is 15 times larger than the next-largest competitor, this choice has been an easy one for dealers to make. In the past 14 years, no dealer has walked away from Trubyte to take on a competitive line. In 1993, five years after its unwritten policy was used to prevent Frink Dental from selling the Ivoclar's teeth, Dentsply memorialized this policy as Dealer Criterion 6, one of the two challenged practices in this case. Dealer Criterion 6 is an express agreement between Dentsply and its dealers, and to the extent Dentsply has not sought express agreements from dealers at the outset, the course of conduct between Dentsply and its dealers established an agreement. These agreements have unreasonably restrained competition.

In light of the evidence of substantial anticompetitive effects resulting from Dentsply's exclusionary conduct, Dentsply has the heavy burden under the Sherman Act and Clayton Act to show that a nonpretextual and sufficiently procompetitive rationale for its conduct. Indeed,

-3-

the United States is aware of no case in which a Court found that higher prices, frustrated consumer choice, market foreclosure and market inefficiency were procompetitive. Yet those are precisely the "benefits" that Dentsply's claimed justification purports to protect. Not surprisingly, Dentsply has not produced evidence that would justify a finding here so fundamentally at odds with the goals of the antitrust laws.

First, Dentsply's current justification is clearly pretextual, in light of the contemporaneous evidence of Dentsply's intent to "block competitive distribution points [and] not allow competition to achieve toeholds in dealers." In addition, Dentsply has since asserted a shifting series of purported justifications that also are inconsistent with the theory its expert articulated to this Court. Second, Dentsply's claimed justification does not apply to the artificial tooth market and is unsupported by the facts in the record. Instead, it consists of the theoretical speculation of its economic expert, Dr. Marvel. He constructed a theory that perhaps the imposition of higher prices is justified because it means that Dentsply might increase its tooth promotions. Dr. Marvel did not even attempt to articulate how, in this hypothetical world, Dentsply's increased promotion could possibly outweigh the benefits to consumers and society of lower prices, more choices, and increased efficiency, nor did he try to evaluate whether "total promotion" in the market would increase.

Finally, even if Dentsply's claimed business justification was not pretextual, insufficiently procompetitive, and overbroad, any negligible benefit is, when balanced under the Rule of Reason, far outweighed by the substantial anticompetitive harm resulting from Dentsply's exclusionary policies. The clear weight of the evidence establishes that Dentsply has violated sections 1 and 2 of the Sherman Act and section 3 of the Clayton Act. Section 2

of the Sherman Act prohibits a monopolist such as Dentsply from using anticompetitive

conduct to maintain monopoly power. Section 1 of the Sherman Act and section 3 of the

Clayton Act prohibit anticompetitive exclusive agreements such as those between Dentsply

and its dealers.

Although exclusive dealing may in some circumstances serve legitimate

procompetitive purposes, it is the effect of the exclusive agreements in this case that matters,

because antitrust cases are resolved "on a case-by-case basis, focusing on the 'particular facts

disclosed in the record'" and "[l]egal presumptions that rest on formalistic distinctions rather

than actual market realities are generally disfavored." Eastman Kodak Co. v. Image Tech.

Services, Inc., 504 U.S. 451, 466-67 (1992) (quoting Maple Flooring Mfrs. Ass'n v. United

States, 268 U.S. 563, 579 (1925)). Where, as here, a firm has foreclosed much of the market

to competitors, the antitrust laws require a fact-bound inquiry into the "probable immediate

and future effects which preemption of that share of the market might have on effective

competition." Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 329 (1961).

## ARGUMENT

I.     **Dentsply Has Violated Section 2 Of The Sherman Act By Unlawfully
       Maintaining Its Monopoly Power In The Artificial Tooth Market.**

Section 2 of the Sherman Act prohibits a firm with monopoly power, such as Dentsply,

from maintaining that power through means that go beyond competition on the merits.[1] "The

---

[1]

Section 2 of the Sherman Act provides that "[e]very person who shall monopolize, or
attempt to monopolize, or combine or conspire with any other person or persons, to
monopolize any part of the trade or commerce among the several States, or with foreign
nations, shall be deemed guilty of a felony . . . ." 15 U.S.C. § 2.

offense of monopoly under section 2 of the Sherman Act has two elements: '(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" Kodak, 504 U.S. at 480 (quoting United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966)); United States v. Microsoft Corp., 253 F.3d 34, 50 (D.C. Cir. 2001) (en banc), cert. denied, 122 S.Ct. 350 (2001); Weiss v. York Hosp., 745 F.2d 786, 825 (3d Cir. 1984). Dentsply has undeniable monopoly power in the United States prefabricated artificial tooth market, which, as it has conceded, is the relevant market here. PFF ¶ 1.[2] Dentsply has used that power unlawfully to impede its rivals' ability to compete and, ultimately, to protect its monopoly. Dentsply's conduct has harmed consumers by maintaining artificially high prices and restricting consumers' choices.

### A.    Dentsply Has Monopoly Power In The Market For Prefabricated Artificial Teeth.

Monopoly power is "'the ability to control price . . . or to exclude or restrict competition.'" Weiss, 745 F.2d at 827 n.72 (quoting Grinnell, 384 U.S. at 571); Houser v. Fox Theatres Mgmt. Corp., 845 F.2d 1225, 1230 (3d Cir. 1988). Dentsply's monopoly power can be established by direct evidence of its control over prices and exclusion of competitors. See Kodak, 504 U.S. at 477 ("It is clearly reasonable to infer that Kodak has market power to raise prices and drive out competition . . . since respondents offer direct evidence that Kodak did so.").[3] Dentsply's monopoly power can also be established by its dominant share in the

---

[2]       "PFF" refers to Plaintiff United States' Proposed Findings of Fact.

[3]       See also Microsoft, 253 F.3d at 51; Re/Max Int'l Inc. v. Realty One, Inc., 173 F.3d

artificial tooth market. Because a true determination of whether a firm possesses monopoly power hinges upon an analysis of complicated economic factors, "[c]ourts often look to market share as a short cut to determine if monopoly power exists." Tarrant Serv. Agency, Inc. v. American Standard, Inc., 12 F.3d 609, 615 (6th Cir. 1993).[4] In the Third Circuit, "the size of market share is a primary determinant of whether monopoly power exists" (Pa. Dental Ass'n v. Medical Serv. Ass'n of Pa., 745 F.2d 248, 260 (3d Cir. 1984)), and monopoly power "'ordinarily may be inferred from the predominant share of the market'." Weiss, 745 F.2d at 827 n.72 (quoting Grinnell, 384 U.S. at 571). Such a high market share "may obviate the need to analyze other pertinent factors." Fineman v. Armstrong World Indus., Inc, 980 F.2d 171, (3rd Cir. 1992). However, where it is difficult for other firms to expand or to enter a market, such evidence bolsters the conclusion that a firm possesses monopoly power. See Microsoft, 253 F.2d at 54-55; Fineman, 980 F.2d. at 202. Dentsply's extremely high market share, along with the barrier to effective entry and expansion that its exclusive dealing has imposed, and the direct evidence of Dentsply's control over prices and exclusion of competition, clearly establish Dentsply's monopoly power.

>    1.    **Dentsply's High Market Share And The Barrier To Entry And Expansion It Has Imposed Establish That Dentsply Has Monopoly Power.**

------

995, 1016 (6th Cir. 1999).

[4]

    See also, e.g., Rebel Oil Co. v. Atlantic Richfield Co., 51 F.3d 1421, 1434 (9th Cir. 1995) ("Market power may be demonstrated through either of two types of proof. One type of proof is direct evidence of the injurious exercise of market power. If the plaintiff puts forth evidence of restricted output and supracompetitive prices, that is direct proof of the injury to competition which a competitor with market power may inflict, and thus, of the actual exercise of market power. . . . The more common type of proof is circumstantial evidence pertaining to the structure of the market.").

-7-

Dentsply's monopoly power could not be more evident. Dentsply has a dominant share of the market, its rivals' shares are insignificant in comparison, and Dentsply's dominant share has persisted for years. The entry barrier imposed by Dentsply's exclusionary conduct makes its monopoly power secure.

Dentsply's "predominant" market share is easily sufficient to support the conclusion that it possesses monopoly power. See Weiss, 745 F.2d at 827 n.72. Dentsply commands at least a 75%-80% share of the United States artificial tooth market. PFF ¶169. Dentsply's own documents show that it has maintained an 80% market share for over 10 years, and some of its documents state that its market share in the premium tooth segment is well above 80%. PFF ¶171.[5] Shares approximating those maintained by Dentsply have routinely been deemed sufficient to establish monopoly power. See, e.g., Kodak, 504 U.S. at 481 (80%); United States v. E.I du Pont de Nemours & Co., 351 U.S. at 377, 379 (1956) (75%); Int'l Boxing Club v. United States, 358 U.S. 242 (1959) (81%); Am. Tobacco Co. v. United States, 328 U.S. 781, 797 (1946) ("over two-thirds of the entire domestic field of cigarettes"); Houser, 845 F.2d at 1229-30 (66%-71%); Weiss, 745 F.2d at 793, 827 (80%); Allen-Myland, 33 F.3d at 201 (79% share would show "substantial market power," but rejecting proposed market definition).[6]

---

[5]

As the Third Circuit has recognized, such internal documents regarding statistics important to a company "can be powerful evidence in an antitrust case." Allen-Myland v. Int'l Business Machines Corp., 33 F.3d 194, 209 (3d Cir. 1994).

[6]

See also, e.g., Grinnell, 384 at 571 (87% share "leaves no doubt . . . that these defendants have monopoly power") (emphasis added); Am. Council of Certified Podiatric

Dentsply's monopoly power is even more evident when its dominant share is

compared to the meager shares of its rivals. See Weiss, 745 F.2d at 827 n.72. Dentsply's

market share is *15 times* greater than the share of its next largest competitor. PFF ¶170.

Courts have credited evidence of monopoly power involving alleged monopolists with shares

far less than Dentsply's where rivals had shares far higher than Dentsply's rivals. See, e.g.,

Fineman 980 F.2d at 201 (market shares were "persuasive" evidence of monopoly power,

where defendant's share was 48% and rivals' shares were between 7.8% and 15%); Reazin,

899 F.2d at 969 (upholding finding of monopoly power, where defendant had 47% to 62%

share, and next largest rival had 5% share). Accordingly, the evidence of Dentsply's

monopoly power is stronger even than its dominant market share suggests.

Moreover, the fact that Dentsply's dominant 75-80% share has persisted for over a

decade is further evidence of Dentsply's monopoly power. See, e.g., II P. Areeda & H.

Hovenkamp, Antitrust Law ¶ 801a (2002) ("substantial single-firm market power" can be

presumed if "the defendant's share of a well-defined market protected by sufficient entry

barriers has exceeded 70 or 75 percent for the five years preceding the complaint"). 

Dentsply's long-standing dominant share is evidence that its share is not transitory and

therefore does not overstate Dentsply's substantial market power. See id. ¶ 801a2.

---

Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc., 185 F.3d 606, 623 (6th Cir.
1999) (55.1%-76.7%); Arthur S. Lagenderfer, Inc. v. S.E. Johnson Co., 917 F.2d 1413, 1443
(6th Cir. 1990) (60%); Reazin v. Blue Cross and Blue Shield of Kansas, Inc., 899 F.2d 951,
969 (10th Cir. 1990) (47%-62%, depending on how measured) Broadway Delivery Corp. v.
United Parcel Service of Am., Inc., 651 F.2d 122, 129 (2d Cir. 1981) ("a share above 70% is
usually strong evidence of monopoly power").

In addition, Dentsply's exclusionary conduct in tying up dental laboratory dealers has thwarted effective entry and expansion in the artificial tooth market. Dentsply's foreclosure of rivals is a significant entry barrier of the kind the antitrust laws condemn. See, e.g., Kodak, 504 U.S. at 485 ("one of the evils prescribed by the antitrust laws is the *creation* of entry barriers to potential competitors") (emphasis added).[7] The lack of effective entry or expansion by any of Dentsply's competitors (or would-be competitors) confirms that Dentsply's exclusionary conduct has been effective and that Dentsply's monopoly power is secure. See, e.g., Microsoft, 253 F.3d at 54-55; Fineman, 980 F.2d at 202.[8]

Dentsply's exclusionary conduct has deterred expansion by established firms. For over ten years, Dentsply's dominant market share has remained unchallenged and its competitors' shares have not increased to any significant degree. PFF ¶171. The market shares of Dentsply's principal competitors, Vita and Ivoclar, have been stuck in the mid-single digits. PFF ¶171, 212. Nor have other established firms come anywhere close to eroding Dentsply's dominant position. PFF ¶ 213. Rather, other firms' market shares have hovered in the 2%-3% range. PFF ¶170.

---

[7]

See also, e.g., A.D. Bedell Wholesale Co. v. Philip Morris, Inc., 263 F.3d 239, 249 (3d Cir. 2001) (allegation that the Multistate Settlement Agreement "restricts production and effectively bars entry into the cigarette production market . . . properly pleaded an antitrust violation"); In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1168 (3d Cir. 1993) (upholding judgment against defendants involving conspiracy to exclude rival firms from the market and thereby delay the introduction of more efficient competing technology); Reazin, 899 F.2d at 971 (upholding finding that "most favored nations clause," which required hospitals to give defendant the lowest price offered its competitors, "contributed to Blue Cross's power over price").

