# Exhibit D



REDACTED
PUBLIC VERSION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

**ORIGINAL**

UNITED STATES OF AMERICA,                )
                                         )
              Plaintiff,                 )
                                         )
        v.                               )    C.A. No. 99-005 (SLR)
                                         )
DENTSPLY INTERNATIONAL, INC.,            )    TO BE FILED UNDER SEAL
                                         )
              Defendant.                 )
                                         )

**DEFENDANT DENTSPLY INTERNATIONAL, INC.'S
BRIEF IN SUPPORT OF ITS PROPOSED FINDINGS OF FACT**

CAUTION:    **This Memorandum contains information designated "Confidential"
            pursuant to the Court-entered Protective Order.**

Of Counsel:

Brian M. Addison
DENTSPLY INTERNATIONAL, INC.
570 W. College Avenue
York, PA 07405-0872
(717) 849-4363

Margaret M. Zwisler
Richard A. Ripley
Kelly A. Clement
Eric J. McCarthy
Douglas S. Morrin
HOWREY SIMON ARNOLD & WHITE, LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 783-0800

William D. Johnston  (No. 2123)
Christian Douglas Wright (No. 3554)
YOUNG CONAWAY STARGATT
    & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6600

Dated:  August 19, 2002

Attorneys for Defendant
DENTSPLY INTERNATIONAL, INC.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION .............................................................................................................. 1

SUMMARY OF ARGUMENT ......................................................................................... 2

ARGUMENT ..................................................................................................................... 3

I.   THE AGENCY DID NOT PROVE THAT THE DEALER CRITERIA
     PRECLUDES DENTSPLY'S RIVALS FROM SELLING ARTIFICIAL TEETH
     TO DENTAL LABORATORIES ................................................................................ 3

     A.   The Agency Conceded The Principal Issue In The Case ...................................... 3

     B.   The Agency Did Not Prove That Direct Sales Are Not A Viable Method
          Of Distribution For Artificial Teeth .................................................................... 9

          1.   Dentsply's Rivals Actually Sell Teeth To Dental Laboratories
               Through Direct Distribution .......................................................................... 9

          2.   The Agency Did Not Prove That The "Local Availability" Of
               Teeth Or The Sales Efforts Of Dealers Render Direct Distribution
               Impossible .................................................................................................... 13

     C.   The Agency Failed To Prove That Tooth Sales Through Non-Trubyte
          Tooth Dealers Are Not Viable ........................................................................... 17

          1.   Dentsply Rivals Also Sell Teeth Through Functioning Dealer
               Networks ...................................................................................................... 17

          2.   There Are Hundreds Of Non-Trubyte Dealers Who Can And Have
               Become Tooth Dealers .................................................................................. 18

II.  THE AGENCY FAILED TO PROVE THAT DENTSPLY'S DEALER
     CRITERIA PRECLUDE DENTSPLY'S RIVALS FROM ATTRACTING
     TRUBYTE DEALERS AWAY FROM DENTSPLY ................................................ 21

     A.   The Trubyte Dealers' Apparent Preference To Remain Trubyte Dealers
          Does Not Legally Or Factually Make Them Foreclosed To Rivals ...................... 21

     B.   The Agency Failed To Prove That Dentsply And Its Dealers Have An
          Enforceable Agreement ..................................................................................... 25

- ii -

III.  VIDENT AND IVOCLAR'S PERFORMANCE IN THE TOOTH MARKET IS
      NOT ATTRIBUTABLE TO ANY INABILITY TO ACCESS TRUBYTE
      DEALERS ........................................................................................................ 28

IV.   DENTSPLY'S DEALER CRITERIA HAVE PROCOMPETITIVE EFFECTS .............. 30

      A.    Exclusive Dealing Policies Protect Investments In Promotion From Free
            Riding .............................................................................................................. 31

      B.    Dentsply's Promotional And Demand-Generating Activities Were
            Substantial And Exceeded Those Of Its Rivals ........................................... 33

      C.    Dentsply's Promotional And Demand-Generating Activities Are Subject
            To Free Riding Because Dental Dealers Can Convert Dental Laboratories
            To Rival Teeth ................................................................................................ 36

      D.    Dentsply's Business Justification For Exclusive Dealing Is Not Pretextual ......... 38

V.    THE AGENCY FAILED TO PROVE A PLAUSIBLE, PALPABLE ADVERSE
      EFFECT ON COMPETITION ........................................................................... 42

      A.    The Agency's Claim That Dentsply Frustrated Consumer Preferences Is
            Neither Factually Accurate Nor Legally Cognizable ............................................ 43

      B.    The Agency's Survey Possesses No Evidentiary Value ......................................... 45

      C.    The Agency's Expert Analyses Based On The Survey Are Entitled To No
            Evidentiary Weight ........................................................................................ 48

            1.    Dr. Wind's Analysis Of The Survey Has No Utility ................................. 48

            2.    Dr. Reitman's Econometric Analysis Is Entitled To No Weight .............. 50

                  a.    Dr. Reitman's Analysis Violates The Standards For Expert
                        Testimony Because It Contradicts And Ignores Market
                        Facts ........................................................................................ 51

                  b.    Dr. Reitman Inappropriately Altered Data To Fit The
                        Regression Model That He Selected For His Analysis ................. 54

                  c.    Dr. Reitman Cannot Isolate The Variations In Price From
                        The Variation In Distribution; Therefore, He Cannot Link
                        His Estimates To The Dealer Option Only ................................... 56

                  d.    The Agency Did Not Prove By A Preponderance Of
                        Evidence That Dr. Reitman's Estimates Were Statistically
                        Significant ................................................................................ 57

- iii -

|     | D.  | Dentsply Dealer Criteria Do Not Exceed The Limits Of What Is Reasonably Necessary To Protect Its Investment In Promotion | 59 |

VI.  THE AGENCY'S NOVEL MONOPOLY THEORY IS NEITHER FACTUALLY NOR LEGALLY SUSTAINABLE ................................................................... 60

A.  The Agency Did Not Prove That Dentsply Has Monopoly Power ...................... 61

1.  Dentsply's Market Share Does Not Permit The Inference Of Monopoly Power ........................................................................... 61

2.  There Is No Direct Evidence That Dentsply Excluded Competitors From The Market ...................................................................... 63

3.  The Agency Failed To Prove That Dentsply Set Prices At Supracompetitive Levels ........................................................... 66

4.  Dentsply's Conduct Is Inconsistent With The Notion That It Has Monopoly Power ..................................................................... 68

B.  No Case Supports The Agency's Legal Theory That Dentsply's Market Share Limits Its Ability To Impose Exclusive Dealing ........................................ 69

CONCLUSION ................................................................................................................. 72

- iv -

## TABLE OF AUTHORITIES

### CASES

*3M v. Appleton Papers, Inc.,*
    35 F. Supp. 2d 1138 (D. Minn. 1999) ............................................................ 22

*A & M Records, Inc. v. Napster, Inc.,*
    2000 U.S. Dist. LEXIS 20668 (N.D. Cal. Aug. 10, 2000) ................................ 46

*Acton v. Merle Norman Cosmetics, Inc.,*
    1995-1 Trade Cas. (CCH) ¶ 71,025 (C.D. Cal. 1995) ...................................... 27

*Advo, Inc. v. Philadelphia Newspapers,*
    51 F.3d 1191 (3d Cir. 1995) ............................................................................ 70

*All Care Nursing Service Inc. v. High Tech Staffing Services, Inc.,*
    135 F.3d 740 (11th Cir. 1998) ......................................................................... 41

*Allapattah Services Inc. v. Exxon Corp.,*
    61 F. Supp. 2d 1335 (S.D. Fla. 1999) .............................................................. 54

*American Motor Inns, Inc. v. Holiday Inns, Inc.,*
    521 F.2d 1230 (3d Cir. 1975) .................................................................. 3, 30, 59

*American Tobacco Co. v. United States,*
    328 U.S. 781 (1946) ........................................................................................ 63

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
    472 U.S. 585 (1985) ............................................................................. 45, 69, 70

*Atlantic Richfield Co. v. USA Petroleum Co.,*
    495 U.S. 328 (1990) ........................................................................................ 49

*Axis S.p.A. v. Micafil, Inc.,*
    870 F.2d 1105 (6th Cir. 1989) ......................................................................... 56

*In re Baby Food Antitrust Litigation,*
    166 F.3d 112 (3d Cir. 1999) ............................................................................ 26

*Bank of Utah v. Commercial Security Bank,*
    369 F.2d 19 (10th Cir. 1966) ........................................................................... 47

*Barr Laboratories, Inc. v. Abbott Laboratories,*
    978 F.2d 98 (3d Cir. 1992) ........................................................................*passim*

- v -

*Beach v. Viking Sewing Machine Co.,*
    784 F.2d 746 (6th Cir. 1986)................................................................................................27

*In re Beltone Electric Corp.,*
    100 F.T.C. 68 (1982)..........................................................................................................31

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,*
    509 U.S. 209 (1993)...........................................................................................................49

*Brown Shoe Co. v. United States,*
    370 U.S. 294 (1962)...........................................................................................................61

*CDC Technologies v. IDEXX Laboratories,*
    186 F.3d 74 (2d Cir. 1999)..........................................................................................7, 23

*Cable Holdings, Inc. v. Home Video, Inc.,*
    825 F.2d 1559 (11th Cir. 1987).........................................................................................56

*California Dental Association v. FTC,*
    526 U.S. 756 (1999)...........................................................................................................41

*Chase v. Northwest Airlines Corp.,*
    49 F. Supp. 2d 553 (E.D. Mich. 1999)...............................................................................27

*Concord Boat Corp. v. Brunswick Corp.,*
    207 F.3d 1039 (8th Cir.), *cert. denied,* 531 U.S. 979 (2000) ................................22, 51, 56

*Continental Airlines, Inc. v. United Airlines, Inc.,*
    277 F.3d 499 (4th Cir. 2002).............................................................................................41

*Contractor Utility Sales Co. v. Certain-Teed Products Corp.,*
    638 F.2d 1061 (7th Cir. 1981)...........................................................................................62

*Conwood Co. v. United States Tobacco Co.,*
    290 F.3d 768 (6th Cir. 2002)........................................................................................57, 70

*Denison Mattress Factory v. Spring-Air Co.,*
    308 F.2d 403 (5th Cir. 1962).............................................................................................24

*Eastman Kodak Co. v. Image Technical Services, Inc.,*
    504 U.S. 451 (1992)......................................................................................................63, 69

*FTC v. Indiana Federation of Dentists,*
    476 U.S. 447 (1985)...........................................................................................................45

*Fabrication Enterprise, Inc., v. Hygenic Corp.,*
    848 F. Supp. 1156 (S.D.N.Y. 1994)................................................................................. 68

*Fineman v. Armstrong World Industries,*
    980 F.2d 171 (3d Cir. 1992)........................................................................................... 62

*General Electric Co. v. Joiner,*
    522 U.S. 136 (1997)....................................................................................................... 57

*Greater Rockford Energy & Technology Corp. v. Shell Oil Co.,*
    998 F.2d 391 (7th Cir. 1993).......................................................................................... 56

*Handicomp, Inc. v. U.S. Golf Association,*
    No. 99-5372 (3d Cir. Mar. 22, 2000) ............................................................................ 62

*Houser v. Fox Theatres Management Corp.,*
    845 F.2d 1225 (3d Cir. 1988)......................................................................................... 63

*International Boxing Club v. United States,*
    358 U.S. 242 (1959)....................................................................................................... 63

*International Distribution Centers v. Walsh Trucking Co.,*
    812 F.2d 786 (2d Cir. 1987)........................................................................................... 66

*International Logistics Group v. Chrysler Corp.,*
    884 F.2d 904 (6th Cir. 1989).......................................................................................... 27

*Jeanery, Inc. v. James Jeans, Inc.,*
    849 F.2d 1148 (9th Cir. 1988)........................................................................................ 27

*Joyce Beverages, Inc. v. Royal Crown Cola Co.,*
    555 F. Supp. 271 (S.D.N.Y. 1983)................................................................................. 72

*Lorain Journal Co. v. United States,*
    342 U.S. 143 (1951)....................................................................................................... 69

*Los Angeles Land Co. v. Brunswick Corp.,*
    6 F.3d 1422 (9th Cir. 1993)............................................................................................ 63

*Maxim Integrated Products, Inc. v. Analog Devices, Inc.,*
    1996-1 Trade Cas. (CCH) ¶ 71,366 (9th Cir. 1996)...................................................... 23

*Monsanto Co. v. Spray-Rite Services Corp.,*
    465 U.S. 752 (1984)....................................................................................................... 26

- vii -

*Ninth Avenue Remedial Group, et al. v. Allis-Chalmers Corp.,*
    141 F. Supp. 2d 957 (N.D. Ind. 2001)................................................................. 44

*Oahu Gas Service, Inc. v. Pacific Resources Inc.,*
    838 F.2d 360 (9th Cir. 1988)............................................................................. 63

*Ocean State Physicians Health Plan v. Blue Cross & Blue Shield,*
    883 F.2d 1101 (1st Cir. 1989) .......................................................................... 41

*Olympia Equipment Leasing Co. v. Western Union Telegraph Co.,*
    797 F.2d 370 (7th Cir. 1986)............................................................................. 41

*Omega Environmental v. Gilbarco Inc.,*
    127 F.3d 1157 (9th Cir. 1997).......................................................................*passim*

*Paddock Publications, Inc. v. Chicago Tribune Co.,*
    103 F.3d 42 (7th Cir. 1996)........................................................................ 22, 23

*In re Paoli Railroad Yard PCB Litigation,*
    35 F.3d 717 (3d Cir. 1994)............................................................................... 55

*Parkway Gallery Furniture, Inc. v. Kittinger/Pennsylvania House Group, Inc.,*
    878 F.2d 801 (4th Cir. 1989)...................................................................... 26, 27

*Pittsburgh Press Club v. United States,*
    579 F.2d 751 (3d Cir. 1978).............................................................................. 47

*Pool Water Products v. Olin Corp.,*
    258 F.3d 1024 (9th Cir. 2001)........................................................................... 49

*R.J. Reynolds Tobacco Co. v. Philip Morris Inc.,*
    199 F. Supp. 2d 362 (M.D.N.C. 2002).............................................................. 24

*Rebel Oil Co. v. Atlantic Richfield Co.,*
    51 F.3d 1421 (9th Cir. 1995)....................................................................... 60, 66

*Roland Machinery Co. v. Dresser Industries,*
    749 F.2d 380 (7th Cir. 1984).......................................................................*passim*

*Roy B. Taylor Sales, Inc. v. Hollymatic Corp.,*
    28 F.3d 1379 (5th Cir. 1994)............................................................................. 72

*Ryko Manufacturing Co. v. Eden Service,*
    823 F.2d 1215 (8th Cir. 1987).....................................................................*passim*

- viii -

*SMS Systems Maintenance Services, Inc. v. Digital Equipment Corp.,*
188 F.3d 11 (1st Cir. 1999), *cert. denied*, 528 U.S. 1188 (2000)......................................57

*Seagood Trading Corp. v. Jerrico, Inc.,*
924 F.2d 1555 (11th Cir. 1991).........................................................................7, 72

*Smithkline Beecham Consumer Healthcare v. Johnson & Johnson-Merck Consumer*
*Pharmaceuticals Co.,* 2001 U.S. Dist. LEXIS 7061
(S.D.N.Y. June 1, 2001)....................................................................................46

*Standard Fashion Co. v. Magrane-Houston Co.,*
258 U.S. 346 (1922).........................................................................................4

*Stelwagon Manufacturing Co. v. Tarmac Roofing System,*
63 F.3d 1267 (3d Cir. 1995)..............................................................................56

*Tampa Electric Co. v. Nashville Coal Co.,*
365 U.S. 320 (1961)..................................................................................3, 4, 71

*Thompson Everett, Inc. v. National Cable Advertising,*
57 F.3d 1317 (4th Cir. 1995).............................................................................31

*Todd v. Exxon Corp.,*
275 F.3d 191 (2d Cir. 2001)..............................................................................41

*Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.,*
559 F. Supp. 1189 (E.D.N.Y. 1983)......................................................................47

*U.S. Anchor Manufacturing, Inc. v. Rule Industrial, Inc.,*
7 F.3d 986 (11th Cir. 1993)..............................................................................61

*U.S. Healthcare, Inc. v. Healthsource, Inc.,*
986 F.2d 589 (1st Cir. 1993).........................................................................8, 30

*United States v. E.I. DuPont de Nemours & Co.,*
351 U.S. 377 (1956)........................................................................................63

*United States v. Eastman Kodak Co.,*
853 F. Supp. 1454 (W.D.N.Y. 1994), *aff'd*, 63 F.3d 95 (2d Cir. 1995) ...........................61

*United States v. Microsoft Corp.,*
253 F.3d 34 (D.C. Cir. 2001) .............................................................................70

*United States v. Syufy Enterprises,*
903 F.2d 659 (9th Cir. 1990)............................................................................24

- ix -

*United States v. Visa, U.S.A.,*
  163 F. Supp. 2d 322 (S.D.N.Y. 2001) ............................................................. 70

*Weiss v. York Hospital,*
  745 F.2d 786 (3d Cir. 1984) ........................................................................ 63

## STATUTES

15 U.S.C. § 1 ..................................................................................................... 3

15 U.S.C. § 2 ..................................................................................................... 3

15 U.S.C. §14 .................................................................................................... 3

15 U.S.C. §§ 13, 13b, 21 .................................................................................. 40

## RULES

Fed. R. Evid. 702 .............................................................................................. 45

Fed. R. Evid. 801 .............................................................................................. 45

## OTHER AUTHORITIES

7 Phillip E. Areeda, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (1986) .......................................................................................... 27

ABA Section of Antitrust Law, *Antitrust Law Developments (Fourth)* (1997) ........................ 3

Glazer & Lipsky, *Unilateral Refusal to Deal under Section 2 of the Sherman Act,* 63 Antitrust L.J. 749 (1995) ............................................................................. 70

Herbert Hovenkamp, *Federal Antitrust Policy* (1994) ............................................... 5

Howard Marvel, *Exclusive Dealing,* 25 J.L. & Econ. 1 (1982) ......................................... 31, 32

Paul E. Green, *et al., Research for Marketing Decisions* 271 (5th ed.) .................................... 47

REFERENCE MANUAL FOR SCIENTIFIC EVIDENCE (2d ed. 2000) ................................... 47, 57

# INTRODUCTION

The eighteen-day trial before this Court represented the culmination of a seven-year investigation and litigation regarding the way in which Dentsply International, Inc. distributes its artificial teeth in the United States. Throughout the trial, the Antitrust Division of the United States Department of Justice ("agency") attempted to portray Dentsply as a voracious monopolist clinging to its dominant market share solely by denying rivals access to Dentsply's network of independent tooth dealers. The agency's brief and proposed findings repeat this theme at exhaustive length, relying principally on the testimony of its economist and by the repeated incantation of conclusory terms such as "monopolist" and "exclusion." [1]

The evidence amassed during the 18-day bench trial reveals something entirely different than the agency and its expert claim. It reveals a market populated by well-financed multinational firms, most of which have been selling artificial teeth for decades, others who have entered as recently as 2000. It reveals that Dentsply has for years been the leader and innovator in products and marketing. It reveals that Dentsply undertakes enormous efforts to generate demand and promote its products in order to create incremental sales. It reveals that Dentsply unilaterally adopted its Dealer Criteria in order to protect its sales and marketing efforts from free-riding by rival tooth manufacturers, most of whom have self-admittedly largely ignored the tooth segment of their businesses. Finally, it unequivocally reveals that no tooth manufacturer in the world has been foreclosed from any share of the dental laboratories in the United States. In other words, the evidence reveals that the agency did not prove the facts nor meet the legal standard that it needs to support any of its legal claims.

