**EXHIBIT E**

532

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 99-005 (SLR) |
| | ) | |
| vs. | ) | |
| | ) | |
| DENTSPLY INTERNATIONAL, INC., | ) | **FILED UNDER SEAL** |
| | ) | |
| Defendant. | ) | |
| | ) | |

**UNITED STATES' REPLY TO DENTSPLY INTERNATIONAL, INC.'S PROPOSED FINDINGS OF FACT AND ITS BRIEF IN SUPPORT**

Dated: August 30, 2002

COUNSEL FOR PLAINTIFF
UNITED STATES OF AMERICA

COLM F. CONNOLLY
UNITED STATES ATTORNEY

Paulette K. Nash
Assistant United States Attorney
1201 Market Street, Suite 1100
Wilmington, DE 19801
(302) 573-6277

William E. Berlin
Jon B. Jacobs
Sanford M. Adler
Frederick S. Young
Steven Kramer
Christopher Hardee
Bennett J. Matelson
United States Department of Justice, Antitrust Division
1401 H Street, N.W., Suite 4000
Washington, D.C. 20530
(202) 616-5938

**REDACTED**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.      THE COURT SHOULD REJECT DENTSPLY'S ATTEMPT TO AVOID
        ANALYSIS OF MONOPOLY POWER AND COMPETITIVE EFFECTS  . . . . . . . . . 3

        A.      Dentsply's Monopoly Power Is Directly Relevant To Whether
                Its Conduct Is Anticompetitive  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        B.      Dentsply's Total Foreclosure Standard Should Be Rejected . . . . . . . . . . . . . . . 6

II.     DENTSPLY HAS UNLAWFULLY MAINTAINED ITS MONOPOLY
        POWER IN THE ARTIFICIAL TOOTH MARKET  . . . . . . . . . . . . . . . . . . . . . . . . . 8

        A.      Dentsply Has Monopoly Power In The Market For Prefabricated
                Artificial Teeth . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

                1.      Dentsply's High Share And The Barrier To Entry And Expansion
                        It Has Imposed Establish That Dentsply Has Monopoly Power  . . . . . . . . 9

                2.      Direct Evidence Of Dentsply's Control Over Prices And Competition
                        Establishes Dentsply's Monopoly Power . . . . . . . . . . . . . . . . . . . . . . . 15

                        a.      Frustration of Consumer Preferences . . . . . . . . . . . . . . . . . . . . . 15

                        b.      Supracompetitive Prices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

                3.      Dentsply's Exclusionary Conduct Is Consistent With The Evidence
                        That It Possesses Monopoly Power  . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        B.      Dentsply Has Wilfully Maintained Its Monopoly Power Through
                Anticompetitive Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

                1.      Direct Evidence Shows That Dentsply's Conduct Is Anticompetitive  . . 23

2.    Dentsply's Exclusive Dealing Arrangements Are Anticompetitive Because They Have Foreclosed Access to 78-87% Of Dental Laboratory Dealer Outlets In The United States . . . . . . . . . . . . . . . . . . . 23

a.    Direct Distribution Is Ineffective . . . . . . . . . . . . . . . . . . . . . . . . . 24

b.    Dentsply Fails To Rebut The Evidence That Lack Of Access To The Dealer Network Is A Substantial Competitive Barrier . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

c.    Other Dental Dealers Are Not Viable Alternatives . . . . . . . . . . . 31

d.    Dentsply's Argument That Ivoclar And Vita Have Not Competed Hard Enough Is Legally And Factually Insupportable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

e.    The At-Will Nature Of Dentsply's Dealer Criteria Does Not Mitigate The Exclusionary Effect . . . . . . . . . . . . . . . . . . . . . . . 37

3.    Dentsply Fails To Address Evidence Of Its Anticompetitive Intent . . . . 40

4.    The United States' Survey And Econometric Analyses Are Reliable And Entitled To Full Weight . . . . . . . . . . . . . . . . . . . . . . . . . 41

III.    DENTSPLY'S EXCLUSIONARY AGREEMENTS VIOLATE SECTION 1 OF THE SHERMAN ACT AND SECTION 3 OF THE CLAYTON ACT . . . . . . . . . . 47

IV.    DENTSPLY'S BUSINESS JUSTIFICATION IS PRETEXTUAL AND IS NOT SUPPORTED BY THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

A.    Dentsply's Justification Is Pretextual . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

B.    Dentsply's Justification Is Not Supported By The Facts . . . . . . . . . . . . . . . . . . 53

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

ii

# TABLE OF AUTHORITIES

**Cases:**                                                                                      **Page**

3M v. Appleton Papers, Inc.,
    35 F. Supp. 2d 1138 (D. Minn. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

All Care Nursing Serv., Inc. v. High Tech Staffing Servs. Inc.,
    135 F.3d 740 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Allen-Myland v. Int'l Bus. Machs. Corp.,
    33 F.3d 194 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Allis-Chalmers Mfg., Co. v. White Consol. Indus., Inc.,
    414 F.2d 506 (3d Cir. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

American Motor Inns, Inc. v. Holiday Inns, Inc.,
    521 F.2d 1230 (3d Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Angelico v. Lehigh Valley Hosp., Inc.,
    184 F.3d 268 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,
    472 U.S. 585 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 40

Barr Lab., Inc. v. Abbott Lab.,
    978 F.2d 98 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 15

Big Apple BMW, Inc. v. BMW of N. Am., Inc.,
    974 F.2d 1358 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Brown Shoe Co. v. United States,
    370 U.S. 294 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Brunswick Corp. v. Pueblo Bowl-o-mat, Inc.,
    429 U.S. 477 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

California Dental Ass'n v. FTC,
    526 U.S. 756 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

CDC Technologies, Inc. v. IDEXX Laboratories, Inc.,
    186 F.3d 74 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 39

Chicago Bd. of Trade v. United States,
    246 U.S. 231 (1918) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 47

Coal Exporters Ass'n of the U. S. v. United States,
    745 F.2d 76 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Concord Boat Corp. v. Brunswick Corp.,
    207 F.3d 1039 (8th Cir. 2000) cert.denied, 531 U.S. 979 (2000) . . . . . . . . 39, 40, 46, 54

Continental Airlines, Inc., v. United Airlines Inc.,
    277 F.3d 499 (4th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Continental Ore. Co. v. Union Carbide & Carbon Corp.,
    370 U.S. 690 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Copperweld Corp. v. Independence Tube Corp.,
    467 U.S. 752 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Eastman Kodak Co. v. Image Technical Servs., Inc.,
    504 U.S. 451 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 18, 50, 57

Elcock v. KMart Corp.,
    233 F.3d 734 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 54

Fineman v. Armstrong World Indus., Inc.,
    980 F.2d 171 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 48

Fraser v. Major League Soccer, L.L.C.,
    284 F.3d 47 (1st Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Free v. Peters,
    12 F.3d 700 (7th Cir., 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

FTC v. H.J. Heinz Co.,
    246 F.3d 708 (D.C. Cir 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

FTC v. Ind. Fed'n of Dentists,
    476 U.S. 447 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 23

Graphic Prods. Distribs., Inc. v. ITEK Corp.,
    717 F.2d (11th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Greyhound Computer, Inc. v. International Bus. Machs. Corp.,
    559 F.2d 488 (9th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

In re TMI Litig.,
193 F.3d 613 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 51, 54

Int'l Smith v. Onyx Oil and Chem Co.,
218 F.2d 104 (3d Cir. 1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Int'l Telemeter Corp. v. Teleprompter Corp.,
592 F.2d 49 (2d Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Lorain Journal Co. v. United States,
342 U.S. 143 (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

MCI Communications Corp. v. AT & T Co.,
708 F.2d 1081 (7th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Monsanto Co. v. Spray-Rite Serv. Corp.,
465 U.S. 752 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 49

National Society of Professional Engineers v. United States,
435 U.S. 679 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

NCAA v. Board of Regents,
468 U.S. 85 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Northeast Telephone Co. v. AT&T Co.,
651 F.2d 76 (2d Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.,
883 F.2d 1101 (1st Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 51

Olympia Equip. Leasing Co. v. Western Union Telegraph Co.,
797 F.2d 370 (7th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Omega Envtl., Inc. v. Gilbarco Inc.,
127 F.3d 1157 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 40

Orson, Inc. v. Miramax Film Corp.,
79 F.3d 1358 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 55

Parkway Gallery Furniture, Inc. v. Kittinger/Pa. House Group, Inc.,
878 F.2d 801 (4th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Rebel Oil Co. v. Atlantic Richfield Co.,
51 F.3d 1421 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Re/Max Int'l v. Realty One, Inc.,
    173 F.3d 995 (6th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

R.J. Reynolds Tobacco Co. v. Phillip Morris Inc.,
    199 F. Supp. 2d 362 (M.D.N.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Roland Mach. Co. v. Dresser Indus.,
    749 F.2d 380 (7th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Rothery Storage & Van Co. v. Atlas Van Lines,
    792 F.2d 210 (D.C. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Ryko Mfg., Co. v. Eden Services,
    823 F.2d 1215 (8th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Seagood Trading Corp v. Jerrico,
    924 F.2d 1555 (11th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Tampa Elec. Co. v. Nashville Coal Co.,
    365 U.S. 320 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 6, 47

Todd v. Exxon Corp.,
    275 F.3d 191 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Town of Concord v. Boston Edison Co.,
    915 F. 2d 17 (1st Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

United States v. Brown Univ.,
    5 F.3d 658 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

United States v. Dentsply Int'l, Inc.,
    2001 WL 624807 (D. Del. March 30, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

United States v. Eastman Kodak Co.,
    853 F. Supp. 1454 (W.D.N.Y. 1994), aff'd, 63 F.3d 95 (2d. Cir 1995) . . . . . . . . . . . 11

United States Football League v. National Football League,
    842 F. 2d 1335 (2d. Cir 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

United States v. General Dynamics Corp.,
    415 U.S. 486 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Microsoft Corp.,
    253 F.3d 34 (D.C. Cir 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

U.S. v. Parke, Davis & Co.,
    362 U.S. 29 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.,
    7 F.3d 986 (11th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

U.S. Healthcare, Inc. v. Healthsource, Inc.,
    986 F.2d 589 (1st Cir 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Weisgram v. Marley Co.,
    528 U.S. 440 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Yeager's Fuel, Inc. v. Pa. Power & Light Co.,
    953 F.Supp. 617 (E.D. Pa. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

## Other Authorities

6 P. Areeda, Antitrust Law (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

2 P. Areeda & D. Turner, Antitrust Law (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

3 P. Areeda & H. Hovenkamp, Antitrust Law (1996) . . . . . . . . . . . . . . . . . . . . . . . 36

R. Bork, The Antitrust Paradox (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

11 H. Hovenkamp, Antitrust Law (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

R. Posner, Antitrust Law (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

L. Sullivan, Handbook of the Law of Antitrust (1977) . . . . . . . . . . . . . . . . . . . . . 21

Webster's Third New Int'l Dictionary (1986) (Unabridged) . . . . . . . . . . . . . . . . . . 52

## SUMMARY OF ARGUMENT

Dentsply has violated Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act by foreclosing its rivals from 78%-87% of the dental laboratory dealers in the United States. Access to those dealers is necessary to effective competition among artificial tooth suppliers. Dentsply's exclusionary conduct has preserved its monopoly power, excluded and deterred expansion by competitors, frustrated consumer preferences, raised prices, reduced efficiency, and is not supported by any procompetitive justification. Dentsply's highest-level executives have conceded that, absent Dentsply's exclusive dealing, market share will shift, prices will fall, and Dentsply will undertake additional promotional activities in an effort to regain lost market share.

Dentsply argues that its monopoly power has no bearing on whether its foreclosure of distributors is anticompetitive, that evidence of anticompetitive effects should be ignored so long as Dentsply's foreclosure of alternative methods of distribution is not total, and that it is entitled to rely on its expert's theoretical justification for Dentsply's exclusionary conduct, even if it is pretextual and not supported by the evidence. Dentsply's arguments are contrary to basic principles of antitrust law, which do not provide the "safe harbor" for anticompetitive conduct that Dentsply seeks. Nor does the evidence support Dentsply's argument that its exclusionary conduct has had a procompetitive effect.

Dentsply's argument that its monopoly power is somehow irrelevant to whether its conduct has had an anticompetitive effect should be rejected. It is well-established that monopoly power is directly relevant to whether exclusionary conduct harms competition. Dentsply's exclusionary conduct has been effective in preserving its monopoly, and Dentsply's monopoly power has allowed it to bind dental dealers to its exclusionary arrangements.

1

Moreover, Dentsply's argument that *all* means of distribution must be foreclosed before exclusive dealing can violate the antitrust laws is also untenable. Dentsply merely repeats its summary judgment argument, which this Court properly rejected in ruling that alternatives must be viable in a competitive sense. The Court's ruling was consistent with the fundamental principle, articulated in <u>Tampa Electric Co. v. Nashville Coal Co.</u>, 365 U.S. 320 (1961), and other decisions, that antitrust cases must be analyzed based on likely competitive effects, not arbitrary legal presumptions. Likewise, Dentsply's argument that the technically "at-will" nature of its exclusionary arrangements renders them presumptively lawful elevates form over substance. The argument ignores the undisputed evidence that dealers have not switched to rival suppliers due to Dentsply's monopoly share. Such switching would result in a severe financial loss to a dealer.

Indeed, Dentsply apparently does not fully believe its arguments that monopoly power does not matter and that foreclosure must be total, because Dentsply addresses some of the evidence of effects. However, Dentsply's repeated failure to take account of the significance of its monopoly power, and its suggestion that ineffective alternative channels are sufficient to render its conduct lawful, is fundamentally at odds with the proper legal standard as well as the facts. The evidence shows that Dentsply's conduct is anticompetitive.

Dentsply's purported justification for its exclusionary conduct should also be rejected. The justification for Dentsply's exclusive dealing theorized by its expert — the prevention of "free riding" — is pretextual and contradicted by market reality. Dentsply's real reason for exclusive dealing is to exclude competitors. In any event, the kind of free riding necessary to

support Dentsply's justification does not occur in the artificial tooth market, even in circumstances where its theory would predict its occurrence.

Accordingly, the Court should reject Dentsply's suggested bright-line immunity from the antitrust laws. Proper analysis turns on market effect, not legal presumptions that would allow a monopolist's anticompetitive conduct to go unredressed. The United States has established that Dentsply's conduct is harming competition and should be enjoined.

## ARGUMENT

## I.  THE COURT SHOULD REJECT DENTSPLY'S ATTEMPT TO AVOID ANALYSIS OF MONOPOLY POWER AND COMPETITIVE EFFECTS.

Much of Dentsply's brief can be discounted because it rests on two fundamental errors: (1) the failure to account for the monopoly power that it clearly possesses; and (2) the erroneous contention that every alternative means of distribution must be foreclosed before exclusive dealing can be anticompetitive, regardless of competitive effects. Its argument that monopoly power does not matter is inconsistent with well-settled law, as is its total foreclosure argument, which has already been properly rejected by this Court.

### A.  Dentsply's Monopoly Power Is Directly Relevant To Whether Its Conduct Is Anticompetitive.

Dentsply's suggestion (at 69) that it would be "novel" to limit a monopolist's ability to impose exclusive dealing, and that its monopoly power is somehow irrelevant, is fundamentally misguided. Dentsply's argument that monopoly power is irrelevant contradicts Third Circuit law. In United States v. Brown University, 5 F.3d 658, 668 (3d Cir. 1993), the court acknowledged that a plaintiff may satisfy its burden of showing competitive effects under Section 1 with *proof of market power alone*. See 5 F.3d at 668 ("Market power, the ability to raise prices

3

above those that would prevail in a competitive market . . ., is essentially a 'surrogate for detrimental effects.'") (Section 1).[1] Monopoly power represents a *higher* degree of market power than is required under Section 1. See Yeager's Fuel, Inc. v. Pa. Power & Light Co., 953 F. Supp. 617, 657-58 (E.D. Pa. 1997)). Where, as here, a monopolist excludes a substantial share of the most effective channel of distribution, the anticompetitive effects can be significant. See, e.g., United States v. Microsoft Corp., 253 F.3d 34, 70 (D.C. Cir. 2001).