[8]

See also, e.g., Reazin, 899 F.2d at 971-72; Oahu Gas Service, Inc. v. Pac. Resources, Inc., 838 F.2d 360, 367 (9th Cir. 1988)

Dentsply's exclusive dealing arrangements have completely excluded some entrants and deterred others. The barrier completely excluded Odipal, one would-be entrant. PFF ¶214. Dentsply's exclusionary arrangements delayed the entry of the large German firm, Heraeus Kulzer. PFF ¶215. Heraeus first considered entering the United States tooth market but declined

Dentsply's conduct has minimized the competitive significance of recent entrants. Firms entering the market within the past two years have not achieved a significant presence and have not constrained Dentsply's monopoly power. PFF ¶216-229. Heraeus did not introduce its teeth into the United States until 2000. PFF ¶218. Heraeus has not obtained dealer distribution and sells its teeth directly to dental laboratories. PFF ¶219. Heraeus missed its sales goals and its market share is currently approximately 1%. PFF ¶220. Likewise, Davis Schottlander & David Ltd, a British firm, introduced its Enigma tooth in the United States in 2001, but did not obtain significant dealer distribution and has failed to achieve a significant market presence. PFF ¶224, 227. Enigma sales are far below Schottlander's initial targets, achieving only $21,278 in sales in the first year. PFF ¶227. The firm's tooth sales are so modest that Lincoln Dental, the one dental laboratory dealer that agreed to help sell Enigma teeth in the United States, provides billing services but refuses to stock or ship the teeth. PFF

**REDACTED**

¶228. By Dentsply's own admission, the recent "entry" by Heraeus and Schottlander has not

affected Dentsply's          tooth quality, or lines of teeth Dentply sells. PFF ¶221, 229.[9]

No evidence establishes that any entry or expansion is likely to be meaningful. For

entry or expansion to be meaningful, it must occur on a scale sufficient to curb Dentsply's

monopoly power. See, e.g., Rebel Oil, 51 F.3d at 1440; Reazin, 899 F.2d at 971. Such entry

must also be timely. See Microsoft, 253 F.3d at 57 ("Structural market power analyses are

meant to determine whether potential substitutes constrain a firm's ability to raise prices

above the competitive level; only threats that are likely to materialize in the relatively near

future perform this function to any significant degree."). Neither expansion by existing firms

nor any recent entry has undermined Dentsply's unilateral price leadership. PFF ¶173-78,

221, 229; see also Section I. A. 2 (discussing Dentsply's pricing control). Dentsply's ability

to maintain supracompetitive prices for so long confirms that Dentsply's exclusionary conduct

has erected a barrier to effective entry and competition, because "'without barriers to entry it

would presumably be impossible to maintain supracompetitive prices for an extended time.'"

Cargill v. Monfort of Colo., Inc., 479 U.S. 104, 119 (1986) (citation omitted); see also Advo,

Inc. v. Phil. Newspapers, Inc., 51 F. 3d 1191, 1200 (3d Cir. 1995). Under these

circumstances, Dentsply's durable high prices warrant close judicial scrutiny because "'the

substantial market power that concerns antitrust law arises when the defendant (1) can

---

[9]
     Courts have rejected arguments that entry precludes monopoly power in cases involving entry far more meaningful and substantial than that the trivial entry present here. See, e.g., Oahu Gas, 838 F.2d at 367 (two rivals entered the market and collectively gained a 32% market share); Reazin, 899 F.2d at 971 (200 rivals operated, but none approximated defendant's "dominant" position).

REDACTED

profitably set prices well above its costs and (2) enjoys some protection against a rival's entry or expansion that would erode such supracompetitive prices and profits.'" Bailey v. Allgas, Inc., 284 F.3d 1237, 1245 (11th Cir. 2002) (quoting IIA Phillip Areeda, et al., Antitrust Law ¶ 501 (2d ed. 2002)); Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp., 79 F.3d 182, 196 (1st Cir. 1996).

It is not enough for Dentsply to speculate about the possible *future* success of recent fringe entrants, absent any evidence suggesting that such firms are likely to gain enough presence to constrain Dentsply's monopoly power. See, e.g., Reazin, 899 F.2d at 971; Colo. Interstate Gas Co. v. Natural Gas Pipeline Co. of Am., 885 F.2d 683, 695 n.23 (10th Cir. 1989) ("A suggestion that unidentified market forces will eventually correct supra-competitive pricing will not suffice to show that monopoly power will be temporary."). Nor is such speculation probative (even if correct) because "'the existence of significant substitution in the event of *further* price increases or even at the *current* price does not tell us whether the defendant *already* exercises significant market power.'" Kodak, 504 U.S. at 471 (quoting P. Areeda & L. Kaplow, Antitrust Analysis ¶ 340(b) (4th ed. 1988). Indeed, such fringe entry into a "slightly declining market" (Jenson Tr. 2303-04) in the face of Dentsply's substantial entry barrier is unsurprising because supracompetitive prices attract entry. See, e.g., In re High Fructose Corn Syrup Antitrust Litig., --- F.3d --- 2002 WL 1315285 at *5 (7th Cir. 2002); Andrx Pharmaceuticals v. Biovail Corp. Int'l, 256 F.3d 799, 814 (D.C. Cir. 2001) (when a firm "exercise[s] market power to charge supracompetitive prices, entry by firms currently not competing in the market becomes likely") (internal quotations omitted). Heraeus's North American president testified that the high prices of artificial teeth in the

*-13-*

United States makes it a very attractive market. PFF ¶218. Such entry does not undermine the conclusion that Dentsply exercises monopoly power.

Accordingly, Dentsply's high market share, and the lack of any effective entry or expansion, confirms Dentsply's monopoly power.

### 2. Direct Evidence Of Dentsply's Control Over Prices And Competition Establishes Dentsply's Monopoly Power.

Dentsply's high share, supported by the barrier to effective competition its exclusionary conduct has erected, establish that Dentsply has the power to control prices and exclude competitors. In addition, there is overwhelming *direct* evidence of Dentsply's monopoly power, including its ability to thwart consumer choices, control prices and exclude competition. This evidence is sufficient by itself to establish Dentsply's monopoly power. See, e.g., Kodak, 504 U.S. at 469 (the defendant "must show that despite evidence of increased prices and excluded competition, an inference of market power is unreasonable"); Microsoft, 253 F.3d at 51 (where such evidence exists, "the existence of monopoly power is clear") (citing FTC v. Ind. Fed'n of Dentists ("IFD"), 476 U.S. 447, 460-61 (1986)).[10]

Frustrating consumer choice and effectively reducing output are anticompetitive effects that confirm the existence of market power. See FTC v Ind.Fed'n of Dentists, 476 U.S. 447 at 457, 462 (1986); United States v. Brown Univ, 5 F.3d 658, 668 (3d Cir. 1993).

---

10

See also Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1367 (3d Cir. 1996) ("Market power — the ability to raise prices above those that would prevail in a competitive market — is essentially a surrogate for detrimental effects."); Re/Max, 173 F.3d at 1019 (holding that IFD's rule under section 1 that a finding of anticompetitive effects obviates need for market power analysis applies under section 2); Rebel Oil, 51 F.3d at 1434.

Dentsply's executives have acknowledged that its market share will decline absent Dealer Criterion 6, a concession that Dentsply's conduct deters consumers from purchasing teeth they would purchase if they could get them through dental dealers.  PFF ¶266.  Other evidence (discussed more fully in connection with Dentsply's willful maintenance of monopoly power) confirms such consumer harm.  See id.

The evidence of Dentsply's pricing control dramatically shows the existence of monopoly power.  See, e.g., Microsoft, 253 F.3d at 58 ("the company set the price of Windows without considering rival's prices . . ., something a firm without a monopoly would have been unable to do").  The evidence is overwhelming that Dentsply controls market prices.  Dentsply is the price leader in the artificial tooth market. PFF ¶173. According to William Turner, Dentsply's Senior Product Manager for Trubyte's tooth products from 1993 until earlier this year, "[a]s the price leader, Dentsply usually sets the prices in the marketplace and everyone else contributes or competes under that broad umbrella." PFF ¶173. In setting the level of this price umbrella, Dentsply consults the consumer price index for medical and dental materials, or possibly other indexes of inflation, but does not consult other factors, including prices of competing teeth. PFF ¶174-75.  Dentsply has not reacted with lower prices when other firms have decided not to follow its price increases.  PFF ¶177.  Rather, its prices have consistently been 10%-15% higher than the prices of both Vita and Ivoclar in the premium segment, and 10% higher than its next-highest priced competitor in the economy segment. PFF ¶176. As a result, Dentsply has earned a reputation in the industry for aggressive price increases.  PFF ¶178.    Dentsply's prices                         its marginal costs of producing teeth, producing gross margins of between            PFF ¶182. Its

*-15-*

REDACTED

margins surpass those of other firms in the industry, even though those firms themselves are able to charge high prices under Dentsply's price umbrella. PFF ¶186. Its margins also far surpass the margins it earns on its non-teeth products. PFF ¶183.

The fact that Dentsply has been able to sustain these high margins and profits for so long also shows its monopoly power. See Colo. Interstate Gas, 885 F.2d at 695 ("One measure of the degree of market power is the persistence of a firm's ability to profitably charge monopoly prices."). Moreover, the evidence of its pricing control is even more dramatic than its high prices and margins alone suggest, because during a substantial period when Dentsply controlled market prices, it produced teeth considered by many in the industry to be inferior to its rivals. PFF ¶191-96; see also text, pp. -- supra. It did not introduce a tooth attempting to match the most popular tooth shades in the industry until 1993. Id. Dentsply's ability to maintain high prices and margins for so long while offering products perceived by many to be inferior "lends strong support" to a finding of monopoly power. Byars v. Bluff City News Co., Inc., 609 F.2d 843, 853 n.26 (6th Cir. 1979); see also Andrx Pharmaceuticals, 256 F.3d at 814.

Moreover, Dentsply has excluded competition from 78%-87% of the dental laboratory dealers in the United States, establishing a substantial barrier to effective competition in the artificial tooth market. PFF ¶242-45 . This pervasive level of exclusion directly reflects Dentsply's monopoly power. See, e.g., Microsoft, 253 F.3d at 51, 58 ("More telling, the District Court found that some aspects of Microsoft's behavior [including its "pattern of exclusionary conduct"] are difficult to explain unless Windows is a monopoly product."); Ryko Mfg. Co. v. Eden Servs., 823 F.2d 1215, 1233 (8th Cir. 1987) ("Where the degree of

foreclosure caused by the exclusivity provisions is so great that it invariably indicates that the supplier imposing the provisions has substantial market power, we may rely on the foreclosure rate alone to establish the violation.").[11]

Accordingly, the evidence of Dentsply's high market share, the barrier to competitively meaningful expansion and entry that its own exclusionary conduct has imposed, and direct evidence of Dentsply's control over the artificial tooth market, all show that Dentsply has monopoly power.

**B.    Dentsply Has Willfully Maintained Its Monopoly Power Through Anticompetitive Conduct.**

Section 2 prohibits the "the willful acquisition, maintenance, or use of [monopoly] power by anticompetitive or exclusionary means or for anticompetitive or exclusionary purposes." Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 595-96 (1985); see also Fineman, 980 F.2d at 197; Houser, 845 F.2d at 1230. In determining whether Dentsply's conduct is exclusionary, the effect of its conduct on consumers and competition should be considered. See Aspen, 472 U.S. at 605. A monopolists' conduct is unlawful

---

[11]

 Consistent with this evidence, perceptions of market participants also show that Dentsply exerts control over the artificial tooth market. These perceptions are valuable indicators of Dentsply's economic power. See, e.g., Rothery Storage & Van Co. v. Atlas Van Lines, 792 F.2d 210, 219 n.4 (D.C. Cir. 1986) ("economic actors usually have accurate perceptions of economic realities"). Dentsply's own studies stated that customers found Dentsply "dictatorial and arrogant;"

PFF ¶¶190 (a)-(c). Many Dentsply tooth dealers believe that, in imposing Dealer Criterion 6 upon them, Dentsply exerts too much control over the products the dealers are able to sell. PFF ¶190(d).

REDACTED

where, as here, it "'tends to impair the opportunities of rivals [and] either does not further competition on the merits or does so in an unnecessarily restrictive way.'" Id. at 605 n.32.

"In section 2 cases, the wrongful act is usually one designed to exclude competitors from the market (e.g., . . . exclusive dealing)." Fraser v. Major League Soccer, L.L.C., 284 F.3d 47, 61 (1st Cir. 2002).[12] A monopolist violates section 2 if it "maintain[s] monopoly [power] by means of those restraints of trade which are cognizable under [Sherman Act] § 1." United States v. Griffith, 334 U.S. 100, 106 (1948); Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d 227, 239 (1st Cir. 1983). Accordingly, the analysis under section 2 is similar to the rule of reason analysis under section 1 (Microsoft, 253 F.3d at 59), with the important caveat that "[w]here a defendant maintains substantial market power, his activities are examined through a special lens: Behavior that might otherwise not be of concern to the antitrust laws — or that might even be viewed as procompetitive — can take on exclusionary connotations when practiced by a monopolist." Kodak, 504 U.S. at 488 (Scalia, J., dissenting) (citing 3 P. Areeda & D. Turner, Antitrust Law ¶ 813, at 300-02 (1978)); see also Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I., 883 F.2d 1101, 1112 (1st Cir. 1989).[13] A monopolist's conduct will be condemned as exclusionary where it has an anticompetitive effect. See Kodak, 504 U.S. at 469, 483; Microsoft, 253 F.3d at 58.