---

[1] Dentsply's findings and conclusion are focused on the factual and legal issues material to the Court's determination on the merits. Dentsply has not attempted to respond to all of the Agency's repetitive, immaterial, and erroneous assertions of fact and law. Dentsply does not concede these points but relies upon the trial record in opposing them.

Those of the agency's proposed factual findings that rely solely on the opinion testimony of its expert are entitled to no weight. *See* Defendant Dentsply International, Inc.'s Post-Trial Motion on Evidentiary Issues.

- 2 -

## SUMMARY OF ARGUMENT

Antitrust law and economics have long recognized the procompetitive benefits of exclusive dealing arrangements between a manufacturer and its distributors. Such arrangements are commonly employed throughout the economy and are almost universally approved when subject to antitrust challenge. Consequently, the controlling law in this Circuit requires a plaintiff challenging such arrangements to demonstrate not only that this arrangement at the distributor level forecloses rival manufacturers from access to end users, but also that the manufacturer who uses the arrangement has sufficient power to control prices in the market such that the arrangement creates an adverse competitive effect significant enough that it outweighs the arrangement's procompetitive benefits.

Nevertheless, the agency seeks to have this Court jettison that burden of proof in favor of the following standard: where a firm with a "high" market share, regardless of how obtained, adopts an exclusive dealing arrangement that gives the manufacturer an advantage over its competitors, liability attaches, even if alternate viable means exist for rivals to compete in the market.

The Court should decline to invent a legal standard on this record and instead require the agency to meet the burden laid out by controlling law in this Circuit: proof by a preponderance of evidence that (1) Dentsply's exclusive dealing policy excluded rivals from a substantial share of the tooth market, if such exclusion is proved, and (2) that policy caused a demonstrated adverse effect on competition that outweighs its procompetitive justification.

The agency failed to meet that burden in every way imaginable. The evidence at trial established that Dentsply's rivals can and do sell artificial teeth to dental laboratories, and the agency presented no evidence to the contrary. Similarly, the evidence at trial established that Dentsply creates the demand for its artificial teeth through sustained and substantial efforts

unmatched by its rivals, and the agency presented no evidence to the contrary. Finally, the agency's attempted demonstration of anticompetitive effect through a jerry-rigged survey and dishonest econometrics proved nothing but the desperation of its sponsors. The result of this utter failure of proof must be judgment in favor of Dentsply.

## ARGUMENT

I.    **THE AGENCY DID NOT PROVE THAT THE DEALER CRITERIA PRECLUDES DENTSPLY'S RIVALS FROM SELLING ARTIFICIAL TEETH TO DENTAL LABORATORIES**

### A.    The Agency Conceded The Principal Issue In The Case

The agency challenges Dentsply's Dealer Criteria as a willful maintenance of monopoly under Section 2 of the Sherman Act, 15 U.S.C. §2, an unreasonable agreement in restraint of trade under Section 1, 15 U.S.C. §1, and a practice that "may substantially lessen competition or tend to create a monopoly", in violation of Section 3 of the Clayton Act, 15 U.S.C. §14. The offense of monopoly is unilateral, that is, it requires an assessment of a single firm's conduct; the legality of an arrangement under Section 1 and the Clayton Act requires that the defendant has entered into an agreement embodying the restraint. All three statutes are not violated unless the defendant's conduct adversely affects competition. ABA Section of Antitrust Law, *Antitrust Law Developments (Fourth)*, pp. 217-18 (1997).

The Supreme Court has held that an exclusive dealing policy that "does not fall within the broader proscription of § 3 of the Clayton Act . . . is not forbidden by [those of Sections 1 and 2]". *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 335 (1961); accord, *Barr Labs., Inc. v. Abbott Labs*, 978 F.2d 98, 110 (3d Cir. 1992) (if exclusive dealing arrangements "do not infringe upon the stiffer standards of anticompetitiveness under the Clayton Act, they will also be lawful under the less restrictive provisions of the Sherman Act."), cf. *American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1250 (3d Cir. 1975) ("[Holiday Inns] would seem to be

- 4 -

correct in stating that an exclusive dealing arrangement which satisfies the test of legality set out in the Clayton Act would *a fortiori* be lawful under the less stringent Sherman Act [standards]."). This is because the Clayton Act standard requires only a showing that the challenged practice "may" substantially lessen competition, but Sherman Act offenses require a finding of actual adverse competitive effect. *Standard Fashion Co. v. Magrane-Houston Co.*, 258 U.S. 346, 357 (1922).

The requisite potential or actual adverse competitive effect in exclusive dealing cases arises only if the rivals of the firm imposing the arrangement are excluded, or "foreclosed," from a substantial share of the relevant market. *Tampa Elec. Co.*, 365 U.S. at 327; *Barr Labs.*, 978 F.2d at 110.

The parties here agree that dental laboratories are the customers in the artificial tooth market. (Tr. 1649 Reitman.) Thus, to prevail on any of its legal theories, the agency must prove, by a preponderance of the evidence, that Dentsply's policy has the effect of foreclosing its rivals from a "substantial share" of the end users in the artificial tooth market, the dental laboratories. The agency's own economic expert, Dr. Reitman, on whom the agency's case substantially relies, candidly conceded this point:

> Q.    I think you said there are about 7,000 dental labs in the United States that make dentures?
>
> A.    That's the number we've been using in court. So that's the number, yes, I think that's about right.
>
> Q:    That seems to be what the business people generally say, 6500 to 7,000 labs?
>
> A.    I think so, yes.
>
> Q:    Now, Dentsply's rivals *are not foreclosed from a substantial share of those labs*, are they?
>
> A:    *No, they are not.*

- 5 -

(Dentsply International, Inc.'s Proposed Findings of Fact ("DPFF") ¶ 69; Tr. 1649-50 Reitman (emphasis added).) Dr. Reitman also admitted that any artificial tooth manufacturer can sell its teeth to any dental laboratory that it wants to. (Tr. 1684 Reitman.) The significance of these admissions cannot be overstated; under applicable legal precedent, they are dispositive of all of the agency's claims against Dentsply.

Despite these unequivocal concessions, the agency asserts that it has met its burden of establishing that Dentsply's rivals are foreclosed from the market because it has shown, using various measures, that between 70-80% of existing tooth dealer outlets are subject to the Dealer Criteria. (Agency Br. 2, 16-17.) However, proof that rivals are foreclosed from existing dealer outlets does not establish that they are foreclosed from the relevant market. *Omega Envtl. v. Gilbarco Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997) (wrong to consider foreclosure as the number of dealers committed to defendants; "[t]he focus on this subset of the relevant market is misplaced.").

To succeed on its claims, the agency must prove that Dentsply's rivals were foreclosed from a substantial share of the tooth business of the dental laboratories, not just that a few select rivals were foreclosed from one of several actual or even potential channels of distribution.[2] *See* Herbert Hovenkamp, *Federal Antitrust Policy* § 10.8, at 391 (1994) (foreclosure of even "a large percentage of one mode of distribution will have little anticompetitive effect if another mode is available."); *Gilbarco*, 127 F.3d at 1163 (alternative channels of distribution are relevant to assessing market foreclosure because such a determination "includes the full range of selling opportunities reasonably open to rivals, namely, all product and geographic sales they may readily compete for, using easily convertible plants and marketing organizations") (citations omitted). Indeed, this Court has previously held that "the existence of alternative channels of

---

[2]    Moreover, where, as here, the exclusive dealing arrangement operates at the distributor level, rather than the end user level, the plaintiff faces a higher standard of proof of substantial foreclosure. *E.g.*, *Gilbarco*, 127 F.3d at 1162-63; *Ryko Mfg. Co. v. Eden Serv.*, 823 F.2d 1215, 1235 (8th Cir. 1987).

- 6 -

distribution to end users lessens the likelihood that an exclusive dealing policy forecloses competition in the relevant market." (D.I. 292 at 22.)

Six Circuits have held that, where existing or even potentially viable alternate channels permit rivals' access to the end users, the plaintiff cannot prove that defendant's rivals are foreclosed from the market.

*Ninth Circuit*. *Gilbarco* involved a manufacturer of petroleum dispensing equipment that announced that it would do business only with distributors who sold only Gilbarco's dispensers. 127 F.3d at 1161. Plaintiffs were former Gilbarco dealers who intended to sell the dispensers of Gilbarco's rivals and whom Gilbarco terminated as a result of its policy. The plaintiffs' exclusive dealing claim went to a jury, which rendered a verdict in plaintiffs' favor. *Id.* at 1161.

The Ninth Circuit vacated the jury's verdict and entered judgment in favor of the defendant Gilbarco. The Ninth Circuit held that, in assessing the foreclosure that the exclusive dealing arrangement imposed, one must consider all "existing" or "potential" alternative channels of distribution, including direct sales and distributors in related businesses. *Id.* at 1162-63. The court observed that the record reflected evidence that manufacturers in the market made "direct sales to end-users." *Gilbarco*, 127 F.3d at 1163. The court also noted that the record contained evidence of companies who serviced the equipment but did not sell it, who "can and do become authorized dispenser distributors." *Id.* (citing evidence of two service companies that became distributors). The court held that the existence of alternative channels of distribution "eliminate[s] substantially any foreclosure effect Gilbarco's policy might have." *Id.* The court concluded that "[c]ompetitors are free to sell directly, to develop alternative distributors, or to compete for the services of the existing distributors. Antitrust laws require no more." *Id.* Thus, the court held that there was no foreclosure as a matter of law. *Id.* at 1165.

- 7 -

*Second Circuit.* In *CDC Technologies,* the Second Circuit expressly agreed with *Gilbarco,* rejecting an exclusive dealing claim in the face of undisputed evidence of direct sales and alternative distributors. *CDC Techs. v. IDEXX Labs.,* 186 F.3d 74, 80 (2d Cir. 1999). There, the parties manufactured and sold competing animal blood analysis machines. *Id.* at 76. Plaintiff CDC utilized four veterinary products distributors to obtain qualified leads for customers. *Id.* CDC employed its own direct sales force to market and sell its machines, and also relied on telemarketing, direct mail, advertising and participation in trade shows to market its products. *Id.* Defendant IDEXX entered the market as a reseller of another manufacturer's blood analyzer machine, and enforced an exclusive dealer policy that prohibited its existing dealers from marketing CDC's machines. *Id.* In approximately two years after entry, IDEXX obtained an 80 percent market share. *Id.* at 77. CDC lost all four of its distributors due to this policy. *Id.* Nonetheless, the court found that no market foreclosure existed because CDC reached the ultimate customer by direct sales and by recruiting other distributors. *Id.* at 80-81.[3]

*Eleventh Circuit.* In *Seagood Trading Corp. v. Jerrico, Inc.,* 924 F.2d 1555 (11th Cir. 1991), the Eleventh Circuit rejected plaintiffs' challenge to an exclusive arrangement between the defendant Long John Silver's, a restaurant franchiser, and the most efficient distributor of wholesale seafood for delivery to Long John Silver's franchisee stores. *Id.* at 1558-62. The court held that the plaintiffs could access the market by attracting potential alternative distributors; therefore, there was no foreclosure. *Id.* at 1572-73.

*Eighth Circuit.* In *Ryko,* the Eighth Circuit held that foreclosure was "neither substantial nor even apparent" where the evidence revealed direct sales and potential alternative distributors. *Ryko,* 823 F.2d at 1233. There, Ryko precluded its dealers from carrying car washing equipment of its rivals. The plaintiff, a dealer terminated as a result of the policy, alleged that the policy

---

[3]    This formed the basis of affirming summary judgment on the Sherman Act Section 1 claim; the Second Circuit affirmed dismissal of the Clayton Act Section 3 claim on the threshold issue of no sale. *See* 186 F.3d at 75-76.

- 8 -

impermissibly foreclosed Ryko's competitors from the market. In holding that there was no foreclosure, the court noted that there was "no evidence that a substantial segment of the equipment buying market will deal only with Ryko's distributors, or that the exclusive dealing provisions have any impact on the ability of Ryko's competitors to make sales presentations to any potential customer through their own distributors or through direct sales representation." *Id.* at 1235.

*Seventh Circuit.* The Seventh Circuit has held no foreclosure as a matter of law where the defendant's rival possessed the resources to access the market through direct sales or by attracting its own distributor, despite the fact that it had not yet tried to enter directly or to attract any distributor but the defendant's. *Roland Mach. Co. v. Dresser Indus.,* 749 F.2d 380, 394-95 (7th Cir. 1984) (Posner, J.).

*First Circuit.* In *U.S. Healthcare, Inc. v. Healthsource, Inc.,* 986 F.2d 589, 596 (1st Cir. 1993), the First Circuit held that the number of doctors tied to the defendant HMO by the exclusive agreement was "significant," but that there was no foreclosure since rivals could easily bid for them, or attract new doctors to its new HMO.

Thus, it was incumbent upon the agency here to prove that all existing and potential alternative distribution methods were not viable in order to prove that Dentsply's Dealer Criteria foreclosed its rivals from the market. The trial record identified two alternative distribution methods to Dentsply's Trubyte dealers -- (1) manufacturer direct sales to laboratories; and (2) dental dealers that do not carry Trubyte teeth. The agency failed to disprove the viability of either of these alternatives.

- 9 -

**B.    The Agency Did Not Prove That Direct Sales Are Not A Viable
Method Of Distribution For Artificial Teeth**

**1.    Dentsply's Rivals Actually Sell Teeth To Dental
Laboratories Through Direct Distribution**

This Court denied Dentsply's Motion for Summary Judgment on the ground that there
was a genuine issue of fact as to whether direct tooth sales to dental laboratories were a viable
method of distribution for artificial teeth. (D.I. 292 at 22.)  At trial, the agency's economist made
quick work of this part of the analysis:

> Q:    Now, you would agree, also, Dr. Reitman that *direct
> distribution is a viable method of distributing artificial
> teeth, correct?*
>
> A:    *Yes, I would call it viable.*

(Tr. 1649-50 Reitman) (emphasis added).)  But this Court need not rest with Dr. Reitman's
admission regarding what had been a genuine issue of fact.  The trial record establishes that
manufacturer-direct sales are not just a potentially available distribution method, although that
would be a legally sufficient showing to defeat the agency's claim of foreclosure.  With the
single exception of Vita,[4] every Dentsply rival in the market was actually selling its teeth directly
to dental laboratories when Dentsply implemented its Dealer Criteria and continues to do so
today.  The agency did not produce a single instance of a dental laboratory that could not buy
teeth from Dentsply's rivals.  It provided no testimony by any lab establishing that the lab did not
purchase teeth from a rival because those teeth were not available from a Trubyte dealer.

The agency's failure of proof is not surprising, given the undisputed facts of record.
Ivoclar has distributed its teeth directly to dental laboratories since at least 1986.  (DPFF ¶ 50.)

Although  Austenal,

---

[4]    Vita is contractually obligated to sell its teeth through a single dealer, Vident.  (DPFF ¶ 165.)

**REDACTED**

- 10 -

American Tooth Industries and Universal each sell teeth to Trubyte dealers, including Zahn, Dentsply's largest dealer, they all also distribute teeth directly to dental laboratories. (DPFF ¶¶ 58, 62, 63.) Despite the supposed advantage of access to Trubyte dealers, Austenal sells 85% of its teeth directly to dental labs. (DPFF ¶ 59.) Dealers consider direct selling manufacturers as competitors. (DPFF ¶ 162.)

The agency argues that direct distribution presents a "significant disadvantage" to tooth manufacturers because dealers are dental laboratories' "preferred source." (Agency Br. 20, 26.) The agency's principal support for this conclusion is the Wind survey. (Agency Proposed Findings of Fact ("APFF") ¶ 47.) The Wind survey does not prove this fact, because the scenarios presented to dental laboratory respondents reflected Vita and Ivoclar teeth available from both dealers and directly from manufacturers so it is impossible to attribute any change in a respondent's purchases to the presence of those brands of teeth in dealers.[5] As established *infra*, the survey proves nothing in any event. The real world record contradicts the agency's assertion.

Seven of the eight labs who testified at trial and 14 of the remaining 18 dental laboratory witnesses who were deposed all stated that they prefer to buy teeth directly from a manufacturer because of the cost savings they recognize through the elimination of the middlemen dealers. (DPFF ¶ 108.) The agency dismisses the trial testimony on the ground that the labs who testified that they prefer to buy direct are large laboratories that are not representative of the universe of dental labs. (APFF ¶ 136-37.)

Dr. Reitman conceded that Dentsply's Dealer Criteria do not foreclose its rivals from these labs' preferred distribution channel (Tr. 1653 Reitman), yet Dentsply's market position with National Dentex, the largest of the national lab chains and a customer with a strong relationship with Ivoclar, is equivalent to its market position generally. (DPFF ¶ 111.) Certainly,

---

[5]    Further, the agency did not introduce into evidence the survey data that purported to measure preferences (Part A).

**REDACTED**

- 11 -

the labs that choose to buy 85% of Austenal's teeth directly from Austenal instead of from Zahn, or one of the other Trubyte dealers that carry Austenal teeth, have expressed a preference for direct distribution. Moreover, the lab deponents who testified that they preferred to buy teeth directly from a manufacturer vary in size and include both small- and mid-size labs. (DPFF ¶ 116.)

It is simply not true, and not supported by real evidence, that direct distribution is "ineffective" and "more costly" than sales through dealers, as the agency claims. Direct distribution actually presents significant financial and competitive advantages over dealer distribution. These advantages have caused Ivoclar to remain a direct seller. From time to time, Ivoclar considered distribution of its teeth through dental dealers but determined that it was better off selling direct to dental laboratories. (DPFF ¶ 119.) Ivoclar appointed Frink Dental as a dealer to determine the effectiveness of a dealer distribution          (DPFF ¶ 120.) However, Ivoclar contemporaneously instituted a price increase for labs to give Frink the profit margin it demanded as a dealer and to maintain its own profitability. (DPFF ¶ 121.) Ultimately, Ivoclar determined that

and the arrangement ended. (DPFF ¶ 126.)

Ivoclar had the opportunity to appoint Darby Dental Supply as an Ivoclar dealer in 1990, before Darby became a Trubyte dealer. Darby offered to distribute Ivoclar teeth from four geographically dispersed locations. (DPFF ¶ 131.) Ivoclar determined, however, that it was more profitable for Ivoclar to sell directly to dental labs. (DPFF ¶ 131.) Ivoclar concluded that, by selling directly to the laboratory customer, it could guarantee continuity in its distribution methods. (DPFF ¶ 131.) Accordingly, Ivoclar rejected Darby's application. (DPFF ¶ 131.) For the same reasons, Ivoclar rejected Accubite Dental's application to become an Ivoclar dealer in 1989. (DPFF ¶ 190.) And in 1995, Ivoclar ended its agency relationship with DTS because it wanted to consolidate its distribution at its facility in New York. (DPFF ¶ 129.) Mr. Ganley conceded that selling directly provides Ivoclar "some advantages" over dealer distribution, such

REDACTED

- 12 -

as permitting a closer relationship with its customers (Tr. 1120 Ganley), and Dr. Reitman agrees. (Tr. 1650 Reitman).

Dentsply's Project Black Jack corroborates Ivoclar's conclusion that selling teeth directly

The facts of record unequivocally establish that Dentsply's direct selling rivals sell teeth in a manner indistinguishable from the business model used by Zahn and Darby,

DPFF ¶172.)  Dr. Reitman agreed that Zahn and Darby exhibit attributes that most labs prefer. (Tr. 1656 Reitman.)  Ivoclar, Vident, Zahn and Darby all maintain phone lines manned by knowledgeable employees to accept orders from dental laboratories.  (DPFF ¶¶ 52, 168.)  Labs place these orders by phone and receive their orders by prompt, accurate, reliable, next day delivery, regardless of the location of the shipper, as Dr. Reitman conceded.  (Tr. 1672 Reitman; DPFF ¶¶ 53, 167.)  All handle accounts receivable from literally thousands of labs. (DPFF ¶ 88.)  All maintain sales forces that

---

6

**REDACTED**

- 13 -

call on dental labs and maintain relationships with those labs. (Tr. 1674 Reitman; DPFF ¶¶ 52, 168.)  All provide "one stop shopping" discounts to customers who order products across their product line offerings, (DPFF ¶ 86)[7] and all accept tooth returns at a single facility. (Tr. 1673 Reitman.)  There simply is no credible evidence that dealers provide some unique collection of attributes that make direct selling manufacturers "ineffective" in meeting the needs of their lab customers, and the agency presented no real person who said so.  Accordingly, the agency failed utterly to prove that direct sales are not a viable method of distribution.