No principle of antitrust law (much less common sense) supports ignoring Dentsply's monopoly power. The very case Dentsply invokes as support for its counter-intuitive rule that monopoly power is irrelevant in exclusive dealing cases, Tampa Electric, makes clear that any analysis of foreclosure must consider the "relative strength of the parties." 365 U.S. at 329; see also Barr Labs. v. Abbot Labs., 978 F.2d 98, 111 (3d Cir. 1992). Tampa Electric involved each of the antitrust laws at issue here. 365 U.S. at 324. Accordingly, contrary to Dentsply's urging, there is no reason to reject the basic principle (as expressed by Justice Scalia) that a monopolist's conduct must be "examined through a special lens." See Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 488 (1992) (Scalia, J., dissenting); see also Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I., 883 F.2d 1101, 1112 (1st Cir. 1989). Nor, contrary to Dentsply's argument, is Tampa Electric at all inconsistent with the ruling in Microsoft that the existence of monopoly power is relevant to whether foreclosure of a

---

[1]    Other Third Circuit cases are to the same effect. See, e.g., Angelico v. Lehigh Valley Hosp., Inc., 184 F.3d 268, 276 (3d Cir. 1999); Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1367 (3d Cir. 1996); see also Yeager's Fuel, 953 F. Supp. at 657-58 (applying Brown market power analysis in exclusive dealing context).

particularly cost-efficient distribution channel harms competition. See Microsoft, 253 F.3d at 70-71. These principles are not "novel," they are long-established.

Dentsply repeatedly fails to account for the significance of its monopoly power on other issues. With respect to whether entry demonstrates that the market is competitive, Dentsply fails to recognize that in a monopolized market with supracompetitive pricing, such entry may be the *result* of monopoly power, because supracompetitive prices attract entry. See USBr. at 13.[2] Fringe entry by firms attracted by Dentsply's umbrella pricing does not suggest that the market is competitive. See id. Dentsply's own expert acknowledged that entry by firms in a market with supracompetitive pricing does not indicate the absence of monopoly power. See Marvel Tr. 3722, 3725, 3765, 3796-97.

Similarly, Dentsply's argument that rivals' resort to alternative distribution channels shows a competitive market fails to account for its monopoly power. Dentsply's argument fails to address the point that its supracompetitive pricing and substantial foreclosure of rivals from dealers fosters distribution through inefficient channels. Rivals can price under Dentsply's price umbrella at levels high enough to justify using direct distribution, which they would not use, or would not survive, if more efficient channels were available to them. See MCI Communications Corp. v. AT&T Co., 708 F.2d 1081, 1117 (7th Cir. 1982); Northeastern Tel. Co. v. AT&T Co., 651 F.2d 76, 87 (2d Cir. 1981). Dentsply's competitors' resort to inefficient direct distribution of teeth may itself be a function of foreclosure from dealers and Dentsply's supracompetitive pricing umbrella. See id. Indeed, Dentsply's expert acknowledged that the existence of

---

[2]     "USBr." refers to the United States' Brief in Support of its Proposed Findings of Fact and Conclusions of Law. "DSBr." refers to Defendant Dentsply Int'l, Inc.'s Brief in Support of its Proposed Findings of Fact.

alternative distribution in a monopolized market does not indicate that those channels are efficient. See Marvel Tr. 3770-71.

Finally, Dentsply's argument that the "at-will" nature of its exclusive dealing arrangements means that rivals can readily convert any of Dentsply's dealers, and thus are not foreclosed, once again ignores the effect of Dentsply's monopoly power. No dealer has switched to a rival brand. Nor would any switching make sense to a dealer, given Dentsply's dominant market share and the severe financial loss that switching would cause. See USBr. at 33.

Dentsply's failure to acknowledge the effect of its monopoly power pervades its arguments with respect to all of the claims brought by the United States, not just the monopolization claim. As Tampa Electric, Brown and Microsoft all indicate, market power is a central feature of any analysis of competitive effects under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act. Many of Dentsply's arguments should be rejected for this reason alone.

### B.    Dentsply's Total Foreclosure Standard Should Be Rejected.

Dentsply attempts to resurrect the total foreclosure argument it advocated unsuccessfully at the summary judgment stage. Dentsply argues that alternative channels of distribution are "viable" (purportedly in the sense used by this Court in denying summary judgment) if they "permit rivals' access to the end users," regardless of their competitive significance or evidence of anticompetitive effects. See DSBr. at 3-6; see also § I.B.2., infra. This is precisely the argument Dentsply made in unsuccessfully seeking summary judgment. If the argument had merit, there would have been no need for a trial because Dentsply's rivals obviously are capable of selling some teeth directly to labs. If the argument had merit, no effort by a monopolist to

foreclose a key distribution channel would be actionable unless that monopolist thereby achieved a market share of 100% (complete foreclosure). Moreover, if the argument had merit, exclusionary conduct would be immune from scrutiny irrespective of evidence of actual anticompetitive effects. Dentsply's argument is obviously insupportable, and should again be rejected.

This Court already considered the non-Third Circuit cases that Dentsply claims (at 6-8) support its total foreclosure standard and rejected Dentsply's effort to craft a bright-line total foreclosure standard out of them. United States v. Dentsply Int'l, Inc., 2001 WL 624807, at *7-8 (D. Del. 2001).[3] Based on those cases, the Court instead correctly ruled that alternative modes of distribution must be a "viable option for manufacturers of teeth," in the sense that they must be capable of "'depriv[ing] existing dental laboratory dealers of significant levels of business.'" Id. at *9 (quoting Omega Envt'l, Inc. v. Gilbarco, Inc., 127 F.3d 1157, 1163 (9th Cir. 1997)). The Court's ruling is entirely consistent with numerous other cases establishing that alternative channels of distribution must be competitively significant, because analysis under the antitrust laws "focuses directly on the challenged restraint's impact on competitive conditions." National Soc. of Prof. Eng'rs v. United States, 435 U.S. 679, 688 (1978).[4]

_____

[3]    Dentsply now also points to Seagood Trading Corp. v. Jerrico, Inc., 924 F.2d 1555 (11th Cir. 1991), which the Court did not cite in its opinion, but Seagood is to the same effect as Dentsply's other authority.

[4]    See also American Motor Inns, Inc. v. Holiday Inns, Inc., 521 F.2d 1230, 1252 (3d Cir. 1975) (analysis of the effects of exclusion requires consideration of "the competitive context of the industry"); accord CDC Technologies, Inc. v. IDEXX Labs., Inc., 186 F.3d 74, 80-81 (2d Cir. 1999); Ryko Mfg. Co. v. Eden Servs., 823 F.2d 1215, 1234 (8th Cir. 1987); Roland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380, 394 (7th Cir. 1984).

Where, as here, foreclosure serves to maintain a defendant's monopoly power by depriving rivals of the only competitive distribution channel, the conduct is unlawful. See USBr. at 21-22, 31-32. The potential harm from foreclosing a cost-efficient distribution channel is greater the greater the defendant's market power. See §I.A, supra. In any event, such foreclosure cannot be ignored where, as here, there is direct evidence of anticompetitive effects. See USBr. at 34-35, 48-49. Indeed, Dentsply's argument that alternatives are competitively "viable" if rivals can make any sales to end users would flip on its head the basic principle that the antitrust laws are for "the protection of competition not competitors." Brunswick Corp. v. Pueblo Bowl-o-mat, Inc., 429 U.S. 477, 488 (1977). The question is not whether Ivoclar and Vita can *survive*, but whether competition and consumers are *harmed* by foreclosing rivals' access to key dealers.[5] As established in the United States' opening brief and below, the evidence shows that Dentsply's foreclosure has harmed competition.

## II. DENTSPLY HAS UNLAWFULLY MAINTAINED ITS MONOPOLY POWER IN THE ARTIFICIAL TOOTH MARKET.

Dentsply's dominant share and foreclosure of 78%-87% of the distribution channels necessary for its rivals to challenge its monopoly power is alone sufficient evidence that its conduct violates Section 2. See USBr. at 19-22. Moreover, where, as here, there is direct

---

[5]    Dr. Reitman testified that alternatives are "viable" in the sense that competitors can make sales to customers and that competitors will not go out of business absent dealer distribution. Reitman Tr. 1650. However, Dentsply's suggestion that this testimony concedes any issue in this case is premised on its erroneous belief that total foreclosure is the proper standard. Dr. Reitman explained at length why he believes alternative distribution channels are not viable in the sense of allowing competitors to challenge Dentsply's monopoly power and compete effectively, and quantified the adverse share and price effects of Dentsply's exclusionary conduct. See, e.g., Reitman Tr. 1512-19, 1526, 1532, 1538-39, 1692, 3903-04.

8

evidence of monopoly power and anticompetitive effects, that evidence also shows that Dentsply's conduct is unlawful.  See id. at 14, 35.

### A.    Dentsply Has Monopoly Power In The Market For Prefabricated Artificial Teeth.

Dentsply's longstanding dominant 75%-80% market share and the entry barrier it has imposed is strong evidence indicating that Dentsply has monopoly power.  See USBr. at 5-14. Moreover, evidence of Dentsply's ability to control prices and harm competition demonstrates its monopoly power directly.  See id. at 14-17.  Dentsply attempts to minimize its market share, renounces or ignores evidence from its own witnesses and documents, and fails to rebut the direct evidence of its ability to control prices and harm competition.

### 1.    Dentsply's High Share And The Barrier To Entry And Expansion It Has Imposed Establish That Dentsply Has Monopoly Power.

Dentsply argues that its market share is not high enough to support an inference of monopoly power and that the barrier to entry and expansion its exclusive dealing imposes has not excluded competitors from the market or deterred expansion by its rivals.  See DSBr. at 61-66. Neither argument has merit.

*First,* Dentsply erroneously contends that its market share cannot raise an inference of monopoly power, based solely on the argument that its market share should be measured in units of teeth sold rather than revenues.  See DSBr. at 61-62.  Dentsply does not question that its revenue market share has been at least 75%-80% for over a decade, and that such a dominant share is sufficient to establish monopoly power.  See USBr. at 8-9.  Dentsply's attempt to minimize its market share is flawed on multiple levels.

9

Revenue share, not unit share, accurately shows Dentsply's market power.  As the United

States' economist, Dr. David Reitman, explained, it is appropriate to look at revenue because

Dentsply's revenue share is what gives it the power to bind dealers to its exclusionary

arrangements and to exclude competition.  Reitman Tr. 1477.[6]


Given this vast disparity in revenue, no dealer will abandon the Trubyte line to take on rival

teeth.  See USBr. at 33-34.  Unit sales understate Dentsply's power in the market and ignore the

competitive significance of different levels of quality and prices among teeth sold in the market.

Reitman Tr. 1552-53.  Dr. Reitman's testimony was not challenged at trial, nor did Dentsply

offer any evidence to explain why unit sales would be the appropriate measure in this case.[7]

---

[6]    Dentsply's assertion (at 1) that the United States' brief and proposed findings
"rely[ ] principally on the testimony of its economist" is consistent with its attempt to downplay
the evidence in this case, but it is incorrect.  In total, 45 witnesses testified at trial, either live or
by deposition. The United States has cited to the testimony of each one of them.  The United
States also relied on numerous trial exhibits, many of which were Dentsply's own
contemporaneous documents.  Moreover, Dentsply's suggestion that many of those proposed
findings relied solely on Dr. Reitman's testimony, and its argument that this Court should not
rely on the proposed findings that do, is erroneous.  See United States' Response to Dentsply's
Mem. of Law on Evidentiary Issues ("US Evid. Reply Br.") at 1-5.

[7]    See, e.g., Greyhound Computer, Inc. v. International Bus. Machs. Corp., 559 F.2d
488, 496-97 (9th Cir.1977) (determining market power based on share of revenues).  Moreover,
revenue share is the appropriate measure under the Horizontal Merger Guidelines.  See
Department of Justice and Federal Trade Comm'n, 1992 Horizontal Merger Guidelines
[hereinafter "Guidelines"] (available at http://www/ftc/gov/bc/docs/horizmer.htm).  The
Guidelines provide that "[d]ollar sales or shipments generally will be used" to measure market
share, where, as here, "firms are distinguished primarily by the differentiation of their products."
Guidelines, at ¶1.41.  Courts have often relied upon the Guidelines as a useful framework within
which to analyze antitrust cases.  See, e.g., FTC v. H.J. Heinz Co., 246 F.3d 708, 715-16 & n.9
(D.C. Cir. 2001); Rebel Oil Co. v. Atlantic Richfield Co., 51 F.3d 1421 (9th Cir. 1995)
(considering Guidelines regarding the significance of entry); Allis-Chalmers Mfg. Co. v. White
Consol. Indus., Inc., 414 F.2d 506, 524 (3d Cir. 1969) (1968 Guidelines).

10



Dentsply's attempt to minimize its market share is also inconsistent with the views of industry participants, who testified that Dentsply's market share is at least 70%. See PFF ¶ 172. These unbiased views are far more reliable indicators of Dentsply's power in the market than Dentsply's effort at market share minimization. See Rothery Storage & Van Co. v. Atlas Van Lines, Inc., 792 F.2d 210, 219 n.4 (D.C. Cir. 1986) ("economic actors usually have accurate perceptions of economic realities"). The survey of dental laboratories conducted by Dr. Jerry Wind confirms this dominance, indicating that, according to dental laboratory respondents, Dentsply's share of their business is upwards of 78%. See Reitman Tr. 1540.

Dentsply invokes Brown Shoe Co. v. United States, 370 U.S. 294 (1962), to support its argument that unit sales are the appropriate measure, but Brown Shoe cuts against Dentsply. There, the Court approved the United States' use of unit sales of shoes where two merging firms competed primarily at the *low* end of the shoe market, and, as a result, revenue sales would have considerably under-represented their market power. Id. at 343.[8] By contrast, Dentsply and its primary competitors, Ivoclar and Vita, compete in the *premium* segment. Therefore, unit sales would under-represent Dentsply's market power. Market share should be calculated based on the

---

[8]    The other cases invoked by Dentsply (at 61) either cited Brown Shoe without any factual analysis of whether unit or revenue sales were appropriate (U.S. Anchor Mfg., Inc. v. Rule Indus., Inc., 7 F.3d 986, 999 (11th Cir. 1993)), or found that unit sales were the appropriate measure where the products were undifferentiated (United States v. Eastman Kodak Co., 853 F. Supp. 1454, 1472 (W.D.N.Y. 1994), aff'd, 63 F.3d 95 (2d Cir. 1995)).

11

**REDACTED**

measure that most accurately captures a defendant's market significance, not arbitrary presumptions. See United States v. General Dynamics Corp., 415 U.S. 486, 501-04 (1974).

Indeed, Dentsply's argument that its flat (or slightly declining) unit sales undercut an inference of monopoly power proves just the opposite, and shows why revenue share is the appropriate measure of Dentsply's monopoly power.

Dentsply's ability to maintain a 75%-80% revenue share in the face of such a flat or declining unit share is strong evidence that its pricing is not competitively sensitive to demand.