---

[12]     See also Microsoft, 253 F.3d at 58, 60; Lorain Journal Co. v. United States, 342 U.S. 143, 155 (1951); 3M v. Appleton Papers, Inc., 35 F. Supp. 2d 1138, 1145-46 (D. Minn. 1999).

[13]     The section 1 rule of reason analysis is addressed specifically in connection with the discussion of Dentsply's violation of section 1 of the Sherman Act and section 3 of the Clayton Act. See Section II. B.

Here, foreclosure is substantial and Dentsply has monopoly power. Moreover, direct evidence of adverse effects confirms that Dentsply's conduct is anticompetitive, as the foreclosure rate and its monopoly power suggest. Dentsply has maintained its monopoly power, deterred effective entry and expansion of rival firms, frustrated consumer preferences, increased prices, and impaired the quality of teeth used in dentures. The anticompetitive nature of Dentsply's conduct shows that its conduct has contributed to the maintenance of its monopoly power. See Microsoft, 253 F.3d at 79 (causation can be "infer[red] . . . from the fact that [a monopolist] has engaged in anticompetitive conduct that 'reasonably appear[s] capable of making a significant contribution to . . . maintaining monopoly power'") (citation omitted). Accordingly, Dentsply's conduct violates section 2.

1.    **Dentsply's Exclusive Dealing Arrangements Are Anticompetitive Because They Have Foreclosed Access To 78%-87% Of Dental Laboratory Dealer Outlets In The United States.**

Dentsply's exclusionary conduct is anticompetitive because it has excluded rivals from the most effective channel for distributing artificial teeth in the United States. By any measure, the foreclosure caused by Dentsply's conduct is substantial. Whether measured by the percentage of Dentsply's market share sold through its distributors, the percentage of dealer outlets foreclosed, or the percentage of dealer tooth stocks foreclosed, Dentsply has foreclosed its principal rivals — Vita and Ivoclar — from at least 78%-87% of dealer outlets that sell teeth (or potentially could sell teeth). PFF ¶244[14] Dentsply has foreclosed other tooth

---

[14]

If foreclosure is based on the percentage of Dentsply's market share sold through its distributors, as suggested in Omega Envtl., Inc. v. Gilbarco Inc., 127 F.3d 1157, 1162 (9th Cir. 1997)), Dentsply has foreclosed 75%-80% of the market. If foreclosure is based on the

manufacturers from at least 60% of the market.  PFF ¶245 .[15]  Moreover, the pure foreclosure

percentages understate the competitive harm because the few dealers left for Dentsply's rivals

are much smaller and much less effective than Trubyte dealers.  PFF ¶258-262.  As established

below, the dealers foreclosed by Dentsply's exclusionary conduct are dental laboratories'

preferred source for ordering artificial teeth, provide important services to customers and

manufacturers, and are by far the most efficient means of distributing teeth in this country.

See Section I. B.2. A

The degree of foreclosure present here is far above what is required to establish

anticompetitive effects.  Even absent monopoly power, exclusive dealing can violate the

antitrust laws if the exclusive agreements foreclose "a substantial share of the line of

commerce affected."  Tampa Elec., 365 U.S. at 327; Barr Labs., Inc. v. Abbott Labs., 978 F.2d

98, 110 (3d Cir. 1992); Am. Motor Inns, Inc. v. Holiday Inns, Inc., 521 F.2d 1230, 1252 (3d

Cir. 1975).  Courts have found exclusive dealing arrangements anticompetitive where they

foreclose 40%- 50% of the market.  Microsoft, 253 F.3d at 70; 11 Herbert Hovenkamp,

---

percentage of dealer outlets foreclosed to Dentsply's rivals, as suggested in Stitt Spark Plug
Co. v. Champion Spark Plug Co., 840 F.2d 1253, 1258 (5th Cir. 1988), Dentsply has
foreclosed roughly 87% of the market.  Even if foreclosure is based only on the percentage of
dealer tooth stocks foreclosed to Dentsply's rivals (given the fact that dealers do not stock
teeth at all of their outlets), the foreclosure rate is still at least 70%-80%. PFF ¶243.
15

Even rival teeth that are sold by some dealers under the "grandfather" provisions of
Dealer Criterion 6 — including the American Tooth, Austenal, and Universal brands — are
foreclosed from at least 60% of dealer outlets.  PFF ¶245. This limited grandfathering does
not cure the anticompetitive effects of Dentsply's exclusive dealing agreements, particularly
when its principal competitors — Vita and Ivoclar — are typically not subject to the
grandfather provisions.  See United States v. Dairymen, Inc., 1983-2 Trade Cas. (CCH) ¶
65,651, at 69,338 (W.D. Ky. 1983) (exclusive dealing contracts with similar grandfathering
clauses found unlawful).  Dentsply prohibits a dealer selling Trubyte teeth *anywhere* from
adding a rival's teeth at any location. PFF ¶241.

Antitrust Law ¶ 1821 at 160 (1998) (foreclosure above 50% "routinely condemned"). The threshold is lower where, as here, a defendant has monopoly power. Because the conduct of a monopolist must be "examined through a special lens" (Kodak, 504 U.S. at 488), "a monopolists' use of exclusive contracts, in certain circumstances, may give rise to a § 2 violation even though the contracts foreclose less than the roughly 40% to 50% share usually required in order to establish a § 1 violation." Microsoft, 253 F.3d at 70.

The fact that Dentsply has not foreclosed *every* dealer and *every* potential avenue of distributing artificial teeth in the United States, including direct distribution of teeth outside the dealer channel altogether, does not make its exclusionary conduct lawful. Complete 100% foreclosure is not required for exclusionary conduct to be anticompetitive. See Tampa Elec., 365 U.S. at 327 ("substantial share"); Lorain Journal, 342 U.S. at 152-53 (no need to prove monopolist "completely eliminated" rival).[16] Foreclosure of a substantial share of a distribution channel can be anticompetitive if the distribution channel is important for effective competition. See, e.g., Microsoft, 253 F.3d at 64, 70-71[17] As this Court recognized

---

[16]

See also Microsoft, 253 F.3d at 70-71, 73-74 (explicitly rejecting a requirement of complete foreclosure and finding section 2 violation based on 15% foreclosure of one important distribution channel for Internet browsers); Woods Exploration v. ALCOA, 438 F.2d 1286, 1307 (5th Cir. 1971) ("absolute success in excluding competition is [not] an essential element to proving monopoly power under Section 2"); Oltz v. St. Peter's Community Hosp., 656 F. Supp. 760 (D. Mont. 1987) (foreclosure of 84% of area hospital admissions made market power inquiry unnecessary), aff'd, 861 F.2d 1440 (9th Cir. 1988); Kohler Co. v. Briggs & Stratton Corp., 1986-1 Trade Cas. (CCH) ¶ 67,047 (E.D. Wis. 1986) (62% market share); United States v. Dairymen, Inc., 1985-1 Trade Cas. (CCH) ¶ 66,638 (6th Cir. 1985) (per curiam) (upholding finding of unlawful exclusive dealing where defendant had 59.5% of the market and exclusive contracts affected 50% of the market).

[17]

See also Am. Motor Inns, 521 F.2d at 1252 (analysis of the effects of exclusion requires consideration of "the competitive context of the industry"); CDC Technologies, Inc.

when denying Dentsply's motion for summary judgment, any alternative channels must be viable; they must be capable of depriving "existing dental laboratory dealers" of "significant levels of business." United States v. Dentsply Int'l, Inc., 2001 WL 624807, *9 (D. Del. March 30, 2001). Otherwise, the exclusionary conduct still serves to maintain a defendant's market power. See, e.g., Microsoft, 253 F.3d at 70-71, 73-74.

The degree of foreclosure in this case easily establishes that Dentsply's conduct is anticompetitive, because, as shown next, dental laboratory dealers are critical to effective competition in the artificial tooth market and other channels of distribution are not viable substitutes for dealer distribution.

> ### a.    Dental Laboratory Dealers Are Important To Laboratories and Suppliers.

It is no accident that Dentsply distributes its teeth through dealers having approximately 100 tooth counters in essentially all metropolitan areas of the United States. PFF ¶91. Tooth dealers are central to tooth manufacturers' sales success in the United States. See, e.g., PFF ¶61  (Kevin Dillon: "If you don't have distribution with the dealer network, you don't have distribution."). The "general norm in the [artificial tooth] business is distribution of teeth through dental dealers. It's the expectation of the laboratory to purchase and receive products that way and it's also the expectation of the laboratory to receive the level of service provided by a dental dealer." Id.

---

v. IDEXX Labs., Inc., 186 F.3d 74, 80-81 (2d Cir. 1999); Ryko Mfg. Co. v. Eden Services, 823 F.2d 1215, 1234 (8th Cir. 1987); Roland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380, 394 (7th Cir. 1984)

Dentsply has acknowledged the competitive importance of its dealer network. According to Dentsply, a "key weakness" of its competitors is their lack of dealers and resulting "limited distribution." PFF ¶153.  Even though Dentsply has over 100 dealer stocks of Trubyte teeth, in essentially all major metropolitan areas, Dentsply believes it would "sell more teeth" if it had more. PFF ¶91 .  Dentsply has encouraged dealers selling Trubyte teeth to open more tooth counters and has tried to slow down any efforts by dealers to consolidate tooth stocks. PFF ¶96. For example, when Healthco, a former dealer selling Trubyte teeth, was on the brink of insolvency, Dentsply encouraged Zahn to open tooth counters in both North Carolina and Texas because otherwise "it would have left a tremendous gap in the southeastern United States." Id .

Dentsply values not only its larger national dealers, but also its smaller local dealers. Dentsply has made clear that it is

Smaller dealers command a very high share of the Trubyte teeth sold in their local areas. PFF ¶93. Dentsply values its local dealers because they provide important service benefits to lab customers. According to the former head of Trubyte, "if a local dealer is successful at selling and providing service, a few dollars in savings from mail order will be more than offset. Customers will return for excellent service. Price can never replace service over the long haul." PFF ¶94 . Dentsply senior management has repeatedly recognized the importance of dealer support to Dentsply's tooth business. PFF ¶91-97.

As Dentsply recognizes, artificial tooth dealers provide numerous services to tooth manufacturers. Dealers carry a substantial tooth inventory, which reduces the supplier's costs.



PFF ¶83 . Dealers employ tooth counter specialists who, along with dealer sales reps, regularly interact with the lab customer. PFF ¶89 . They are experienced in handling teeth and are familiar with different shades and moulds, and are therefore able to assist labs when they have questions. PFF ¶81. The relationships that arise out of these lab-dealer interactions are important to a supplier because there are thousands of laboratories, and a supplier, even one as large as Dentsply, cannot maintain this level of contact with so many customers. PFF ¶89. Dealers also handle accounts receivable, which allows manufacturers to avoid incurring the substantial costs of billing, invoicing, and collecting debts from thousands of dental labs (a group with a poor credit reputation in the industry). PFF ¶84.

In addition, tooth dealers promote suppliers' products. PFF ¶90. Although each supplier employs sales representatives, dealer sales representatives add another "voice in the marketplace." PFF ¶85. They co-travel with supplier reps and refer customers to supplier representatives. PFF ¶87 . Dealers provide additional advertising vehicles such as dealer catalogues and other promotions. PFF ¶86. These services also benefit labs. Dealers inform labs of new products, and as a result, labs are able to make more informed choices about products. PFF ¶80 .

Dental laboratory dealers also provide important services to dental laboratories. These services benefit suppliers as well. PFF ¶62. Unlike a manufacturer, dealers specialize in the business of providing prompt, accurate, and reliable delivery of dental products, including teeth, to dental laboratories. PFF ¶74 . When a lab places an order for teeth, the lab needs the order filled properly and needs the teeth quickly. Id. Consequently, dealers maintain tooth stocks, which provide labs with a local inventory of readily available teeth. PFF ¶63 . The

-24-

need for same-day pick-up or delivery of teeth is fairly common in the industry. PFF ¶66-68 . Indeed, Dentsply has recognized the importance of dealers with a "local presence" that can provide teeth next-day or by pickup in "rapid turnaround situations." PFF ¶69. Labs value local access to a wide array of teeth even in non-emergency situations. PFF ¶68. Small labs, in particular, regard a local dealer inventory as a surrogate for their own, in-house inventory. PFF ¶63 . A local tooth stock increases the delivery options available to a lab, decreases shipping charges, and decreases the amount of inventory the lab must keep, thereby reducing the lab's expenses even further. PFF ¶65.

In addition, dealer sales representatives visit dental labs and manage their tooth inventories, determining which tooth cards have been used, placing restocking orders, and taking back broken sets of teeth for credit. PFF ¶71-73. Dealers provide a "far higher" level of service than manufacturers because dealer representatives regularly call on labs, count teeth and restock inventory. PFF ¶71. The inventory management function is particularly valuable where a lab's tooth stock is consigned from a manufacturer or dealer. Dealer sales representatives monitor consigned tooth stocks, replenish them, and make sure the lab is properly billed for the inventory used. PFF ¶73 . The dealers' role in handling tooth returns is also important. Labs return approximately        of the teeth they purchase, and this percentage is likely to increase. PFF ¶79 . Dealers collect the teeth themselves or process teeth returned to them to make sure the labs receive proper credit. Id.