### 2.    The Agency Did Not Prove That The "Local Availability" Of Teeth Or The Sales Efforts Of Dealers Render Direct Distribution Impossible

The agency devotes a substantial number of pages in its brief and findings to the allegedly "important services" that dealers provide to manufacturers and dental labs.  As shown above, however, direct selling rivals already perform these services for labs or handle the dealer functions themselves.  The two other issues that the agency raises, the "local availablity" of teeth, permitting "same day delivery or pick-up" and a collection of sales efforts by dealer personnel (representative coverage, and dealer advertising, and promotion) do not establish that direct distribution is not a viable method of distribution.

---

[7]    The agency's definition of one-stop shopping has changed over the course of this case.  The agency used to define this dealer benefit as the ability to offer labs all the products they needed for both their denture and their crown and bridge business, with a volume discount.  (D.I. 214 at 9.)  Because Dentsply proved that Ivoclar and Vident sell all products that labs need and offer similar total volume discounts (DPFF ¶¶ 81, 85), the agency now claims that this benefit involves reducing the number of vendors with whom that lab must deal.  (Agency Br. 25-26.)

This is not a benefit that the labs appear to require.  Most labs buy even the same products from multiple vendors.  (DPFF ¶ 84.)  The agency presented no witness that testified that they did not buy artificial teeth from a direct seller because they did not want to write one more check or make one less call.  Indeed, when ordering teeth and other products from dealers, labs have to make more than one call (to the tooth counter and the general ordering number) and, in some cases, they receive more than one invoice.  (DPFF ¶ 82.)  In any event, since many crown and bridge products are only sold directly (DPFF ¶ 81), direct sellers like Ivoclar and Vident actually do provide one stop shopping that dealers like Zahn cannot.  (DPFF ¶¶ 81, 82.)

- 14 -

*Local availability of teeth permitting same day delivery.* The agency admits that, with the current widespread availability of direct mail, dental labs generally can obtain teeth the next day, regardless of where the shipper is located. (Tr. 1687 Reitman.) This means that local tooth stocks are no longer necessary for rivals to access the market for artificial teeth. Ivoclar ships all of its tooth orders from a single warehouse in Amherst, New York directly to dental laboratories for next-day or second-day delivery. (DPFF ¶¶ 51, 53.) All the labs that testified at trial purchase teeth directly from Ivoclar and are as geographically distant as Idaho and Minnesota. (DPPF ¶ 54.)

Over the past ten years, dental dealers have reduced their tooth stocks significantly in large part due to the emergence of reliable overnight and second-day delivery. (DPFF ¶¶ 70-78.) These delivery services have empowered dental dealers to service their laboratory customers from a reduced number of strategically placed tooth stocks. In fact, each dealer testified at trial that it can effectively service the tooth needs of the laboratory customers throughout the United States with a limited number of such stocks; in many cases, just one. (DPFF ¶ 73.)

Zahn Dental, for example, has reduced the number of its tooth distribution facilities from 13 in 1997 to just 5-9 in 2002 and is examining the advisability of additional consolidation. (DPFF ¶ 70). Zahn reduced its stocks because it was more efficient and therefore more profitable to distribute teeth from a few strategically placed distribution facilities and rely on direct mail and telemarketing. (DPFF ¶ 74.) Mr. Weinstock admitted that he did not maintain local tooth stocks but instead "multiple distribution points." (DPFF ¶ 73.) Mr. DeSautel, of Accubite Dental, testified that his company services the entire United States from a single tooth stock location in Michigan. (DPFF ¶ 73.) Darby Dental primarily services the entire United States from one tooth stock. (DPFF ¶ 70.)

The evidence also shows that Trubyte dealers make substantial sales in geographic areas remote from their tooth stock locations.

**REDACTED**

- 15 -

For example, Zahn and Darby, Dentsply's fastest growing dealers, make substantial sales in states where they have no tooth stocks at all. (DPFF ¶ 79.)

Dentsply's drop shipment data also confirms that the market no longer requires local tooth stocks.

The agency claims that local availability of teeth is important because it is "common" for labs to need teeth on the same day that they order them. (APFF ¶ 66.) However, the evidence demonstrates that the need for teeth the same day that the order is placed, stated as a percentage of all teeth orders by a particular laboratory, is *de minimis*. The dental laboratories who testified in this record uniformly estimate those purchases to be no greater than 1% to 2% of all their teeth orders. (DPFF ¶¶ 94-95.) Only 10% of Zahn's orders are picked up at its distribution facilities. (DPFF ¶ 95.) Indeed, the only dental laboratory called by the agency as a witness, Sonshine Labs, testified that it never had a need to have teeth delivered on the same day that they were

---

8

**REDACTED**

- 16 -

ordered.  (DPFF ¶ 94.)  Further, many of those laboratories satisfied that same-day need by taking the teeth out of their in-laboratory inventory, thus obviating the need to place a purchase order with any supplier.  (DPFF ¶ 94.)

All direct-selling tooth manufacturers provide tooth consignments to their dental laboratories.  (DPFF ¶¶ 56, 58, 69, 169, 175.)  Dental laboratories can satisfy the rare and isolated need to have teeth on a same-day basis from these consignments.  The agency failed to prove with any precision the dollar volume or order volume of teeth needed the same day that could not be filled with the laboratory's in-house inventory.  Further, the record contains no laboratory testimony, either live or by deposition, where the laboratory testified that they do not buy a particular brand of teeth because of this same-day availability issue.[9]

Finally, the agency claims that dental dealers provide manufacturers with additional sales representative coverage, and promotional and advertising support, generating incremental business for their suppliers.  (APFF ¶¶ 86-90.)  The agency did not present any evidence that the value of these services exceeds the margin that suppliers pay dealers for them so these services are meaningless in a a foreclosure analysis.[10]

In sum, the agency's argument that the services that Trubyte dealers provide labs and manufacturers make those dealers necessary for access is not supported by the record.

---

[9]  The agency cites to a single September 1993 Dentsply letter as evidence that Dentsply recognizes the importance of same-day service.  (APFF ¶ 69.)  This isolated incident from 9 years ago hardly demonstrates that "same-day availability" is a unique service that only dental dealers can provide.

[10]  Also, the agency did not prove the extent that dealers actually provide additional sales representative coverage to manage lab inventories or build "relationships."

Darby's call on less than a third.  (Id.)  Patterson had just three dedicated lab representatives during most of the period.  (Id.)  Dealer sales representatives are responsible for selling the thousands of products that the dealers sell, not just the artificial teeth of one supplier.  (DPFF ¶ 93.)

REDACTED

- 17 -

C.    **The Agency Failed To Prove That Tooth Sales Through Non-Trubyte Tooth Dealers Are Not Viable**

1.    **Dentsply Rivals Also Sell Teeth Through Functioning Dealer Networks**

The agency next argues that Dentsply's rivals cannot create their own dealer networks because "Dentsply has tied up so many of the dealers required to establish a network." (Agency Br. at 26.) This is false. The record shows that rivals have built their own dealer networks by attracting non-Trubyte dealers to sell their teeth.

For example, Vita Zahnfabrik has contractually bound itself to sell its teeth only through a single national dealer, Vident, since 1985.[11] (DPFF ¶ 165.) Vident describes itself as a national dental distributor. (DPFF ¶ 165.) Vident has a long-standing relationship with dental laboratories and is focused completely on the dental laboratory business. Vident re-sells Vita teeth directly to laboratories from its distribution center in Brea, California. (DPFF ¶ 167.) Vident offers overnight and two-day shipments on all tooth products to its dental laboratory customers. (DPFF ¶ 167.) Vident also offers tooth consignments to dental laboratories.[12] (DPFF ¶ 169.) In terms of services that it offers to dental laboratories, Vident is absolutely indistinguishable from Zahn Dental or any other large Trubyte tooth dealer. (DPFF ¶ 172.)

To supplement its direct efforts to re-sell Vita teeth to dental laboratories in the United States, Vident has created a network of 18 sub-dealers. These sub-dealers purchase Vita teeth from Vident. (DPFF ¶ 17.) The geographic distribution of Vident, its sub-dealers and their

---

[11]    As an initial matter, throughout this case, up to and including trial, the agency inexplicably attempts to identify Vident as equivalent to a tooth manufacturer. But the sworn testimony of Wayne Whitehill, President of Vident since 1985, refutes that attempted characterization. (DPFF ¶ 165.) Mr. Whitehill unequivocally stated that Vident is not a tooth manufacturer, and therefore would not be part of the tooth manufacturer component of GX356, the agency's flow chart that attempted to describe tooth distribution within the United States. (DPFF ¶ 165.)

[12]    Three of the dental laboratories that testified at one time had Vita tooth consignments from Vident: Armstrong Dental Laboratories, Langer Dental Arts, and Jaslow Dental Lab. (DPFF ¶ 169.)

- 18 -

respective tooth stocks closely mirrors the tooth distribution locations of Zahn Dental. (DPFF ¶ 172.)

Austenal and Universal both have a dealer network that includes many of Dentsply's Trubyte tooth dealers. (DPFF ¶ 177.) Thus, they have a subset of the very dealers that the agency claims are necessary in order to distribute teeth in the United States. Moreover, Universal has upwards of 100 dental dealers that resell Universal teeth to dental laboratories. (DPFF ¶ 177.) There is no evidence in the record from any dental laboratory that the alternative dealer networks of Vita, Austenal and Universal are materially different or lacking an essential attribute necessary to distribute artificial teeth in the United States. Indeed, the fact that

and yet these rivals are not a "model of success" in the industry proves that having access to the Trubyte dealers network is no "magic elixir." (Tr. 3604 Marvel.) In short, the agency failed to prove that these rival dealer networks were not viable.

### 2.    There Are Hundreds Of Non-Trubyte Dealers Who Can And Have Become Tooth Dealers

The agency also failed to prove that non-Trubyte dental dealers are not potential alternative tooth dealers. There are hundreds of independent dealers that sell dental products in the United States; only 23 of those are authorized Trubyte tooth dealers. (DPFF ¶¶ 134, 178.) The remainder are available for Dentsply's rivals to authorize and use as tooth dealers. This universe of dealers includes existing non-Trubyte tooth dealers that Dentsply's rivals have either ignored or previously refused to authorize, as well as dental dealers that do not currently carry artificial teeth, but have expressed an interest or demonstrated the capability of becoming a tooth dealer. Dentsply receives between one and two requests per month from companies seeking to become authorized Trubyte tooth dealers. (DPFF ¶ 179.) Each has expressed an interest in becoming a Dentsply authorized Trubyte tooth dealer. (DPFF ¶ 179.) These dental dealers have demonstrated an interest in carrying teeth and are therefore available to Dentsply's rivals.

**REDACTED**

- 19 -

One such applicant is Tri-State Dental, whose president, Vito Clavelli, testified at trial. Tri-State is a dental products dealer located in New Jersey. (DPFF ¶¶ 192-194.) Tri-State sells both operatory and laboratory products. (DPFF ¶ 192.) Tri-State has customers located throughout the United States. (DPFF ¶ 192.)

Tri-State promotes the products it sells through brochures, seminars and trade shows. Tri-State has demonstrated a serious interest in taking on artificial teeth and has taken affirmative steps toward that objective. (DPFF ¶ 194.) Tri-State intends to hire a tooth counter some time in the Summer of 2002 and has begun to expand its facilities by 6,500 square feet in order to accommodate an artificial tooth inventory. (DPFF ¶ 194.)[13]

The agency dismisses those available non-Trubyte dealers that presently call on dentists ("operatory dealers") as potential tooth dealers on the ground that they are not "likely" to enter the dental laboratory market because they supposedly lack the interest in the business[14] or the ability to take sales from existing Trubyte dealers. (Agency Br. 29-31.) There is abundant record evidence, however, that operatory dealers have both an interest and the wherewithal to distribute artificial teeth. Most existing Trubyte dealers function primarily as operatory dealers, including 7 of Dentsply's top ten dealers: Zahn (a division of Henry Schein, one of the country's largest operatory dealers), Patterson Dental, Darby, Benco, JB Dental, AccuBite and Arnold. (DPFF ¶¶ 187-88.)

One former operatory dealer, Accubite, has become one of Dentsply's top ten dealers and undoubtedly took sales from other Trubyte dealers to do so. In 1992, Accubite was not even in

---

[13] The agency's attack on Mr. Clavelli's testimony is unwarranted. (APFF ¶ 255.) There is nothing in the record to cast doubt on his testimony regarding Tri-State's interest in selling teeth, his belief that Tri-State could sell them profitably or the concrete steps it has taken to give it the capability to warehouse and sell artificial teeth.

[14] The agency's sole evidence supporting this proposition is the testimony of one operatory dealer representative, Kevin Ackeret, of Sullivan Dental Supply. (APFF ¶ 253(a).) However, Sullivan Dental Supply is an affiliate of Zahn Dental Supply, both of whom are owned by Henry Schein. (DPFF ¶ 200.) So it should come as no surprise that Sullivan Dental Supply has no interest in selling teeth because another division of its parent company handles that aspect of the business.

REDACTED

- 20 -

the tooth business. (DPFF ¶¶ 189-91.) Nevertheless, Accubite successfully recruited an individual with experience in the tooth market and through that talent acquisition was able to secure a contract with the State of Michigan to supply artificial teeth to Michigan's state correctional facilities. (DPFF ¶ 191.) In connection with those events, Accubite sent out letters to various tooth manufacturers, including Dentsply, Universal, Justi and Ivoclar, seeking to become a tooth dealer for those manufacturers' products. (DPFF ¶ 190.) All rejected Accubite. (DPFF ¶ 190.) Dentsply ultimately appointed Accubite to expand its distribution in the Midwest in 1992. Accubite has built its tooth sales over the ensuing ten years from zero to          at the end of 2001. (DPFF ¶ 191.)

In addition to these operatory dealers, the available non-Trubyte dealers include those already focused on the dental laboratory business. The agency itself introduced the deposition testimony of four dental dealers that sell non-tooth products (called merchandise) to dental laboratories regarding their potential as tooth dealers. (APFF ¶ 253(b.)) Every one of those dealers testified that, given an adequate financial incentive and customer demand, they would be interested in taking on artificial teeth. (DPFF ¶ 178.)

Another laboratory-focused dealer is Lincoln Dental, a national full-service dealer of dental laboratory products, including artificial teeth. (DPFF ¶ 181.) Lincoln Dental actively promotes the products that it distributes; it generates demand for these products through its sales representatives, catalogs and sales flyers. (DPFF ¶ 181.) Lincoln Dental has distributed teeth for over 20 years. (DPFF ¶ 182.) In 2001 its total sales exceeded $10 million, $800,000 of which represent sales of artificial teeth.[15] (DPFF ¶ 181.) According to the uncontroverted testimony of its Vice President and Sales Manager, Jeffrey DiBlasi, Lincoln is capable and available to sell other lines of teeth, including premium lines of teeth. (DPFF ¶ 183.) Lincoln already sells its products to high-end dental laboratories and has the capability to sell premium teeth to those

---

[15] This level would put Lincoln among the top 10 Trubyte tooth dealers.

**REDACTED**

- 21 -

customers. (DPFF ¶ 183.) In the past, Lincoln Dental has asked Dentsply to authorize it as a Trubyte tooth dealer, but Dentsply has refused because Lincoln has failed to demonstrate its ability to generate incremental sales of Trubyte teeth. (DPFF ¶ 183.) Mr. DiBlasi testified that he was near an agreement with Vident to become a sub-dealer for Vita teeth, but backed out when Vita demanded that Lincoln accept a 20% gross margin on the Vita teeth rather than the standard 30-35% margin that tooth dealers receive. (DPFF ¶ 183.)

Jack Silcox, Ltd. is another example of an available dental laboratory dealer. Jack Silcox has 700 active dental laboratory customers. (DPFF ¶ 184.) Most of its tooth customers are located in Ohio, but Mr. Silcox sells to customers located throughout the United States. (DPFF ¶ 184.) Mr. Silcox currently distributes Justi, Dentorium, Coral and Universal teeth. (DPFF ¶ 185.) Silcox discussed with Vident the possibility of becoming a sub-dealer of Vita teeth but Mr. Silcox ended that discussion when he learned of Vident's reputation for underselling its sub-dealers. (DPFF ¶ 184.)

In sum, the agency has failed to meet its burden of showing that non-Trubyte tooth dealers, whether dental laboratory or operatory dealers, are not either an actually or potentially viable alternative means to distribute artificial teeth in the United States.

II.     **THE AGENCY FAILED TO PROVE THAT DENTSPLY'S DEALER CRITERIA PRECLUDE DENTSPLY'S RIVALS FROM ATTRACTING TRUBYTE DEALERS AWAY FROM DENTSPLY**

A.     **The Trubyte Dealers' Apparent Preference To Remain Trubyte Dealers Does Not Legally Or Factually Make Them Foreclosed To Rivals**

Even if it had shown that alternative means of distribution other than Dentsply's dealer network are not viable, the agency failed to prove that Trubyte dealers are themselves not available to Dentsply's rivals. The agency concedes that Trubyte dealers are not contractually bound to Dentsply in a manner that would put them in breach of their obligations if they changed

- 22 -

suppliers. (Agency Br. 33.) However, the agency contends that "no dealer is willing to 'walk away' from its substantial Trubyte tooth sales to take on a competitive line of teeth with insubstantial market share," thus placing them off limits to Dentsply's rivals "in perpetuity." (Id.)

This argument is factually wrong and legally unsupportable. Trubyte dealers have the unfettered ability to drop Dentsply teeth without any financial or legal liability in order to take on the teeth of a rival. Rivals are not foreclosed from competing in the market where there is no contract that precludes them from competing for the business of the defendant's dealers. See Paddock Publications, Inc. v. Chicago Tribune Co., 103 F.3d 42, 45 (7th Cir. 1996). No court of appeals construing an exclusive dealing arrangement that was terminable at will has held that such an arrangement foreclosed competition, even where the defendant was the market leader, and therefore important to a dealer's business.[16]

For example, in Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039 (8th Cir.), cert. denied, 531 U.S. 979 (2000), Brunswick provided huge discounts to dealers that purchased stern drive outboard motor engines exclusively from Brunswick. The plaintiffs alleged that these discounts amounted to "golden handcuffs" that locked-in Brunswick's customers to deal only with Brunswick and contributed to its dominant 78% market share. 207 F.3d at 1063. The record established that the market share discount program did not require the dealers to commit to Brunswick for any specified period of time, and they were "free to walk away" and switch to

---

[16] The agency cites 3M v. Appleton Papers, Inc., 35 F. Supp. 2d 1138 (D. Minn. 1999), for the proposition that exclusive dealing can exclude rivals if dealers would suffer financially by leaving the defendant's dealer system to carry a rival product. (Agency Br. 34.) In Appleton Papers, the district court held that an issue of fact was raised on summary judgment because the supplier's sole sourcing agreements had incentives built in that had the practical effect of "tying up the paper sheet inventory of a merchant over a period of several years." 35 F. Supp. 2d at 1144. The court pointed to evidence that dealers faced high switching costs that made it difficult for rivals to dislodge the incumbent. Id. Here, the agency has not disputed that, if Dentsply's dealers decide to carry the teeth of a rival, they can either sell their Dentsply inventory (for which the agency concedes there is substantial demand) or return the teeth to Dentsply for full credit. Similarly, there is no evidence of any "switching costs" associated with distributing rivals' teeth in lieu of Dentsply's. Thus, Appleton Papers is inapposite, and the agency is left with no legal authority for its novel argument.