In any event, even if unit sales accurately reflected Dentsply's market power, Dentsply does not have a reliable estimate of its market share in units.[9] Even accepting its unreliable estimate, the proper measure of its unit market share would still be approximately 67%.[10] Dentsply's share would still dominate those of its rivals, who all have very small market shares, a point Dentsply fails to address. Moreover, its share has remained stable for over a decade despite

_____

[9] Dentsply bases its        estimate on DX 1594, a document to which the United States objected at trial. DX 1594 is a Trubyte document that cited as its sources a seven-year-old "survey" of market share in units and internal estimates. The original survey was not produced to the United States in discovery or introduced at trial. Dentsply produced no sponsoring witness to lay the proper foundation for DX 1594 or the survey, or to explain how the internal market share estimates were derived or how reliable they are. See United States' Mem. in Support of its Objections to Dentsply's Trial Evidence ("US Evid. Br.") at 15-17.

[10] Dentsply's DX 1594 understates its unit share by including subeconomy teeth, Dentsply's relevant unit share excluding sub-economy teeth is approximately 67%. See GX20 at DS 053583; GX23A at DS 054130.



supracompetitive pricing and offering products many in the industry considered inferior to those of its rivals.  <u>See</u> USBr. at 12.  These facts, especially when considered in light of the barrier to entry Dentsply has imposed, would be easily sufficient to show monopoly power.  <u>See</u> <u>Fineman v. Armstrong World Indus.</u>, 980 F.2d 171, 201 (3d Cir. 1992) (market share was "persuasive" evidence of monopoly power, where defendant's share was 48% and rivals' shares were between 7.5% and 15%); USBr. at 12.

   <i>Second,</i> Dentsply's argument that its foreclosure of dealers is not a barrier to entry and expansion is insupportable.  Dentsply claims that there is no evidence that its exclusive dealing has excluded any competitors from the market, but Dentsply simply ignores the evidence that Unidesa decided not to enter the United States market with its Odipal brand due to Dentsply's exclusive dealing arrangements.  <u>See</u> PFF ¶ 214.

   Dentsply's effort to bolster the significance of two recent entrants is a stretch.  Dentsply attempts to portray Heraeus Kulzer's entry in the United States as significant, but omits the fact that Heraeus's entry was delayed for years as a result of Dentsply's exclusive arrangements, that Heraeus has been unable to achieve dealer distribution despite trying, has badly missed its sales targets, and currently has only a 1% market share after two years of attempting to expand its sales.  <u>See</u> <u>id.</u> ¶¶ 219-21.  Dentsply's attempt to bolster the significance of Davis Schottlander & Davis Ltd.'s entry is even more far-fetched.  Schottlander has been unable to convince an established dental dealer to carry its teeth because its sales are so small, and its sales are trivial, amounting to $21,278 in the first year, which was well below Schottlander's initial targets.  <u>See</u> PFF ¶¶ 224, 227.

13

Since entry by Heraeus, Dentsply has maintained its 3%-4% annual price increases, including a 4.2% price increase for 2000-2001 and a 3.4% price increase for 2001-2002. See id. ¶ 174; Jenson Tr. 2307-08.

Moreover, contrary to Dentsply's argument that incumbent firms have been able to expand, the record is replete with evidence that Dentsply's exclusive dealing has prevented meaningful expansion. See, e.g., PFF ¶¶ 153-62.[11]

More fundamentally, Dentsply also fails to address whether such entry (or any limited expansion) is merely the result of Dentsply's monopoly power, rather than a meaningful constraint on it, ignoring its own expert's recognition that a firm can have monopoly power despite fringe rivals and entry. See § I.A, supra; Marvel Tr. 3722, 3725, 3765, 3796-97. Dentsply's unsupported presumption that any entry or any expansion signifies an absence of monopoly power (at 62-66) would allow a firm, no matter how dominant, to engage in any kind of anticompetitive conduct, no matter how exclusionary, so long as any rivals sell in the market, no matter how trivial their presence.

---

[11]    Dentsply claims that Ivoclar has increased sales, but refrains from comparing that increase to Dentsply's own over the same time-frame. Indeed, given Dentsply's aggressive pricing increases from which others take their lead, substantial sales growth would be necessary just to keep even with the growth in market sales. As Dr. Marvel admitted, Ivoclar, Vita, and Dentsply's other rivals have not touched Dentsply's share. Marvel Tr. 3629 ("Dentsply's rivals, particularly Ivoclar and Vident, have not been manufacturing a larger share in this market. They have not been cutting into Dentsply's Trubyte position.").

14

REDACTED

Accordingly, the evidence of Dentsply's high market share, and the barrier to entry and expansion Dentsply's exclusive dealing has imposed, support the inference that Dentsply has monopoly power. See USBr. at 12 & n.9.[12]

## 2.    Direct Evidence Of Dentsply's Control Over Prices And Competition Establishes Dentsply's Monopoly Power.

There is also *direct* evidence of monopoly power. Dentsply's ability to thwart consumer choices and maintain supracompetitive prices is sufficient by itself to prove Dentsply's monopoly power. See USBr. at 14.

### a.    Frustration of Consumer Preferences

The evidence is clear that Dentsply's conduct has frustrated consumer preferences. Dentsply's executives have acknowledged that, absent exclusive dealing, its rivals will gain market share as more consumers buy rivals' teeth through dealers, and that Dentsply's market share will decline, and that prices will be lower. See USBr. at 14-15, 37.[13] Such an anticipated

---

[12]    Barr Labs., Inc. v. Abbott Labs., 978 F.2d 98 (3d Cir. 1992), does not remotely support Dentsply's contention that these basic antitrust principles — that entry must be sufficient to constrain monopoly power, and that entry may just be the product of monopoly power, rather than a constraint on it — are "not cognizable in this Circuit." See DSBr. at 65. Barr Labs *did not involve a monopolization claim*; it involved an *attempted* monopolization claim, where the question was whether conduct by a defendant *without* monopoly power posed the dangerous probability of the defendant obtaining monopoly power in the future. See 978 F.2d at 112-13. The market was characterized by low foreclosure (15%), strong competitors, and entry by six firms in a market with low entry barriers. Id. at 114. Although entrants had small initial shares, the decision suggests there were no barriers to their continued expansion. The Court did not establish any broad presumptions, as Dentsply suggests, but determined that, "[t]aken as a whole, this evidence reflects a competitive market and establishes the absence of any dangerous probability" that the defendant could obtain monopoly power. Id.

[13]

15

**REDACTED**

market share shift shows that Dentsply's exclusionary conduct has prevented consumers from getting the products they prefer. See id. at 37. The survey-based analysis conducted by the United States' experts provided another estimate of the significant market share shift that Dentsply's own executives concede will occur. See id. Dentsply's criticisms of the survey and survey analysis are meritless, but in any event, Dentsply's single-minded focus on the survey analysis is remarkable in light of the other evidence, much of it supplied by the concessions of its own executives, that its conduct is having the very market effect that the survey confirms.

The consumer harm that has occurred has been substantial and has related to important attributes of product quality. For example, prior to Dentsply's introduction of its Portrait tooth, its premium teeth were a poor match to the popular Vita shade guide and were, in general, aesthetically inferior to Vita's and Ivoclar's teeth. PFF ¶¶ 191-201. Dealers were receiving requests from lab customers who wanted to buy Vita teeth from them, but Dentsply prevented dealers from adding the Vita line. Id. Without the ability to buy Vita teeth from their dealer, most labs used the more-expensive and aesthetically inferior Trubyte tooth when receiving a prescription for a Vita-shaded tooth. Id. This frustration of consumer preferences was substantial; Dentsply found that labs "cross matched" to the Trubyte tooth in 72% of the cases.

---



Id. ¶¶ 201-02. It also related to a critical attribute of a tooth's quality, its aesthetics and shade-matching capability. Id. ¶ 196.[14]

Dentsply argues that such frustration of consumer preferences is not "legally cognizable" in any event, absent complete foreclosure. DSBr. at 43. Dentsply rejects the possibility of consumer harm, despite its own executives' admissions, suggesting that "[e]ven if the evidence demonstrated a frustration of consumer preferences, that fact would be *legally irrelevant* without accompanying proof that the frustration manifested itself as foreclosure, *i.e.,* that dental labs could not or would not buy rival teeth because they were not in Trubyte dealers." Id. at 44-45 (emphasis added). Dentsply's effort to render consumer harm irrelevant is misguided.

Contrary to Dentsply's argument, ensuring that anticompetitive conduct does not frustrate consumer choice is one of the fundamental goals of the antitrust laws. See FTC v. Indiana Fed'n of Dentists, 476 U.S. 447, 452, 462 (1986); Brown Univ., 5 F.3d at 668; United States Football League v. National Football League, 842 F. 2d 1335, 1367-68 (2d Cir. 1988) ("An inquiry into consumer preference is obviously relevant to a determination of whether a monopolist has engaged in predatory conduct." (citing Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 605 (1985)).[15] Therefore, in Microsoft, the court determined that

---

[14]     Dentsply contends (at 44) that its teeth were still highly aesthetic, and that labs actually wanted to buy Vita-shaded teeth from Dentsply, not Vita teeth themselves. DS Br. at 44. But Dentsply cannot dispute that its teeth were found to be aesthetically inferior to both Vita and Ivoclar in two different surveys. PFF ¶ 195 (a). Nor does it address the evidence that labs were asking their dealers to sell them the Vita tooth line (id. ¶ 204), which clearly supports the fact that labs wanted to buy Vita teeth from dealers and not just Trubyte teeth in Vita shades.

[15]     Dentsply (at 45 n.23) claims that Indiana Federation and Aspen Skiing are distinguishable as standing for the proposition that the particular *theory* of harm dictates whether consumer preferences matter, but fails to explain why harm to consumers would matter in those cases but not here. Dentsply's argument mischaracterizes Indiana Federation and ignores

exclusionary conduct was anticompetitive where it "harm[e]d the competitive process by deterring consumers" from using rival products, "even though they might prefer to do so," irrespective of total foreclosure. 253 F.3d at 65. Even Dentsply's expert, Dr. Marvel, acknowledged that frustrated consumer preferences is anticompetitive, even absent complete foreclosure. See PFF ¶¶ 270, 285.

### b.    Supracompetitive Prices

Testimony of Dentsply's Senior Products Manager of its Trubyte division, testimony of Dentsply's customers, and the price effects demonstrated by Dr. Reitman's analysis of the dental laboratory survey, all show that Dentsply prices at supracompetitive levels.

Dentsply's Senior Products Manager, William Turner, testified that Dentsply consistently prices at least 10% above the competition, establishes a "price umbrella" in the market under which competitors price their products, and generally does not consider competitors' prices when setting its own prices. See USBr. at 15-16; PFF ¶¶ 173-76. Dentsply now calls Mr. Turner a "lower level Dentsply employee" whose testimony was "unsupported by documents or data"

---

controlling law. Contrary to Dentsply's mischaracterization, the defendant dentist group's challenged conduct was not a "naked restraint," but was unlawful because it "withh[e]ld from . . . customers a particular service (pre-treatment forwarding of dental x-rays to insurers) that they desire[d]" and had the effect of "limiting consumer choice." Indiana Fed'n, 476 U.S. at 459. Nor was the foreclosure of access to the withheld information total, as Dentsply claims, because the defendants made it available for insurers at their offices, but in a "more costly manner." Id. at 457. Dentsply is also wrong that Indiana Federation does not apply to vertical exclusionary conduct. The Sixth Circuit has rejected just such a contention, after observing that the Supreme Court in Kodak also extended Indiana Federation to such conduct. See Re/Max Int'l v. Realty One, Inc., 173 F.3d 995, 1019 (6th Cir. 1995). Moreover, Dentsply's claim that "consumer frustration" in Aspen Skiing was tied to "an essential facilities theory" is wrong. The Court expressly disavowed reliance on any such theory. See 472 U.S. at 611 n.44. Accordingly, Dentsply's effort to distinguish the cases is seriously flawed.

18

(DSBr. at 66), but his testimony on these points was unchallenged and credible.[16]  Indeed, Steve

Jenson, General Manager of the Trubyte Division, acknowledged that in the 1990s Dentsply had

a reputation for aggressive price increases and corroborated Mr. Turner's testimony about

Dentsply's pricing umbrella.  Jenson Tr. 2217-20.  Other participants in the market confirmed

that Dentsply is "the price leader" and has "continually raise[d] prices each year."  E.g., Swartout

Tr. 1296.

Moreover, there was substantial evidence of Dentsply's high margins on teeth.

Dentsply's margins, which already exceed those of competitors,                    PFF ¶¶

182-86.  The huge funds generated by its "cash cow" tooth business (id. ¶¶ 187-89) demonstrate

that Dentsply makes high profits.  See, e.g., Reitman Tr. 1561-66.  Examination of relative

margins for other markets and products also demonstrate that its margins are high.  Id. at 1557.[17]

_____

[16]    Mr. Turner worked for Dentsply for 18 years (Turner Tr. 401) and was the Senior
Product Manager for Trubyte Tooth Products for the last nine (id. at 403).  In that position, he
had the overall responsibility for the strategic direction for tooth products and consulted with
division management on annual price increases and pricing adjustments.  Id. at 403-04.  He
supervised market research related to teeth.  Id. at 430.

[17]    Dentsply engages in speculation and faulty reasoning in its attempt to explain the
dramatic difference between Austenal's and Dentsply's margins.  See DSBr. at 67 n.39.
Dentsply attributes Austenal's lower margins solely to Austenal's producing overseas, which
Dentsply speculates is more costly due to shipping costs.  Dentsply ignores evidence explaining
why Austenal's margins are lower, including the fact that Austenal's prices are lower than
Dentsply's and Dentsply's exclusive dealing has raised Austenal's distribution and
manufacturing costs.  See Swartout Tr. 1320-21.  Moreover, Dentsply's proffered explanation for
Austenal's lower margins does not help its case.  If Austenal can compete while incurring
unnecessarily high costs, this further demonstrates how high Dentsply has set the pricing
umbrella in the United States.  In any event, the fact that Austenal continues to compete while
earning a        margin underscores how extraordinarily high Dentsply's margins are, which are
almost        as great.  Compare PFF ¶¶ 182,        186.

19

REDACTEI

Dentsply's challenge to this evidence is based on compilations of pricing information that purportedly show that Dentsply's prices are below Vita's (but not Ivoclar's) for some teeth. Dentsply's own expert admitted that such pricing information would be no more than "remotely useful" because the prices do not include actual transaction prices charged by manufacturers or dealers. Marvel Tr. 3575-76. Instead, the prices are manufacturer suggested retail prices, which are prices that manufacturers *suggest* that labs charge dentists for the teeth included in the final denture. Id.

Dentsply also argues that Dentsply's discounting to selected large buying groups under its Preferred Laboratory Incentive Program ("PLIP") shows that it does not control prices and responds to competitive pricing pressure. DSBr. at 67. However, Dentsply's PLIP large lab discounts were based on very large purchases. See Mariacher Tr. 2942, 2965-66. Such customers are more capable of turning to competitors like Vita and Ivoclar because larger laboratories can afford a substantial in-house inventory of teeth and therefore are not as reliant on dealer distribution. See, e.g., Challoner Tr. 2868, 2872-74; Mariacher Tr. 2963; Turner Tr. 422 ("a smaller lab might be more dependent on a local dealer's service regardless of the dealer's price"). The fact that Dentsply may charge lower prices to its largest customers, who may have some pricing leverage, does not undercut evidence of supracompetitive pricing in the rest of the market, which is overwhelmingly comprised of mid-sized and small labs. See PFF ¶ 34 (b), (c).[18]

---

[18]     Indeed, "it is well established that the ability of a firm to price discriminate is an indicator of significant monopoly power." Coal Exporters Ass'n of the U.S. v. United States, 745 F.2d 76, 91 (D.C. Cir. 1984) (citing 2 P. Areeda & D. Turner, Antitrust Law 342 ("[P]ersistent price discrimination . . . clearly indicates . . . that there is a lack of effective competition in the market where the higher net returns are made."); Robert Bork, The Antitrust Paradox 395 (1978) (it is "essential" to "[p]ersistent or stable price discrimination in favor of specific customers" that a "seller possess[ ] . . . a substantial degree of market power or

Moreover, one of Dentsply's own witnesses, Reynolds Challoner, was on the purchasing task force of TEREC (Challoner Tr. 2873), a buying group comprised of 14 very large labs (PFF ¶ 137(d), Pohl Tr. 1931), and he testified that Dentsply's "discounts" made Dentsply's prices only "somewhat" more competitive. Challoner Tr. 2875.[19] Accordingly, even Dentsply's response to its largest customers hardly demonstrates vigorous competition.