Dealers also provide one-stop shopping benefits to labs. PFF ¶76-78 . These benefits include the availability of multiple products from one source, reducing separate orders and shipping, fewer accounts, fewer invoices to pay, and consolidation of tooth returns in one

-25-

REDACTED

dealer.  Reducing suppliers saves labs time, effort and cost.  PFF ¶76 .  Large lab dealers

selling Trubyte teeth offer a broad array of products for sale.  PFF ¶77.  Zahn offers over

25,000 tooth choices and 8,500 merchandise and equipment options.  Id.  No manufacturer can

match this array of products.  Moreover, by consolidating purchases with a single dealer, labs

are able to take advantage of volume purchase discounts.  PFF ¶78 .

    Dentsply's rivals cannot create their own networks, because Dentsply has tied up so

many of the dealers required to establish an effective network.  PFF ¶242-46  Other

manufacturers have repeatedly attempted to obtain meaningful dealer distribution but have not

been able to do so.  PFF ¶44-60;247 .  Accordingly, Dentsply's foreclosure of 78%-87% of

this important distribution channel has seriously impaired its rivals' ability to compete and has

preserved its monopoly power.

> **b.**    **Other Distribution Channels Are Not Viable Alternatives
> To Laboratory Dealer Distribution.**

    The alternative distribution channels available to Dentsply's rivals — selling direct,

selling through "operatory" dealers that are not in the lab business, or selling through

distributing labs that compete with the labs that suppliers need to reach — are not

competitively viable alternatives to dealer distribution.  Accordingly, these ineffective

alternatives do not mitigate the competitive harm caused by Dentsply's foreclosure.  See, e.g.,

Microsoft, 253 F.3d at 70-71.

    *1. Direct distribution is ineffective.*  Because dealers provide important services to

tooth suppliers and dental laboratory customers, selling teeth directly is a significant

disadvantage for a supplier.  PFF ¶140-41, 153. Indeed, Dentsply has discouraged customers

from trying to purchase directly from Trubyte and has told them that "Dentsply simply cannot

provide adequate service to our lab customers absent our dealer network." PFF ¶ 97 .

Dentsply has acknowledged that direct selling involves additional costs. PFF ¶142.

Dentsply would

have to

Dentsply's competitors agree that selling direct is more costly than selling through

dealers. PFF ¶143. Even though direct sellers do not have to pay the standard 35% dealer

margin, they incur significant additional costs associated with the services that otherwise

would be handled by a dealer, such as maintaining tooth stocks, accounting, accounts

receivable, billing, returns, capitalizing higher inventories, and fulfilling orders. PFF ¶140-41.

As Mr. Swartout of Meyerson explained, access to dealers "helps us reduce our operating

-27-

REDACTED

expenses and invest more in sales and marketing" by making collections more efficient and "tak[ing] advantage of [dealers] doing cooperative sales and marketing efforts, thereby sharing costs." PFF·¶143. Others in the industry confirm this view. See PFF ¶¶143-45 (Desautel Tr. 2466 (it is a "fallacy" to assume that it is cheaper to sell teeth directly); Obst Tr. 2752-53 (DSG obtains Myerson teeth cheaper from Zahn than from Myerson).[18]

Each of Dentsply's major competitors has tried, but failed, to overcome the disadvantages of selling teeth directly. Ivoclar's president, Mr. Ganley, testified that Ivoclar's primary difficulty is being "locked out" of dealers, because "the market is used to buying [from a] dealer. . . . It's what they're comfortable with." PFF ¶155. Ivoclar has tried several different strategies to overcome this difficulty, including selling teeth through regional distribution centers and providing consignments of teeth to labs, but all of them have failed. PFF ¶156. Ivoclar has developed a sales force dedicated solely to selling teeth, and hired one of Dentsply's former tooth salesmen to lead that effort. Id.   This effort has failed, however, because the small increase in sales has been outweighed by the costs of creating a separate sales force focused on selling only one product. Id.

Vident has had a similar experience. PFF ¶158.  Vident tried several different strategies to overcome the disadvantages of selling directly, including shipping teeth to labs

---

[18]

The fact that crown and bridge materials are sold direct does not suggest that it is efficient to sell teeth direct.  Crown and bridge products have historically been distributed directly to labs. PFF ¶148.  There are significant differences between selling crown and bridge products and selling teeth, including the fact that teeth are ordered much more frequently and involve a substantially greater range of SKUs.  See PFF ¶¶147 -152.

on an overnight basis, subsidizing the cost of next-day service, and providing consignments to labs. PFF ¶159. However, these costly efforts have not been successful. Id .

Likewise, Myerson has attempted unsuccessfully to overcome the hurdles imposed by the lack of effective dealer distribution. It cannot establish regional tooth distribution centers today because Myerson manufactures only teeth and it is not economical to sell only teeth through a regional distribution center. PFF ¶161.[19] Nor is it feasible for Myerson to ship all of its orders to labs overnight in light of the high cost of services like Federal Express. Id.

Accordingly, Dentsply's rivals have not been able to overcome the hurdles of direct distribution.

2. *Operatory dealer distribution is ineffective.* Operatory dealers are not an effective means of distributing teeth to labs because, as this Court previously recognized, "operatory dealers sell various merchandise and equipment to *dentist offices* as opposed to the *dental laboratories* who purchase teeth." Dentsply, 2001 WL 624807 at *9 (emphasis added).[20] The evidence confirms that operatory dealers that do not currently sell teeth are not viable

---

[19]

When Myerson was part of the larger Austenal Corporation, Myerson added local tooth stocks to distribution centers that Austenal established for other products in Orlando, New York, and Los Angeles. These distribution centers allowed Myerson to offer local availability of teeth and provided Myerson with additional marketing opportunities for teeth. When Dentsply acquired Austenal in early 2002, however, Myerson lost these distribution centers and the additional business they generated. PFF ¶161. Maintaining local tooth stocks presents a significant cost of distribution. PFF ¶143.

[20]

The term "operatory dealer" is used in two ways in the industry: to refer to dealers that are in both the dental operatory business and the dental laboratory business, and to refer to dealers that are only in the operatory business. PFF ¶249. As used here, the term refers to those dealers, as recognized by the Court in its summary judgment opinion, that do not sell teeth or other products to labs at all. PFF ¶250

alternative distribution channels for the sale of artificial teeth. Pure operatory dealers testified that they have no interest in entering the dental laboratory business. PPF ¶253 .

As Dentsply has conceded, the

Dentsply does not view operatory dealers as likely entrants into the tooth market. PPF ¶252. When looking for new tooth dealers, Dentsply looks for dealers that already have a strong and dedicated focus on laboratory business. Id. It has found very few. Id. Dentsply's characterization of operatory dealers' business is shared by other tooth suppliers. See, e.g. PFF ¶256 (Dillon Tr. 4083 ("They're not in that business. They don't call on laboratories. It would be like me saying do I consider a hardware store a place to distribute my dental products. No different. I wouldn't want to distribute my dental products through a hardware store and I surely wouldn't want to do it through an operatory.").

There are several reasons why operatory dealers will not likely enter the dental laboratory market. First, before entering, an operatory dealer must identify and cultivate a completely different set of customers. PFF ¶ 251(a). Second, the dealer must invest in a stock of artificial teeth *and* a comprehensive stock of other laboratory merchandise, because to be competitive, laboratory dealers must offer a broad range of products. PFF ¶ 251(b). As Dentsply's Mr. Clark testified, these investments are "significant" in terms of personnel and inventory. PFF ¶ 251(c). Third, operatory dealers often view the tooth distribution business as too labor intensive because it involves too many returns and requires specialized knowledge of teeth that they do not have. PFF ¶253 (Sullivan Dental). Fourth, for a number of reasons, operatory dealers view the laboratory market as unattractive economically. Dental

-30-

**REDACTED**

labs are viewed as notoriously poor credit risks, particularly compared to dentists,

PFF ¶251 (d)-(f).

Accordingly, operatory dealers are competitively insignificant as potential alternative channels of distribution. As this Court previously held, to be viable, such operatory dealers must have the "'actual or potential ability to deprive existing dental laboratory dealers of significant levels of business.'" Dentsply, 2001 WL 624807 at *9 (citation omitted). Clearly they lack that ability.

   3. *Distribution through "distributing labs" is ineffective.* Vident and Ivoclar also attempted to overcome their exclusion from a dealer network by selling teeth through "distributing labs," dental labs that also sell teeth to competing dental labs. PFF ¶257. However, the clear consensus in the industry,                              is that using distributing labs is an ineffective method of selling teeth to other labs because labs do not like to buy products from their competitors. Id. Moreover, the principal business of a lab is producing dentures and other appliances, not selling teeth. PFF ¶33-36. Distributing labs do not have the size, scope or expertise in distribution to mitigate Dentsply's thorough foreclosure of access to a real artificial tooth distribution network.

*   *   *

Where, as here, a firm forecloses a substantial portion of the most effective distribution channel in an industry, and leaves its rivals such ineffective alternatives, courts have not hesitated to condemn the exclusionary conduct. For example, in Microsoft, although Microsoft did not foreclose every software distribution channel, the Court condemned exclusions that barred rival software manufacturers "from the cost-efficient ones" (253 F.3d at

*-31-*

REDACTED

64) and kept rivals' distribution "below the critical level necessary for [them] to pose a real threat to Microsoft's monopoly." Id. at 71.

Likewise, in United States v. VISA U.S.A., Inc., the court determined that agreements among VISA and MasterCard member banks not to issue American Express and Discover cards violated section 1. 163 F. Supp. 2d 322, 383, 389 (S.D.N.Y. 2001), appeal pending, No. 02-6074 (2d Cir.). Even though American Express and Discover had for years issued credit cards directly to consumers, the court held that their foreclosure from banks — which collectively controlled important banking assets and issued 85% of all credit and charge cards — harmed competition. Id. Excluding the American Express and Discover networks from banks was anticompetitive because "[t]he member banks [were] a unique distribution source for general purpose card products because of their expertise and experience." Id. at 383. The court concluded that rival card networks' access to multiple, diverse bank issuers would increase competition based on the varied skills, expertise, and customer relationships the banks possessed, which could not be effectively duplicated by the vertically integrated rivals or by potential alternative issuers such as insurers. Id. at 382-83, 387-94; see also Conwood Co. L.P. v. United States Tobacco Co., 290 F.3d 768, 787-88 (6th Cir. 2002) (upholding monopolization claim where defendant excluded competition in the moist snuff market through elimination of substantial number of rivals' sales racks and point of sale advertising, which are important distribution and advertising avenues).

Because the alternative distribution channels left open to Dentsply's rivals are clearly ineffective to restore competition in the artificial tooth market, Dentsply's conduct is anticompetitive.

c.    **The At-Will Nature Of Dentsply's Dealer Criteria Does Not Mitigate The Exclusionary Effect.**

The technically "at-will" nature of Dentsply's dealer criteria does not make mitigate the substantial level of foreclosure present here. Whether Dentsply's dealer criteria violate section 2 turns on the competitive effect, because "the Sherman Act . . . is aimed at substance rather than form." Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 760 (1984); see also Kodak, 504 U.S. 478-79 (rejecting suggested "legal presumption" inconsistent with the facts). Although Dealer Criterion 6 does not include a stated duration, the effect is exactly the same as if the restriction were explicitly perpetual. Dentsply's rivals cannot successfully bid for or bargain away the dealers currently selling Dentsply teeth because Dealer Criterion 6 imposes an all-or-nothing choice on dealers. Under Dealer Criterion 6, if a Trubyte dealer adds a rival's tooth line, they lose all of their Trubyte teeth. PFF ¶180.

Given Dentsply's monopoly market share, no dealer is willing to "walk away" from its substantial Trubyte tooth sales to take on a competitive line of teeth with an insubstantial market share. No dealer has given up its Trubyte tooth business to take on a rival tooth line. PFF ¶179. Dentsply's competitors have repeatedly run into a wall when attempting to convince dealers to take on their teeth. "Each time" Myerson has approached a dealer to distribute Myerson teeth, the dealer has refused to give up its Trubyte line. PFF ¶ 162. Vident for years tried to obtain distribution through a national tooth dealer, such as Patterson or Zahn, but dealers declined distributing Vident teeth because the dealer cannot afford to disrupt their relationship with Dentsply. PFF ¶160.

As the Third Circuit has made clear, an assessment of competitive effects must consider this "competitive context of the industry" and "'relative strength of the parties'." Am. Motor Inns, 521 F.2d at 1252 (quoting Tampa Elec., 365 U.S. at 329). Numerous cases have acknowledged the effective perpetual exclusivity of similar at-will restrictions imposed by dominant firms. See, e.g., Lorain Journal, 342 U.S. at 152-53 (monopolist publisher's "refusal to print [newspaper] advertising for those using [a local radio station to advertise] often amounted to an effective prohibition of the use of the [radio station] for that purpose"); 3M, 35 F. Supp.2d at 1144 (rejecting the argument that at-will agreements are lawful *per se,* where the defendant's high market share and customer preference prevented switching to rivals as a practical effect); VISA, 163 F. Supp. 2d at 382 ("Because of the defendants' exclusionary rules [prohibiting VISA and Mastercard member banks from issuing rival credit cards] American Express and Discover have not been able to convince U.S. banks to issue cards over their networks. This prevents them from competing in the network services market for the business of bank issuers.").[21]

Accordingly, given Dentsply's monopoly power, its foreclosure of all of the most effective dealers in the country is powerful evidence of the anticompetitive nature of its conduct. There are no viable alternative channels available for rivals to challenge Dentsply's monopoly power.