- 23 -

other manufacturers who offered superior discounts. *Id.* at 1059. The Eighth Circuit held that these facts defeated any claim of foreclosure. *Id.*

In *Paddock*, plaintiff challenged news and features syndication contracts terminable at will or requiring notice of between 30 days and one year. 103 F.3d at 44. The Seventh Circuit found contracts of a year's duration lawful as exclusivity "mak[es] it feasible for firms to invest in promoting their products," yet, annually, "the entire market is up for grabs." *Id.* at 47 ("[C]ompetition for the contract makes it possible to have the benefits of exclusivity and rivalry simultaneously.") Similarly, *Roland Mach. Co.*, 749 F.2d at 394, involved dealership agreements at issue that were terminable by either party on short notice. The Seventh Circuit held that a rival manufacturer could simply offer "a better deal" to the defendant's dealer in order to enter the market (contracts terminable in less than a year presumptively lawful). *Id.* at 394-95.

In *Gilbarco*, the plaintiffs' expert opined, just as the agency has done here, that the agreements were really not terminable at will because "no distributor would abandon the Gilbarco line for an untested product with no reputation." 127 F.3d at 1164. The Ninth Circuit "agree[d] with the unremarkable proposition that a competitor with a proven product and strong reputation is likely to enjoy success in the marketplace" but rejected the notion that the distributor's willing adherence to such a supplier was "anticompetitive" on the ground that it was, instead, "the essence of competition." *Id.* The court found that "the short duration and easy terminability of these agreements negate substantially their potential to foreclose competition." *Id.* at 1163.

To the same effect is *CDC Tech.*, 186 F.3d at 81 (affirming a finding of no violation in part because the agreements were terminable on 60 days' notice; "exclusive dealing arrangements with reasonable termination provisions may actually promote, rather than discourage, competition.") (citations omitted); *accord, Maxim Integrated Prods., Inc. v. Analog Devices, Inc.*, 1996-1 Trade Cas. (CCH) ¶ 71,366, at 76,842 (9th Cir. 1996), (fact that the

- 24 -

exclusivity agreements "allow the distributors to, without penalty, terminate their relationship with ADI strongly favors a finding of no unreasonable restraint on competition"); *Denison Mattress Factory v. Spring-Air Co.*, 308 F.2d 403, 412 (5th Cir. 1962) (exclusive dealing contract permissible because terminable without cause in six months).

Recently, in *R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362 (M.D.N.C. 2002), the court rejected the plaintiffs' argument that the defendant's "high market share and strong customer preference 'coerce' retailers" into entering into retail merchandising agreements and make the terminability provisions of the agreements "illusory." *Id.* at 392. The court held that the defendant's marketplace success has given it "competitive advantages, including promotional and advertising advantages, and higher sales, which the Sherman Act does not prohibit." *Id.* (citing *Gilbarco*, 127 F.3d at 1164).

Here, the agency's concession that Dentsply relationships with its dealers are "at will" ends the inquiry. Dealers can cease buying and distributing Trubyte artificial teeth at any time. (DPFF ¶¶ 135-36.) If they do decide to take on the teeth of a rival, they can either sell their Dentsply tooth inventory or send it back to Dentsply for full credit. (DPFF ¶¶ 135-36.) Because rivals at any point in time can compete with Dentsply to secure distribution of their tooth products through currently existing Trubyte dealers, Dentsply's Dealer Criteria are presumptively lawful, *Roland Mach. Co.*, 749 F.2d at 395, and do not result in adverse competitive effects as a matter of law. If Dentsply's marketplace strength is the reason that its dealers do not take on the teeth of a rival, as the agency claims, that fact does not unlawfully exclude Dentsply's competitors from the market. As the Ninth Circuit has held: "[w]e fail to see how the existence of good will achieved through effective service is an impediment to, rather than the natural result of, competition." *United States v. Syufy Enters.*, 903 F.2d 659, 669 (9th Cir. 1990) (cited in *Gilbarco* approvingly).

- 25 -

Moreover, the agency's argument that no dealer will walk away from Dentsply's high market share is not supported by the evidence. Dentsply's dealers compete against each other because Dentsply does not provide them with exclusive territories. (DPFF ¶¶ 273-276.) Dentsply introduced evidence that the Trubyte tooth sales of many of Dentsply's dealers in particular geographic areas – stated as a percentage of all Trubyte teeth sold in particular geographic area – are in the single digits. (DPFF ¶¶ 80, 141;                These statistics demonstrate that these dealers would make more tooth sales if they took on the teeth of Ivoclar, Vita or even Heraeus Kulzer than they are making of Trubyte teeth.

Finally, the agency's argument that the fact that no dealer has dropped Trubyte teeth since Dentsply announced the Dealer Criteria does not prove that a dealer could not do so. There is no evidence that any rival offered a Trubyte tooth dealer sufficient financial motive, such as a bigger profit margin, in order to gain the dealer's business. In fact, the record is rife with evidence that rivals who approached Trubyte dealers offer less-appealing terms – lower profit margins, competition from the rival selling direct, prohibitions from accessing certain large tooth accounts and the general lack of demand for the rival's teeth. (DPFF ¶¶ 128, 171, 183, 185, 302, 303.) The agency had the burden to demonstrate that the duration of the exclusive dealing policy barred rivals from competing for the business of Trubyte dealers; it failed to prove that the Dealer Criteria had any duration, or that the rivals even tried to compete for that business, or that Trubyte dealers would not accept an invitation. Consequently, the terminable-at-will character of Dentsply's policy confirms its legality.

**B.      The Agency Failed To Prove That Dentsply And Its Dealers Have An Enforceable Agreement**

The agency also argues (apparently in the alternative) that Dentsply and its dealers have an actual "agreement" within the meaning of Section 1 of the Sherman Act and Section 3 of the Clayton Act, one that is concededly terminable at will. But the evidence does not establish an agreement, in the antitrust sense.

**REDACTED**

- 26 -

Under the antitrust laws, a manufacturer's announcement of a policy, and a dealer's conformance to the policy, does not constitute an "agreement" unless there is evidence of a "meeting of the minds" or "common scheme" in furtherance of which "the distributor communicated its acquiescence or agreement, and [evidence] that this was sought by the manufacturer." *Monsanto Co. v. Spray-Rite Servs. Corp.*, 465 U.S. 752, 764 n.9 (1984) (relying on *United States v. Colgate Co.*, 250 U.S. 300 (1919)). There must be evidence, direct or circumstantial, that "reasonably tends to prove that [the parties] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 768. *Accord In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999).

The agency's proof does not satisfy that burden. Statements by Dentsply employees and Trubyte tooth dealers using the terms "agree" or "agreement" in discussing the Dealer Criteria do not mean that the parties entered into an agreement under the antitrust laws. (Agency Br. 45.) The evidence is unrefuted that Dentsply unilaterally adopted and implemented Dealer Criterion 6. Dentsply did not obtain the consent of dealers to do so; it simply unilaterally refuses to sell Trubyte teeth to dealers that do not comply with its Dealer Criteria. The fact that some witnesses in shorthanded fashion refer to the dealers' compliance with Dealer Criterion 6 as "agreeing to it" has no legal significance.[17] *Parkway Gallery Furniture, Inc. v. Kittinger/Pennsylvania House Group, Inc.*, 878 F.2d 801, 804-06 (4th Cir. 1989) (no agreement despite undisputed evidence that dealers were "in agreement" with manufacturer's announced policy that it would not recognize any dealer that sold furniture over 1-800 telephone numbers).

The agency also argues that an agreement is evidenced by Dentsply's enforcement of its Dealer Criteria. (Agency Br. 46.) To the contrary, uniform enforcement demonstrates that the

---

[17] Even the agency concedes that Dentsply imposed Dealer Criterion 6 upon the dealers, and it is not the result of a conscious commitment to a common scheme: "[m]any Dentsply tooth dealers believe that, in imposing Dealer Criterion 6 upon them, Dentsply exerts too much control over the products the dealers are able to sell." (Agency Br. 17 n.11.)

- 27 -

reasons underlying the policy are not pretextual and in fact supports the unilateral character of the policy. *E.g., Beach v. Viking Sewing Mach. Co.*, 784 F.2d 746, 750 (6th Cir. 1986) (no concerted activity where the supplier enforced a "uniform policy" that it unilaterally formulated); *Roland Mach.*, 749 F.2d at 393 (holding that a need to enforce a policy "does not establish an agreement, but if anything the opposite: a failure to agree on a point critical to one of the parties").

The agency claims that Dentsply's enforcement rose to the level of an agreement because it "threatened" to terminate dealers and subsequently obtained assurances of compliance from its dealers. (Agency Br. 46-47.) However, the law permits Dentsply to notify dealers of the consequence of non-compliance without transforming a dealer's subsequent acquiescence into an unlawful agreement. *See Jeanery, Inc. v. James Jeans, Inc.*, 849 F.2d 1148, 1158-59 (9th Cir. 1988) (visits by a manufacturer to a non-complying dealer to discuss non-compliance constitute "legitimate pressure" to get dealer to abide by policy; "[n]o inference of antitrust conspiracy can be drawn from such evidence."); *see also International Logistics Group v. Chrysler Corp.*, 884 F.2d 904, 906-07 (6th Cir. 1989) (upholding defendant's efforts to induce distributors to comply with policy); *Parkway Gallery Furniture*, 878 F.2d at 805-06 (same). A conspiracy "may not evolve under circumstances where a dealer or distributor involuntarily complies to avoid termination of his product source." *International Logistics Group*, 884 F.2d at 906; *Chase v. Northwest Airlines Corp.*, 49 F. Supp. 2d 553, 560-61 (E.D. Mich. 1999) (§ 1 conspiracy cannot exist where a dealer involuntarily complies with a producer's sales policies to avoid termination of his product source); *Acton v. Merle Norman Cosmetics, Inc.*, 1995-1 Trade Cas. (CCH) ¶ 71,025, at 74,817-18 (C.D. Cal. 1995) (manufacturer's establishment of exclusive dealing policy and its pressuring dealers to comply was "consistent with the privilege of independent action permitted a manufacturer under *Colgate*") (citation omitted); 7 Phillip E. Areeda, *Antitrust Law: An Analysis of Antitrust Principles and Their Application,* ¶ 1446, at 90 (1986) (the *Monsanto* Court "was explicit that no agreement arises when dealers comply in order to avoid termination").

- 28 -

In any event, the agency's concession that Dentsply's arrangement is terminable at will negates any foreclosure effect that any exclusive dealing agreement would have.

### III.    VIDENT AND IVOCLAR'S PERFORMANCE IN THE TOOTH MARKET IS NOT ATTRIBUTABLE TO ANY INABILITY TO ACCESS TRUBYTE DEALERS

The agency claims that the lack of viability of alternative distribution methods is proved by evidence that, "despite substantial efforts," Vident and Ivoclar have not been successful in the tooth market. (APFF ¶¶ 154-160.)  But the agency did not prove that the performance of these suppliers was not the result of their own actions.  Substantial record evidence establishes that Ivoclar's and Vita's and Vident's performance in the tooth market is due to their own business decisions and not to their inability to access Trubyte dealers.

When Ivoclar experimented with selling teeth through Frink in the late 1980s,

Throughout most of the 1990s, Ivoclar's sole means of promoting and selling its artificial teeth was through a sales force that also promoted and sold Ivoclar's crown and bridge products.  These sales representatives spent  very little time promoting Ivoclar's teeth because they made better commissions selling Ivoclar's popular crown and bridge products.  (DPFF ¶¶ 292-93.)  Ivoclar also focused its promotional efforts on that aspect of its business.                      of Ivoclar NA's marketing dollars in the U.S. were spent in support of Ivoclar's artificial tooth products.  (DPFF ¶ 313.)  In 1999, Ivoclar NA's marketing budget for all products was                      (DPFF ¶ 313.)  Of that, Ivoclar NA earmarked                      for purposes of marketing its artificial teeth.  (DPFF ¶ 313.)

**REDACTED**

- 29 -

In addition to the lack of support for its tooth business, Ivoclar concedes that, until it introduced two new tooth lines last January, its teeth were not suited to the U.S. market. (DPFF ¶¶ 294, 296, 298.) Ivoclar's teeth are made using European moulds; they are longer and have a thicker ridge lap than teeth made using American moulds. (DPFF ¶¶ 5, 294-95.) Ivoclar's tooth design requires denture laboratory technicians to expend significant time grinding the teeth in order to set them in a denture. (DPFF ¶¶ 295, 300.) Because labor is the most expensive component of a denture, the grinding necessary to fabricate Ivoclar's teeth is costly for the laboratory. (DPFF ¶ 295.) Further, the appearance of Ivoclar's tooth moulds are not attractive to American dentists and denture wearers, and, although the shading is attractive while on a tooth card, the teeth appear gray in patients' mouths. (DPFF ¶¶ 298-300.) Ivoclar's shade guide system also limits the marketability of its teeth. (DPFF ¶ 299.) When Ivoclar finally brought out an American tooth, Mr. Mariacher of National Dentex, one of the country's largest purchasers of artificial teeth, told Ivoclar that Ivoclar "finally" had made a tooth that National Dentex could buy. (DPFF ¶ 296.)

Vident's performance in the U.S. market is directly due to its lack of promotion and marketing of Vita teeth and not to its lack of access to Dentsply's dealer network. (DPFF ¶¶ 308, 310.) Vident employs        outside sales representatives with combined responsibility for porcelain products and artificial teeth. (DPFF ¶¶ 289-90.)

                                                                                Vita does not market or promote artificial teeth in the United States at all, and Vident is charged with accomplishing all such marketing efforts.

The evidence shows that another significant problem for Vita teeth is that Vident, which sells both direct and through sub-dealers, has a reputation for undercutting the pricing of its subdealers

**REDACTED**

- 30 -

for the lucrative laboratory accounts. (DPFF ¶¶ 171, 183, 185, 305.) This substantially inhibits the willingness of dealers to take on Vita teeth.

The choices that these firms have made about the operation of their tooth business in the United States provide a complete explanation for whatever level of success they have had in this country. (DPFF ¶¶ 301-03.) Their experience does not affect the weight of the evidence that direct sales and sales through non-Trubyte laboratory and operatory dealers are viable distribution methods for artificial teeth.

## IV.    DENTSPLY'S DEALER CRITERIA HAVE PROCOMPETITIVE EFFECTS

If the agency cannot prove that the Dealer Criteria caused significant foreclosure at the dental laboratory level, then its claims fail and this Court's inquiry is at an end. "Absent a compelling showing of foreclosure of substantial dimension," there is no need to pursue any inquiry into the defendants' precise motive or to consider "the existence and measure of any claimed benefits from exclusivity, the balance between harms and benefits, or the possible existence and relevance of any less restrictive means of achieving the benefits." *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 596 (1st Cir. 1993).

Even in the unlikely event that the agency had met its threshold burden of showing foreclosure, the determination of the legality of Dentsply's exclusive dealing policy would merely have begun. *Tampa Electric* holds that, before deciding that an exclusive dealing arrangement is illegal, courts must take into account the economic justification for the arrangement. *American Motor Inns*, 521 F.2d at 1252. Specifically, courts must evaluate both "the restrictiveness and the economic usefulness of the challenged practice in relation to the business factors extant in the market." *Id.* at 1251 n.75. Determination of the economic usefulness of the challenged exclusionary arrangement involves consideration of the legitimate economic justifications for the arrangement. *Barr Labs.*, 978 F.2d at 111 (concluding that the

- 31 -

existence of legitimate business justifications supported the validity of the exclusive contracts as a matter of law). This requirement recognizes the long-standing belief that exclusive dealing arrangements can generate procompetitive benefits. As explained below, Dentsply proved that its Dealer Criteria promote competition by neutralizing free-riding by its rivals in the artificial tooth market. This bona fide procompetitive justification confirms the legality of the Dealer Criteria.

### A.    Exclusive Dealing Policies Protect Investments In Promotion From Free Riding

Protection from competitively damaging free-riding operates as a legal justification for exclusive dealing arrangements. *Thompson Everett, Inc. v. National Cable Advertising*, 57 F.3d 1317, 1326 (4th Cir. 1995); *Ryko Mfg. Co.*, 823 F.2d at 1235 n.17; *Roland Mach. Co.*, 749 F.2d at 395; *In re Beltone Elec. Corp.*, 100 F.T.C. 68 (1982); *Barr Labs.*, 978 F.2d at 111.

The concept of free riding relates to the ability of a firm's rivals to benefit or "free ride" on its investment in demand-generating activities and creates a disincentive for the firm to engage in such activities in the market. (Tr. 3540-41 Marvel.) As a result, there is less information for consumers in the market about the product at issue, resulting in the diminution of interbrand competition. (Tr. 3550 Marvel.)

Dentsply's expert economist, Dr. Howard Marvel, a professor of both law and economics at Ohio State University, is credited with developing the procompetitive explanation for exclusive dealing. (DPFF ¶ 321.) Dr. Marvel is the author of the seminal article regarding exclusive dealing and the pro-competitive benefits that flow from exclusive dealing's ability to eliminate free riding. *See* Marvel, *Exclusive Dealing*, 25 J.L. Econ. 1, 6-25 (1982). (DPFF ¶ 321.) He has written and lectured extensively on the economics of distribution. The economic theory of exclusive dealing holds that manufacturers adopt such arrangements in order to create a property right in their own promotional investments in the marketplace. (Tr. 3539-40 Marvel.)

- 32 -

The construct of the economic theory is as follows: the manufacturer undertakes efforts to generate demand for its products. These efforts motivate customers to seek out sources for the manufacturer's products. A dealer that stocks the manufacturer's products receives the business from the customers created by the manufacturer's demand-generation activities. As a result, the dealer benefits simply by carrying the manufacturer's brand of products. The manufacturer prices its promoted product to reflect the value of the customers that its activities pull through to the dealer. To the extent that a rival can place its products into the manufacturer's dealers, it obtains access to those customers created by the promoting manufacturer, without any of the costs associated with generating the demand for the product. Because the rival manufacturer has less promotional investment to recoup, it can offer the dealer a motive – i.e., a lower price resulting in a higher margin for that dealer – to convert the customers to the rival brand. (Tr. 3539-50 Marvel.) This conduct means that the manufacturer's ability to recoup an investment from its promotional and sales efforts necessarily depends upon its ability to restrict its distributors from carrying rival products.[18] (DPFF ¶¶ 321-326; Tr. 3546-50 Marvel.)

The case law has accepted Dr. Marvel's economic justification for exclusive dealing. *See Roland Mach.*, 749 F.2d at 395 (exclusive dealing protects manufacturer investment and demand-creating activities by precluding dealers from converting customers to unpromoted brands that provide more margin) (*citing* Marvel, *Exclusive Dealing, supra,* at 6-7). As the Eighth Circuit held in *Ryko,* "Where, as here, the manufacturer engages in promotional activity that is designed to dovetail with the distributor's efforts, an exclusive dealing clause guarantees that the manufacturer's marketing investment will not be lost to other firms" when the distributor interacts with the buyer. Such an assurance "encourages the manufacturer's investment in marketing activity, and thus encourages interbrand competition." 823 F. 2d at 1235 n.17.

---

[18] Economists consider product promotion a procompetitive activity because it increases information in the marketplace, thereby enhancing interbrand competition. (Tr. 3541-42 Marvel.)

- 33 -

In short, the economic theory of exclusive dealing comprises two principal components: (1) the existence of promotional and demand-generating activities on the part of the manufacturer invoking the exclusive dealing arrangement that exceeds those of its rivals, and (2) the willingness and ability of that manufacturer's dealers to convert the customers created by the manufacturer's activities to competitive products that cost the dealer less, but provide it with greater profits. Dentsply has proved that both components of Dr. Marvel's theory operate in the tooth market.