Finally, Dentsply's argument that its rivals' prices are allegedly comparable to its own, even if true, tells nothing about whether it is exercising monopoly power. In a market characterized by supracompetitive pricing, it is not uncommon that rivals will take advantage of the price leadership of the dominant firm. See § I.A., supra. The admissions of Dentsply's executives that absent its exclusive dealing market share will shift substantially, prices will decrease, and promotion will increase, all show that current market-wide prices are supracompetitive. The concessions are consistent with basic economics. Increasing consumer choices by making competing brands more available to consumers will lead to more vigorous competition, greater price elasticity, and a resulting decrease in artificial tooth prices. See USBr. at 38; PFF ¶ 280. Dr. Reitman's analysis of the dental laboratory survey was an effort to quantify this price effect. Dentsply spends much of its brief attacking the quantification of the price decrease, but offers no evidence or explanation of why, in the view of all the other evidence, such a price decrease will not occur.

---

monopoly"); Richard Posner, Antitrust Law 63 (1976) ("[p]ersistent discrimination is very good evidence of monopoly because it is inconsistent with a competitive market"); L. Sullivan, Handbook of the Law of Antitrust 89 (1977) ("A firm will not discriminate unless it has market power.").

[19]    Although the buying group sought price breaks in cash discounts, Dentsply agreed only to provide extra teeth, which was cheaper for Dentsply. Challoner Tr. 2876.

21

### 3.    Dentsply's Exclusionary Conduct Is Consistent With The Evidence That It Possesses Monopoly Power.

Dentsply argues (at 68) that its conduct is "inconsistent with the notion that it has monopoly power." However, Dentsply's pervasive exclusion of its rivals from an overwhelming percentage of dental laboratory dealers is the type of conduct that demonstrates an abuse of monopoly power. See, e.g., Fraser v. Major League Soccer, L.L.C., 284 F.3d 47, 61 (1st Cir. 2002) ("In section 2 cases, the wrongful act is usually one designed to exclude competitors from the market (e.g., . . . exclusive dealing)."); Microsoft, 253 F.3d at 51, 58 ("More telling, the District Court found that some aspects of Microsoft's behavior [including its "pattern of exclusionary conduct"] are difficult to explain unless Windows is a monopoly product."); USBr. at 16-17.

Dentsply erroneously contends that its introduction of new products and investment in manufacturing are inconsistent with monopoly power. This argument has been repeatedly rejected, including in this circuit and in Microsoft, because even a monopolist may find it profitable to innovate and invest in new products. See Allen-Myland v. Int'l Bus. Machs. Corp., 33 F.3d 194, 210-11 (3d Cir. 1994) ("[W]ere we to accept the district court's reasoning, a great many defendants with market power, such as Alcoa in the 1920s and perhaps even the former AT&T telephone monopoly, could be insulated from antitrust attack. Here, technology was improving and prices were steadily falling, but the district court cited no evidence that these changes had any connection with a decrease in IBM's market power."); Microsoft, 253 F.3d at 56-57. Indeed, Dentsply's own economic expert, Dr. Marvel, agreed that this argument should be rejected. Marvel Tr. 3726-27. Moreover, the evidence shows that many of Dentsply's new

products have been substantially delayed, that it has substantially underspent its research and

development budget over the last several years, and that the investments it has made in

manufacturing have not been sufficient to correct serious customer complaints about quality and

its ability to deliver its products. See PFF ¶¶ 53, 207-11, 321-24.

Accordingly, it is clear that Dentsply possesses monopoly power.

**B.    Dentsply Has Wilfully Maintained Its Monopoly Power Through Anticompetitive Conduct.**

The direct evidence of anticompetitive effects and evidence that Dentsply has foreclosed

access to an overwhelming percentage of dealers necessary for its rivals to compete show that

Dentsply has unlawfully maintained its monopoly power.

**1.    Direct Evidence Shows That Dentsply's Conduct Is Anticompetitive.**

The evidence discussed above that Dentsply has frustrated consumer preferences and

raised prices shows that its conduct is anticompetitive. See also USBr. at 35-39. Contrary to

Dentsply's argument that foreclosure of *all* dealer outlets must be shown before exclusive

dealing can be condemned, it is well-settled that direct evidence of effects is sufficient *by itself* to

establish anticompetitive harm. See id. at 35 (citing Indiana Fed'n, 476 U.S. at 460-61; Brown, 5

F.3d at 668).

**2.    Dentsply's Exclusive Dealing Arrangements Are Anticompetitive Because They Have Foreclosed Access to 78%-87% Of Dental Laboratory Dealer Outlets In The United States.**

Dentsply's substantial 78%-87% foreclosure of dental laboratory dealer outlets in the

United States also proves that its conduct is anticompetitive. See USBr. at 17-34. Significantly,

23

in its brief and findings Dentsply does not dispute this foreclosure rate. Instead, Dentsply argues

that its exclusionary conduct cannot be anticompetitive because its rivals "actually sell teeth" to

dental laboratories (at 9), because direct distribution is not "impossible" (at 13), and that, even

with proof of monopoly power, the United States must show complete foreclosure of alternative

distribution channels to prevail (at 69). However, the question is not whether direct distribution

or other alternatives are "impossible," it is whether foreclosure harms competition. <u>See</u> § I.B.,

<u>supra.</u> Dentsply nonetheless attempts to address some of the evidence that alternative channels

are ineffective (apparently in the alternative), but its discussion reflects its erroneous standard

and seriously misstates the evidence showing that such alternatives are not competitively viable.

### a.    Direct Distribution Is Ineffective.

As compared to distribution through dealers, direct distribution has not enabled

Dentsply's competitors to erode its monopoly power. <u>See</u> USBr. at 26-29. Dentsply (once

again) ignores the admissions in its own documents and from its own executives that direct

distribution is more costly and that its rivals' lack of access to the dealer network is a major

competitive obstacle. <u>See</u> <u>id.</u> at 26-27.


Direct sales are a more costly and ineffective method of distributing artificial teeth, as

recognized by Dentsply's demonstrated preference for selling its own teeth through dealers. PFF

¶¶ 141-67. Dentsply relies on testimony from seven lab witnesses to argue that labs generally

prefer to buy direct because it is cheaper. DSBr. at 10; DPFF ¶ 108. Even if these witnesses

represented the preferences of the 7,000 dental laboratories throughout the United States (and

24



there is no proof that they do), Dentsply misrepresents their actual testimony. One witness,

George Obst of DSG labs, testified that he buys his Austenal/Myerson teeth from Zahn Dental,

instead of directly from Myerson, because Zahn offers a *better* price. Obst Tr. 2752-53. One

was asked only whether he would buy teeth directly from Dentsply *assuming* a lower price.

Jaslow Tr. 2003-04.[20] One said that he would buy direct only if he could save 10%-20% off of

his current prices. Challoner Tr. 2871. Another testified that he did not expect to save any

money by buying teeth from Dentsply directly. Armstrong Tr. 2356.[21]

Buying teeth from dealers offers numerous benefits to dental labs. PFF ¶¶ 62-81.[22] As

illustrated by the testimony of Richard Mariacher of National Dentex, price is just one factor

among many in deciding whether to buy from dealers and, if so, how many dealer services to pay

---

[20]    Similarly, much of the deposition testimony submitted post trial and cited by
Dentsply (at DPFF ¶ 108) *assumes* lower prices and is otherwise very qualified. E.g., Boshoven
Dep. 134-35 (would "lean towards" buying direct if 10%-20% cheaper); Moyer Dep. 133 (would
"investigate" if 10% cheaper); Fox Dep. 108 ("good probability" if 10% cheaper); Thayer Dep.
152 (if 15%-30% cheaper); Watkins Dep. 199-200 (lower price "an assumption"); Peebles Dep.
183-84 (would buy direct if cheaper because values Zahn's services); Haynes Dep. 112 (if
cheaper); O'Brien Dep. 82 (same); Willits Dep. 81 (same); Lantz Dep. 65 (same); Wong Dep.
155 (same). At least two deponents are not even the person responsible for ordering teeth for
their lab. Watkins Dep. 98-99; Hugo Dep. 4-5, 36-37, 68, 74.

[21]    Dentsply conveniently ignores the testimony of another one of its witnesses,
Steven Desautel of the Accu Bite dealership, who said that it is a "fallacy" to assume that it is
cheaper to cut out "the middle man." DeSautel Tr. 2466.

[22]    Indeed, many of the deponents cited in Dentsply's post-trial brief and findings
testified to these benefits. E.g., Murray Dep. 17-19, 104, 207-08 (would "always" buy 30%-60%
from Patterson, regardless of price, because "nice to have somebody close by in emergencies and
they have been good to me in the past"); Cook Dep. 115 (Zahn offers good pricing, free
shipping), 121-22 (would prefer to buy Vita, Ivoclar teeth from dealer); Fox Dep. 109-10 (dealers
better equipped to ship same day order placed); Haynes Dep. 89-90 194-99 (benefits to using
DLDS); Murphy Dep. 55-58 (Darby's inventory management useful because lab "too busy"
to do it).

for. Mariacher Tr. 2971. Mr. Mariacher conceded that he did not know whether it made sense to buy teeth directly from Dentsply, and agreed he would have to consider "a lot of different factors" before doing so. Id. At the time of his deposition, National Dentex had a discount program with Zahn Dental in which Zahn offered two different pricing options, a 9% discount with limited dealer services and a 4% discount with a higher level of dealer services. The majority of National Dentex labs selected the *higher* level of dealer services. Id. at 2966-67.

Dentsply claims that direct sales present significant competitive advantages to selling through dealers, as allegedly shown by its competitors' decisions to sell direct. See DSBr. at 11. But Dentsply ignores all of the competitors' testimony that their inability to access the dealer network is a major competitive disadvantage and is the reason they have "chosen" to distribute directly. PFF ¶¶ 155, 158, 161. The record indicates that Ivoclar and Vident have tried persistently to develop effective dealer networks, but have failed. See, e.g., id. ¶¶ 45-46, 52, 157 (Ivoclar); id. ¶ 160 (Vident); id. ¶ 162 (Myerson).[23] The fact that competitors such as Ivoclar, Vident, and Myerson testified about their desire to obtain dealer distribution contradicts Dentsply's argument that they prefer selling direct. See, e.g., id. ¶ 269.

Dentsply erroneously asserts (at 11-12) that Ivoclar actually prefers direct distribution. As support, Dentsply suggests that Ivoclar, unhappy with how Frink Dental was performing as a dealer in the late 1980s, terminated Frink. But the opposite is true. According to Ivoclar's president, Robert Ganley, Ivoclar was happy with Frink's performance and progress. Ganley Tr. 1000, 1105. Mr. Ganley believed that Frink was "a quality dealer with a good reputation and

---

[23]     Dentsply's contrary claim that "Ivoclar has consistently chosen direct distribution and rejected dental dealers who expressed interest in carrying Ivoclar teeth" (DPFF ¶ 130) is unsupported by any cite to the record.

26

good people." <u>Id.</u> at 1105.  And it was Frink, not Ivoclar, that initiated the termination (<u>id.</u>) when

Dentsply finally forced Frink to decide between selling Ivoclar teeth or keeping its Trubyte tooth

business.  PFF ¶ 45.  Similarly, Ivoclar's arrangement with DTS was terminated at the insistence

of DTS, not Ivoclar (Ganley Tr. 1118-19), as a result of Dentsply's insistence that DTS drop the

Ivoclar tooth brand to obtain the Trubyte tooth line.  PFF ¶ 52.[24]

---

[24]     Nor does Ivoclar's decision not to sell teeth to Darby Dental in 1990 show that
Ivoclar prefers direct distribution.  To support its contrary argument, Dentsply cites to a single
Ivoclar document written by Ivoclar's Ken Liebscher.  DSBr. at 11; DPFF ¶ 131.  But the
decision to turn down Darby was made by Robert Ganley, not Mr. Liebscher.  Ganley Tr. 1104.
Mr. Ganley did not turn down Darby because he believed that direct sales were a superior form
of distribution; he disagreed with Mr. Liebscher on that issue.  Ganley Tr. 1102.  He rejected
Darby because of the poor working relationship between the two companies, resulting from an
extensive lawsuit between them in the 1980s.  <u>Id.</u> at 1104.  Mr. Ganley also had concerns about
the Darby executive with whom he was dealing.  <u>Id.</u>  Finally, Dentsply's argument concerning
Ivoclar and Accu Bite relies entirely on an unexplained, objectionable hearsay statement made by
an Ivoclar executive named Doug Wills to Steve Desautel of Accu Bite.  The statement should be
excluded.  <u>See</u> US Evid. Br. at 28-29.


REDACTED

Finally, Dentsply's sweeping claim (at 12) that "Dentsply's direct selling rivals sell teeth in a manner indistinguishable from the business model" used by dealers Zahn and Darby overlooks obvious and critical differences between those dealers and Dentsply's rivals.[25] Nowhere does Dentsply explain why a significant share shift would occur absent exclusive dealing, if dealers are functionally the same as manufacturers. Nowhere does Dentsply explain why, if there is no difference, its rivals have persistently sought access to the dealers and believe such access is competitively significant. The differences are obvious. Vident and Ivoclar market and sell predominately Vita and Ivoclar products, whereas key distributors like Zahn and Darby carry a huge variety of products from hundreds of different manufacturers, providing a range of choices, ease of ordering and one-stop shopping benefits.[26] Vident and Ivoclar cannot offer these benefits. PFF ¶¶ 76-78. As Dr. Reitman testified, Zahn and other dental dealers specialize in providing distribution services in a way that tooth suppliers do not. Id. ¶¶ 74-75. If dealers were

_____

[25]     Dentsply claims that Dr. Reitman's testimony supports its argument, but the testimony Dentsply relies upon states only

[26]     Dentsply erroneously claims (at 13 n. 7) that the United States has changed its definition of one-stop shopping to mean using fewer vendors. Dr. Reitman in his expert report explicitly stated that "the advantage of using a more limited number of suppliers is frequently referred to as one-stop shopping." D.I. 214 at 9 & n.9. The United States continues to use this same definition. See PFF ¶ 76; U.S. Br. 25-26 ("fewer accounts"). Moreover, in artfully claiming that the United States "presented no witness that testified that they did not buy artificial teeth from a direct seller because they did not want to write one more check or make one less [sic] call" (DSBr. at 13 n.7), Dentsply simply ignores Mr. Ryan's testimony. He testified that if he could buy Ivoclar teeth from DLDS rather than direct from Ivoclar, he would buy and use more than he does today. Ryan Tr. 1252-54, 1286 (noting added burdens from not obtaining Ivoclar and Vident from DLDS).

28


REDACTED

indistinguishable from manufacturers, the dealers would not play the key role in the industry that they undeniably play.

**b.      Dentsply Fails To Rebut The Evidence That Lack Of Access To The Dealer Network Is A Substantial Competitive Barrier.**

Dentsply's argument that dealers are not important is inconsistent with its own recognition of their importance and other evidence in the case.  First, Dentsply offers no response to the evidence, from its own executives and documents, that Dentsply

Dentsply executives have consistently emphasized this fact.  See, e.g., id. ¶¶ 93-96.  A Dentsply internal competitive analysis acknowledged the weakness of its rivals' distribution channels and noted that a key Dentsply strength is that its                                         Dentsply's executives acknowledged *at trial* that dealers are important to its business and that more dealer tooth stocks would allow it to sell more teeth.  See, e.g., id. ¶¶ 91-92.  Mr. Jenson, the current Trubyte General Manager, has directed his Trubyte sales staff to reinforce to dentists and labs the service advantage of a dealer network versus a manufacturer's direct tooth sales.  Id. ¶ 153.