---

[21]

See also, e.g., PepsiCo, Inc. v. Coca-Cola Co., 1998-2 Trade Cas. (CCH) ¶ 72,257 at 82,644-45 (S.D.N.Y. Aug. 27, 1998) (refusing to dismiss complaint despite at-will nature of exclusive agreements); Dairymen, 1983-2 Trade Cas. (CCH) ¶ 65,651 at 69,338 (defendant's 59.5% market share rendered otherwise-legitimate contract duration unreasonable).

2.    **Dentsply's Exclusive Arrangements Have Caused Substantial
Anticompetitive Effects.**

Although the degree of foreclosure caused by a restraint is an indicator of the

"probable" or "likely" anticompetitive effects (Tampa Elec., 365 U.S. at 327), here there is

also direct evidence of *actual* anticompetitive effects.  The high degree of foreclosure

attributable to Dentsply's exclusive dealing arrangements has not only contributed

significantly to maintaining its monopoly power, it has frustrated consumer preferences and

enabled Dentsply to keep prices and quality at non-competitive levels.  See Aspen, 472 U.S. at

605 & n.32.  The direct evidence of these anticompetitive effects, by itself, establishes that

Dentsply is a monopolist.  It also establishes that Dentsply's conduct is exclusionary.  See

Brown Univ., 5 F.3d at 668 (citing IFD, 476 U.S. at 460-61); Re/Max, 173 F.3d at 1016.

a.    **Frustration Of Consumer Preferences.**

Dentsply's exclusionary conduct is anticompetitive because it has frustrated consumer

preferences.  Dentsply has intervened and stopped many dealers from selling competitive

teeth, including the largest and most effective dealers in the industry.  PFF ¶¶265, 268.  These

dealers were increasing the sales of rival brands, satisfying consumer demand.  PFF ¶268.

Dentsply's conduct restricts the availability of teeth that consumers want to buy through

dealers, the distribution channel consumers prefer.  See IFD, 476 U.S. at 457 (condemning

conduct that "resulted in the denial of information customers requested in the form they

requested it, and forced them to choose between acquiring that information in a more costly manner or forgoing it altogether").[22]

Dentsply's conduct has deprived many consumers of the teeth they want. For example, dental laboratories have routinely used Dentsply teeth despite receiving prescriptions for Vita-shaded teeth. PFF ¶270-272. Even before Dentsply developed its Portrait tooth, which inexactly copied Vita shades, 72% of prescriptions specifying Vita shades were switched by labs to Dentsply teeth. PFF ¶ 272. Unlike Vita, Dentsply teeth were available through the dealer network. Id. Indeed, Dentsply's former tooth products manager acknowledged that when a lab used Dentsply's Bioform IPN tooth to fill a prescription for a Vita shade (as was common), the lab used a more expensive tooth that did not match the prescribed shade as well. Id. [23] During this same period, many consumers considered Vita and Ivoclar teeth aesthetically superior to Dentsply's teeth. Id. And, as discussed below, Dentsply's teeth were 10%-15% higher priced. Dentsply's ability to maintain its high prices for so long, while offering teeth many considered to be inferior and which did not match the most popular shade guide in the industry, is a serious source of competitive harm. See Brown Univ., 5 F.3d at 668 (reduction in quality is an anticompetitive effect) (citing Tunis Bros. Cos.

---

[22]

See also Aspen, 472 U.S. at 606 (defendant's conduct "made it more difficult to satisfy" consumers preferences); Brown Univ., 5 F.3d at 668 (reducing output is an anticompetitive effect); VISA, 163 F. Supp. 2d at 382-83, 395-96 (determining that exclusionary rules pursuant to horizontal agreement among competitors limited product variety and consumer choices). Dentsply's expert, Professor Marvel, recognized such frustration of consumer preference as an anticompetitive effect during his previous work on a case involving the "augurs" market. PFF¶ 270.

[23]Even today, after Dentsply's effort to copy Vita shades with its Portrait Teeth, many believe that Dentsply's teeth do not match Vita shades. PFF ¶273

v. Ford Motor Co., 952 F.2d 715, 728 (3d Cir. 1991)). It also confirms Dentsply's monopoly

power. See Andrx, 256 F.3d at 814.

The consumer harm caused by Dentsply's conduct is confirmed by the market share

shift in favor of rival teeth that Dentsply executives concede would occur in the absence of

Dealer Criterion 6. PFF ¶266 (Miles Tr. 3513; Clark Tr. 2584; Brennan Tr. 1718). Three

separate analyses of the Wind survey — by Dr. Wind, Dr. Reitman, and by Dentsply's expert,

Dr. Rossi — all confirm what Dentsply's executives have acknowledged, showing that the

market shares of Dentsply's rivals would increase substantially with dealer access. PFF ¶

267.[24]

In the absence of Dealer Criterion 6, dealers would add competing brands, labs would

buy more of those brands, and Dentsply's market share would fall. PFF ¶ 266. The fact that

Dentsply's rivals would gain market share with access to dealers means that consumers would

buy more of the rivals' teeth if they could get them through dealers, which, currently, they

cannot do. PFF ¶271. It is therefore direct evidence of consumer harm. Id. This harm will

continue if Dentsply's anticompetitive conduct is not enjoined. Vita has introduced a new 3D

shade guide system and teeth, and Ivoclar has introduced a revolutionary new tooth. PFF ¶

274. The lack of dealer distribution that has historically induced labs to use Dentsply teeth,

---

[24]

In a complaint (later voluntarily dismissed) seeking a declaratory judgment against the
United States on these same issues in December 1998, Dentsply alleged that rival tooth lines
could displace an "enormous" amount of Trubyte teeth in its dealerships if it were forced to
surrender Dealer Criterion 6. D.I. 1 (Compl. for Declaratory and Injunctive Relief ¶ 26,
Dentsply Int'l, Inc. v. Antitrust Division of the U.S. Dep't of Justice, No. 98-693 (D. Del.)
(filed Dec. 10, 1998)).

irrespective of the quality of rival products, will persist if Dentsply's exclusionary conduct continues.

### b.   Supracompetitive Prices.

Dentsply's conduct is also anticompetitive because it has caused tooth prices to remain artificially high. Such supracompetitive pricing is additional direct evidence of anticompetitive effects. See Brown Univ., 5 F.3d at 668.

Dentsply's pricing control, including its high margins and profits, suggest that it has imposed a serious barrier to free competition in the artificial tooth market. See Section I.A.1. In the absence of Dentsply's exclusionary conduct, prices will fall because consumers will become more price sensitive once multiple brands become available through the dealer distribution channel consumers prefer. PFF ¶ 275. This will produce more competition between tooth manufacturers, resulting in lower prices.Id.

The survey of dental laboratories conducted by Dr. Wind confirms this intuitive conclusion. Based on the survey, Dr. Reitman estimated that, without Dealer Criterion 6, the average price for premium artificial teeth would fall 4% -5% in just three months. PFF ¶278. Market-wide price reductions would likely be even more significant in the long term than the price effects shown by analysis of the survey. PFF ¶280. The survey measured only the short-term effect of making rivals' teeth available through dental dealers. Id. In the long run, dental labs will have time to change the brands of teeth they have in stock, communicate to dentists the availability of the competing brands, and provide additional training to their technicians in the use of the other brands of teeth. Id.

Tooth manufacturers, including Dentsply, uniformly confirmed that this analysis is correct. Where firms have adequate dealer distribution, they have an incentive to lower prices because the lower prices can increase sales. PFF ¶276. Also, they have increased incentives to promote more. PFF ¶ 281-82. However, where firms do not have dealer distribution, there is no incentive to lower prices, and reduced incentives to engage in promotion, because increased sales do not follow. PFF ¶275, 281-82.[25] Accordingly, there is direct evidence of adverse price effects caused by Dentsply's conduct.

Dentsply's conduct has also raised prices indirectly, by increasing the costs of dental laboratory dealers. Dentsply's exclusionary conduct has caused dealers selling Trubyte teeth to be less efficient than they would have been without Dealer Criterion 6. Several dealers have attempted to add rival lines of teeth and, if they had done so, they would have achieved greater economies of scale by spreading their fixed costs over more units of sales. PFF ¶284. By limiting the efficiency of dealers, Dentsply has raised their costs, which will be passed on to consumers. This increase in costs has also led some dealers to close tooth counters that otherwise would have been economical to keep open, thereby reducing consumer choice. Id. Accordingly, there is direct evidence of adverse price effects and consumer harm caused by Dentsply's conduct.

### 3. Dentsply's Exclusionary Intent Confirms The Anticompetitive Nature Of Its Conduct.

---

[25]

Even Dr. Marvel, Dentsply's expert, conceded that prices would fall if Dealer Criterion 6 were eliminated, although he contended that prices would fall due to Dentsply's reduced incentive to engage in promotion. PFF ¶279.

Dentsply's exclusionary intent is abundantly clear and directly "relevant to the question whether the challenged conduct is fairly characterized as 'exclusionary' or 'anticompetitive.'" Aspen Skiing, 472 U.S. at 602; Chicago Bd. of Trade v. United States, 246 U.S. 231, 238 (1918). While it is not necessary to prove intent, "knowledge of intent may help the court to interpret facts and to predict consequences." Microsoft, 253 F.3d at 59.

The *express purpose* of Dealer Criterion 6 was anticompetitive. A high-level Dentsply document titled "Sales/Distribution Principles for Cash Cow Business" identified Dealer Criterion 6 as one of five principles for running the Trubyte tooth business, and stated that its purpose was to:

- Block competitive distribution points. Do not allow competition to achieve toeholds in dealers.

- Tie-up dealers

- Do not "free up" key players.

PFF ¶231. The document sets forth the sales and distribution principles under which Dentsply's tooth business operated. PFF ¶232.

Top Dentsply representatives have also elaborated on the exclusionary purpose of Dealer Criterion 6. Dentsply's Chief Executive Officer, Burt Borgelt, explained to Tom Cavanaugh of Frink Dental that Dentsply would terminate Frink for taking on the Ivoclar line because "we cannot let Ivoclar get a foothold in the United States. This is our most highly profitable product out of our Dentsply division." PFF ¶233. According to Gordon Hagler, Trubyte's Director of Sales and Marketing from 1989-93 , the sole purpose of the policy was to exclude Dentsply's competitors from the dealers. PFF ¶234.

Dentpsly's actions also confirm its exclusionary intent.  Dentsply routinely used Trubyte merchandise as additional leverage to coerce dealers to agree not to add competing tooth brands.  For example, Dentsply terminated Trinity Dental as a Trubyte merchandise dealer in 1993 when Trinity decided to add the Vita tooth line, even though Trinity did not sell Trubyte teeth. PFF ¶235. This application of Dealer Criterion 6 belies Dentsply's contention that it enforced Dealer Criterion 6 to prevent free-riding by rivals on Trubyte's tooth business because Trinity had no tooth business.  PFF ¶ 235(c). There is no suggestion that Trinity's distribution of *Vita teeth* would affect its distribution of *Trubyte merchandise*.  Indeed, Dealer Criterion 6 does not mention merchandise.  Rather, the only explanation for Dentsply's conduct is that it aimed to foreclose a Vita distribution point. PFF ¶235(d).  Likewise, Dentsply terminated Frink as a Trubyte merchandise dealer when Frink took on Ivoclar teeth, not because Dentsply believed that Frink would not be an ineffective merchandise dealer after adding the Ivoclar tooth line, but because Dentsply "wanted to make a strong point." PFF ¶236(a).  When DLDS sought to add the Universal and Vita tooth lines, Dentsply threatened it with the loss of not only the Trubyte tooth line but its merchandise business as well.  PFF ¶ 236(b).

Similarly, Dentsply has recognized dealers, including ones it previously rejected, in part to block distribution points for its rivals. PFF ¶237-40. Dentsply recognized Jan Dental as a Trubyte tooth dealer and required Jan to stop selling Vita, Kenson, Dentorium and Justi teeth in part to "eliminate several competitors." PFF ¶ 237. In 1994, after Dentsply had turned down Darby's request to sell Trubyte based on having adequate distribution in Darby's area, Dentsply authorized Darby as a Trubyte tooth dealer.  Dentsply did so upon learning that

*-41-*

Darby was contemplating distributing Vita teeth. PFF ¶238. Robert Brennan, the former head

of the Trubyte division, acknowledged that Dentsply recognized Darby as a tooth dealer

"because it prevented Vita from getting a dealer." PFF ¶238(f) . Dentsply engaged in the

same conduct with DTS, recognizing DTS as a tooth dealer in 1995

Finally, the anticompetitive purpose of Dealer Criterion 6 is also apparent from its

overbreadth. Dentsply prevents a dealer selling Trubyte teeth at some, but not all, of its

locations from adding a competing line at *any* of its locations. PFF ¶241. For example,

despite the fact that Patterson Dental does not stock artificial teeth at all of its locations,

Dentsply enforces Dealer Criterion 6 to prohibit Patterson from adding rival teeth at locations

where it does not currently stock teeth. Id. Dentsply's free-riding justification does not

explain this overbroad application of the criterion because no free riding is possible at

locations where Trubyte teeth are not sold. The sole justification for such an overbroad

requirement is to foreclose Dentsply's rivals from as many distribution outlets as possible.