**B.    Dentsply's Promotional And Demand-Generating Activities Were Substantial And Exceeded Those Of Its Rivals**

The evidence at trial clearly demonstrated that Dentsply generates demand for its artificial teeth through marketing and through all levels of the market (laboratory, dentist and patient) with the primary focus on the laboratory or end-user level. (DPFF ¶¶ 226-239.) By focusing its demand creation activities at the laboratory level, Trubyte pulls volume through to the dealer.[19] (DPFF ¶¶ 226, 230, 232.) The primary vehicle that Dentsply uses to create demand is its dedicated sales force. (DPFF ¶ 227.) Throughout the 1990's Dentsply used between 30 and 32 sales representatives that were dedicated to tooth products and now has 31. (DPFF ¶ 228.) These dedicated tooth sales representatives made 10,000 sales calls on dental laboratories, or almost 48% of all sales calls, in 2001 and are expected to increase that number this year. (DPFF ¶ 229.)

Dentsply's extensive promotional investments are designed to pull sales through to the dealers by persuading dentists to prescribe and laboratories to use Trubyte teeth with denture cases. (DPFF ¶¶ 236, 240.) Unless the dentist submits a brand-specific prescription, the dental

---

[19] Pull-through marketing was a "drumbeat" within Dentsply throughout the relevant time period. (DPFF ¶¶ 236, 226-257; Tr. 3563-64 Marvel.) This pull-through marketing philosophy is significant from an economic perspective because it indicates that Dentsply, once it announced the Dealer Criteria, did not just sit back and simply accept existing orders; it sought to expand sales. (Tr. 3557-58 Marvel.)

- 34 -

laboratories are the primary influence as to which brand of teeth will be used in the denture. (DPFF ¶¶ 9, 10, 15, 16, 240.) Today, only approximately 10% of dental prescriptions specify a particular tooth brand; as a result, the tooth brand decisions are typically made at the laboratory level. (DPFF ¶ 10.) In recognition of this development, over the past 13 years, Dentsply shifted its promotional focus more toward dental laboratories. (DPFF ¶ 226.)

Dentsply has devised a series of promotional and sales programs geared toward the dental laboratories. For instance, Dentsply provides rebates to participating laboratories based on Trubyte tooth purchases that the laboratories make through Trubyte dealers. (DPFF ¶ 234.)

Other examples of Dentsply's demand-creation activities at the laboratory level are its Add-A-Drawer program, and its Dentsply Order Network ("DON"). (DPFF ¶¶ 238-239.)

Over the years, Trubyte has developed and implemented promotional programs geared specifically to the dentist for a variety of Dentsply's tooth lines. (DPFF ¶¶ 240-257.) Trubyte also designed and implemented the Denture Opportunity Program to assist dentists with their practice and then expand the over-all tooth market. (DPFF ¶¶ 245-247.)

Further, it benefits all brands of teeth. (Tr. 3573-74 Marvel.) Again, the trial record contains no evidence that any other tooth manufacturer undertakes promotional activities such as these in an effort to expand the current size of the tooth market.

Dentsply's demand-generating activities at the dentist level are not limited to practicing dentists. Dentsply has had a presence in dental schools for decades; in fact, Dentsply's presence

**REDACTED**

- 35 -

in dental schools has always been at the core of its marketing and sales efforts.  (DPFF ¶ 248.)
Dentsply is the only tooth manufacturer with an educational department.  (DPFF ¶¶ 254-257.)
This educational department operates and manages a core Dentsply education center at
Dentsply's headquarters.    (DPFF ¶¶ 254-255.)    Dentsply schedules courses that provide
comprehensive training and removable prosthetics at the Dentsply education center.  (DPFF
¶ 255.)  Dentsply also offers courses co-sponsored by regional dental laboratory associations
throughout the United States. (DPFF ¶ 256.)

     Conversely, as set forth above, the evidence regarding rival manufacturers establishes that
they conducted no promotion on teeth.   There is no evidence that Vita had *any* demand-
generating or promotional activities during the entire relevant time period. Vident, ,

                    largely  ignored  Vita teeth

                    (DPFF ¶¶ 301-303, 304-310.)  Similarly, Ivoclar's efforts during
this time period focused primarily on its crown and bridge products.  (DPFF ¶¶ 301-303,
311-313.)  During virtually all of the relevant time period, Ivoclar did not have *any* sales
representatives dedicated to teeth, notwithstanding *its direct sale distribution system.*  (DPFF
¶ 311.)  What little evidence there is on the frequency of sales calls these rival manufacturers
paid to dental laboratories established that those events were isolated and rare.   (DPFF
¶ 301-303.)  In short, the rival manufacturers' presence in the tooth market from a promotional or
demand-generating perspective was non-existent.

     In its rebuttal case, the agency attempted to establish that the relative promotional efforts
of Dentsply and its rivals were not consistent with Dr. Marvel's conclusion that those relative
investments satisfied the theoretical justification for exclusive dealing that Dr. Marvel developed.
Dr. Reitman attempted to compare the ratio of sales volume to the number of sales
representatives that some manufacturers had, and the ratio of advertising to sales volume. He
concluded that Dentsply advertised and promoted its products less than its rivals.  (APFF
¶¶ 350-353.)

**REDACTED**

- 36 -

Dr. Reitman's analysis is fundamentally wrong. Dr. Reitman conceded that firms create demand for their products through advertising, promotion and direct selling, that firms make subjective judgments about which of these strategies to emphasize in a given year, and that it is relevant to look at all three of these strategies in assessing a company's effort to create demand for its products. (Tr. 3989 Reitman.) Dr. Reitman did not calculate a comparable ratio across all three of these strategies for Dentsply and its rivals, and the agency therefore failed to prove that Dentsply's total investment in demand generation activities is less than its rivals.[20]

### C.    Dentsply's Promotional And Demand-Generating Activities Are Subject To Free Riding Because Dental Dealers Can Convert Dental Laboratories To Rival Teeth

The second component of the economic justification for exclusive dealing is whether dental dealers, when presented with a dental laboratory customer as a product of Dentsply's extensive demand-creation activities, can convert that dental laboratory to a rival brand. (Tr. 3578-81, 3584-85 Marvel.) The agency misconstrues this argument and ignores record facts that prove it.

Conversion involves two things: motive and opportunity. Dentsply's Dealer Criteria are aimed at limiting the opportunity for conversion. Part of that opportunity already exists at the dealer level because Dentsply does not sell directly to dental laboratories; thus, any dental laboratory that Dentsply creates as a Trubyte tooth-using laboratory, it must refer to one of its dealers. However, the second piece of opportunity is whether the dealer has a competitive brand of teeth that it can offer the dental laboratory to achieve the conversion. The motive aspect of the

---

[20] Dr. Reitman's exhibits do not prove his point. The sales representative exhibit, when adjusted to include telemarketers and government agency representatives, and to exclude those that he included for Vident that do not sell teeth, shows that Dentsply's ratio of sales representatives to its sales volume is equivalent to its rivals. But, in any event, all the chart establishes is that Dentsply is more efficient than its rivals. Similarly, Dr. Reitman's advertising to sales chart does not prove that Vident advertises more than Dentsply in light of the unequivocal statement in Vident's marketing plan

**REDACTED**

- 37 -

conversion process is the financial incentive to the dealer to move the dental laboratory from the Trubyte teeth. Without that financial incentive, the dealer has no motive to change the status quo. Here, Trubyte dealers do not carry Ivoclar and Vita teeth, so they lack the necessary opportunity with those rivals. No supplier has offered them the necessary financial motive. Conversely, where that financial motivation exists, dealers have made the conversion where there was the opportunity, as the record shows.

The record clearly establishes that dealers actually convert dental laboratories from one tooth brand to another if it is profitable for them to do so. (DPFF ¶¶ 327-332.) When Dentsply brought out its Portrait line, Zahn switched a huge number of its customers for Universal teeth to Portrait teeth. (DPFF ¶¶ 330-331.) He did this because he made "more profit" on Portrait teeth than he did on Universal teeth. (DPFF ¶ 331.) When Ivoclar obtained Frink as a dealer, it explicitly expected that Frink would transfer its Trubyte customer base to Ivoclar. (DPFF ¶ 333.) , a fact consistent with Ivoclar's lack of promotion during this period and with the economic incentive for exclusive dealing. The agency cites testimony by the president of Darby Dental that Darby would have pushed Vita teeth to every customer it had and likely would have been quite successful. (APFF ¶ 268.) Darby believes that those sales would come at Dentsply's expense. (APFF ¶ 268.) So the fact that dental dealers are capable of converting laboratories between tooth brands is undisputed.

Indeed, Dealer Criterion 5 proves that dealers believe that they can convert their customers to new tooth brands. Dealer Criterion 5 requires that dental dealers wanting to become authorized Trubyte tooth dealers demonstrate how they would bring incremental tooth sales to Dentsply. (DPFF ¶ 338.) In most cases, dental dealers have demonstrated that ability to generate incremental tooth sales by converting their laboratory customers who are currently using non-Trubyte teeth into Trubyte-using dental laboratories. (DPFF ¶¶ 327, 338-340.) For

**REDACTED**

- 38 -

example, DTS converted its Vita and Ivoclar customers to Trubyte when it became a Trubyte dealer. (DPFF ¶ 342.)

The agency's defense to the proof that dealers, properly incentivized, can and will convert their customers from one brand to another is that some witnesses testified that dealers are just order takers, offering their wares for sale altruistically (Agency Br. 55). The agency also contends that there is no evidence that Trubyte dealers that carry the "grandfathered brands" steer Trubyte customers to these rival teeth. . Neither of these arguments proves that Dentsply's exclusive dealing policy is not justified by a valid concern that such conversion is likely. Because Dentsply's Trubyte dealers do not carry Vita or Ivoclar teeth, they have no opportunity to convert customers to other brands. The necessity for both motive and opportunity in order to achieve conversion also explains why dealers carrying grandfathered brands have not converted Trubyte customers to other brands. There is no evidence that rival manufacturers created a financial incentive or motive to induce the Trubyte dealers that carried both their teeth and Trubyte teeth to convert Trubyte dental laboratories to one of those rivals' brands of teeth. Thus, although the dealers have had the opportunity for conversion because they carry both Trubyte teeth and a rival brand of teeth, rivals offered them no motive to convert.

Finally, the agency's own theory of anticompetitive effect assumes the capability of conversion. The entire premise of its conclusion on its survey is that, if Trubyte dealers carry Vita and Ivoclar teeth, the dealers will convert Trubyte customers to rival brands and that dental dealers will sell more Vita and Ivoclar teeth at the expense of Dentsply teeth. This is precisely what conversion is.

### D.    Dentsply's Business Justification For Exclusive Dealing Is Not Pretextual

To rebut Dentsply's showing that its policy is supported by a plausible procompetitive justification, the agency argues that it is "pretextual" by personally attacking the credibility of Dr.

Marvel.[21] The agency claims that he changed aspects of his theory to fit the facts of the case, but that the facts do not fit the theory in any event. It is understandable why the agency tries so hard to discredit Dr. Marvel, given the universal acceptance of his theory. However, Dr. Marvel did not abandon components of his theory and ignore record evidence inconsistent with it, as the agency claims. He performed a detailed empirical analysis of the record, and concluded that the economic conditions that would result in a firm choosing to protect its property right in demand-generating activities were present in the tooth market when Dentsply began to demand it of its dealers, and that he observed real world facts that were consistent with the components of his procompetitive explanation for exclusive dealing.

Dr. Marvel observed that, prior to the mid-1980s, dentists were the primary determinant of the tooth brand used in dentures. (Tr. 3632 Marvel; DPFF ¶ 319.) Gradually, as dental schools put less emphasis on dentures, dental laboratories became the more important determinant of brand selection. Once the lab was making the brand choice, the dealers had a much greater opportunity to convert them to different brands. Contemporaneously with these events, Dr. Marvel observed that Dentsply introduced its IPN material and began to put more emphasis on the sale of premium teeth. (Tr. 3632 Marvel.) These developments required Dentsply to induce laboratories, more than dentists, to trade up to a premium brand, *i.e.*, it required Dentsply to promote more to laboratories. Dr. Marvel observed that Dentsply changed its sales force emphasis, around 1985, from calling on dentists to calling on labs, according to Mr. Weinstock, who was employed by Dentsply at the time. In light of these events, an economist would expect a firm like Dentsply to require exclusive dealing to protect its investment in the lab customers that it brought to its dealers. (Tr. 3632-34 Marvel.) It was in the

---

[21] The agency complains at length that Dr. Marvel's analysis should be rejected because he did not perform an "empirical analysis" of the artificial tooth market in concluding that his theory fit the facts of this case. The agency, quite simply, is wrong. An empirical analysis is one simply based upon observable facts. As was apparent from his 3-hour direct examination, and his two extensive expert reports that cite substantial record evidence in support of his theory, Dr. Marvel performed an empirical analysis of this market and reached his conclusions on the basis of the facts that he observed.

- 40 -

late 1980s, right at this time period, when Ivoclar approached Frink, and Dentsply insisted on exclusive dealing. (DPFF ¶¶ 119-126.)

The Frink episode also proves the other components of Dr. Marvel's theory, in his view. Ivoclar offered Frink an exclusive territory, a mechanism used to protect a dealer's sales efforts from free riding competitive dealers. (DPFF ¶¶ 120-121.) This is a recognition that Frink, not Ivoclar, owned the customers. Ivoclar offered Frink a higher margin on Trubyte teeth, meaning that Frink could sell the Ivoclar teeth at the same price that it sold Trubyte teeth, and make more money. (DPFF ¶¶ 120-121.) This gave Frink a motive to convert its customers to Ivoclar teeth, and it was Ivoclar's expressed objective that Frink "transfer its customer base" to Ivoclar. (DPFF ¶ 121.) Dr. Marvel expected exclusive dealing to arise in these circumstances, and it did. (Tr. 3577-78 Marvel.)

Dr. Marvel observed that, throughout the 1990s, the conditions for exclusive dealing persisted. Dentsply's focus on the lab as its principal customer increased; Dentsply increased its emphasis on premium brands like Portrait, requiring continued promotion for acceptance; well financed global competitors entered the market. (DPFF ¶¶ 64-68.) Dr. Marvel concluded that the facts of this case fit his theory "wonderfully." (Tr. 3659 Marvel.)

There is nothing about Dr. Marvel's discussion of the components of his theory on cross examination that call into question his ultimate conclusion that it is applicable here. Accordingly, Dr. Marvel's opinion will assist the Court in determining whether Dentsply's business justification is plausible, and the Court should accept it.

The agency also argues that Dentsply's economic justification for the Dealer Criteria are "pretextual" because Dentsply's contemporaneous documents and testimony do not describe the economic theory identified by Dr. Marvel, but instead express the "motive" of using exclusive

- 41 -

dealing to block competitors.[22] (Agency Br. 52-53.) The issue here, however, is the actual effect of the policy, not Dentsply's subjective intent in adopting it. *See, e.g., California Dental Ass'n v. FTC*, 526 U.S. 756, 775 n.12 (1999); *Continental Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499 (4th Cir. 2002); *Todd v. Exxon Corp.*, 275 F.3d 191, 213 (2d Cir. 2001); *All Care Nursing Serv. Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 749 (11th Cir. 1998). If conduct is not objectively anticompetitive, the motive animating the conduct is legally irrelevant. *Olympia Equip. Leasing Co. v. Western Union Tel. Co.*, 797 F.2d 370, 379 (7th Cir. 1986) ("That [defendant] wanted to 'flush these turkeys' tells us nothing about the lawfulness of the conduct."); *Ocean State Physicians Health Plan v. Blue Cross & Blue Shield*, 883 F.2d 1101, 1113 (1st Cir. 1989) ("the desire to crush a competitor, standing alone, is insufficient to make out a violation of the antitrust laws"). Here, because Dealer Criterion 6 objectively is justified as a means of protecting against competitively damaging free-riding, the agency's extensive frolic and detour into Dentsply's intent in seeking to implement the policy simply is irrelevant.

The agency's argument that Dr. Marvel's theory is inapposite because he has no opinion on Dentsply's subjective "motive" for exclusive dealing misperceived the role of an economist in antitrust cases. (Agency Br. 51 n.33.) An economist is not a mind reader, or a fact reciter. An economist assists the Court by explaining an economic theory, and whether the observed record facts fit that theory. Simply put, the economic "motive" for exclusive dealing justifies it, and an economist has no role in opining on the relevance of a firm's subjective motive.

Lastly, the agency argues that Dentsply's justification is pretextual because Dentsply's executives contemporaneously have said that its policy is designed to insure dealer focus on the

---

[22]  The agency also argues that, because Dentsply promotes at the same level for tooth dealers carrying grandfathered rival brands, the free-riding justification is pretextual. (Agency Br. 58-60.) Apparently this group of prosecutors is unfamiliar with the Robinson-Patman Act, 15 U.S.C. §§ 13, 13b, 21, which outlaws discrimination among customers with respect to, *inter alia*, promotional services. Moreover, Trubyte dealers do not have exclusive territories, so they share customers. It would be impossible to differentiate dealer support in these circumstances. (Tr. 3597-99 Marvel.)

- 42 -

Trubyte brand and that this justification is different from the rationale described by Dr. Marvel. (Agency Br. 52.)  But the two explanations are in complete harmony; Dr. Marvel's theory predicts that Dentsply employs exclusive dealing to preclude its dealers from converting Trubyte customers to the teeth of a rival.  Dentsply desire for "dealer focus" is merely a different articulation of the same rationale.

## V.    THE AGENCY FAILED TO PROVE A PLAUSIBLE, PALPABLE ADVERSE EFFECT ON COMPETITION

The agency recognizes that, to prevail on its claims, it must show that Dentsply's dealer criteria have likely or probable anticompetitive effects.  (Agency Br. 33.)  In light of its concession that Dentsply's rivals are not foreclosed from the dental laboratories, and the evidence that supports it, this showing is impossible.  However, the agency attempted to overcome the real world facts that establish that Dentsply's rivals can and do sell teeth to dental laboratories by relying upon the alleged results of a hypothetical survey to assert that, without Dentsply's Dealer Criteria, Dentsply would lose market share and prices in the market would fall. The agency's proof of adverse effect, consists exclusively of speculation, ungrounded estimates and a series of implausible what-ifs that arise from the survey and its experts' simulations.

In the first place, a showing that Dentsply would lose share and prices would fall in a world without Dealer Criterion 6 does not establish that Dentsply's conduct has produced an anticompetitive effect. The economic justification for exclusive dealing assumes that Dentsply's prices reflect a margin for its demand generating, procompetitive promotional efforts that is protected by an exclusive dealing restriction. (Tr. 3547-48, 3658-59 Marvel.)

So, without a consideration of the procompetitive justification for Dentsply's policy, the results of the agency's survey do not establish anticompetitive effect, even if they could be credited.

**REDACTED**

- 43 -

As this Court is aware, however, the agency's survey is the subject of substantial controversy regarding its construction, methodology, and the econometrics that the agency's expert performed with its results. Dentsply moved before trial to exclude it, and has moved to exclude it as unreliable in light of the trial evidence. In anticipation of a potential conclusion by this Court that the survey is either inadmissible or entitled to no weight, the agency now argues that it has shown that Dentsply's Dealer Criteria caused "direct, actual anticompetitive effects" because it permitted Dentsply to "frustrate consumer preferences", and that the survey merely "quantifies" that effect. (Agency Br. 35-37.) The agency's factual argument that consumer preferences are frustrated is not supported by the record, and the agency is left with the survey and its econometric manipulations in an ultimately vain attempt to show anticompetitive effect.

> **A.    The Agency's Claim That Dentsply Frustrated Consumer Preferences Is Neither Factually Accurate Nor Legally Cognizable**

The agency argues that Dentsply has precluded dental labs from obtaining the brand of teeth that they want "through dealers, the distribution channel that consumers [dental labs] prefer" (Agency Br. 35), and this preclusion "frustrated consumer preferences." However, since the record conclusively demonstrates the existence of other viable means for rivals to access dental labs, the fact that Trubyte dealers do not sell the teeth of some of Dentsply's rivals does not establish that dental labs could not obtain Ivoclar or Vita teeth by picking up the telephone and ordering them for next day delivery. The agency has no evidence from a single dental lab that it was unable to get the rival teeth that it needed; rather, the evidence demonstrates that for the most part there is no demand for the teeth. (DPFF ¶¶ 302-03.) In short, the evidence of viable alternate means of distribution refutes the agency's claim that dental labs cannot get what they want.