To argue that local availability of teeth is not important, Dentsply relies primarily on evidence that some dealers have reduced their tooth stocks.  However, dealers have not reduced their tooth stocks to the degree Dentsply claims.  Mr. Jenson's testimony about Trubyte dealer tooth stock consolidations was strikingly unreliable.[27]  More important, Dentsply fails to address

---

[27]

REDACTED

the fact that dealers continue to maintain approximately 100 Trubyte tooth stocks throughout the country. Jenson Tr. 2267. If such geographically dispersed tooth stocks were not important, dealers would not incur the significant expense to maintain them.[28]

The dealer testimony Dentsply invokes does not support its claim (at 14) that "each dealer" testified that "it can effectively service the tooth needs" of labs throughout the United States with one tooth stock or "a limited number" of them. Dentsply's conclusory assertion ignores the existence of its own "vast" network of about 100 tooth stocks in essentially all major metropolitan areas. PFF ¶ 153; Jenson Tr. 2267. The assertion also contradicts testimony from many of the dealers that Dentsply highlights. Compare DPFF ¶ 73 with PFF ¶ 64(a), (b), (e), (f). Dentsply also ignores adverse testimony of other dealers. See, e.g., PFF ¶ 64(c), (d).

Nor does Dr. Marvel's "zip to ship" map (DX 1674) support Dentsply's argument that local stocks are unimportant. The map shows (unsurprisingly)

---

Despite Mr. Jenson's lack of knowledge regarding Zahn's tooth stocks, and in the face of Mr. Weinstock's more precise and reliable testimony, Dentsply persists in citing Mr. Jenson to state that Zahn has a range of 5-9 tooth stocks. DSBr. at 22. Although Dentsply now does not rely on Mr. Jenson's testimony that Darby has only one stock (DPFF ¶ 70), it unconvincingly tries to explain away his erroneous testimony as meaning that Darby "'primarily' services the entire United States from one stock," an assertion for which it offers no support.

[28]    Dentsply's exclusive dealing may have contributed to the consolidation that has occurred. By limiting dealers' ability to spread costs over more tooth units sold, Dentsply has caused dealers to become less efficient, which has caused some dealers to close some tooth counters that lab customers otherwise value. PFF ¶ 284.

30

**REDACTED**

See Weinstock Tr. 133; Reitman Tr. 1499.[29]

Dentsply also ignores the substantial evidence that dealers offer labs lower delivery costs than do direct-selling manufacturers (USBr. at 25, PFF ¶ 65), and that the 100 dealer tooth stocks around the country represent millions of dollars worth of Dentsply tooth inventory that Dentsply does not need to pay for and maintain (USBr. at 23-24, PFF ¶ 83). Dentsply attempts to avoid other evidence of important dealer services with the conclusory assertion that if such services do not "exceed[] the margin that suppliers pay dealers for them," they are "meaningless in a foreclosure analysis." DSBr. 16. Dentsply cites no expert testimony or authority for the argument, and there is none. In any event, the argument fails because it addresses only benefits dealers provide to manufacturers and ignores the many other benefits dealers provide to dental labs. See PFF ¶¶ 62-81.

### c.    Other Dental Dealers Are Not Viable Alternatives.

Dentsply argues that the other dental lab dealers not selling Trubyte teeth are viable alternatives for Dentsply's rivals, but the evidence does not support the argument. Indeed, the undisputed foreclosure rate of 78%-87% understates the competitive impact of Dentsply's conduct because the remaining laboratory dealers are substantially inferior to those selling

---

[29]     In addition, Dentsply's drop shipments statistics say nothing meaningful about the importance of local tooth stocks. Dentsply's drop shipment calculation (DX 1638) is inadmissible hearsay and should be excluded as unreliable. See US Evid. Br. at 10-12. In any event, many of these drop shipments are at Dentsply's insistence, e.g., to fill new stocks and for price deviations, not at the behest of labs or due to lab buying preferences. Weinstock Tr. 158-159; Clark Tr. 2659-60. Moreover, the percentage of *Dentsply* drop shipments is meaningless in measuring the importance of local dealers because it fails to measure that percentage vis a vis the shipments made by dealers on a daily basis, which are substantial. PFF ¶ 74

31



REDACTED

Trubyte teeth. PFF ¶¶ 258-62. For example, Dentsply suggests Jack Silcox's dealership as a

viable channel, but Silcox has no employees, no sales force, no customer service department,

does not issue a catalogue, does not advertise in trade journals, and does not have a tooth counter.

Id. ¶ 260. Dentsply's artful assertion that there is no evidence from any *dental laboratory* that

these dealers are "materially different" from dealers selling Trubyte teeth (DSBr. at 18) tries to

avoid the evidence, obtained from both manufacturers and dealers, that such dealers are

substantially inferior to those selling Trubyte teeth. PFF ¶¶ 258-62.

　　　　Dentsply also argues that Vita already has a large dealer in the United States, Vident,

trying to make much of the fact that Vident is merely affiliated with, and is not a wholly owned

subsidiary of, Vita Zahnfabrik. PFF ¶ 19. As a result of this fact, Dentsply asserts that Vident is

a distributor that is "absolutely indistinguishable" from Zahn and the other dealers selling

Trubyte teeth. See DSBr. at 17-18.[30] However, Vident is an importer that sells only products

made by Vita, with few exceptions. Whitehill Tr. 221. Zahn sells a very broad range of products

to dental labs, and therefore offers labs a one-stop shopping benefit that Vident cannot offer. GX

160 (Zahn catalogue). Whereas Vident maintains a single tooth inventory in Brea, California,

Zahn maintains nine. Weinstock Tr. 104. Moreover, Dentsply's comparison between Vident

(and its dealers' tooth stocks) and Zahn overlooks the fact that there are many more dealers

selling Trubyte teeth (at many more locations) than just Zahn. Zahn is the largest Trubyte dealer,

but its nine tooth stocks nonetheless represent less than 10% of the 100 Trubyte tooth stocks

around the country. PFF ¶ 83; Weinstock Tr. 104.

---

30

32

REDACTED

In addition, Dentsply argues that operatory dealers are viable alternatives, but ignores much of the evidence establishing that such dealers are not interested in the laboratory business. Id. ¶¶ 249-56. Moreover, Dentsply fails to address its admission that the

                                        and other testimony by industry participants that operatory dealers are not in the tooth business (e.g., id. ¶ 256). Dentsply has not offered any credible example of a purely operatory dealer who has entered, or is capable of entering, the tooth business as an extension of its existing operatory business. Dentsply points to Accu Bite, but Accu Bite did not enter the tooth market de novo. Rather, it acquired an existing tooth dealer's business, including its critical personnel and customers. Id. ¶ 255(a).[31] The testimony of Mr. Clavelli of Tri-State Dental is too speculative to establish anything about the interest or ability of operatory-only dealers to enter and become successful in the tooth business. Id. ¶ 255(b).[32] And the fact that Trubyte has received inquiries from various entities, including labs and dentists, about becoming dealers for either Trubyte teeth or merchandise products does not prove that there are ample dealers that are ready, willing, and financially able to sell the teeth of Dentsply's competitors. Id. ¶ 254. Indeed, contrary to Dentsply's argument, every one of the operatory

---

[31]    Previously, Accu Bite had been turned down by Dentsply and others because Accu Bite was a very small dealer and was not focused on the lab market. Mr. Desautel conceded that Accu Bite did not have the expertise to sell teeth until it hired someone who had it, and that he would "have absolutely zero incentive to go and create that experience." Id.

[32]    Mr. Clavelli has never worked in the tooth business and knows little about it, he has no experience in adding teeth to an operatory dealer's product offering, and his speculation about how many of his dentists have in-house labs is inaccurate. Id.; Clavelli Tr. 3365.

REDACTED

dealers whose testimony was read at trial testified that they have no interest in selling teeth to

dental laboratories. Id. ¶ 253(b).[33]

Accordingly, the evidence shows that other dental dealers are not effective alternatives for

Dentsply's rivals.

>    **d.    Dentsply's Argument That Ivoclar And Vita Have Not**
>    **Competed Hard Enough Is Legally And Factually**
>    **Insupportable.**

Dentsply attempts to blame its rivals for their low shares.  DSBr. at 28-30; DPFF ¶¶ 289-

313.  However, even if Dentsply were correct that Vita and Ivoclar have not been aggressive

enough in their tooth businesses (which is incorrect as a factual matter), Dentsply's causation

argument is erroneous as a matter of law.

Contrary to Dentsply's argument, proof of monopolization requires only proof of

monopoly power and "conduct that 'reasonably appear[s] capable of making a significant

contribution to . . . maintaining monopoly power'," not an accounting of every other fact

potentially contributing to monopoly power.  Microsoft, 253 F.2d at 79; Town of Concord v.

Boston Edison Co., 915 F.2d 17, 21 (1st Cir. 1990) (Breyer, J.).  Otherwise, if firms exited the

market or underinvested as a result of exclusion, exclusionary conduct would be impossible to

establish.  As a result, "[t]o some degree, 'the defendant is made to suffer the uncertain

consequences of its own undesirable conduct.'"  Microsoft, 253 F.3d at 79 (citing 3 Phillip E.

---

[33]    Dentsply's suggestion that the testimony of Mr. Ackeret of Sullivan Dental should
be discounted because Sullivan was acquired by Schein/Zahn in 1997 is misguided.  In his
testimony — that as an operatory dealer he was not interested in or well suited to sell teeth — he
was clearly referring to the time prior to the merger.  Ackeret Tr. 1788, 1791-92, 1797.
Moreover, Dentsply's assertion that Mr. Ackeret is the only operatory dealer representative cited
by the United States is simply wrong.  See PFF ¶ 253(b).

Areeda & Herbert Hovenkamp, Antitrust Law ¶ 651c, at 78 (1996)).  Accordingly, Dentsply

cannot escape the consequences of its monopoly maintenance by claiming inefficient competition

that its conduct may have caused.

In any event, Dentsply's argument is factually incorrect.  As a percentage of sales,

Dentsply's competitors actually spend *more* on their tooth businesses than Dentsply does.  PFF

¶¶ 350-53.  Dentsply erroneously criticizes the analysis demonstrating this fact.  See text, p. 56,

infra.  However, even if the critique were accurate, it would show at most that Dentsply's

competitors spend an *equivalent* proportionate amount on their sales forces as Dentsply, not that

they spend less.  DSBr. at 36 n.20.  Moreover, Dentsply does not contest the evidence that its

rivals would promote even more if they were able to develop adequate dealer networks, which

underscores that Dentsply's conduct remains the core problem they face.  PFF ¶ 282 (a).

Dentsply mischaracterizes Ivoclar's and Vident's promotional efforts by invoking a few

anecdotal accounts that do not support its argument.  For example, Dentsply claims that Frink

Dental dropped the Ivoclar tooth line because Ivoclar failed to support Frink adequately (an

argument at odds with its suggestion elsewhere (at 11) that Ivoclar terminated Frink).  DS Br. at

28.  However, the testimony of the owner of Frink Dental and the president of Ivoclar contradict

the claim.  See PFF ¶ 366 (a); DX 9 at IVC 023658 (memorandum regarding understanding of

Ivoclar's president, Robert Ganley, that Frink appreciative of Ivoclar's support); Ganley Tr.

1000-01.

Dentsply's arguments regarding Vident are also erroneous.

Dentsply relies on the testimony of Vident's president, Mr.



Whitehill, but he explicitly disagreed with the contention. Whitehill Tr. 315 ("That's absolutely wrong.").

Dentsply claims that Vident has a reputation for undercutting its dealers and selling directly to lucrative lab accounts. DSBr. at 29-30. Dentsply relies on a general comment from a witness that fails to establish that the witness ever observed such undercutting. DPFF ¶ 171 (citing Dillon Tr. 4089-90).[35]

Vident has told both national and regional dealers that, if they take on Vita teeth, Vident will stop selling teeth directly in their

---

[34]    Similarly, Dentsply cites Mr. Whitehill for the proposition that,

        Mr. Whitehill testified to the contrary. Whitehill Tr. 363 ("Well, it's wrong. This document has to be wrong"). DX 399, the Vident marketing plan that was the subject of these cross examination questions of Mr. Whitehill, is not in evidence. Tr. 2888 (withdrawn by Dentsply's counsel).

[35]    The other three related proposed findings cited in Dentsply's brief are inapposite. One refers to Jeff DiBlasi's testimony regarding Lincoln Dental's negotiations with Vident, and does not cite an example of, or Vident's reputation for, undercutting dealers. DPFF ¶ 183. Another involves Jack Silcox, who testified over the United States' hearsay objection that an Indiana lab told him that it was buying Vita teeth for a price "very close" (not *lower*, as Dentsply claims in its proposed finding) to what Vident was quoting him. Silcox Tr. 2063; DPFF ¶ 185. And the third is simply a summary proposed finding citing the other findings. DPFF ¶ 305.



sales territories. Id. at 271. This commitment is consistent with Vident's conduct in the past. Id. at 260-61 (when DTS sold Vita teeth, Vident did not sell directly in DTS's territories). Moreover, any tensions caused by such hybrid distribution is one of the by-products of Dentsply's foreclosure of Vita's access to an effective dealer network. See id. at 271 (Vident also sells directly because "[w]e feel that we must").

Finally, Dentsply predictably makes much of the differences between "European" and "American" molds, and cites Ivoclar's introduction earlier this year of an innovative new line of teeth featuring American molds. DSBr. at 29; DPFF ¶¶ 294-99. Dentsply overstates the significance of these differences. PFF ¶¶ 305-10. There is no dispute that some labs in the United States market prefer American-style teeth. But it is also undisputed that some labs prefer European-style teeth. Id. ¶ 309. Two of Dentsply's own lab witnesses explained how they were able very easily to convince their dentist customers to start using Vita and Ivoclar teeth (id. ¶ 306), testimony that Dentsply does not address.[36]

Accordingly, even if Dentsply's causation argument were legally sufficient (which it is not), it fails as a factual matter.

>    **e.    The At-Will Nature Of Dentsply's Dealer Criteria Does Not Mitigate The Exclusionary Effect.**

The fact that Dentsply's Dealer Criteria do not have a stated term does not mitigate their exclusionary effect. See USBr. at 33-34. Dentsply's argument that its "at-will" agreements are

---

[36]    Dentsply quotes the testimony of Mr. Mariacher from National Dentex stating that Ivoclar's new tooth lines had "finally" given him a tooth he can buy from Ivoclar. DS Br. at 29; DPFF ¶ 296. However, he also testified that National Dentex has been buying Ivoclar's older, more European-style teeth since the time they were first introduced into the United States market. Mariacher Tr. 2902-03.

essentially *per se* legal is inconsistent with the fact that Dentsply's monopoly power binds

dealers to the agreements. See §I.A., supra. Its argument is inconsistent with the evidence (that

Dentsply does not contest) that *no dealer* has ever dropped the Dentsply line to take on rival

teeth. Its argument is also inconsistent with the evidence, including Dentsply's concessions, that

its conduct is having a substantial market share and price effect in the market.

Dentsply's argument that at-will agreements are "presumptively legal," even where a

defendant has monopoly power, elevates form over substance. It is well-settled that "the

Sherman Act . . . is aimed at substance rather than form." Copperweld Corp. v. Independence

Tube Corp., 467 U.S. 752, 760 (1984); see also U.S. Healthcare, Inc. v. Healthsource, Inc., 986

F.2d 589, 595-96 (1st Cir. 1993); USBr. at 5, 34. Dentsply attempts to distinguish only one case

invoked in the United States's opening brief (3M v. Appleton Papers, Inc., 35 F. Supp. 2d 1138

(D. Minn. 1999)), but Dentsply's own characterization of 3M admits that the agreements there,

which had no stated term, were held to be potentially anticompetitive based on their "practical

effect" of excluding rivals. DSBr. at 22 n.16.