Accordingly, Dentsply's exclusionary intent confirms the anticompetitive nature of its

conduct.

## II.    Dentsply Has Violated Section 1 Of The Sherman Act And Section 3 Of The Clayton Act.

Dentsply's exclusive agreements with dental laboratory dealers also violate section 1

of the Sherman Act and section 3 of the Clayton Act. Section 1 makes unlawful "[e]very

**REDACTED**

contract . . . in restraint of trade."[26] Section 3 prohibits sales "on the condition, agreement or understanding" that the lessee or purchaser not use or deal in the goods of a competitor, where the effect is "to substantially lessen competition."[27]

The agreement elements of sections 1 and 3 are easily satisfied. The evidence establishing Dentsply's violation of section 2 also establishes that Dentsply's conduct restrains trade and lessens competition. Indeed, because "significant market power is enough to trigger section 1's rule of reason approach" for evaluating whether a restraint is anticompetitive , and "something less than monopoly power is required . . . under . . . [the] 'substantially lessen competition' test" of the Clayton Act (Fraser, 284 F.3d at 60 n.9), the existence of monopoly power here makes plain that Dentsply's conduct is anticompetitive under either provision. See Brown Univ., 5 F.3d at 668 ("courts typically allow proof of the defendant's 'market power' instead" of proof of actual "market effects"). Even absent the

---

[26]

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. . . ." 15 U.S.C. § 1.

[27]

Section 3 of the Clayton Act, 15 U.S.C. § 14, provides:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for the sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

*-43-*

compelling evidence of Dentsply's monopoly power in this case (discussed above), the very

high degree of foreclosure and the direct evidence of anticompetitive effects resulting from

that foreclosure establish that Dentsply's exclusive agreements are unreasonable restraints of

trade.  See id. at 668-69 (because "[m]arket power . . . is essentially a 'surrogate for

detrimental effects,' . . . plaintiff may satisfy [its] burden by showing actual anticompetitive

effects") (quoting IFD, 476 U.S. at 460- 61); see also Microsoft, 253 F.3d at 70; Orson, 79

F.3d at 1367; Angelico, 184 F.3d at 276.

**A.      Dentsply's Exclusionary Agreements With Artificial Tooth Dealers
Are Agreements Within The Meaning Of Sections 1 and 3.**

An agreement under section 1 of the Sherman Act and section 3 of the Clayton Act can

be either express or implied, and can be established by direct or circumstantial evidence,

including evidence of a course of conduct.  See United States v. General Motors Corp., 384

U.S. 127, 142-43 (1966) ("it has long been settled that explicit agreement is not a necessary

part of a Sherman Act conspiracy"); United States v. Parke, Davis & Co., 362 U.S. 29, 44

(1960); Alvord-Polk, Inc. v. F. Schumaker & Co., 37 F.3d 996, 1000 (3d Cir. 1994).[28]  It is not

---

[28]

The language in section 3 prohibiting sales "on the *condition*, agreement or *understanding*" that the lessee or purchaser not use or deal in the goods of a competitor arguably reaches conduct beyond that proscribed by Section 1.  See Areeda ¶1438g (the "understanding" requirement in section 3 "may go further" than the "agreement" requirement in section 1, "and 'condition' aptly describes the conditioned refusal to deal").  According to Areeda, "[c]onditioned sales to others may be readily inferred when the supplier has expressly announced his conditions for future dealing," irrespective of a formal agreement. Id. According to Areeda, lower court cases to the contrary have not analyzed the difference in language between section 1 and section 3.  Id.  Because the agreement element of section 1 is, if anything, narrower than section 3 (id.), and is clearly satisfied here, it follows that the agreement element of section 3 is also satisfied.

necessary that each of the parties share the same motive, so long as the agreement produces an anticompetitive effect. See Parke, Davis, 362 U.S. at 45; Fineman, 980 F.2d at 213. Such concerted action "is fraught with competitive risk" because it "not only reduces the diverse directions in which economic power is aimed but suddenly increases the economic power moving in one particular direction." Alvord-Polk, 37 F.3d at 1000.

There is direct evidence that Dealer Criterion 6 is an express agreement between Dentsply and its dealers. Dentsply considers Dealer Criterion 6 to be an agreement between Dentsply and its dealers selling Trubyte teeth. PFF ¶287. According to Christopher Clark, the former head of Dentsply's Trubyte Division, dealers must "agree to the Trubyte dealer criteria" in order to be recognized as an authorized tooth dealer. PFF ¶287. Dentsply executives informed Tom Cavanaugh of Frink Dental that he "had an agreement with them that [Frink] would only carry their line." Carl Uthus, Trubyte's Director of Sales, characterized the dealer criteria as "our current dealer contract" and "our agreement." PFF ¶ 287. Likewise, Dentsply's dealers consider the dealer criteria to represent an agreement with Dentsply and have consistently characterized it as such. PFF ¶288 ___

Indeed, Dentsply entered into express agreements with several dealers when it first recognized them. Dentsply has required dealers to agree expressly to drop some, or all, of their competing tooth lines in order to obtain the Trubyte line. PFF ¶293. (e.g., GX 24 ("Jan Dental has agreed to carry only Trubyte and Universal tooth brands."); GX 26 ("Per the terms

-45-

REDACTED

of our agreement, all except Universal would be eliminated."); GX 158 and GX 77 (regarding the conditions imposed on Darby to be recognized, including not adding the Vita tooth line)).

Even if this evidence did not uniformly establish that Dentsply sought and received express agreements from its distributors at the outset, the agreement element is satisfied based on the course of conduct between Dentsply and its dealers. Dentsply has "go[ne] beyond mere announcement of [its] policy and the simple refusal to deal, and [has] employ[ed] other means which effect adherence." Parke, Davis, 362 U.S. at 44; see also Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 765-66 (1984). An announced policy, accompanied by threats of termination, active surveillance, and reinstatement conditioned on assurances of future compliance, is sufficient to establish an agreement. See id.; see also Monsanto, 465 U.S. at 765-66 (agreement element satisfied based in part on individualized dealings with dealers where the manufacturer complained to non-compliant dealer's parent company and dealer later "informed Monsanto that it would charge the suggested price"); Baker's Carpet Gallery, Inc. v. Mohawk Indus., Inc., 942 F. Supp. 1464, 1477-79 (N.D. Ga. 1996).[29]

Dentsply has gone beyond a mere announcement of its dealer criteria and its intent to terminate violators. It actively monitored compliance and, when Dentsply detected a

---

[29]

The special concern Monsanto expressed regarding evidence of agreement in vertical price-fixing cases stems from the fact that resale price maintenance is *per se* illegal. See Monsanto, 465 U.S. at 763 ("[I]t is of considerable importance that independent action by the manufacturer, and concerted action on nonprice restrictions, be distinguished from price-fixing agreements, since under present law the latter are subject to *per se* treatment and treble damages."). That concern does not apply here, where the challenged conduct is not illegal *per se* and involves an exclusion of competitors. See id. Moreover, the evidence here is far stronger than the evidence in Monsanto, and in Monsanto the Court determined that the evidence was sufficient to show an agreement. See id. at 765-66.

violation, it engaged in individualized negotiations with the dealer to obtain compliance. PFF ¶289.   For example, when Frink started selling rival teeth, Dentsply sent high-level executives to meet with Frink's president, terminated Frink after the company began to sell Ivoclar teeth, threatened Frink with the loss of Dentsply merchandise, then reinstated Frink after the company agreed to drop the Ivoclar line. PFF ¶290.   Likewise, Dentsply negotiated for over a year with Darby Dental to convince Darby to drop the Vita tooth stock it acquired as part of its acquisition of DTS, which Darby ultimately agreed to do. PFF ¶ 291.   In response to Dentsply's negotiations with dealers and threats of termination, Dentsply received assurances of future compliance from its dealers. PFF ¶ 292.

These incidents of individualized negotiation, threats of termination, and assurances of compliance, go far beyond the permissible announcement of a unilateral policy and refusal to deal.  See, e.g., Parke, Davis, 362 U.S. at 45-46 (evidence that manufacturer individually negotiated with non-compliant retailers, that one retailer informed manufacturer it would comply with policy, and retailer complied, is enough to establish an agreement); Monsanto, 465 U.S. at 765-66 (involving individualized dealings with dealers where in one instance the manufacturer complained to non-compliant dealer's parent company, threatened to cut off supply "when herbicide was in short supply" so that it could "use supply as a lever to force compliance," and the dealer later "informed Monsanto that it would charge the suggested price").  Accordingly, the evidence easily satisfies the agreement element.

**B.      Dentsply's Exclusive Dealing Agreements Have Unreasonably Restrained Competition.**

Under section 1, a "rule of reason" analysis applies to those restraints that are not *per se* illegal. See Angelico, 184 F.3d at 275 n.3. "Proof of anticompetitive effect is the hallmark of a rule of reason test." Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1376 n.13 (3d Cir. 1992) (citing Tunis Bros., 952 F.2d 715).[30] The rule of reason requires the fact-finder to "'weigh [ ] all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition.'" Brown Univ., 5 F.3d at 668 (quoting Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 49 (1977)). "The plaintiff bears an initial burden under the rule of reason of showing that the alleged combination or agreement produced adverse, anti-competitive effects within the relevant product and geographic markets." Id. (citing Tunis Bros., 952 F.2d at 722). "The plaintiff may satisfy this burden by proving the existence of actual anticompetitive effects, such as reduction of output, . . . increase in price, or deterioration in quality of goods or services." Id. (citing IFD, 476 U.S. at 460-61; Tunis Bros., 952 F.2d at 728). Alternatively, a plaintiff may satisfy its burden by proving market power as a "surrogate" for effects. Id. Accordingly, proof of either market power *or* actual anticompetitive effects can, independently, establish a violation of section 1. See id.

Where challenged conduct involves exclusive dealing, the foreclosure rate also is relevant to whether there are "likely" or "probable" adverse effects. See text, supra §I.B.1. Courts have "routinely condemned" foreclosure of 40%-50% of the market to rival firms. See

---

30

Because, if anything, section 3 of the Clayton Act requires a lesser showing of anticompetitive effects than section 1 (Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp., 959 F.2d 468, 487 (3d Cir. 1992); Barr Labs., 978 F.2d at 110), anticompetitive conduct that violates section 1 also violates section 3.

text, supra §I.B.1. Where there is substantial market power, as in this case, the foreclosure showing can be far less for conduct to be deemed anticompetitive. See id. Dentsply's conduct has foreclosed a far-higher percentage of the market than 50%. See id.

Dentsply's monopoly power and substantial foreclosure of competition point to "likely" and "probable" serious competitive harm. In many cases, that evidence alone would suffice as a "surrogate" for actual adverse effects. See Brown Univ., 5 F.3d at 668-69. However, here there is *direct* evidence of anticompetitive effects. Dentsply's exclusive agreements with dental dealers have restricted the availability of teeth that consumers want to buy, thereby keeping its own market share artificially high and interfering with consumer preferences for brand and distribution channel; raised prices, restricted the availability of its rivals' aesthetically superior teeth; and caused dealers selling Trubyte teeth to be less efficient than they would have been without Dealer Criterion 6, raising prices for consumers. See text, supra §I.B.2.

Accordingly, Dentsply has violated section 1 of the Sherman Act and section 3 of the Clayton Act.

### III.    Dentsply's Alleged Business Justifications Are Insufficient To Justify Its Exclusionary Conduct And Are Outweighed By The Substantial Anticompetitive Effects.

In light of the evidence of substantial anticompetitive effects resulting from Dentsply's exclusionary conduct, Dentsply has the burden under the Sherman Act and Clayton Act to show that its conduct "promotes a sufficiently procompetitive objective." Brown Univ., 5 F.3d at 669; see also Tampa Elec., 365 U.S. at 329; Microsoft, 253 F.3d at 59. Even if

Dentsply could meet its burden of showing that its claimed justification is sufficiently procompetitive, it is rebutted by the evidence "that the restraint is not reasonably necessary to achieve the stated objective." Brown, 5 F.3d at 669. Moreover, the justification is far outweighed by the anticompetitive harm.

### A.    Dentsply Has The Burden Of Showing That Its Exclusionary Conduct Promotes A Sufficiently Procompetitive Objective.

Dentsply must show not only that its exclusionary policies have procompetitive benefits, but also that each of those benefits are valid and sufficient. Kodak, 504 U.S. at 483. Under a rule of reason analysis, the evidence of Dentsply's supracompetitive prices and exclusion of competition places upon Dentsply "a heavy burden of establishing an *affirmative defense* which competitively justifies this apparent deviation from the operations of a free market."[31] NCAA v. Bd. of Regents, 468 U.S. 85, 113 (1984) (emphasis added). Dentsply's procompetitive justification must be a "nonpretextual claim that its conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal." Microsoft, 253 F.3d at 59.