The agency also claims that the Dealer Criteria "has deprived many consumers of the teeth that they want" because, before Dentsply developed its Vita-shaded Portrait tooth, labs

- 44 -

frequently substituted a Trubyte tooth when dentists submitted prescriptions containing Vita shades. (Agency Br. 36.) Dr. Reitman, however, did not conclude that Dentsply's development and introduction of Portrait was indicative of monopoly power. (Tr. 1594 Reitman.) Nevertheless, the inference that this evidence means that dental labs actually wanted the Vita tooth as opposed to a Vita-shaded tooth is unreasonable. The record is undisputed that Dentsply has the most popular moulds and that almost half of denture prescriptions contain both a mould and shade designation. (DPFF ¶¶ 10, 35.) Since the mould is the more unique of the two prescription elements, it is more reasonable to infer that the labs chose to match the mould precisely. With respect to shade-only prescriptions, there is no evidence that labs cross-matched a Vita shade prescription to a Trubyte tooth because the rivals could not get their teeth to the labs. Indeed, given the ability of labs to easily order Vita teeth, it is not credible that labs cross-matched unwillingly.

Finally, the agency's argument that Dentsply's ability to sell "aesthetically inferior" teeth for "so long" before its introduction of Portrait does not establish any anticompetitive effect. The record shows that Dentsply's teeth, even before Portrait was introduced, were rated superior on a number of parameters including aesthetics. (DPFF ¶¶ 209-10.) Mr. Weinstock testified that the Vita shade guide gained prominence only as recently as the early 1990s. (DPFF ¶ 211.) Dentsply began researching the concept of Vita-shaded teeth in 1993. (DPFF ¶¶ 211-14.) Thus, the evidence reflects that Dentsply responded timely to market requests for a Vita-shaded tooth, not that it dragged its feet and ignored customer feedback. The agency introduced no evidence supporting an inference that Dentsply used its Dealer Criteria to insulate itself from the need to innovate and respond to market demand.

Even if the evidence demonstrated a frustration of consumer preference, that fact would be legally irrelevant without accompanying proof that the frustration manifested itself as

foreclosure, *i.e.*, that dental labs could not buy or would not buy rival teeth because they were not in Trubyte dealers. The evidence shows no such foreclosure.[23]

### B.    The Agency's Survey Possesses No Evidentiary Value

The agency's effort to prove that Dentsply's Dealer Criteria caused an adverse effect on competition begins and ends with its inadmissible, implausible, methodologically defective dental lab survey. The agency did not present evidence from a single dental laboratory that it had refrained from purchasing or reduced its purchases of rival tooth lines because those tooth lines were not available from authorized Trubyte dealers. It did not introduce any sworn testimony from dental laboratories that dental laboratories prefer to buy their teeth through dental dealers to the exclusion of buying directly from manufacturers.

Assuming that the survey survives Fed. R. Evid. 702 and 801,[24] it deserves no weight. First, the level of involvement (or rather lack thereof) of the sponsoring witness, Professor Yoram Wind, at every stage of the survey – design, drafting, execution, data collection, data input, data analysis – approaches embarrassment. (DPFF ¶¶ 346-48.) *Compare Ninth Avenue Remedial Group, et al. v. Allis-Chalmers Corp.*, 141 F. Supp. 2d 957, 960 (N.D. Ind. 2001). In *Ninth Avenue*, the court considered whether a single expert could testify about the independent work conducted by two other experts with respect to a Superfund site. *Id.* at 959. Significantly, the testifying expert "did not exercise any independent judgment" "but instead relied entirely and

---

[23]  The agency cites *FTC v. Indiana Federation of Dentists*, 476 U.S. 447 (1985) as support for this "frustration of preferences" argument. (Agency Br. 35.) But *Indiana Federation of Dentists* had nothing to do with a consumer preference of how to receive a product.  Instead, it was a horizontal conspiracy (a naked restraint with no justification) to deny a service to a customer.  476 U.S. at 457.  In other words, the defendants colluded to prevent the plaintiff from receiving particular information (x-rays) in any manner.  The evidence here demonstrates that labs were not so foreclosed here.  In *Aspen Skiing* the "consumer frustration" was tied to an essential facilities theory, not an exclusive dealing theory.  472 U.S. at 598.  Further, the evidence included quantified consumer responses that consumers would not use the rival's ski lift because it was not part of the defendant's ticket.  472 U.S. at 606.  There is no such evidence here.

[24]  Dentsply has separately moved to exclude the survey and any testimony that relied on that survey pursuant to Rules 702 and 801, Federal Rules of Evidence.

- 46 -

without question" on the other expert's conclusion on a material issue in the case. *Id.* at 960. As such, the court held that the testifying expert could not testify or be cross-examined as to the non-testifying expert's work, nor could she vouch for the truth of that work because she did not supervise it. *Id.* Consequently, the court had no basis to assess the reliability of the work and excluded the testifying expert's opinion. *Id.* at 961.

Here, Dr. Wind did not supervise, nor could he testify to or be cross-examined on, the data collection, data inputting, interviewer training or the interview process (DPFF ¶¶ 347-48.) The analysis that Dr. Wind offers to the Court with respect to estimated share shifts were solely the work of Dr. Kreiger, on which Dr. Wind relied entirely and without question. (Tr. 810, 833 Wind.) Dr. Wind did not even look at the completed questionnaires; thus, he had no knowledge about the reason why Dr. Kreiger had included the data that came from the questionnaires that interviewer Tiffany Wigley materially altered. (*See* DPFF ¶¶ 37 n.7, 373-82.) As a result, Dr. Wind's testifying protects Dr. Kreiger from cross-examination on this vulnerable aspect of the survey analysis. Therefore, Wind's testimony deserves no weight. *A & M Records, Inc. v. Napster, Inc.*, 2000 U.S. Dist. LEXIS 20668 at *20-*25 (N.D. Cal. Aug. 10, 2000) (giving survey no weight where sponsoring witness could not attest credibly that survey conformed to accepted survey principles, including design, execution, collection and validation).

Next, the survey suffered from serious methodological flaws. It contained intentionally undefined material terms, in particular "local dealer."[25] (DPFF ¶¶ 358-59.) *Compare Smithkline Beecham Consumer Healthcare v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 2001 U.S. Dist. LEXIS 7061, at *21 (S.D.N.Y. June 1, 2001) (giving no weight to a survey that did not define "dose" or "unit" for the respondents, where the expert assigned it a particular meaning for

---

[25] This term is significant because the agency's experts based their entire opinions that Vita and Ivoclar's market shares would increase if their teeth were available through "local dealers."

- 47 -

purpose of his analysis).[26]  The survey exposed the responding dental labs to an overly complicated exercise, with the result being that many of the completed questionnaires suggest that the respondents did not understand or did not take the survey seriously.  (DPFF ¶¶ 371-72.) The agency did not pre-test the survey, a "virtual necessity" for all surveys, so the agency could not rebut the evidence of undefined terms and confusing stimuli.[27]  (DPFF ¶¶ 365-70.)  *Compare Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.*, 559 F. Supp. 1189, 1205 (E.D.N.Y. 1983) (trustworthiness of survey depends, *inter alia*, on evidence the questions were "clear, precise and non-leading") (citing Manual for Complex Litigation 116 (5th ed. 1981); *see Pittsburgh Press Club v. United States,* 579 F.2d 751, 757 (3d Cir. 1978) (survey questionnaires must meet standard of objective surveying).

The survey also has serious data collection and recordation errors. (DPFF ¶¶ 373-82.)  A survey interviewer named Tiffany Wigley changed the lab respondents' answers on 38 questionnaires, or nearly 15 percent of all completed questionnaires. (DPFF ¶ 382.)  These changes, some of which Dr. Reitman called "material adjustments," many times increase the shares for rival teeth and decrease the share for Dentsply – coincidentally the precise conclusion both agency experts reached. (DPFF ¶ 379.)  *Compare Bank of Utah v. Commercial Sec. Bank,* 369 F.2d 19, 27-28 (10th Cir. 1966) ("The offeror has the burden of establishing that a proffered

---

[26] In *Smithkline Beacham*, the court considered a diary survey ("Mediscope Study") in which respondents tracked their usage of the antacid Tums.  2001 U.S. Dist. LEXIS 7061, at *13. The survey did not give respondents the opportunity to explain how many Tums tablets they believed constituted a "dose."  Nor did the survey give respondents instruction on what either "dose" or "unit" meant for purposes of this study. *Id.* at *21. The expert had no basis to define a "dose" as one tablet, a definition that materially altered the results.

[27] The REFERENCE MANUAL FOR SCIENTIFIC EVIDENCE states

> when unclear questions are included in the survey they may threaten the validity of the survey by systematically distorting responses if respondents are misled in a particular direction or by inflating the random error if respondents guess because they do not understand the question.  If the crucial question is sufficiently ambiguous or unclear it may be a basis for rejecting the survey.

REFERENCE MANUAL FOR SCIENTIFIC EVIDENCE 248 (2d ed. 2000); Paul E. Green, *et al.*, *Research for Marketing Decisions* 271 ("Pretesting of questionnaires is a virtual necessity.  The only way that questions are unambiguous is to try them.").  Dr. Green is a colleague of Dr. Wind's who helped design the agency's survey. (Tr. 3024-25 Rossi.)  .

- 48 -

poll was conducted in accordance with accepted principles of survey research," such as showing, *inter alia*, that mode of questioning the interviewees was correct and data gathered was accurately reported); *see* REFERENCE MANUAL at 268. This is particularly significant given that the survey's predicted share shifts for Vita and Ivoclar are less than 2%. These operations certainly affect that result. Finally, the survey's low response raises a serious risk of non-response bias that the agency took no steps to dispel. (DPFF ¶¶ 361-64.)[28]

### C.    The Agency's Expert Analyses Based On The Survey Are Entitled To No Evidentiary Weight

#### 1.    Dr. Wind's Analysis Of The Survey Has No Utility

Dr. Wind's adopted analysis of the survey data suffers from four fundamental defects. First, none of the three scenarios in the analysis reflect a hypothetical in which Vita and Ivoclar distribute only through dental dealers. Rather, all three scenarios reflect Ivoclar and Vita distributing both directly as manufacturers as well as through some combination of dealers. (GX140.) The problem with this distribution dynamic is that it does not reflect how these two rivals actually operate or would operate in the market. First, Vita Zahnfabrik has never sold directly to any dental laboratories. It is contractually bound to distribute exclusively through Vident, its national dealer. (DPFF ¶ 165.) Vident will no longer distribute teeth directly to labs if it can distribute teeth through Trubyte's national dealers. (DPFF ¶ 305.) Ivovlar testified that during the one time it sold through a dealer, it did not sell directly to lab customers of that dealer. (DPFF ¶¶ 120-21.) As a result, Dr. Wind's scenarios contradict the but-for world that the agency's claim posits. This error renders Dr. Wind's adopted analysis unreliable.

---

[28] The survey's response rate was just under 40%. (DPFF ¶ 362.) The REFERENCE MANUAL unequivocally instructs "if the response rate drops below 50% the survey should be regarded with significant caution as a basis for precise quantitative statements about the population from which the sample was drawn." REFERENCE MANUAL at 245. When this occurs, "the survey experts should be prepared to provide evidence on the potential impact of non-response on the survey results" by analyzing "the differences between those who answered and those who did not answer." *Id.* at 245-46. Dr. Wind did not do this; further, Dr. Wind did not retain any of the information about the non-respondents, so such a comparison would be impossible. (Tr. 773, 913 Wind; Tr. 3043 Rossi.)

- 49 -

Second, Dr. Wind's adopted analysis only estimates the amount of market share that would change among the manufacturers listed on the stimulus cards based on varying price levels and distribution options. Dr. Wind performed no analysis and gave no opinion that the shares would result in any change in the price of artificial teeth. As a matter of law, a demonstration that sales would simply move from one competitor to another without a corresponding decrease in prices is immaterial to determining an effect that the Dealer Criteria might have had on the artificial tooth market. *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1036 (9th Cir. 2001) (antitrust laws specifically concerned with acts that harm "allocative efficiency *and* raise the price or goods"; simply proving that sales shift among competitors insufficient). "[T]he antitrust laws were passed for the protection of competition, not competitors." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)); *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990) (same).

Moreover, the share shifts that Dr. Wind estimates are small in absolute numbers: at best, his analysis shows that, if Vita and Ivoclar were sold through dealers, Vita's share would increase by 1.07 points, Ivoclar's would increase by 1.79 share points. Although Dr. Wind terms these share shifts "incredibly significant" (Tr. 804 Wind), the agency has characterized similar absolute increases in market share – specifically the sales growth of the new entrants, Heraeus Kulzer and Schottlander – "not successful." (APFF ¶ 217.) The agency cannot have it both ways. Either this type of share growth is material, in which case, the recent entries are meaningful or the share shifts estimated by Dr. Wind are also meaningless.

Dr. Wind's analysis does not attribute the share shifts to a corresponding reduction in Dentsply's share. (Tr. 889-90 Wind.) In fact, Dr. Wind conceded that the share increases he estimates for Vita and Ivoclar could come at the expense of any of the six different manufacturers represented on the stimuli cards. (Tr. 891-92 Wind.) Because Dr. Wind's estimates cannot be

- 50 -

tied to Dentsply, they cannot be attributable to Dentsply's Dealer Criteria. Consequently, Dr. Wind's estimates cannot assist this Court.

Finally, Dr. Wind concedes that he cannot state that his estimated market share shifts are statistically significant:

> Q.     So I'm going to Exhibit 4. Okay? These estimations that you have here in Exhibit 4, you are not here as an expert saying that these explanations are statistically significant; correct?
>
> A.     Correct. We cannot calculate for them the statistical significance.
>
>          \*     \*     \*
>
> Q.     Right. And so what you want, it's your position that you give an estimation and you want the user of that information to determine whether the estimation is meaningful; correct?
>
> A.     Correct. Managerially meaningful.
>
>          \*     \*     \*
>
> Q.     Isn't it true that the concept of managerially sound is not the same as statistically sound?
>
> A.     Correct.

(Tr. 905, 906-07.)  Thus, Dr. Wind cannot vouch for his predictions in any statistically meaningful manner. Unable to provide the Court with some objective proof of his estimates' reliability (in fact, he places that burden on the Court), Dr. Wind's predictions are nothing more than unusable guesses.

### 2.     Dr. Reitman's Econometric Analysis Is Entitled To No Weight

In addition to Dr. Wind, the agency had a second expert, David Reitman, attempt to prove an adverse effect on competition from the Dealer Criteria.[29]  Like Dr. Wind, Dr. Reitman

---

[29]  Dr. Reitman is not an independent expert. He is the agency's staff economist. The agency did not, or more likely could not, retain a respected independent expert economist to offer the opinion that, under any accepted

- 51 -

crunched the data supposedly obtained from the survey. Using those numbers, Dr. Reitman performed a number of multinomial regressions and testified that, in his opinion, if Dentsply did not have its Dealer Criteria, Vita Zahnfabrik and Ivoclar would gain less than 1 ½ share points each, and that "the prices of all premium teeth in the market would fall by approximately 4% to 5%." (APFF ¶ 278.) These estimates are utterly unreliable.

Dr. Reitman's econometrics and the expert opinion he offers suffer from four core shortcomings: (1) his analysis contradicts and/or ignores market facts; (2) Dr. Reitman altered data in order to have the survey responses fit the regression model on which he based his opinion; (3) Dr Reitman's analysis does not eliminate the other potential causes for the estimates, consequently, he cannot link the estimates to the absence of Dentsply's Dealer Criteria; and (4) Dr. Reitman's point estimates and many of the variables used in calculating those estimates are statistically insignificant. Consequently, Dr. Reitman's predictions are entitled to no weight, and since those predictions form the sole basis for the agency's proof of anti-competitive price effect, the agency has failed to satisfy this critical element of its claims against Dentsply.

a.    **Dr. Reitman's Analysis Violates The Standards
For Expert Testimony Because It Contradicts
And Ignores Market Facts**

This Court cannot rely upon an expert opinion that does not "incorporate all aspects of the economic reality" of the market at issue. *Concord Boat Corp. v Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir.), *cert. denied*, 531 U.S. 979 (2000). In *Concord Boat*, plaintiffs' economist employed an econometric model to analyze the impact of Brunswick's discount programs on the

---

formulation of antitrust economic principles, the exclusive dealing arrangement reflected in Dealer Criterion 6 can be viewed as restraining competition. In dire need of an economist to support their case, the agency made the highly unusual decision to have Dr. Reitman, its own employee, offer that opinion.

By any measure, Dr. Reitman's qualifications to offer an opinion on exclusive dealing are marginal. He has never written an article on exclusive dealing. He has never presented a paper or given a speech on the topic, or worked on any public matter that in any way has involved exclusive dealing. Even outside the scope of exclusive dealing issues, Dr. Reitman's accomplishments are less than distinguished. Dr. Reitman has not published an article on any topic in seven years and has presented just one paper in that time. (Tr. 545-46 Reitman.)

- 52 -

stern drive boat engine market. Plaintiffs' expert opined that the discount programs effectively imposed a tax on all boat builders that chose to purchase engines from manufacturers other than Brunswick. 207 F.3d at 1056. The Court found, however, that he used the model to "construct a hypothetical market which was not grounded in the economic reality" of relevant product market because the econometric model "ignored inconvenient evidence" in the record. *Id.*

In particular, the model created a hypothetical market in which an overcharge was assessed on each engine sold over any point where Brunswick possessed a 50% market share. *Id.* The record evidence, however, reflected that the Brunswick's discount programs at issue did not begin until it already had achieved a 75% market share. *Id.* The model also failed to account for specific "market events" not related to anticompetitive conduct. For instance, Brunswick gained additional market share as a result of a rival's engine recall and problems associated with two other rivals' merger. *Id.* at 1057. Consequently, the Court held that the opinion should not have been admitted at trial under *Daubert,* concluding that "deficiencies in the foundation of the opinion" rendered the expert's conclusions "mere speculation." *Id.* (citation omitted).

Dr. Reitman's estimates are fraught with similar disregard for and contradiction of the facts. The various distribution and pricing alternatives reflected in the survey's scenario cards do not reflect the economic reality of the artificial tooth market. On many of the cards for which Vita and/or Ivoclar teeth are available through local dealers, the cards provide that the teeth will continue to be sold to the lab respondents directly from the manufacturer. (DPFF ¶¶ 390-91; Tr. 1615-16 Reitman.) Vita has never sold directly to laboratories and is contractually forbidden from doing so. (DPFF ¶ 165.)

Thus, like Dr. Wind, the data Dr. Reitman relies upon to form his opinion, *i.e.,* labs' allocation of tooth purchases given various distribution scenarios is based on distribution scenarios that are not reflective of the tooth market.

**REDACTED**

- 53 -

The price estimates suffer the same fate.  Dr. Reitman's prediction requires Vident and Ivoclar to drop the price they charge dental laboratories currently for their teeth by nearly 19%. Dentsply would drop its price only 2.6%. (Tr. 1623 Reitman.)[30]  These details contradict real-world facts.[31]  The evidence establishes that when a rival added a dental dealer to its distribution system, that rival raised, not lowered, its artificial tooth prices.  Ivoclar instituted a price increase across the board for its artificial teeth when it appointed Frink as a dental dealer.  (DPFF ¶ 121.) According to Ivoclar's President, Mr. Ganley, that price increase was necessary in order to maintain Ivoclar's profitability while giving Frink the ordinary 35 margin points that dental dealers receive with respect to artificial teeth.  (DPFF ¶ 121.)

Similarly,                                    Vident performed an economic and financial analysis on the costs and benefits of adding a "national dealer" to its sub-dealer network.