Dentsply claims that "[n]o court of appeals construing an exclusive dealing arrangement

that was terminable at will has held that such an agreement foreclosed competition" (at 22), but

Dentsply fails to address this aspect of the *Supreme Court's* decision in Lorain Journal Co. v.

United States, 342 U.S. 143 (1951). Lorain Journal involved a local newspaper's refusal to allow

advertisers to use its advertising if they also used local radio advertising to reach customers, in

the effort to exclude local radio competition. Id. at 152-53. The exclusion did not involve any

long-term contract, and the radio station was free to compete for the newspaper's advertisers. Id.

However, the practical effect of the newspaper's monopoly power prevented advertisers from

using radio advertising, thereby preserving the newspaper's monopoly power. Id. Moreover, Microsoft held that exclusionary conduct that deterred use of rival products was anticompetitive, irrespective of the fact that customers could technically switch to the products. See, e.g., 253 F.3d at 65.

The cases Dentsply invokes (at 22-24) do not support its argument. The cases involved conduct that would have had no anticompetitive effect, even if the agreements were long-term, because they neither excluded any competitors from any meaningful share of the market nor excluded rivals from any channel necessary for them to compete effectively.[37] Moreover, unlike this case, none of the cases Dentsply cites (at 22-23) involving a "market leader" considered evidence that the defendant's conduct resulted in actual anticompetitive effects or that the defendant's market presence prevented distributors from switching among suppliers.[38] In any

---

[37] For example, in CDC Technologies, Inc. v. IDEXX Labs. Inc.,186 F.3d 74 (2d Cir. 1999), the limited duration of the contracts at issue was noted but not analyzed in any depth because the evidence there showed that the foreclosed distributors provided only sales "leads" in the industry, were easily replaced with others, and were not competitively significant. Id. at 80-81.

[38] Dentsply fails to note that in Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039 (8th Cir.), cert. denied, 531 U.S. 979 (2000), the court determined that Brunswick's challenged market-share discount programs for its sale of boat engines "were not exclusive dealing contracts." Id. at 1062-63. The supposedly "huge" (DSBr. at 22) discounts at issue ranged from 1%-5% and the evidence showed (contrary to the record in this case) that boat builders did "walk away" from Brunswick and buy more engines from its competitors when they offered more favorable pricing. Id. at 1059, 1063. Accordingly, Concord Boat is inapposite. Similarly, in R.J. Reynolds Tobacco Co. v. Philip Morris Inc., 199 F. Supp. 2d 362 (M.D.N.C. 2002), the court determined that the plaintiffs failed to prove supracompetitive pricing or that the defendant had market power. Id. at 382, 386. The court found that the defendant's conduct, involving offering promotional payments and discounts for advantageous promotional space in stores, was not exclusive dealing. Id. at 387. Contrary to Dentsply's argument (at 23), even the dicta in Reynolds about the legality of short-term contracts was predicated on situations where "'there are no other impediments to switching.'" Id. at 391 (quoting XI Herbert Hovenkamp, Antitrust Law § 1821d3 (1998)). Unlike the evidence in this case, the court in Reynolds, as in

39

event, to the extent that any of the decisions contain broad *dicta* suggesting that such agreements

are lawful irrespective of effects, the language is inconsistent with Supreme Court and Third

Circuit law (not to mention other decisions cited in the United States' opening brief).  See § I.A-

B, supra; USBr. at 20-22, 33-34.[39]

### 3.    Dentsply Fails To Address Evidence Of Its Anticompetitive Intent.

Although Dentsply's anticompetitive intent is strong corroborative evidence that its

conduct is anticompetitive, Dentsply erroneously contends that the evidence is irrelevant.

Dentsply ignores Supreme Court law that exclusionary intent is "relevant to the question whether

the challenged conduct is fairly characterized as 'exclusionary' or 'anticompetitive.'" USBr. at

40 (quoting Aspen Skiing 472 U.S. at 602); see also Chicago Bd. of Trade v. United States, 246

U.S. 231, 238 (1918); Microsoft, 253 F.3d at 59 ("knowledge of intent may help the court to

interpret facts and predict consequences").  Dentsply concedes that its intent behind Dealer

Criterion 6 was to "block competitive distribution points," "not allow competition to achieve

toeholds in dealers," "tie-up dealers," and "not 'free up' *key* players."  See USBr. at 40; PFF ¶¶

231-32.  Dentsply does not question the testimony of Trubyte's former Director of Sales and

Marketing that the sole purpose of the policy was to exclude Dentsply's competitors from

---

Concord Boat, determined that the record did not support the allegation that retailers incurred
high switching costs to rearrange promotional space.  Id. at 392-93.  The other opinions cited by
Dentsply either did not consider whether there was any impediment to switching other than
duration or did not consider an impediment to switching remotely approaching the substantial
financial disincentive that Dentsply's criteria impose on dealer switching.  See Gilbarco, 127
F.3d at 1164 (reputation insufficient particularly in view of substantial entry and expansion).

[39]    Even Dentsply's expert has found exclusive dealing anticompetitive in the
absence of contracts, much less long-term contracts.  Marvel Tr. 3791-94 (exclusive dealing
accomplished through offering dealers lower prices for exclusivity, and coercing and intimidating
dealers).

dealers, and ignores other evidence of its exclusionary intent. See USBr. at 40-42. Such specific evidence of how Dentsply itself intended for its exclusive dealing to harm competition is far more probative than the general expressions of competitive bravado at issue in the cases Dentsply invokes.

Though a "bad" intent alone would not establish that conduct is anticompetitive where the conduct appears objectively incapable of harming competition, Dentsply's intent underlying its exclusive dealing is strong evidence corroborating the other evidence of substantial anticompetitive effects.

### 4.    The United States' Survey And Econometric Analyses Are Reliable And Entitled To Full Weight.

The survey and survey-based analysis are reliable and are direct evidence of anticompetitive effects.[40]  However, Dentsply is wrong that the United States' evidence of anticompetitive effects "begins and ends" with the survey conducted by Dr. Jerry Wind of the Wharton School and with the analysis of the survey data by Dr. Wind and Dr. Reitman.  DSBr. at 45, 51.  To the contrary, the survey confirms all of the other evidence of anticompetitive effects, and as Dr. Reitman testified, it verified and quantified the anticompetitive market share and price effects that he found based on his comprehensive review of the evidentiary record over the past

---

[40]       The United States addresses in more detail Dentsply's specific criticisms going to the weight and the admissibility of the survey and expert opinions relating to the survey in US Evid. Reply Br. at 10-38.

41

five years. PFF ¶¶ 135, 267, 278, 285.[41] The survey evidence is also consistent with Dentsply's

own executives' admissions of substantial share and price effects. See § II.A.2.a-b, supra.

Dentsply's criticisms of the survey and Dentsply's reliance on an unrepresentative hand-

picked selection of large lab witnesses at trial stands on its head the well-established rationale for

using surveys as evidence in litigation.[42] As this Court has recognized, the proper way to obtain a

representative and accurate sample of the heterogeneous views of the 7,000 denture laboratories

nationwide is through a scientifically conducted random probability survey, which is what the

---

[41]    Dr. Reitman has extensive real world experience as an expert in the fields of
industrial organization economics and antitrust economics analyzing cases such as this one.
Reitman Tr. 1449-55, 1462; GX 441. His opinion here is based on his economic analysis of the
testimony (both at trial and all of the over 100 depositions), interviews, site visits, documents,
and data (including but not limited to the survey data) of market participants at every level of the
dental laboratory product market, as well his review of the relevant economic literature. Reitman
Tr. 1464-70. In addition to his analysis of the survey data, Dr. Reitman also performed analyses
of Dentspsly's zipcode sales data, pricing and cost data to determine margins, sales and marketing
expenses to determine relative promotional spending, and a foreclosure rate calculation. Id. at
1468-69, 1474, 1518-20, 3881-85, 3953-61.

[42]    The United States relied primarily on the survey to represent lab preferences but
offered the testimony of a lab owner, Mr. Ryan, in part, to put a human face on the survey by
illustrating how consumer choices and purchasing patterns have been affected by Dentsply's
exclusionary conduct. PFF ¶139. Dentsply misleadingly claims (at 45) that the United States did
not present the testimony or deposition of a single laboratory that dental laboratories prefer to
buy their teeth from dental dealers "to the exclusion of" buying directly from manufacturers.
However, the fact that laboratories prefer to and would in fact buy *more* rival teeth if those lines
were available from dealers, rather than excluded by Dentsply's policies, is sufficient to establish
likely adverse effects. See § II.A.2.a., supra. Mr. Ryan testified directly to the fact that his
purchases of Vita and Ivoclar are lower than they would be if he could buy them through his
primary dealer, DLDS. See id. ¶ 139; Ryan Tr. 1238-39, 1244-47, 1250-55. Dentsply ignores
the extensive trial testimony not only of Mr. Ryan and other dental laboratories (PFF ¶¶ 139,
145), but also participants at other levels of the market, including dealers (id. ¶ 268), rival
manufacturers (id.), and even Dentsply officials (id. ¶¶ 266, 268, 269), as well as the economic
testimony by Dr. Reitman (id. ¶264). That testimony establishes that laboratories would buy
greater amounts of rival teeth if those teeth were available from dealers, resulting in a market
share shift from Dentsply to those rivals. Much of this testimony was by Dentsply's own
witnesses. Id. ¶¶ 145, 266, 269.

United States did in this case.  See D.I. 396 at ¶ 4 (April 3, 2002 Pretrial Order); see also PFF ¶¶ 98, 100, 116, 139.[43]  Dentsply's small selection of labs is less probative than the survey, and the testimony is even less reliable when presented through out-of-court depositions not subject to cross-examination in the courtroom.  See id.[44]

Dentsply failed to conduct its own survey of dental laboratory views and predicted purchases.  PFF ¶¶121, 122(e), 136.  Instead, in addition to offering its selected sample of labs, it

---

[43]    Dentsply itself recognizes the utility of surveys in making business decisions, and has conducted and relied upon surveys of the artificial tooth market, including surveys of dental laboratories (PFF ¶ 112) and surveys of consumer preferences for brand attributes.  Id. ¶¶ 123(d), 171, 193, 195, 196; GX 14, 17, 18, 20; Turner Tr. 430-439, 449 ("We did a lot of research.  This could have been one of the many research surveys we did. . . ." (439)).  Moreover, Dentsply recognizes the need to conduct its surveys in a double-blind manner to protect its identification as sponsor of the survey and avoid biasing the results.  See Turner Tr. 431-34, 437 ("I think it makes results more valid").  It also recognizes that a random probability survey is the best approach because the results can be projected to the entire universe.  Id. at 434, 437; GX 14, 17.  Dentsply has conducted and relied on surveys with response rates far lower than the one in Dr. Wind's survey.  PFF ¶ 123(d).

[44]    After the United States highlighted the unrepresentative nature of Dentsply's evidence in its opening brief, Dentsply sought to admit the testimony of an additional 14 laboratories by filing their deposition transcripts.  When the Court rejected this submission, Dentsply endeavored to read the deposition testimony of these witnesses into the record.  The United States objects to the post-trial submission of additional evidence, as discussed in more detail in the United States' Evidentiary Brief.  See US Evid. Br. at 29-33.  In any event, whatever the final number of witnesses, Dentsply's small sample is less probative than the survey conducted by the United States.  See D.I. 396 at ¶4 (April 3, 2002 Pretrial Order).  Many of the deponents cited post trial by Dentsply are from either very large or mid-sized labs.  See Fichter Dep. 26, 93-94, 177-78 (Glidewell largest lab in country; 110 denture techs; "significantly different" from other labs; not an "apples against apples" comparison); Peebles Dep. 20-21, 134-35 ("largest user of denture teeth in the Rocky Mountain region"; 10 denture techs); Colgin Dep. 12-13 (75 denture techs); Cook Dep. 36 (17 denture techs); Boshoven Dep. 10 (13 denture techs); Moyer Dep. 10-11 (10-12 denture techs); Willits Dep. 58 (10-15 denture techs); Haynes Dep. 23 (10 denture techs); Lantz Dep. 41-42 (same).  And it is clear that Dentsply hand picked many of these witnesses to be deposed in the first place.  E.g., Peebles Dep. 134-35 (chosen because of size); Hugo Dep. 98-99 (Dentsply noticed deposition only after interview); Lantz Dep. 177-78 (same).

criticized the United States' survey through its expert, Dr. Peter Rossi. Id. ¶¶136, 137. However, there is no dispute that the type of conjoint survey conducted by the United States' experts was appropriate to measure the tradeoff made by dental technicians between brand, distribution, and price when purchasing artificial teeth. Id. ¶¶ 100, 101, 106, 110, 116. Conjoint analysis is the most widely-used and widely-accepted market research analytic methodology among both practitioners and academics, and it has been used in thousands of marketing studies. Id. ¶ 102. Its widespread use, including repeated use by companies in major business decisions, is an indicator of its reliability. Id. Moreover, Dr. Rossi agreed with Dr. Wind that a conjoint analysis survey is superior to simply asking individuals about their preferences, and he conceded that a survey was necessary in this case to sample the preferences of the thousands of dental laboratories in the United States. Id. ¶¶ 104, 116.

Although Dr. Rossi offered academic criticisms of the way the survey was worded and conducted, the criticisms should be given no weight.[45] The criticisms were based on his speculation about the competence and states of mind of laboratory respondents, very limited survey experience, and little knowledge of the artificial tooth market upon which to rest his speculative criticisms. PFF ¶¶ 121-23.[46] Dr. Rossi failed to conduct a survey of his own to

---

[45]    The United States has separately moved to exclude Dr. Rossi's opinions regarding survey design and execution under Fed. R. Evid. 702 and 703. See US Evid. Br. at 22-28.

[46]    Dentsply does not dispute that Dr. Wind is one of the foremost experts in the field of market research, and that his practical experience designing and executing hundreds of surveys overshadows what little survey experience Dr. Rossi claims. PFF ¶¶ 98 n.13, 103 & n.15, 122. Dr. Rossi has had primary responsibility for designing or executing only one survey. Id. ¶ 122 (a)-(c). In the only other case where Dr. Rossi testified in connection with a survey, the Seventh Circuit found the survey Dr. Rossi endorsed "so deficient" it "would not support the conclusion" that Dr. Rossi advocated. Id. ¶122 (d); Free v. Peters, 12 F.3d 700, 705 (7th Cir. 1993) (Posner, J.). See US Evid. Reply Br. at 16.

empirically test the reliability of Dr. Wind's survey. Indeed, Dr. Rossi formed his opinion in this case after only two or three months' work. Id. ¶121.

Likewise, none of Dentsply's criticisms of the survey analysis have merit. As the United States previously established, Dr. Reitman's econometric analysis of the survey data is more reliable than Dr. Rossi's analysis. See id. ¶¶123(b) & (c), 126-135. Dr. Reitman used a widely-accepted model (the multinomial logit model) to evaluate the survey data in order to quantify the anticompetitive market share and price effects he found. Id. ¶¶ 126-28, 134, 267, 278.[47] Although Dr. Rossi criticized Dr. Reitman's use of this logit model, Dr. Rossi has stated in the past that logit models perform exceptionally well with the type of aggregate data generated by Dr. Wind's survey. See id. ¶¶ 106, 108. A publication presented by the leading firm producing commercial software for analyzing conjoint survey data, Sawtooth, states that the logit model used by Dr. Reitman is appropriate for analyzing the type of data present here. Dr. Rossi *endorsed* the Sawtooth publication. Id. ¶¶ 128, 129.