Dentsply has failed to meet its burden here to show that its claimed justification for its exclusive dealing practices is both (1) nonpretextual, and (2) sufficiently procompetitive. Dentsply has provided no evidence to support such a finding. Moreover, the United States' expert, Dr. Reitman, conducted a detailed examination of the record and gave thorough

---

[31]

The defendant bears the burden of persuasion for an affirmative defense. Hughes v. United States, 263 F.3d 272, 278 (3d Cir. 2001); see also United States v. Dodd, 225 F.3d 340, 342 (3d Cir. 2000); Donahue v. Consolidated Rail Corp., 224 F.3d 226, 229 (3d Cir. 2000).

consideration of Dentsply's alleged justifications to determine whether Dentsply's exclusive dealing has any procompetitive benefit. He concluded that any procompetitive benefit is negligible.[32] PFF ¶ 328. By contrast, Dentsply's expert, Dr. Marvel, has done no empirical analysis quantifying the effects of removing Dentsply's exclusive dealing policy. PFF ¶ 328.

### 1. Dentsply Has Failed To Demonstrate That Its Alleged Business Justifications Are Nonpretextual.

Dentsply's business justification — that exclusive dealing prevents free riding on Dentsply's promotional efforts — is belied by the evidence showing that is not the motive Dentsply's exclusionary conduct. Dentsply's motive has been to exclude competitors and protect its monopoly, and its purported justifications for its conduct have been inconsistent. Accordingly, Dentsply has failed to surmount the initial hurdle that its claimed business justification is nonpretextual.[33] See Microsoft, 253 F.3d at 59.

First, Dentsply's justification should be rejected based on evidence of its exclusionary motives. The evidence "makes it less likely that the free rider problem was really uppermost

---

[32]

Dr. Reitman began evaluating Dentsply's claimed justifications when he started working on this case five years ago, three years before receiving Dr. Marvel's first report. Reitman Tr. 3918-19. He reviewed the entire evidentiary record, just as he did in his anticompetitive effects analysis, to evaluate whether there are procompetitive reasons for Dentsply's policies. In contrast, Professor Marvel admitted that the primary benefit from Dentsply's exclusive dealing he predicts are not based on empirical analysis or supported by facts in the record, but are "merely theoretical expectations." PFF¶ 328, 341(a) . Such speculation, unsupported by evidence in the record, is wholly unpersuasive if even admissible. Elcock v.KMart Corp., 233 F.3d 734, 756 (3d Cir. 2000).

[33]

Dentsply cannot cite to Professor Marvel to satisfy its burden of showing its justification is nonpretextual, in light of his testimony that he did not have an opinion on Dentsply's motive for adopting exclusive dealing. PFF ¶ 337 (e.g. Marvel Tr. 3686-87 ("I don't much care about motive")).

in the minds of defendants' executives." Brokers' Assistant, Inc. v. Williams Real Estate Co.,

646 F. Supp. 1110, 1120 n.38 (S.D.N.Y. 1986). Here, the evidence establishes that what was

"uppermost" in the minds of Dentsply's executives was not a concern over free riding, but an

intent to "block competitive distribution points" and prevent its closest competitors from

gaining a "foothold" in the U.S. market. See text, supra § I.B.3. The contemporaneous

evidence demonstrating that Dentsply's "real" motive behind Dealer Criterion 6 was to restrict

competition shows that the claimed justification is pretextual, not procompetitive. VISA, 163

F. Supp.2d at 400-402.

Second, the inconsistencies and contrasts between the internal and public explanations

of Dentsply's conduct support the conclusion that its claimed justification is pretextual.

Alvord-Polk, 37 F.3d at 1010-13. Despite this evidence of Dentsply's express exclusionary

intent, Dentsply has asserted a shifting series of purported justifications both at and before

trial and in its business dealings. In responding to an interrogatory during the investigation

that preceded this litigation, Dentsply explicitly set forth a rationale for its exclusionary

arrangements that is different from the rationale it asserts now. Dentsply stated:

> In Dentsply's experience, the greater the number of competing tooth lines carried, the
> less likely that a dealer will be able to sustain all of the desired service and
> promotional elements at a high, competitive level. In short, service and promotional
> support for a particular line is likely to suffer the greater the number of lines carried.
> Recognizing the need for dealers to focus their efforts in order to effectively promote
> the company's teeth and service laboratory customers, the company formalized criteria
> in February 1993 for dealers to meet in order to be Trubyte teeth dealers. One of these
> criteria is that dealers that are recognized as authorized distributors of Trubyte teeth
> cannot add additional lines of teeth after becoming a Trubyte dealer.

PFF ¶332 . In the past, before its expert filed a report in this case, Dentsply has proferred this

"focus dealer services" rationale as its justification for Dealer Criterion 6. The rationale was

given by the Dentsply executive responsible for promulgating the dealer criteria. PFF ¶333. At times, Dentsply still uses the same rationale when communicating Dealer Criterion 6 and the policy supporting it to the marketplace.[34] PFF ¶333.

This "focus dealer services" rationale is inconsistent with Dr. Marvel's efficiency theory in this case, as Dr. Marvel himself concedes.[35] PFF ¶336. *Dr. Marvel's* theory attempting to support Dentsply's exclusionary conduct is based on his notion that Dentsply's marketing brings customers to the dealer, and if dealers can "bait and switch" the customers to a rival product, the rival can free ride on the Dentsply's promotional investment. DX. 1671-D. Dentsply's prior explanations for Dealer Criterion 6, and its marketplace conduct, including its conduct in enforcing the criterion, are inconsistent with its claimed justification here. See text, supra §I.B.3. This evidence makes plain that Dentsply's most recent version of its business justification is pretextual. See Alvord-Polk, 37 F.3d at 1012. Accordingly, Dentsply has failed to meet its threshold burden.

--------------------

[34]

    This contemporaneous explanation by the Dentsply executive who promulgated the criteria demonstrates that the vague language of Dealer Criterion 6 ("In order to effectively promote Dentsply/York products, dealers that are recognized as authorized distributors may not add further tooth lines to their product offering") does not allude to Dr. Marvel's claimed justification.

[35]

    In addition to showing that Professor Marvel's justification theory is pretextual, the "focus dealer services" rationale is itself not a valid justification for Dentsply's exclusionary policies. PFF ¶334. Dentsply's explanation that it wants to keep dealers focused on its products is in reality nothing more than wanting to preserve its market power. Microsoft, 253 F.3d at 71. "That is not an unlawful end, but neither is it a procompetitive justification" for its exclusionary policies. Id. Moreover, this rationale is invalid because a dealer has a strong incentive on its own to ensure that its service does not suffer by adding a rival tooth line. PFF ¶334. Dentsply's own dealers testified that adding another line of teeth would not affect their level of service or amount of Dentsply inventory, and those dealers also carrying grandfathered lines of rival teeth have shown no lack of focus on Dentsply teeth. PFF ¶335.

2.    **Dentsply Has Failed to Demonstrate That Its Alleged Business Justifications Are Procompetitive.**

Dentsply also has failed to demonstrate that is has "valid business reasons" for its exclusionary policies. Kodak, 504 U.S. at 483 (citing Aspen, 472 U.S. at 605). To meet this standard, Dentsply must prove that "it was in fact pursuing its goals as a rational economic actor and [can] justify its conduct by reference to rational, procompetitive economic principles." Flegel v. Christian Hosp., 4 F.3d 682, 688 n.4 (8th Cir. 1993). Such a showing must consist of more than unsupported assertions. Id. Procompetitive justifications must be more than theoretical or speculative. "[M]erely offering a rationale for a vertical restraint will not suffice; the record must support a finding that the restraint in fact is necessary to enhance competition and does indeed have a procompetitive effect." Graphic Prods. Distribs., Inc. v. ITEK Corp., 717 F.2d 1560, 1576 (11th Cir. 1983); cf. H.J. Heinz Co., 246 F.3d at 721 (in a merger case where parties have high market concentration levels, "the court must undertake a rigorous analysis of the kinds of efficiencies being urged by the parties in order to ensure that those 'efficiencies' represent more than mere speculation and promises").

a.    **Dr. Marvel's Free Riding Theory Does Not Apply To The Artificial Tooth Market and Is Unsupported by the Facts.**

Dr. Marvel claims that consumers have benefitted from Dentsply's exclusive dealing because, by protecting its promotional investments from free riding, exclusive dealing encourages market expansion through promotional activity by Dentsply, such as promotion under the Denture Opportunity Program and to dental schools. PFF ¶340. However, Dr. Marvel conceded, and Dr. Reitman agrees, that Dr. Marvel's theory does not apply to this type of promotion, and the two economic experts agree also that Dentsply does not need exclusive

-54-

dealing at the dealer level to protect promotion to dentists and consumers. PFF ¶340; see

VISA, 163 F. Supp.2d at 404 (where there is "no asset on which free-riding could occur"

exclusionary policies are unnecessary). Dr. Marvel's remaining efficiency claim is based

merely on theoretical expectations, not empirical analysis, and it is not supported by the facts.

PFF ¶341. Indeed, Dr. Marvel ignored a number of opportunities to investigate the record

facts in order to test his theory rather than simply speculate. PFF ¶341(b). Where, as here, an

economic expert offers no empirical analysis to support his position, his opinion is "based on

a cursory examination of the facts," and his testimony is "belied by the uncontradicted record

evidence," his justifications do not withstand scrutiny.[36] See VISA, 163 F. Supp.2d at 402;

accord, Elcock v.KMart Corp., 233 F.3d 734, 756 (3d Cir. 2000).

An essential element of Dr. Marvel's free-riding theory is that dealers will actively

"bait and switch" laboratory customers to steer them from one tooth brand carried by the

dealer to another. PFF ¶343 (e.g., DX. 1671-D). There is "zero evidence" in the record,

however, that dealers, in fact, have or will do so. PFF ¶ 343, 348. Dealers are more interested

in satisfying existing consumer demand and concerned about alienating customers than in

actively steering their lab customers from one brand to another. PFF ¶343-46. Numerous

dealers testified that they do not attempt to steer a lab ordering a particular tooth to order

---

[36]

     Because it is Dentsply's burden to demonstrate a sufficiently procompetitive
justification and it is not yet scheduled to submit its brief and findings of fact pursuant to the
parties' agreed-upon schedule, it is not clear that Dentsply will rely on Dr. Marvel's theory to
make this showing. Depending on the extent to which Dentsply ultimately relies on Professor
Marvel, the United States may reassert some or all of the arguments previously made in its
motion in limine to exclude Professor Marvel's testimony, now that his opinion has been
tested at trial and found wanting on the same grounds advanced in the limine motion. (D.I.
337, 338, 396).

another brand.[37]  PFF ¶344.  In addition, Dentsply's primary competitors testified that they do

not require or encourage dealers to steer labs, and the labs themselves agree that dealers do not

attempt to determine or influence their choice of brands.  PFF ¶ 345.  Dr. Marvel

acknowledged that the non-exclusive dealers that carry both Dentsply teeth and the teeth of

Dentsply's rivals, under the grandfathering provision of Dealer Criterion 6, would be a good

test of his theory, but he failed to investigate whether those dealers were engaged in steering.[38]

PFF ¶¶341 (b)(ii), 348.  There is no evidence in the record indicating that Dentsply's non-

exclusive tooth dealers have, in the past, actively steered their lab customers from Dentsply

teeth to grandfathered rival brands.[39]  PFF ¶¶348-49.  Although Dr. Marvel pointed to the

Frink episode as his primary example of bait and switch steering, the facts do not support that

conclusion.  Among other facts, when Frink sold both brands of teeth, its sales of Trubyte

teeth actually increased over the level of sales when Trubyte was the sole brand Frink carried.

PFF ¶¶347(a).  In any event, Dr. Marvel's theory does not apply to Frink in the first place

because Frink had been terminated by Dentsply  and knew it would not be able to sell

---

[37]

     In addition, although dealers should support exclusive dealing because in theory they
get a share of the increased profits from more efficient distribution, here dealers vigorously
oppose Dentsply's exclusionary policies.  PFF ¶379-81.

[38]

     Under the grandfathering provision of Dealer Criterion 6, dealers are permitted to
continue carry competitor's tooth brands that they were already carrying before that policy
was implemented.  PFF ¶ 39.  The six largest dealers selling Dentsply teeth also carry rival
brands of teeth.  PFF ¶341(b)(i).

[39]

     The grandfathered brands provide particularly compelling evidence that dealers do not
steer customers because, if anything, dealers should be able to steer customers more easily
from Dentsply to those brands than to Vita and Ivoclar.  PFF ¶349.  Dr. Marvel did not
recognize the fact that the grandfathered rival brands include lines of teeth in copies of
Dentsply moulds and shades.  Compare  PFF ¶341(b) to ¶349.

Dentsply teeth for much longer, so it was simply trying to preserve its customers in order to survive. PFF ¶ 347(a). Where there is no evidence of the harm that Dentsply's exclusionary policies allegedly protect against — here, dealer steering — defendant's procompetitive justifications are not persuasive. See VISA, 163 F. Supp.2d at 403-04.

The second essential element of Dr. Marvel's theory is that Dentsply must charge a price premium greater than that charged by its rivals because it spends more on promotions. PFF ¶350. Dentsply has failed to sustain its burden to show that it spends proportionately more on sales and advertising than its rivals; indeed, the evidence shows that Dentsply does not need to charge a price premium because it in fact spends proportionately *less* than its rivals. PFF ¶350-353. In addition, the evidence from Dentsply's own employees and the dealers consistently shows that the level and effectiveness of Dentsply's promotional, advertising, and educational efforts fall far short of what Dentsply claimed at trial. PFF ¶354-64. Conversely, the facts show that Dentsply's competitors, when given the opportunity to compete through dealers, do not free ride on existing dealer business, but instead actively promote their products to labs and dentists. PFF ¶365-69.