Thus, in the context of the real world, Vident and Ivoclar determined that were they to add a tooth dealer to their respective distribution systems, a necessary prerequisite would be an increase in the prices charged to dental laboratories for artificial teeth. Dr. Reitman's hypothetical modeling, therefore, does not reflect actual pricing practices in the market. [32]

---

[30]  There is no basis to assert, as the agency implies, that the predicted price reduction is the result of price competition that occurs *after* the rivals gain access to the Trubyte dealers.  The survey presents to the labs simultaneously both a predetermined price and a distribution scenario; thus it does not permit an argument that the price caused the distribution scenario or vice versa.

[31]  Dr. Reitman concedes that it was not part of the survey exercise to have the scenario cards reflect prices that tooth manufacturers actually would charge.  (Tr. 1614 Reitman ("the actual representation [of] what is on the card is not supposed to represent what is out there in the real world").)

[32]  Furthermore, Dentsply's main dealers – whom Ivoclar and Vident want – did not testify that they would automatically take on Vita or Ivoclar.  (DPFF ¶ 162.)  Patterson has no interest in adding a tooth line unless the

REDACTED

- 54 -

Moreover, the 35 margin points that Ivoclar would have to give to a dealer means that Ivoclar would lose both the 19% price reduction and the 35% dealer margin on top of that. The assumption that Ivoclar would do that given its historical pricing conduct formula is implausible. The same is true for Vident. Vident has not lowered the tooth prices that it charges sub-dealers *once* during the relevant time period. That Dr. Reitman says rivals would now does not make it so. "[An] expert's 'self proclaimed' accuracy is insufficient. 'Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.'" *Allapattah Services Inc. v. Exxon Corp.*, 61 F. Supp. 2d 1335, 1340 (S.D. Fla. 1999) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999)).

Dr. Reitman's opinion that availability of local dealers would result in a market share shift to Vita and Ivoclar and a decrease in premium tooth prices is based on an econometric model that ignores the realities of the tooth market. As such, Dr. Reitman's opinion constitutes nothing more than mere speculation.

### b.    Dr. Reitman Inappropriately Altered Data To Fit The Regression Model That He Selected For His Analysis

Dr. Reitman also inexplicably and inappropriately manipulated and modified the purported survey data so that it would fit the econometric model that he selected to generate his estimates. These inexplicable actions render the model unreliable and the estimates that it generated useless.

---

brand had at least a 10% market share (which neither Ivoclar nor Vita would, even with the purported increase). (DPFF ¶ 162.)

        : There is no evidence that would happen. Therefore, equating the survey's dealer availability with the lack of Dealer Criteria is just another Reitman *ipse dixit.*

**REDACTED**

- 55 -

First, Dr. Reitman's model is misspecified, *i.e.*, he uses the wrong logit model for the data. The ECONOMETRICA article by Halbert White,[33] which Dr. Reitman cites in support of using a multinomial logit model, proposes a test for determining if the model is appropriate for the data. (Tr. 3095-96 Rossi.) That objective test, when applied here, demonstrates that the model is misspecified. (Tr. 3096-100 Rossi; Tr. 4054-55 Reitman.) This misapplication of methodology violates a fundamental tenet of *Daubert*. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994) (an expert analysis any step of which either "completely changes a reliable methodology or merely misapplies that methodology" is unreliable).

Second, Dr. Reitman inexplicably changes a parameter which his logit model uses to calculate the estimates. The survey data generated several parameters – or numerical characteristics – including a price sensitivity parameter. (Tr. 3077-78 Rossi.) Unfortunately, one of the price sensitivity parameters implies a negative marginal cost.[34] (Tr. 3079 Rossi.) Of course, this implication is implausible.[35] In order to get an economically plausible result from this model, Dr. Reitman was forced to disregard the price sensitivity parameter that the the logit model produced from survey data and simply self-select a price sensitivity parameter with a higher value. (Tr. 3077-80 Rossi.) Dr. Reitman's reason for this change is that the price sensitivity parameter was "too low." (Tr. 3079 Rossi.) But the data is what generated the original parameter, and he arbitrarily changed it to a value inconsistent with what the data indicated. (Tr. 3079-80 Rossi.)

There is no justification for the action. An economist using a regression model must use the parameters dictated by the sample data. (Tr. 3082 Rossi.) Here "what we have is a situation

---

[33]  Halbert White, "Maximum Likelihood Estimation of Misspecified Models," ECONOMETRICA 2 (Jan. 1992).

[34]  "Negative marginal cost" means that the cost of producing the next card of teeth is negative, *i.e.*, someone is paying you to manufacture it. (Tr. 3079 Rossi.)

[35]  Dr. Reitman identified a few exigent market circumstances that might result in a negative marginal cost, but did not state, nor was there any proof at trial, that those circumstances exist in the artificial tooth market.

- 56 -

in which these calculations, the end result of all this are based not on what the data say [] but what Dr. Reitman would like the data to say." (Tr. 3082 Rossi.) Moreover, this change was material in that by increasing the price sensitivity parameter, Dr. Reitman was instructing the logit model that market shares react more strongly to price changes than the data survey results reflect. Thus, this arbitrary change of a major variable renders the analysis unreliable.

**c.    Dr. Reitman Cannot Isolate The Variations In Price From The Variation In Distribution; Therefore, He Cannot Link His Estimates To The Dealer Option Only**

The third core shortcoming of Dr. Reitman's econometric analysis is his failure to isolate the price and distribution variables in his estimates. Dr. Reitman bore the responsibility to demonstrate that his price and share estimates were caused by the Dealer Criteria. *Stelwagon Mfg. Co. v. Tarmac Roofing Sys.*, 63 F.3d 1267, 1275 (3d Cir. 1995). In *Stelwagon*, the Third Circuit held that the expert's analysis was insufficient to prove that the defendant's anticompetitive conduct caused plaintiff's injuries. 63 F.3d at 1275. Significantly, the expert's analysis failed to eliminate as potential causes other issues, such as plaintiff's own business problem during the relevant time period. *Id.*; *see Concord Boat Corp.*, 207 F.3d at 1056-57; *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 401 (7th Cir. 1993) (antitrust plaintiff must prove that, "but for" the alleged violation, the claimed effect would not have occurred); *Cable Holdings, Inc. v. Home Video, Inc.*, 825 F.2d 1559, 1561 (11th Cir. 1987) (same); *Axis S.p.A. v. Micafil, Inc.*, 870 F.2d 1105, 1107 (6th Cir. 1989) (proof must demonstrate that effect flows "directly" from the alleged antitrust violation).

In addition to Dr. Reitman's admission that the survey was not intended to predict what would happen without the Dealer Criteria (Tr. 1607-08 Reitman), the survey's set-up made such an objective impossible. The scenario cards were designed so that the respondents provided the data in response to a combination of tooth price and a matrix of distribution options (local dealer,

-57-

national dealer, and/or direct-from manufacturer). Thus, for a particular scenario card, if a dental laboratory predicted that 30% of its purchases would be of Vitapan teeth at the price of $26.40 a card with local dealer and manufacturer direct as available distribution options, it is impossible to say that the distribution options only generated the 30% share response. As a result, Dr. Reitman did not, and cannot, say that any share difference was the result of dealer availability as opposed to the particular price stated on the scenario card. This flaw in the survey makes it impossible for Dr. Reitman to link the survey respondents' answers to the survey distribution options, let alone to Dealer Criterion 6. *Compare Conwood Co. v. United States Tobacco Co.*, 290 F.3d 768, 794 (6th Cir. 2002) (rejecting causation challenge to expert's analysis because the expert had accounted for every other potential cause of injury and eliminated each as a factor) (cited by agency).

### d.     The Agency Did Not Prove By A Preponderance Of Evidence That Dr. Reitman's Estimates Were Statistically Significant

Finally, it is axiomatic that "whenever possible an estimate should be accompanied by its standard error." REFERENCE MANUAL at 117-18. This requirement is necessary because any estimate based on a sample is likely to be off the mark due to a random error. According to Dentsply's expert, Peter Rossi, it was possible to calculate standard errors for Dr. Reitman's estimates. (DPFF ¶¶ 385-87; Tr. 3070 Rossi.) However, Dr. Reitman did not calculate standard errors for any of the estimates that he proffered. (DPFF ¶¶ 386, 401.) This failure is fatal. *See General Electric Co. v. Joiner*, 522 U.S. 136, 145-46 (1997) (evaluating reliability based on statistical significance); *cf. SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 25 (1st Cir. 1999) ("[A]n expert must vouchsafe the reliability of the data on which he relies and explain how the cumulation of that data was consistent with standards of the expert's profession."), *cert denied*, 528 U.S. 1188 (2000).

- 58 -

Dr. Reitman claims that it is unnecessary to calculate a standard error for his ultimate share and price estimates because each of the parameters used in those calculations themselves were statistically significant. (Tr. 3910-11 Reitman.) This testimony is incorrect in two material ways. First, as Dr. Rossi explained, having statistically significant parameters does not mean that calculations using those parameters will necessarily be statistically significant. (Tr. 3084 Rossi.) Second, and more importantly, the parameters that Dr. Reitman inserted in order to calculate the price effect were not all statistically significant. Dr. Reitman testified at trial that "key" parameters necessary for the price effect calculation were statistically significant, but, when pressed, admitted that only one of the price interaction parameters was statistically significant and, not surprisingly, he considered that to be the single key parameter. (Tr. 4042-43 Reitman.) However, Dr. Rossi explained the critical interaction of the other parameters, all of which were statistically insignificant. (Tr. 3086-88 Rossi.) Thus, Dr. Reitman's explanation as to why a standard error calculation on his final price and share estimates was unnecessary is not credible.

Dr. Rossi, on the other hand, did calculate standard errors and presented them to the Court, using an accepted econometric analysis called "Monte Carlo simulations." Each of the estimates that Dr. Reitman calculated for the share change of Vita and Ivoclar teeth, the change of Dentsply premium teeth, the change in Vita and Ivoclar tooth prices, the overall change in premium tooth prices, and the change in total tooth market prices each had an estimated error range that rendered these estimates utterly useless from a statistical standpoint. (DPFF ¶¶ 401-02.) Dr. Reitman did not offer any quantitative rebuttal to Dr. Rossi's standard error calculations. The upshot of Dr. Rossi's estimated error ranges for Dr. Reitman's estimates means that there is no way for Dr. Reitman to demonstrate that the estimates were the result of the survey data as opposed to the "white noise" and random error inherent in data taken from the sample and the interaction from the manipulation of that data in the logit model. Therefore, the agency has given this Court no meaningful quantitative proof that Dentsply's Dealer Criteria had a probable anticompetitive effect in the marketplace.

- 59 -

**D.    Dentsply Dealer Criteria Do Not Exceed The Limits Of What Is Reasonably Necessary To Protect Its Investment In Promotion**

The agency conceded that to prevail on its claim, it must prove that the Dealer Criteria exceed the "outer limits of [what] is reasonably necessary to protect" Dentsply's investment in promotion. *American Motor Inns.*, 521 F.2d at 1248,49. The agency claims that it has met its burden for a variety of reasons, most of which are easily dismissed.[36]  Principally, the agency argues that the Dealer Criteria are overly broad and pretextual because, it claims, the record shows that, without Dealer Criterion 6, Dentsply would actually promote more.[37]

The agency's "proof" of that assertion is that Dentsply's executives agree that they would not sit idly by while their market share eroded. Increased promotion must be funded by higher prices, a result the agency certainly would reject.  But that answer to a hypothetical question does not prove that the restraint is not justified; it proves, rather, that the justification for exclusive dealing is true as a matter of fact.

In any event, Dentsply's Dealer Criteria are not overly broad.  Criterion 5 serves as a reasonable limitation on Criterion 6.  Dentsply does not authorize every dealer who asks, rather it requires proof of the ability to generate incremental business.  (DPFF ¶¶ 338-42.)  As a result, there are viable alternative dealers available to rival manufacturers.  Further, the ability for dealers to drop Trubyte teeth without penalty serves to keep the exclusivity requirement in place only as long as the potential for free riding exists, as opposed to a concrete term.  Finally, when Dentsply imposed Criterion 6, it did not force any existing dealer to drop existing suppliers.  This conservative approach also supports the reasonableness of the Dealer Criteria.

---

[36] The fact that Dentsply does not impose exclusive dealing in non-tooth products is irrelevant, without a showing that those products are characterized by substantial presale promotion, dealer distribution, etc.  The fact that Dentsply imposes the criteria on all of a dealer's outlets, even if it does not carry teeth at some of them, is irrelevant because conversion does not require a tooth stock.

[37] The agency also relies on this claim to argue that Dr. Marvel's theory does not fit the facts of this case.  For the reasons stated above, that argument must be rejected as well.

- 60 -

## VI.    THE AGENCY'S NOVEL MONOPOLY THEORY IS NEITHER FACTUALLY NOR LEGALLY SUSTAINABLE

This Court's analysis of the trial record need go no further than the conclusion mandated by the foregoing sections of our brief: the agency failed to prove that Dentsply's rivals cannot access the market through viable channels of distribution other than Trubyte dealers, failed to rebut Dentsply's procompetitive justification, and failed to establish any actual anticompetitive effects from Dentsply's conduct that outweigh the procompetitive benefits which, it concedes, are positive.

But the agency argues that they have proved that Dentsply willfully maintained a monopoly in violation of Section 2 of the Sherman Act, because it has proved that Dentsply has monopoly power and has utilized this power to gain a competitive advantage over its rivals by distributing its teeth through a "preferred", and more "effective", distribution channel. (Agency Br. 1-3, 19-20.)  This theory is the central premise of the agency's case, that Dentsply has violated the law, not through exclusion of its rivals from the market, but by maintaining a high market share and excluding its rivals from its dealer network.

This theory must be rejected for two reasons:  the agency did not prove, in the first instance, that Dentsply possesses monopoly power.  More importantly for the resolution of this case, the agency's theory that Dentsply's high market share changes and lessens the burden that the law places on a plaintiff in an exclusive dealing case is wrong as a matter of law.

### A.    The Agency Did Not Prove That Dentsply Has Monopoly Power

To establish that Dentsply violated Section 2 of the Sherman Act, the agency must first show that Dentsply possesses monopoly power.  The agency can meet this burden either through direct evidence that Dentsply charged supracompetitive prices or excluded rivals or by raising an inference of monopoly power from Dentsply's market share. *Rebel Oil Co. v. Atlantic Richfield*

- 61 -

*Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). The agency has failed to demonstrate by a preponderance of the evidence that Dentsply has monopoly power in the artificial tooth market under either approach.

1.    **Dentsply's Market Share Does Not Permit The Inference Of Monopoly Power**

The agency argues that the Court can infer monopoly power from Dentsply's "predominant" and "high" market share alone. (Agency Br. 7-8.) The agency's first problem is that it did not establish that Dentsply's market share is at a level from which monopoly power can be inferred. The market share figures on which the agency relies are based on Dentsply's share of artificial teeth sales on a dollar basis, but this is not the appropriate way to measure market share in a market where, as here, products have widely varying attributes and prices. (DPFF ¶¶ 2-6, 286.) This is because revenue-based estimates in markets with products sold at widely varying prices distort the effect of a firm's actual output. *Brown Shoe Co. v. United States*, 370 U.S. 294, 343 n.69 (1962) (since shoes sold in differentiated price ranges, "sales measured by pairage provide a more accurate picture of [defendant's] shares of the market than do sales measured in dollars."); *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 999 (11th Cir. 1993) ("When assessing market shares for the purpose of ascertaining market power the appropriate measure of a firm's share is the quantity of goods or services actually sold to consumers" since "price spread between various products would make the revenue figure an inaccurate estimator of unit sales."); *United States v. Eastman Kodak Co.*, 853 F. Supp. 1454, 1472 (W.D.N.Y. 1994) (finding relevant measure of market share in unit sales since film can be sold for different prices), *aff'd*, 63 F.3d 95 (2d Cir. 1995).

In the artificial tooth market, Dentsply sells teeth in the premium, mid-line and economy segments, but its principal rivals, Vita and Ivoclar, do not. (DPFF ¶¶ 27, 36, 41.) Consequently, a revenue-based market share figure overstates Dentsply's capability of exercising monopoly power. A metric that reflects the actual number Trubyte teeth sold more accurately reflects

- 62 -

Dentsply's market position. Dr. Reitman acknowledged that Dentsply tracks its performance versus the performance of its competitors on a unit volume basis. (DPFF ¶ 287.) Dr. Reitman also agreed that Dentsply's unit volume share is substantially lower than its revenue share in the artificial tooth market. (DPFF ¶ 287.).

Under controlling Third Circuit law, a market share in this range is insufficient as a matter of law to support an inference of monopoly power. *Fineman v. Armstrong World Indus.*, 980 F.2d 171, 201-02 (3d Cir. 1992) ("As a matter of law, absent other relevant factors, a 55 percent market share will not prove the existence of monopoly power.")

in part to competitive entries of Heraeus Kulzer and Schottlander and to Ivoclar's more aggressive presence in the market. (DPFF ¶ 288.) Evidence of such market share decreases "[substantially] undermines any argument claiming that [an exclusive dealing agreement] effectively foreclosed other manufacturers from a substantial portion of the market." *Contractor Utility Sales Co. v. Certain-Teed Prods. Corp.*, 638 F.2d 1061, 1079 (7th Cir. 1981).

### 2.      There Is No Direct Evidence That Dentsply Excluded Competitors From The Market

But even if the agency had shown that Dentsply's market share was high enough to cause concern, that would not end the monopoly power inquiry. While the monopoly power element may be inferred from a showing of substantial market share, this inference is rebutted by, among other things, low barriers to the entry of firms that can discipline any attempt to raise prices. *See Handicomp, Inc. v. U.S. Golf Ass'n*, No. 99-5372, A-2049 (3d Cir. Mar. 22, 2000) (72% market share does not confer monopoly power in absence of significant barriers to entry), *cert. denied,*

**REDACTED**

- 63 -

531 U.S. 928 (2000); *Oahu Gas Serv., Inc. v. Pacific Resources Inc.*, 838 F.2d 360, 366 (9th Cir. 1988) ("A high market share, though it may ordinarily raise an inference of monopoly power, will not do so in a market with low entry barriers or other evidence of a defendant's inability to control prices or exclude competitors") (internal citation omitted). For example, the Ninth Circuit in *Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1425-26 (9th Cir. 1993) held that a firm with *100%* market share did not possess monopoly power absent evidence that the defendant could prevent entry.

In each of the cases that the agency cites to support their claim that Dentsply's market share permits an inference of monopoly power, the courts considered and credited evidence other than the defendant's market share in determining that the defendant had monopoly power. *See Eastman Kodak Co. v. Image Technical Serv., Inc.*, 504 U.S. 451, 469 (1992) (evidence in the record of increased prices and excluded competition); *International Boxing Club v. United States*, 358 U.S. 242, 249 (1959) (direct evidence of the exclusion of competition); *American Tobacco Co. v. United States*, 328 U.S. 781, 798-801 (1946) (direct evidence of controlling prices and excluding competition); *Weiss v. York Hosp.*, 745 F.2d 786, 827 (3d Cir. 1984) (evidence regarding defendant's power to control prices and exclude competition supported inference of monopoly power).[38]

In light of Dr. Reitman's damning concessions regarding foreclosure and the viability of alternative channels of distribution, the agency does not nor could it argue that Dentsply has actually excluded rivals from the market. Instead, the agency argues that "the lack of effective

---

[38]  In *Houser v. Fox Theatres Management Corp.*, 845 F.2d 1225 (3d Cir. 1988), the Third Circuit did not hold that market share between 66% and 71% constituted market power. Rather, it said that this market share was sufficient to create a genuine issue of fact over whether the defendant possessed market power. *Id.* at 1230 n.12. Finally, the agency's citation of the *United States v. E.I. DuPont de Nemours & Co.*, 351 U.S. 377 (1956) is perplexing. There, the defendant held a 75% market share in cellophane wrapping; the Court held that market share did not permit an inference of market power since there were sufficient substitute products to discipline the defendant's conduct. *Id.* at 379-81.