Little weight should be given to results of the various alternative models Dr. Rossi used to analyze the survey data, or to his purported "estimated error ranges."[48] His use of the logit model (which differed from Dr. Reitman's use of it) is not the preferred method, according to the

---

[47]     Dr. Reitman testified that his price effect results stem solely from the anticompetitive effects of Dealer Criterion 6, and can be distinguished from any procompetitive effects, contrary to Dentsply's claim (DPFF ¶406), because his model holds costs (including promotional costs) constant. PFF ¶279 (citing Reitman Tr. 3887-88).

[48]     Dr. Reitman calculated standard errors for his analysis. PFF ¶ 133. After Dr. Reitman calculated standard errors and included them in his expert report, Dr. Rossi attempted (well after the deadline for expert reports) to calculate his own "error ranges." Id.; DX. 1623. Dr. Rossi's estimates should be excluded because they were untimely (see US Evid. Br. at 1-10) and because they are "dramatically" unreliable. PFF ¶¶ 133, 134.

Sawtooth publication he endorsed, because his method eliminates important data. Id. ¶ 129. Dr.

Rossi also used a linear model, but he omitted important variables from that model as well. Id. ¶

130. As the United States has explained, Dr. Reitman's logit model fits the data and marketplace

reality better than Dr. Rossi's linear model in several ways. Id. ¶ 131. Finally, Dr. Rossi's

criticisms should be rejected because, despite his lack of any factual knowledge regarding the

artificial tooth market, he did not consult with anyone with such knowledge in constructing the

models he estimated in his report. Id. ¶132. For these reasons, to the extent they are not

excluded outright, Dr. Rossi's theoretical opinions are divorced from marketplace reality and are

entitled to little weight. See, e.g., In re TMI Litig., 193 F.3d 613, 674 (3d Cir. 1999); Elcock v.

Kmart Corp., 233 F.3d 734, 745, 755-56 (3d Cir. 2000); Concord Boat, 207 F.3d at 1057 (citing

Weisgram v. Marley Co., 528 U.S. 440 (2000)).

        In any event, even if Dr. Rossi's academic criticisms were credited, he does not ultimately

dispute the effects from Dr. Wind's and Dr. Reitman's analysis. See PFF ¶ 135. Indeed, Dr.

Rossi's own models show very similar share effects. Id. ¶ 267. Instead, he concluded that the

survey data and analysis was "not very informative," but failed to consider other evidence

pointing in the same direction. Id. ¶ 135. As a result, at the end of the day, the Court is left with

evidence of survey results that are entirely consistent with all the other evidence of

anticompetitive effects in the record — higher prices, frustrated consumer preference, and market

share shift from Dentsply to its rivals — all of which Dentsply concedes elsewhere exist. The

survey confirms and quantifies those share and price effects and should be credited.

III.    **DENTSPLY'S EXCLUSIONARY AGREEMENTS VIOLATE SECTION 1 OF THE SHERMAN ACT AND SECTION 3 OF THE CLAYTON ACT.**

The same evidence establishing that Dentsply's exclusive dealing has unlawfully maintained its monopoly power in violation of Section 2 also establishes that its conduct is anticompetitive under Section 1 and Section 3.  Under established law, which Dentsply ignores, proof of market power alone (much less monopoly power) can serve as a surrogate for effects under Section 1 and Section 3.  See § I.A., supra; USBr. at 43-44, 47-49.  However, here there is also strong direct evidence of anticompetitive effects.  See §II.B.2., supra; USBr. at 35-39, 47-49.

Because the existence of monopoly power and anticompetitive effects has been established, the only additional evidence required to show a violation of Section 1 or Section 3 is proof of an agreement.  This element is easily satisfied.  See USBr. at 44-47.  Dentsply erroneously argues that there is some special requirement of an agreement "in an antitrust sense" (DSBr. at 25-26) to violate Section 1 or Section 3.  Dentsply's effort to invoke yet another non-existent legal rule should be rejected.  Both sections reach traditional contracts and agreements. See, e.g, Chicago Bd. of Trade, 246 U.S. at 238 (the literal language of the Sherman Act reaches all contracts, and the purpose of rule of reason analysis is to distinguish between those contracts that promote competition and those that restrain it); Tampa Elec., 365 U.S. at 329 (involving supply contracts).

Under traditional contract principles, evidence that both parties understood that they have an agreement is direct evidence of their intent and that an agreement exists.  See International Smith v. Onyx Oil & Chem. Co., 218 F.2d 104, 108 (3d Cir. 1955); International Telemeter Corp. v. Teleprompter Corp., 592 F.2d 49, 55-56 (2d Cir. 1979).  Likewise, all that is required to

establish an agreement under the antitrust laws is a "meeting of the minds." See Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752 (1984). Contrary to Dentsply's suggestion (at 26 & n.17), there is no requirement that the parties to such an agreement share an *anticompetitive* intent. See, e.g., Fineman, 980 F.2d at 213-15 ("'The precedents are numerous that a § 1 conspiracy arises when an unwilling dealer, to avoid termination by [its] supplier, promises . . . to deal exclusively. . . .'") (quoting 6 Philip Areeda, Antitrust Law ¶ 1408d at 47-48 (1986)).

Here, there is ample evidence that both Dentsply and dealers selling Trubyte teeth consider Dealer Criterion 6 to be an agreement between them. See PFF ¶¶ 287-88. This evidence contradicts Dentsply's unsupported assertions (at 26) that its conduct is purely unilateral. See USBr. at 45.[49] Moreover, Dentsply fails to address *other* direct evidence of agreement, including the evidence that it entered into express agreements with its dealers when it first recognized them, requiring them to drop some, or all, of their competing tooth lines in order to obtain Trubyte teeth. See USBr. at 44-45.

Moreover, there is strong circumstantial evidence demonstrating an agreement between Dentsply and its dealers. Contrary to Dentsply's reliance on Monsanto, Monsanto makes clear that a course of dealing like the one present here can establish the agreement element. 465 U.S.

---

[49]    The one non-Third Circuit case Dentsply invokes is not to the contrary, because it did not involve evidence, present here, that the manufacturer and dealers considered themselves to have an agreement. See Parkway Gallery Furniture, Inc. v. Kittinger/Pa. House Group, Inc., 878 F.2d 801, 804-06 (4th Cir. 1989). Rather, the case involved whether circumstantial evidence satisfied the standard in Monsanto. Contrary to Dentsply's suggestion, the case involved only evidence of "agreement with the aims and purposes of the policy" among some dealers, not evidence that the manufacturer or dealers considered it an agreement between them. See id. at 805.

at 764.[50]  Monsanto held that proof of an announced policy, active surveillance, and

reinstatement conditioned on assurances of future compliance was sufficient to establish an

agreement.  Id. at 765-66; see also United States v. Parke, Davis & Co., 362 U.S. 29, 44 (1960);

Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1365 (3d Cir. 1992) ("Monsanto

does not require that a plaintiff provide direct evidence of a causal relationship; concerted action

may be inferred from circumstantial evidence.").

Under Monsanto, the course of dealing between Dentsply and its dealers contradicts

Dentsply's unsupported assertion that it engaged in purely unilateral conduct.  Dentsply is

incorrect that the United States relies solely on Dentsply's "enforcement" of the dealer criteria.

See DSBr. at 26.  Rather, the United States relies on other evidence (that Dentsply does not

rebut), including evidence that Dentsply repeatedly engaged in individualized negotiations with

dealers to ensure compliance.  See USBr. at 47; PFF ¶¶ 289-92.  Dentsply's attempt to focus on

only one aspect of Dentsply's conduct is unavailing, because such "evidence should be analyzed

as a whole, rather than compartmentalized, to determine whether it supports an inference of

concerted action."  Big Apple BMW, 974 F.2d at 1365 (citing Continental Ore Co. v. Union

Carbide & Carbon Corp., 370 U.S. 690 (1962)).

Accordingly, the agreement element is satisfied.  Because Dentsply's agreements are

anticompetitive, they violate Section 1 and Section 3.

---

[50]    Monsanto held that proof that a manufacturer terminated a dealer after receiving
complaints from other dealers was not, alone, evidence of a conspiracy among the manufacturer
and non-terminated dealers.  465 U.S. at 764 ("[t]here must be evidence that tends to exclude the
possibility that the manufacturer and nonterminated distributors were acting independently.").
The United States is not relying on evidence of dealer complaints.  Rather, the United States is
relying on the type of circumstantial evidence Monsanto held is sufficient to show an agreement.

49

## IV.   DENTSPLY'S BUSINESS JUSTIFICATION IS PRETEXTUAL AND IS NOT SUPPORTED BY THE FACTS.

The purported business justification given by Dentsply's expert — that Dentsply's exclusive dealing is necessary to prevent "free riding" — does not justify its conduct. Dentsply apparently does not dispute that it has the "heavy burden" of establishing a non-pretextual justification for its conduct that outweighs the anticompetitive effects. See USBr. at 50 (quoting NCAA v. Bd. of Regents, 468 U.S. 85, 113 (1984)); Microsoft, 253 F.3d at 59. Dentsply cannot meet its burden because its justification is a pretext and is not supported by the facts. Moreover, even if any evidence supported its justification, Dentsply has not attempted to show that any procompetive benefits outweigh the anticompetitive harm.

### A.     Dentsply's Justification Is Pretextual.

Dentsply's undisputed exclusionary intent, its shifting justifications for its exclusionary conduct, and its marketplace conduct inconsistent with its purported justification, all show that its free riding justification is pretextual. See US Br. at 52-53; PFF ¶¶ 331-37.

First, Dentsply's exclusionary motives for its conduct show that its purported justification is pretextual. Dentsply does not contest this evidence, which is overwhelming. See USBr. at 40-42. Instead, Dentsply erroneously argues (at 39-42) that the evidence is irrelevant to whether its expert's litigation theory is pretextual. DSBr. at 40-41. Dentsply's argument is inconsistent with settled law, which makes clear that motive is directly relevant to assessing whether business justifications are supportable. See, e.g., Kodak, 504 U.S. at 484. In Kodak, the Court upheld a denial of summary judgment in part because evidence suggested "reasons to question Kodak's proffered motive" for its exclusionary conduct. Id.; see also U.S. Healthcare, 986 F.2d at 596

50

(after anticompetitive effects have been established, a court must determine a defendant's

"precise motives" allegedly justifying the conduct) (cited by Dentsply at 30); Microsoft, 253 F.3d

at 59. None of the cases invoked by Dentsply (at 41) is to the contrary, because none of the cases

involved an inquiry into whether business justifications are pretextual.[51] Indeed, Dentsply does

not question that a showing of non-pretext is a threshold burden it must meet. Pretext, according

to its plain meaning, obviously encompasses an inquiry into motive and intent. See Webster's

Third New Int'l Dictionary 1797 (1986) (Unabridged) ("pretext" is "a purpose or motive alleged .

. . in order to cloak the real intention or state of affairs"). Moreover, contrary to Dentsply's claim

(at 41) that the proper role of an economist does not involve examining motive, an expert's

examination of motive is a first step in determining whether a theoretical efficiency justification

"fl[ies] in the face of reality." In re TMI Litig., 193 F.3d at 683.

---

[51]    Half of the cases Dentsply cites do not even discuss the relevance of subjective intent evidence. See California Dental Ass'n v. FTC, 526 U.S. 756, 775 n.12 (1999) (discussing whether FTC's "quick look" rule of reason analysis was sufficiently thorough to find anticompetitive effects where theoretical effects were only identified, not verified); Continental Airlines, Inc. v. United Airlines Inc., 277 F.3d 499, 506-07 (4th Cir. 2002) (intent not at issue because "testimony revealed that no one . . . perceived that any [employee of defendant] . . . had an anticompetitive purpose" in initiating the challenged restraint); Todd v. Exxon Corp., 275 F.3d 191, 213 (2d Cir. 2001) (intent evidence not at issue; vacating dismissal of challenge to exchange of salary information); All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc., 135 F.3d 740, 747 (11th Cir. 1998) (involving "blatant" price-fixing, conduct that is per se illegal irrespective of a showing of effects or a good intent). The others stand for the unremarkable proposition (that the United States does not dispute) that an anticompetitive intent, standing alone, will not condemn conduct that is not objectively anticompetitive. See Olympia Equip. Leasing Co. v. Western Union Tel. Co., 797 F.2d 370, 379 (7th Cir. 1986); Ocean State Physicians Health Plan v. Blue Cross & Blue Shield, 883 F.2d 1101, 1113 (1st Cir. 1989). However, as the Supreme Court has made clear, intent is relevant to determining whether conduct is anticompetitive. See § II.B.3., supra. In any event, unlike in those cases, here there is evidence of anticompetitive effects, and the inquiry is whether Dentpsly can justify its conduct based on non-pretextual, procompetitive reasons.

51

*Second,* Dentsply's new "free rider" justification should be rejected because it is inconsistent with the justifications Dentsply has used in the past to explain its conduct. See USBr. at 52-53. Before it hired an expert, Dentsply tried on several occasions to explain its exclusive dealing by claiming that it is necessary to "focus" dealers on selling Trubyte teeth. See id. at 52-53; PFF ¶¶ 332-35. Dentsply's "focus dealer services" rationale differs from its expert's free riding justification. As Dr. Marvel has acknowledged, "exclusive dealing is not an efficient means by which to promote increases in dealer services." Marvel Tr. 3704-05. Dentsply attempts to reconcile the two justifications (at 41-42), claiming they are "merely a different articulation of the same rationale," but Dr. Marvel's explicit rejection of Dentsply's pre-litigation "focus" justification contradicts the argument.[52]

*Third,* Dentsply's conduct in the marketplace is inconsistent with its new justification. See USBr. at 58-59. It is undisputed that Dentsply does not impose exclusive dealing in distributing other dental laboratory products. Id.[53] It also engages in the same level of promotion with respect to nonexclusive dealers with rival "grandfathered" tooth brands and fully exclusive dealers. Id. The evidence of Dentsply's equal treatment of exclusive and non-exclusive dealers contradicts a fundamental premise of Dr. Marvel's free-rider theory that, if dealers carry

_____

[52]     The decision in <u>Microsoft</u> also rejected such a "focus dealer services" rationale as a procompetitive justification, because the justification amounts to nothing more than a desire to preserve market power and is therefore not procompetitive. See 253 F.3d at 71-72 (rejecting Microsoft's desire to keep developers focused on Microsoft's products as a justification for exclusive dealing).

[53]     Although Dentsply argues that the fact that it does not impose exclusive dealing in non-tooth products is "irrelevant, without a showing that those products are characterized by substantial presale promotion, dealer distribution, etc." (DS Br. at 59 n. 36), the United States has provided that showing. See PFF ¶ 385.

competitive tooth lines, Dentsply's promotional efforts will decline. <u>See</u> DSBr. at 31; PFF ¶ 282(b). Dentsply argues (at 38) that free riding does not occur at dealers with grandfathered brands, but Dentsply's concession just shows that free riding is not likely to occur. Moreover, its concession shows that its exclusive dealing is not motivated by procompetitive concerns, because it has also occasionally enforced its criteria against grandfathered brands. PFF ¶¶ 47, 49, 50, 53, 58.[54]

Accordingly, Dentsply's purported business justification is a mere pretext and should be rejected for this reason alone.