Third, Dr. Marvel and Dr. Reitman agree that "purely brand specific" promotions, as defined by Dr. Marvel in his 1982 paper on exclusive dealing, also are not susceptible to steering and thus are not subject here to free riding. PFF ¶370, 372 (e.g. DX 1666 at 8 (Howard P. Marvel, "Exclusive Dealing", 25 J. L. & Econ. 1 (1982))). For these types of promotions, such as Dentsply's "add-a-drawer" and Portrait sticker programs, there is "no asset on which free-riding could occur," and no support in the record for Dentsply's contention that its exclusionary policies are necessary to prevent free riding on them. PFF ¶

-57-

371; see VISA, 163 F. Supp.2d at 404.  To the extent that Dr. Marvel now contends that

exclusive dealing is necessary to protect *branded* promotions, he has admitted that this claim

is based merely on theoretical expectations and not empirical analysis. PFF ¶341.

     Accordingly, the record belies Dentsply's primary purported justification for its

exclusionary policies. See VISA, 163 F.Supp. at 405; Flegel, 4 F.3d at 688 n.4.


           **b.**      **Dentsply's Business Justification Theory Is Inconsistent With Its Overall Conduct In Both The Artificial Tooth And Dental Laboratory Product Markets.**

     Dentsply's claimed justification for imposing its exclusionary policies in the artificial

tooth market is flatly inconsistent with its policy regarding other dental laboratory products

and its treatment of nonexclusive dealers with grandfathered tooth brands.  To meet its burden

of demonstrating procompetitive effects, Dentsply must show that from the "totality of

circumstances, [its] articulated procompetitive rationale is consistent with [its] overall

conduct." Flegel, 4 F.3d at 688 n.4.  Dentsply's confliciting conduct demonstrates that it has

failed to do so.

     First, there is no evidence that Dentsply has applied exclusive dealing to dental

laboratory products other than teeth, such as acrylics, waxes, and related products, despite the

fact that Dr. Marvel's theory is more applicable to some of these other products (such as

Dentsply's Lucitone acrylic).[40]  PFF ¶385.  See Flegel, 4 F.3d at 688 n.4 (Dentsply must show

---

[40]

     No other supplier has applied exclusive dealing in either the dental laboratory products market or more specifically the artificial tooth market. PFF ¶383-385.  If, according to Dr. Marvel's theory, it is efficient for Dentsply to apply exclusive dealing to teeth, it should be efficient for Dentsply's rivals as well.  PFF ¶384.

that it has actively promoted its policy "in other areas"). More significantly, Dentsply does

not treat its wholly exclusive dealers any differently than the nonexclusive dealers carrying

grandfathered brands of teeth. PFF ¶386-93. These grandfathered dealers are a significant

test of Dr. Marvel's theory in several ways, as he acknowledges. PFF ¶¶341(b)(ii), 386. Not

only do they show that there is no bait and switch steering occurring in the market, as

discussed above, they show that Dentsply's rationale is inconsistent with its overall conduct.

PFF ¶386. Under Dr. Marvel's theory, Dentsply should devote fewer promotional resources

to the nonexclusive dealers because it cannot protect its promotional investment in those

dealers. PFF ¶386 (i).

There is no evidence in the record, however, that Dentsply devotes more promotional

resources to wholly exclusive Dentsply dealers. PFF ¶386-89. In fact, Dentsply executives

are very clear that the company does not treat exclusive dealers any differently than

grandfathered dealers in the area of promotional support. PFF ¶387. Also, when Dentsply has

converted a lab from using a competitive tooth to a Trubyte tooth, it has not tried to steer that

lab away from buying Trubyte teeth from a non-exclusive dealer such as Zahn. PFF ¶388

(Clark Tr. 2687 (It is a "cardinal rule in terms of how we conducted ourselves with dealers

that we would not cross")). And there is no evidence that dealers currently carrying

grandfathered brands of rival teeth are less efficient or effective than the exclusive Dentsply

dealers; in fact, the most effective dealers selling Trubyte teeth are nonexclusive dealers such

as Zahn and Darby. PFF ¶390-93 .

In sum, Dentsply's justifications are theoretical and not supported by the facts in

evidence, including its own public explanations for its exclusionary policies, and they are

inconsistent with its overall conduct. As a result, Dentsply has failed to meet its burden of

showing that its alleged business justification is nonpretextual, much less procompetitive.[41]

Moreover, there is no risk of deterring procompetitive conduct by enjoining Dentsply's

exclusionary policies here. Under Dr. Marvel's theory, Dentsply charges higher prices and

excludes its rivals from dealers in order to benefit consumers. This conduct — higher prices

and market foreclosure — "is facially anticompetitive and exactly the harm that antitrust laws

aim to prevent." Kodak, 504 U.S. at 478. Though exclusive dealing may be procompetitive

in some circumstances, Dentsply's attempt to impute a procompetitive effect to the specific

conduct challenged here "is far less clear." Id. at 479.

### B.     The Evidence Establishes That Dentsply's Exclusionary Arrangements Are Overbroad And Not Reasonably Necessary To Achieve The Stated Objective Of Protecting Its Promotions.

Even if Dentsply somehow satisfied its burden, it is easily rebutted by the evidence

demonstrating that the restraint is overbroad and "not reasonably necessary to achieve the

stated objective." Brown Univ., 5 F.3d at 669. Dr. Marvel's theory fails because the

evidence demonstrates that Dentsply would in fact increase, not decrease, its level of

promotion and marketing absent exclusive dealing.[42] PFF ¶373-77. The evidence shows,

---

[41]

     Even if Dentsply is able to meet it burden of showing that its claimed justifications are applicable to protect its promotions from free-riding by its principal rivals, Vita and Ivoclar, they do not apply to Myerson, Universal and Justi. Those rival's teeth are sold by many of the same dealers that sell Dentsply teeth under the grandfathering provision of Dealer Criterion 6. PFF ¶ 341(b)(i). Dentsply's inconsistent application of its exclusionary policy not only calls into question the validity of its claimed justification as to any of these rival brands, it demonstrates that, at a minimum, its claimed rationale does not justify its exclusion of Myerson, Universal, and Justi.

[42]

     Dr. Marvel's testimony cannot contradict this evidence, as he acknowledged that he

therefore, that Dentsply's challenged conduct is unnecessary to prevent Dr. Marvel's posited harm in its absence. The testimony of Dentsply's own executives indicates that, if Dealer Criterion 6 is removed and as a result Dentsply loses market share, Dentsply will likely *increase* its promotions to regain its lost share. PFF ¶374. The conclusion that Dentsply would compete aggressively even without exclusive dealing is buttressed by its behavior with respect to other Trubyte products that are not protected by exclusive dealing, such as introducing the new "Eclipse" denture system which is a merchandise product not subject to Dealer Criterion 6. PFF ¶ 376. And if marketing expenditures would increase absent Criterion 6, there can be no concern about an inefficient level of marketing by Dentsply and therefore no procompetitive justification for maintaining Dentsply's exclusionary policies. PFF ¶375.

Moreover, the evidence also shows that Dentsply's rivals would increase their levels of promotion and marketing if Dealer Criterion 6 were no longer in effect. PFF ¶377. As a result, the overall level of interbrand promotional efforts marketwide — the relevant consideration — would increase absent Dealer Criterion 6.

In addition, the record contains several examples of Dentsply's overbroad enforcement of Dealer Criterion 6 that have no connection to the purported justifications put forward by Dentsply at trial. PFF ¶382. First, Trinity, a dealer that sold Dentsply merchandise but not teeth, was terminated by Dentsply for adding Vita teeth. Dr. Marvel's theory, however, does not apply to dealers who do not carry Dentsply teeth because there are no tooth promotions on which a competitor can free ride. PFF ¶382 (a). Dentsply had made no investment in

---

has "done no empirical analysis of what would happen if Dentsply abandoned its exclusive dealing." PFF ¶ 341(b).

Trinity's tooth sales; nor is there any reason to believe that preventing Trinity from selling competitive brands of teeth would somehow enhance its ability to sell Trubyte merchandise. PFF ¶382 (a). Second, Leach & Dillon proposed to dealers that they handle the accounts receivable function for the Davis Schottlander Enigma teeth, which Leach & Dillon would sell, stock, and ship itself. PFF ¶ 382(a). Dr. Marvel's efficiency story does not apply here because the dealers would not be stocking or selling any Enigma teeth and consequently they would have no opportunity to steer customers. PFF ¶382(b). Nonetheless, Dentsply viewed such an arrangement as a violation of the dealer criteria and took steps to put a stop to it. PFF ¶382(b)

Dentsply also applies Dealer Criterion 6 to prohibit multi-outlet dealers such as Patterson from adding rival brands of teeth even at those outlets where it does not carry Dentsply's teeth. PFF ¶241. Again, under these circumstances, there is no opportunity for steering at outlets where Trubyte teeth are not sold. Finally, Dentsply has conceded that it has authorized additional dealers under the Dealer Criteria, such as Darby Dental, despite concluding internally that it did not need additional distribution points. PFF ¶238. Each of these examples demonstrates that Dentsply's application of its exclusionary arrangements is both overbroad and "not reasonably necessary to achieve the stated objective." Brown Univ., 5 F.3d at 669.

C.    **The Substantial Evidence Of Anticompetitive Effects Outweighs Any Procompetitive Benefit.**

Even if Dentsply's claimed business justification was not pretextual, insufficiently procompetitive, and overbroad, any negligible benefit is far outweighed by the substantial

anticompetitive harm resulting from Dentsply's exclusionary policies. <u>Brown Univ.</u>, 5 F.3d at 669; <u>Law v. NCAA</u>, 134 F.3d 1010, 1019 (10th Cir. 1998) (citing <u>Brown Univ.</u>) ("Ultimately, if these steps are met, the harms and benefits must be weighed against each other in order to judge whether the challenged behavior is, on balance, reasonable."); <u>Microsoft</u>, 253 F.3d at 59. Courts routinely apply a similar "rule of reason" balancing approach under both Section 1 and Section 2. <u>Id.</u> (citing <u>Standard Oil Co. v. United States</u>, 221 U.S. 1, 61-62 (1911)); <u>Mid-Texas Communications Sys., Inc. v. AT & T</u>, 615 F.2d 1372, 1389 n.13 (5th Cir. 1980) (citing <u>Byars</u>, 609 F.2d at 860); <u>see also</u> <u>Cal. Computer Prods., Inc. v. IBM Corp.</u>, 613 F.2d 727, 737 (9th Cir. 1979).

As previously established, Dentsply's conduct has caused significant anticompetitive harm in the market. On the other side of the balance, any procompetitive benefits of Dentsply's conduct are at most negligible. PFF ¶328. Accordingly, as Dr. Reitman concluded, the anticompetitive harm far outweighs any procompetitive benefits. PFF ¶329. Dentsply's expert, Dr. Marvel, in contrast, has done no empirical analysis quantifying the effects of removing Dentsply's exclusive dealing policy to justify it based on a weighing of effects. PFF ¶328. Dentsply's conduct results in harm to consumers in the form of frustrated consumer choice, higher prices, and inferior quality and service. <u>See</u> text, <u>supra</u> §I.B.2. Accordingly, Dentsply's conduct, on balance, is clearly anticompetitive.

## CONCLUSION

For the foregoing reasons, this Court should declare that Dentsply's conduct has violated sections 1 and 2 of the Sherman Act and section 3 of the Clayton Act, and bar Dentsply from enforcing Dealer Criterion 6 and engaging in related conduct.

Respectfully submitted,

COUNSEL FOR PLAINTIFF
UNITED STATES OF AMERICA

COLM F. CONNOLLY
UNITED STATES ATTORNEY

*Paulette K Nash*

Paulette K. Nash (DSB #2901)
Assistant United States Attorney
1201 Market Street, Suite 1100
Wilmington, DE 19801
(302) 573-6277

*William E. Berlin*

William E. Berlin *by pkn*
Jon B. Jacobs
Sanford M. Adler
Frederick S. Young
Steven B. Kramer
N. Christopher Hardee
Bennett J. Matelson
United States Department of Justice,
Antitrust Division
325 Seventh Street, NW, Suite 400
Washington, D.C. 20530
(202) 616-5938

Dated: July 19, 2002

-64-

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,    :
             :
    Plaintiff,      :
             :
    v.         :  Civil Action No. 99-005-SLR
             :
DENTSPLY INTERNATIONAL, INC.,  :
             :
    Defendant.    :

## AFFIDAVIT OF SERVICE

I, **Maureen R. Davis**, an employee in the Office of the United States Attorney for the District of Delaware, hereby attest under penalty of perjury that on **October 29, 2003**, a copy of the foregoing

### UNITED STATES' BRIEF IN SUPPORT OF ITS PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

was served via hand-delivery upon counsel at the following address:

**William Johnston, Esquire**
Young, Conaway, Stargatt & Taylor
Eleventh Floor
Rodney Square North
Wilmington, DE 19801

An Additional copy of the above document will be hand delivered on **October 30, 2003**, by Jonathan Jacobs, Trial Attorney, Antitrust Division, U.S. Department of Justice, Health Care Task Force, Liberty Place Building, 325 Seventh Street, N.W., Suite 400, Washington, DC 20530, to:

**Margaret M. Zwisler**
**Richard A. Ripley, Esquire**
Howrey & Simon
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004

Maureen R. Davis
Legal Assistant