- 64 -

entry or expansion" in the market is direct evidence of monopoly power. (Agency Br. 10.) This contention is not borne out by the evidence.

It is apparent that there are no barriers to entry into the market for artificial teeth, since the market experienced two entries in the last two years. Heraeus Kulzer is a German company that is part of a multinational corporation with $7 billion in annual revenue, $480 million in the dental products division alone. (DPFF ¶ 47.) Although Heraeus Kulzer has sold teeth in Europe for many years, it did not enter the U.S. market with its pre-existing European teeth. Rather, prior to entering the U.S. market, }

Heraeus Kulzer believes that it is in    competition with Dentsply and believes it can meet its objective of becoming the second leading tooth company in the United States. (DPFF ¶ 68.) It is a committed entrant that would not have made this investment if it did not expect to recover these sunk costs. (Tr. 3635 Marvel.) Heraeus Kulzer was fully aware of Dealer Criterion 6 prior to entry, and Dr. Reitman concedes that Criterion 6 did not prevent Heraeus Kulzer from entering the U.S. market. (Tr. 1588 Reitman.)

The agency contends that Heraeus Kulzer's entry is not capable of "constraining" Dentsply's pricing practices. (Agency Br. 11-12.) The evidence strongly establishes otherwise. Heraeus Kulzer has exceeded its initial sales goals, as well as its goals for placing tooth consignments in dental laboratories. (DPFF ¶¶ 67-68.) It achieved         in sales in just two years, and placed over 100 consignments with laboratories. (DPFF ¶¶ 67-68.) Heraeus Kulzer's presence in the market already has caused Dentsply to make price concessions. As a result of direct competition with Heraeus Kulzer for business with the National Dentex laboratory chain, Dentsply provided an additional rebate to National Dentex for its tooth purchases. (DPFF ¶ 288.)

**REDACTED**

- 65 -

Like Heraeus Kulzer, Schottlander was fully aware of Dealer Criterion 6 prior to entry. It decided to distribute its teeth through its exclusive importer, Leach & Dillon located in Rhode Island. (DPFF ¶ 174.) Leach & Dillon is a small family company, but nonetheless anticipates achieving seven-fold growth in sales by year-end. (DPFF ¶ 176.) As with Heraeus Kulzer, Schottlander is committed to competing in the U.S. artificial tooth market.

The agency's dismissal of these entries as "insignificant" and "not meaningful" because they have yet to attain substantial market shares (Agency Br. 12-13) is not cognizable in this Circuit. In *Barr Labs.*, the court affirmed summary judgment in an exclusive dealing case, on the ground, among others, that the record showed entry, although the entrants' market shares remained low. 978 F.2d at 114 ("continued entry of competition, albeit with small initial market share shown on this record, indicates that Abbott's position is subject to significant potential erosion").

Also, it is factually incorrect that existing tooth rivals have not expanded their positions in the market.

More importantly, Ivoclar has invested substantial sums in new tooth lines. In January 2002, Ivoclar expanded its tooth offering with two new lines of teeth – the Ortholingual and Orthoplane tooth lines – featuring "American moulds." (DPFF ¶¶ 296-298.) Ivoclar's purpose in this expansion is to participate in an aspect of the market that heretofore it did not participate in. (DPFF ¶¶ 296-297.) These two new Ivoclar tooth lines compete directly with Dentsply tooth lines and have been received well by dental laboratories. (DPFF ¶ 297.)

Dr. Reitman conceded that Dealer Criterion 6 did not prevent Ivoclar from investing in the tooth market and expanding its presence here. (Tr. 1594 Reitman.)

**REDACTED**

- 66 -

Such evidence of the ability of existing competitors to expand output defeats a claim of monopoly power as a matter of law. *Rebel Oil Co.*, 51 F.3d at 1443; *see International Distribution Ctrs. v. Walsh Trucking Co.*, 812 F.2d 786, 792 (2d Cir. 1987) (entry into market by one new competitor and expansion into market by several existing competitors sufficient to find lack of barrier to entry ) (cited approvingly in *Barr Labs.*, 978 F.2d at 113).

### 3.    The Agency Failed To Prove That Dentsply Set Prices At Supracompetitive Levels

Finally, the agency argues that it proved that Dentsply has monopoly power because it "controls market prices." (Agency Br. 15.) The agency claims that Dentsply prices have "consistently been 10-15% higher than Vita and Ivoclar." (*Id.*) The sole support cited for these assertions is the testimony of William Turner, a lower level Dentsply employee. Mr. Turner's testimony was unsupported by documents or data. (*Id.*)

According to the actual pricing evidence, however, Dentsply's prices were not 10-15% higher than prices for Vita and Ivoclar teeth, or higher than the teeth of rivals in the economy segment of the market. Since 1996, the first full year of its introduction, Dentsply's Portrait tooth line consistently has been priced approximately midway between Vita and Ivoclar's premium tooth lines. (DPFF ¶ 270; DX511-13 (comparing anterior 1x6 for Dentsply Portrait, Vita Vitapan, and Ivoclar Vivodent PE Hardened Acrylic).) During this same period, Dentsply's best-selling premium tooth, Bioform IPN, Dentsply's "workhorse" tooth, has been priced at parity with Ivoclar's comparable tooth line, and between $4.00 and $5.00 below Vita's comparable tooth. (DPFF ¶ 271; DX511-13 (comparing anterior 1x6 for Dentpsly's Bioform IPN, Vita Vitapan, and Ivoclar Vivodent PE Hardened Acrylic.)

The agency's assertion that Dentsply has not reacted to the prices of its rivals also is belied by the evidence. For the most part, Dentsply's rivals have chosen not to compete on price. They have raised their prices at a faster rate than Dentsply and have not implemented a price

- 67 -

decrease within the last ten years. (DX511-13.)  However, in the early 1990s, Vita and Ivoclar instituted volume discount programs with large laboratory chains and buying groups. (DPFF ¶¶ 85-86.)  The rivals offered the laboratory chains and buying groups discounts for meeting certain quantity purchasing targets. (DPFF ¶¶ 85-86.)  Dentsply responded by implementing its Preferred Laboratory Incentive Program, which provided rebates to these same large laboratory chains and buying groups upon meeting volume purchasing goals. (DPFF ¶¶ 85-86.)

The Preferred Laboratory Incentive Program remains in effect today.  The record evidence therefore establishes that Dentsply does not control prices, but rather sets its tooth prices moderately compared to rivals, and responds to competitive pricing pressure with its own pricing discounts and marketing benefits.

The agency also argues that Dentsply's "high" gross profit margin establishes that it has monopoly power.[39]  According to both Dr. Reitman and Dr. Marvel, however, substantial profit margins are expected to be found in markets requiring substantial pre-sale promotion. (Tr. 3640-41 Marvel; 557-58 Reitman.)  The relative margins of Trubyte teeth and merchandise also do not prove that Dentsply's tooth margins are "high"; Trubyte artificial teeth have far more substantial selling and promotional costs (including, for instance, costs associated with administering returns of 30% of all teeth sold) than Trubyte merchandise and Dentsply requires additional gross profit on Trubyte teeth to support these efforts. (DPFF ¶ 278.)

In sum, the agency did not prove that Dentsply's prices and, derivatively its margins, show either actual monopoly power or permit such an inference.

---

[39]  In any event, the agency failed to prove that Dentsply's margin is higher than some accurate benchmark of its competition.  The agency's use of Vident's profit margin is inappropriate in that Vident is a reseller and not a manufacturer of teeth.  The agency introduced no evidence of Ivoclar's or Vita's gross profit margins.  The comparison with Austenal's profit margins is also flawed.  Austenal, although a U.S. corporation, has chosen to manufacture its artificial teeth in Trinidad. (DPFF ¶ 42.)  Its gross margins are impacted by the cost of shipping its teeth into the United States.  Dentsply, which manufactures its teeth domestically in York, Pennsylvania, does not have to absorb that importation cost. (DPFF ¶ 26-27.)

**REDACTED**

- 68 -

4.    **Dentsply's Conduct Is Inconsistent With The Notion
That It Has Monopoly Power**

The evidence at trial regarding performance in the artificial tooth market during the
relevant time period unquestionably refutes the inference that Dentsply has monopoly power,
notwithstanding Dentsply's market share. *See, e.g., Fabrication Enter., Inc., v. Hygenic Corp.,*
848 F. Supp. 1156, 1160 (S.D.N.Y. 1994) (market share statistics are irrelevant "if they do not
reflect the true competitive situation"). The evidence establishes that Dentsply has been the
leading innovator in the artificial tooth market throughout its 100-year history. (DPFF
¶¶ 201-225.) Some of Dentsply's earlier innovations include the first mould guide, which
allowed a laboratory technician to use exact measurements when setting artificial teeth, ensuring
that the teeth would fit the patient's jawline; the introduction of fluorescence into teeth, which
makes teeth appear more lifelike and translucent; pioneering of plastic artificial teeth as the
standard, instead of porcelain;[40] and the development of an occlusion system that may bring
artificial teeth into articulation more easily for dental laboratories. (DPFF ¶¶ 201-204.)

More recently, Trubyte invented a material called Interpenetrating Polymer Network
(IPN), which significantly increased the durability of plastic teeth. (DPFF ¶ 205.) IPN, which
Dentsply introduced in 1981, quickly became and remains the industry standard for artificial
tooth materials. (DPFF ¶ 205.) It marked a significant advancement relative to conventional
plastic teeth both with respect to wear resistance and aesthetics. (DPFF ¶ 205.)

In the mid-1990's after years of development and millions of dollars in research and
clinical testing, Dentsply introduced the Portrait IPN premium tooth. (DPFF ¶¶ 209-220.)
Portrait was a direct response to market pressure for a Vita-shaded tooth with the quality of
Dentsply's IPN material. (DPFF ¶¶ 210-214.)

---

[40]   Unlike porcelain artificial teeth, which require a fastening to a denture, plastic teeth can chemically anchor to the
denture. Additionally, plastic teeth look more like natural teeth than porcelain teeth. (DPFF ¶ 204.)

- 69 -

Aside from product innovation,

Most recently, Dentsply invested significant research and development capital for the design and development of denture-related products such as Genios and Eclipse, which work synergistically with artificial teeth to improve the quality and the aesthetics of the overall denture, as well as saving the laboratories time and money in the fabrication process. (DPFF ¶ 225.) This history of continual, significant product and production investment and innovation is fundamentally at odds with the agency's argument that Dentsply possesses monopoly power.

**B.    No Case Supports The Agency's Legal Theory That Dentsply's Market Share Limits Its Ability To Impose Exclusive Dealing**

Fundamentally, the agency has tried this case on the acknowledged premise that, because of Dentsply's "high" market share, it can prove that Dentsply violated Section 2 of the Sherman Act by establishing something less than that Dentsply's rivals are excluded from the market by their alleged lack of access to Dentsply's dealer network. The agency claims that all it needs to prove, in addition to Dentsply's market share, is that Dentsply denied its rivals a "competitive advantage", the "preferred" channel of distribution, the channel "most effective" in distributing artificial teeth. (Agency Br. 31.) For this central proposition the agency relies on completely inapposite or uncontrolling precedent, ignoring the substantial body of antitrust jurisprudence that makes this claim legally untenable.

The agency claims that it need not show "complete 100% foreclosure" to prevail, and instead can show exclusion from a preferred distribution channel. This claim is based on a comment in Judge Scalia's dissenting opinion in *Kodak* that a monopolist's conduct must be viewed under a "special lens" (a comment not adopted by the Court majority, of course), 504 U.S. at 488 (Scalia, J., dissenting), and on the Court's holdings on *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) and *Lorain Journal Co. v. United States*, 342 U.S.

**REDACTED**

- 70 -

143 (1951).[41] Neither *Aspen Skiing* nor *Lorain Journal* involved an exclusive dealing restriction in a distribution context; both involved a monopolist that excluded rivals from end user customers, making it impossible for the rivals in each case to access the end users. Where a monopolist's exclusive dealing policy ties up end users as opposed to dealers, foreclosure can be more easily measured, and the business justification is usually lacking. Glazer & Lipsky, *Unilateral Refusal to Deal* under *Section 2 of the Sherman Act*, 63 Antitrust L.J. 749 (1995) (recognizing that end user exclusive dealing by a monopolist obviously affects a rival's access to the market and, since end users do not "play any role in activities that promote successful distribution of the product," such exclusivity provisions "rarely serve any procompetitive purpose") (citing *ABA Antitrust Section Monograph No. 8, Exclusive Dealing and Requirements Contracts* 91-94 (1982)). Thus, the agency's cases, dealing as they do with a monopolist's foreclosure of its rivals through conduct directed at end user customers, do not address the issue of a policy that allegedly restricts rivals from even a "preferred" distribution channel.

The agency also relies on the decision of the Court of Appeals for the District of Columbia in *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001). The *Microsoft* court held that Microsoft's exclusionary conduct violated Section 2 on the basis of evidence that Microsoft's conduct foreclosed its rival, Netscape, from the most effective distribution channel. Of course, the *Microsoft* case involved allegations of a pattern of exclusionary conduct, including written agreements, far beyond the single, at-will exclusive dealing arrangement that is at issue

---

[41] The agency also relies on a district court opinion from New York to argue that foreclosure from a preferred distribution channel is cognizable. *United States v. Visa, U.S.A.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001). The agency contends that the court there held that an exclusive dealing policy that foreclosed rivals from banks that issued credit cards to consumers was unlawful because those banks provided "unique" services such as relationships and expertise. This is a gross misstatement of the holding. The court actually held that rivals could not replicate the bank network services that Visa and Mastercard had; it actually held that there was no foreclosure from the consumer market since rivals could distribute cards directly to them. In any event, if the court relied on banks' expertise and relationships as a non-replicable barrier, it is not controlling; the Third Circuit holds that credibility and reputation are not barriers in an antitrust sense. *Advo, Inc. v. Philadelphia Newspapers*, 51 F.3d 1191, 1202 (3d Cir. 1995).

The agency's reliance on *Conwood Co. v. United States Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002) is also misplaced; *Conwood* does not involve exclusive dealing but the physical destruction of plaintiff's sales records without the knowledge of the store owner.

- 71 -

here. Nevertheless, this Court should not, and need not, adopt the *Microsoft* holding, because it is completely inconsistent with the Supreme Court's unequivocal holding in *Tampa Electric* that the conduct of a monopolist imposing an exclusive dealing arrangement must be judged by the same standards as any other proponent of an exclusive dealing policy.

In *Tampa Electric*, the Court considered the legality of a requirements contract under which an electric utility purchased all its coal needs from one producer for 20 years. The Court held that, if an exclusive dealing arrangement does not satisfy section 3's requirement that it "may" substantially lessen competition, "it follows that it is not forbidden by those of [section 1 and 2]." *Tampa Elec.* 365 U.S. at 335. This quote means that a firm's high market share does not establish liability when it imposes an exclusive dealing arrangement; the court must analyze the competitive effects of the restraint in the same manner as it would with any defendant.

Many of the leading exclusive dealing cases considered the precise question of whether the fact that the defendant firm's dealer network gave it a competitive advantage over its rivals was cognizable as an anticompetitive effect, and each court rejected that theory. For example, in *Gilbarco*, the plaintiffs complained that direct sales, or potential distributors not yet carrying the equipment at issue, were "inadequate substitutes" for the defendant's existing distributors. *Gilbarco*, 127 F.3d at 1163. The plaintiffs argued that "almost all of the 500 existing distributors" with "proven finances, abilities and customer relationships" were restricted by the defendant's arrangements. *Id.* The court held that "[t]he short answer is that the antitrust laws were not designed to equip [Gilbarco's rivals] with Gilbarco's legitimate competitive advantage." *Id.* (citing *General Bus. Sys. v. North Am. Phillips Corp.*, 699 F.2d 965, 979 (9th Cir. 1983) (a defendant having succeeded in legitimately controlling the best, most efficient and cheapest source of supply does not have to share the fruits of its superior acumen and industry)). Thus, the court held that Gilbarco's rivals were "free to sell directly, to develop alternative distributors, or to compete for the services of existing distributors. Antitrust laws require no more." *Id.*

- 72 -

Similarly, in *Seagood Trading Corp. v. Jerrico, Inc.*, plaintiffs challenged an arrangement between the defendant Long John Silver's, a restaurant franchiser, and the most efficient distributor of wholesale seafood for delivery to Long John Silver's franchisee stores. *Id.* at 1558-62. Plaintiffs claimed that the exclusive arrangement foreclosed it from the relevant market because it was not "economically feasible" for them to emulate the services provided by the defendant's exclusive distributor. 924 F.2d at 1572. The Eleventh Circuit held that plaintiffs could access the market by attracting potential alternative distributors, and the fact that the defendant's distributor was the best available and provided the defendant with a "competitive advantage" not shared by the plaintiffs was irrelevant. *Id.* at 1572-73. The court held that "[this] is not a function of the antitrust laws" to equip the plaintiffs with the defendant's competitive advantage. *Id.* at 1573.

To the same effect is *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1383 (5th Cir. 1994) (where dealers are subject to a purchase restriction, competitors do not lose a segment of the market if there are alternative paths to consumers; "[a]lternative distributors did not have to be robust to compete; they merely had to exist."); *Joyce Beverages, Inc. v. Royal Crown Cola Co.*, 555 F. Supp. 271, 278-79 (S.D.N.Y. 1983) (court denied motion for preliminary injunction predicated on Clayton Act § 3 exclusive dealing claim where distributor was not manufacturer's only choice, but merely its first choice).

Thus, the agency's argument that Dentsply's distribution policy excludes its rivals from the best way to get to the market and thus gives it a competitive advantage is insufficient to establish a violation of the Sherman Act or the Clayton Act, as a matter of law.

- 73 -

## CONCLUSION

The agency had the obligation to prove two principal facts, by a preponderance of the evidence: that Dentsply's Dealer Criteria adversely affected competition in the artificial tooth market by blocking its rivals from it, and that this effect outweighed the plausible procompetitive benefits that Dentsply established. The agency did not win this balance. As its expert candidly admitted, any artificial tooth manufacturer in the world can sell its teeth to any dental laboratory that it wants to. In light of the overwhelming evidence of the plausibility of Dentsply's procompetitive justification for its Dealer Criteria, the agency simply failed to carry its burden of proof that Dentsply's conduct has any adverse effect on the tooth market.

Dentsply respectfully requests that this Court enter judgment for Dentsply on all the agency's claims.

- 74 -

Respectfully submitted,

/s/

_____

Margaret M. Zwisler
Richard A. Ripley
Kelly A. Clement
Eric J. McCarthy
Douglas S. Morrin
HOWREY SIMON ARNOLD & WHITE, LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 783-0800

Of Counsel:

Brian M. Addison
DENTSPLY INTERNATIONAL, INC.
570 W. College Avenue
York, PA 07405-0872
(717) 849-4363

/s/

_____

William D. Johnston (No. 2123)
Christian Douglas Wright (No. 3554)
YOUNG CONAWAY STARGATT
    & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6600

Dated: August 19, 2002

Attorneys for Defendant
DENTSPLY INTERNATIONAL, INC.

# CERTIFICATE OF SERVICE

I, Christian Douglas Wright, hereby certify that copies of the foregoing *Defendant Dentsply International, Inc.'s Brief in Support of Its Proposed Findings of Fact* were caused to be served on March 28, 2003 on the following counsel of record in the manner indicated:

**BY HAND DELIVERY**                           **BY FEDERAL EXPRESS**

Paulette K. Nash, Esquire                      William E. Berlin, Esquire
Assistant United States Attorney               United States Department of Justice
U.S. Attorney's Office                         Antitrust Division
1201 Market Street, Suite 1100                 325 7th Street, N.W., Suite 400
Wilmington, DE 19801                           Washington, D.C. 20530

Christian Douglas Wright