### B.    Dentsply's Justification Is Not Supported By The Facts.

Dentsply cannot rely on the theoretical supposition of its expert to support its conduct. Dentsply claims that its expert engaged in a "detailed empirical analysis of the record" to support his theory (at 39), even though his theory was not *Dentsply's* rationale for excluding competitors. However, contrary to Dentsply's claim, Dr. Marvel conceded that "he ha[d] not done [an] empirical analysis" and instead relied on "merely theoretical expectations of what might happen if Dentsply abandons exclusive dealing." Marvel Tr. 3727. He ignored numerous opportunities

---

[54]      In its post-trial brief, Dentsply alleges, for the first time in this case, that the Robinson-Patman Act explains its equal treatment of its grandfathered dealers. DS Br. at 41 n.22. The absence of any record evidence showing that the Act motivated the equal treatment reduces Dentsply's Robinson-Patman rationale to yet another pretext in support of its pretextual free riding rationale.

to determine if his theory fits the facts of the artificial tooth market. *See* PFF ¶ 341 (b).[55]  Such

failures fatally undermine his opinion. See, e.g., In re TMI Litig., 193 F.3d at 674; Elcock v.

Kmart Corp., 233 F.3d at 755-56; Concord Boat, 207 F.3d at 1057.

Dentsply's justification must fit the facts.  As Dentsply acknowledges, to show that its

exclusive dealing is pro-competitive, Dentsply must first demonstrate that it spends more on

promotion and demand-generating activities than its rivals.  See DSBr. at 33.  Otherwise, there

are no investments that can be "free ridden" upon.  See PFF ¶ 342.  To fit Dr. Marvel's theory,

Dentsply must also show that exclusive dealing is necessary to protect such investments.  The

facts must show that exclusive dealing is pro-competitive because it prevents dealers from

engaging in "bait and switch" steering of tooth customers to rival brands that, due to lower

promotional investments, can offer dealers higher sales margins by free riding on Dentsply's

promotional investments.  See DSBr. at 33; PFF ¶ 342.  However, the evidence does not fit the

theory.

*First*, record evidence that Dentsply will *increase* its promotional spending absent

exclusive dealing is fundamentally inconsistent with the theory that exclusive dealing protects

Dentsply's incentive to promote.  See USBr. at 60-61; PFF ¶ 375.  Dentsply and its expert fail to

address the significance of the evidence that Dentsply will promote *more* absent exclusive

dealing, including admissions of Dentsply executives.  See PFF ¶¶ 373-77.  Moreover, the

---

[55]    Dr. Marvel's perfunctory analysis of procompetitive benefits reflects his approach
to this entire case.  For example, he claimed that he could say that Dentsply lacked monopoly
power even though he had not done the work to determine if monopoly power existed and had no
methodology for doing it.  Marvel Tr. 3721-22; see PFF ¶ 230.  Moreover, although professedly
an expert on exclusive dealing, Dr. Marvel found himself forced to change his analysis on the
stand during cross examination regarding an essential element of his theory.  Marvel Tr. 3758;
see PFF ¶ 285.

evidence demonstrates that rivals would also increase promotion in the absence of Dealer

Criterion 6. Id. ¶ 377. Such increased market-wide promotion is *procompetitive*. See Orson, 79

F.3d at 1368. Indeed, because Dentsply recognizes elsewhere the procompetitive benefits of

increased marketing and promotional activity (at 32), it must reconcile with its justification the

admissions of its top executives that it will promote more absent Dealer Criterion 6. Therefore,

Dentsply asserts (at 59) that increased promotions in the absence of exclusive dealing proves that

Dr. Marvel's justification is "true as a matter of fact." DSBr. at 59. But the opposite is true.

Dr. Marvel's theory depends on Dentsply promoting *less* not *more* (DSBr. at 31), so his theory is

inapplicable.

    *Second*, Dentsply's argument erroneously claims that exclusive dealing protects its

investments in promotional spending that its own expert testified are *not* protected by exclusive

dealing. For example, Dentsply argues (at 34-35) that its promotional spending "geared

specifically to the dentist" and its other promotional spending at the "dentist level" justify

exclusive dealing. However, Dr. Marvel testified that if such an argument were made he would

not find it "credible." *See* PFF ¶ 340.[56] In addition, Dentsply asserts (at 34) that various brand-

specific promotions justify its exclusive dealing, including offering labs rebates based on their

Trubyte teeth purchases, cooperative marketing programs, the Add-A-Drawer program, and the

---

[56]    See Marvel Tr. 3698-99 ("[Y]ou wouldn't expect to see exclusive dealing at the
dealer level to explain protection of the promotion at the dentist level or at the final consumer
level, so if Dentsply were to be promoting there and saying you've got to give me the right to
have exclusive dealing at the dealer level in order to protect that promotion, I would say that is
not an answer, that I would find an explanation that I would find credible."). Dentsply gets not
only the economics wrong, but the facts as well. For example, Dentsply erroneously claims that
it alone among manufacturers has an education department. But see, e.g., Ganley Tr. 986
(Ivoclar).

Dentsply Order Network ("DON"). However, such promotions are not susceptible to free riding, because they are keyed specifically to the purchase of Trubyte teeth. See PFF ¶¶ 370-72. Accordingly, they do not justify exclusive dealing.

*Third*, the evidence is clear that Dentsply does not promote more than its rivals on a proportionate basis. Dentsply claims (at 35) that its rivals do no promotion at all, but Dentsply is incorrect. See § II.B.2.d, supra. Dentsply attacks Dr. Reitman's calculations showing Dentsply does proportionately less promotion than its rivals, but none of its attacks have merit. Dentsply contends that

Dr. Reitman failed to calculate a ratio covering advertising, promotion, and direct selling, but that is exactly what Dr. Reitman did. *See* PFF ¶¶ 351-53. Most important, Dentsply concedes that Dr. Reitman's calculations, even after its various suggested adjustments, show that "Dentsply's ratio of sales representatives to its sales volume is *equivalent* to its rivals." DSBr. at 36 n.20 (emphasis added). Therefore, even if the adjustments had merit (which they do not), they still would undermine Dentsply's claim that it invests more than its rivals in promotion.[57] That is a necessary element of its free riding defense under Dr. Marvel's theory.

*Fourth,* dealers do not engage in "bait and switch" steering of tooth customers. PFF ¶¶ 343-46. Dentsply admits that it cannot show real world examples of such steering, but argues that it needs to show merely "motive and opportunity" for dealers to convert. DSBr. at 36.

---

[57]      Dentsply's suggested adjustments are meritless.  Dr. Reitman used the figure that Mr. Jenson, Trubyte's General Manager, gave for the number of sales representatives that call on customers.  Jenson Tr. 2136.  Government agency representatives are irrelevant, because the sales volume numbers in the chart do not include government sales.  Reitman Tr. 3998-99.  The claim concerning Vident's advertising also lacks merit because, as explained by Dr. Reitman, the document was referring to 1992-95, not 1997, the year for which Dr. Reitman did the calculation. Reitman Tr. 4011-13.

Contrary to Dentsply's effort to reduce its burden, it is well-established that a pro-competitive

justification must be more than hypothetical speculation. See Kodak, 504 U.S. at 483-85;

Graphic Prods. Distribs., Inc. v. ITEK Corp., 717 F.2d 1560, 1576 (11th. Cir. 1983) ("[M]erely

offering a rationale for a vertical restraint will not suffice; the record must support a finding that

the restraint is necessary to enhance competition and does indeed have a procompetitive effect.").

Dentsply's attempt to explain away the lack of real world examples (at 38) of free riding

ignores the evidence showing that, where Dentsply's exclusion has not prevented dealers from

carrying multiple brands, bait and switch steering has not occurred.  Dentsply does not dispute

that bait and switch steering does not occur at dealers that carry Dentsply teeth and

"grandfathered" brands, which include Myerson and Universal, nor does it offer proof that this

would likely change if additional Trubyte dealers were permitted to carry the brands.  Dentsply's

argument (at 38) that no Trubyte dealer currently carries either Ivoclar or Vita teeth overlooks the

fact that until only recently DTS's New York branch sold both Dentsply and Vita teeth.  Not only

does the DTS example show an absence of bait and switch steering (PFF ¶ 347 (c), (e)), it

demonstrates the *procompetitive* effects of dealers selling multiple brands of premium teeth.

When DTS sold both brands, Dentsply competed even harder to try to convert Vita labs over to

Dentsply.  Id. ¶ 282 (c).

In any event, the evidence contradicts Dentsply's argument that dealers have either the

motive or opportunity to convert labs.  Contrary to its argument, Dentsply must show that its

dealers have the motive and opportunity to engage in the kind of bait and switch, margin-driven

steering that it concedes it must show, not just that dealers have the ability to promote competing

brands of teeth.  See DPFF ¶ 324; Marvel Tr. 3548-49.  Absent free riding, dealer promotion of

57

rival brands is the essence of competition; indeed, it is one of the procompetitive effects that

enjoining Dentsply's conduct will achieve.  As Dentsply's expert acknowledged, it is not free

riding to offer a customer a selection so that it can choose between different brands; it is not free

riding for a dealer to offer a customer a lower price on a particular brand; and it is not free riding

to offer a customer a comparison of different products so the customer can make an informed

choice of the one it wants.  Marvel Tr. 3693.

Dentsply's anecdotal dealer examples involve dealers legitimately promoting non-

Dentsply brands and provide no evidence of a motive or opportunity to bait and switch

customers.  For example, Dentsply points to Zahn's switching customers from Universal teeth to

Portrait teeth.  However, even Dr. Marvel conceded that this was not a valid example of free

riding, because all Zahn did was trade out Universal teeth in favor of Trubtye teeth.  See Marvel

Tr. 3803; PFF ¶ 347(b).  Dentsply's other dealer examples are to the same effect.  See PFF ¶

347.[58]

Dentsply's examples involving Vident do not prove that Vident requires each of its

dealers to engage in the kind of "bait and switch" tactics envisioned by Dr. Marvel.  The

examples show, unsurprisingly, that Vident requires its dealers to vigorously promote its teeth.

See DX 5, DX 1587.  However, none of the examples show that Vita teeth were sold by the

---

[58]    Although Dentsply points to Darby's intention to aggressively sell Vita teeth if it
had distributed them and the fact that those sales would have come at Dentsply's expense,
Dentsply fails to explain that Darby was not carrying Dentsply teeth at the time and that Dentsply
had refused to allow it to do so.  Thus, Darby's intent to compete aggressively against the
dominant firm in the market had nothing to do with free riding.  Indeed, Dentsply's fear of facing
an aggressive competitor in Darby led it to offer Darby the right to carry Dentsply teeth on the
condition it not carry Vita teeth.  See PFF ¶ 238.

dealer alongside other teeth, a necessary fact for free riding to occur.[59]  Dentsply ignores the

testimony of the president of Vident that he was not aware of Vident ever requiring one of its

dealers to sell Vita teeth over another tooth brand also carried by that dealer.  Whitehill Tr. 391.

More important, they also show that Vident, far from free riding, has supported its dealers by

promoting Vita teeth in a number of different ways, including advertising in trade journals,

training labs, attending trade shows, and sponsoring lectures for dentists.  See DX 5 at 2; DX

1587 at VID 4597.

     Contrary to Dentsply's mistaken examples, the record is clear that dealers would not

engage in the kind of bait and switch steering speculated by Dentsply.  See PFF ¶¶ 343-46.  Labs,

not dealers, are experts in teeth in the dental industry.  See id. ¶¶ 343, 346.  Dealers risk

important customer relationships by attempting to switch labs to non-preferred teeth based on

dealer margin considerations.  See id. ¶ 344.  Dentsply's own lab witnesses stated they would

consider this "unethical."  Langer Tr. 3298.

     *Fifth,* in any event, even if Dentsply could establish that free riding is likely (which it is

not), Dentsply cannot show that its exclusionary conduct is a reasonable response.  Dentsply's

enforcement of Criterion 6 is overbroad and has no connection to its purported justification.  For

example,  Dentsply terminated the dealer Trinity Dental for adding Vita teeth, even though

Trinity sold only Dentsply *merchandise.*  Dentsply does not address this overreaching conduct,

---

[59]     Dentsply's ironic invocation of its own exclusionary conduct with DTS (at 37-38) as an example of bait and switch steering fails for the same reason.  When DTS became a Trubyte dealer, Dentsply forced DTS to drop Ivoclar and Vita teeth at all locations (except New York).  With that one exception, DTS did not sell Dentsply and Vita or Ivoclar teeth side by side. PFF ¶ 347 (c).  Even in New York, bait and switch steering was impossible.  Under the terms of its agreement with Dentsply, DTS was not permitted to sell Vita teeth to any labs other than existing customers in the northeast. Id. ¶ 52.

which is not supported by its theory. USBr. at 61-62; PFF ¶382. Dentsply has enforced Dealer

Criterion 6 against dealers seeking to handle the accounts receivable function for Schottlander's

Enigma teeth, even though Dr. Marvel's theory does not apply to these situations. Id. Dentsply's

argument that Dealer Criterion 5's "incremental business" provision is a "reasonable limitation"

on Criterion 6, leaving alternative dealers available for rivals, ignores the fact that 78%-87% of

the lab dealer outlets are foreclosed to those rivals. It also overlooks the unrebutted evidence that

Dealer Criterion 6 is designed to "block competitive distribution points" and "tie-up dealers"

(GX 171), and that Dentsply has recognized dealers in order to deprive its competitors from key

distribution points. PFF ¶¶ 237-39. According to Chris Clark, what adding "incremental

business" really means is the ability of a dealer to convert labs from using Vita or Ivoclar to

using Trubyte teeth. Clark Tr. 2704. Viewed that way, Dealer Criterion 5, far from being any

kind of limitation on Criterion 6, is nothing more than Dentsply's excuse for depriving its closest

competitors of their effective dealers.

Finally, even if there were any negligible procompetitive benefit associated with

Dentsply's exclusionary conduct, Dr. Reitman weighed the benefits against the substantial harm

to competition in concluding that Dentsply's conduct is anticompetitive. See USBr. at 63.

Dentsply's expert performed no such analysis.

Accordingly, Dentsply's purported justification for its conduct is not supported by the

facts and should be rejected.

60

## **CONCLUSION**

For the foregoing reasons, this Court should declare that Dentsply's conduct has violated

Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act, and bar Dentsply from

enforcing Dealer Criterion 6 and engaging in related conduct.

Respectfully submitted,

COUNSEL FOR PLAINTIFF
UNITED STATES OF AMERICA

COLM F. CONNOLLY
UNITED STATES ATTORNEY


Paulette K. Nash (DSB #2901)
Assistant United States Attorney
1201 Market Street, Suite 1100
Wilmington, DE  19801
(302) 573-6277


William E. Berlin
Jon B. Jacobs
Sanford M. Adler
Frederick S. Young
Steven Kramer
N. Christopher Hardee
Bennett J. Matelson
United States Department of Justice,
Antitrust Division
325 Seventh Street, NW, Suite 400
Washington, D.C.  20530
(202) 616-5938

Dated: August 30, 2002

61

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 99-005-SLR |
| | : | |
| DENTSPLY INTERNATIONAL, INC., | : | |
| | : | |
| Defendant. | : | |

### AFFIDAVIT OF SERVICE

I, **Maureen R. Davis**, an employee in the Office of the United States Attorney for the District of Delaware, hereby attest under penalty of perjury that on **October 29, 2003**, a copy of the foregoing

**UNITED STATES' REPLY TO DENTSPLY INTERNATIONAL, INC.'S PROPOSED FINDINGS OF FACT AND ITS BRIEF IN SUPPORT**

was served via hand-delivery upon counsel at the following address:

**William Johnston, Esquire**
Young, Conaway, Stargatt & Taylor
Eleventh Floor
Rodney Square North
Wilmington, DE 19801

An additional copy of the above document will be hand delivered on **October 30, 2003**, by Jonathan Jacobs, Trial Attorney, Antitrust Division, U.S. Department of Justice, Health Care Task Force, Liberty Place Building, 325 Seventh Street, N.W., Suite 400, Washington, DC 20530, to:

**Margaret M. Zwisler**
**Richard A. Ripley, Esquire**
Howrey & Simon
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004

Maureen R. Davis
Legal Assistant