# Exhibit G

# No. 03-4097

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

**United States of America,**
*Plaintiff-Appellant,*

v.

**Dentsply International, Inc.,**
*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
CIVIL ACTION NO. 99-005
CHIEF JUDGE SUE L. ROBINSON

**BRIEF OF DEFENDANT-APPELLEE
DENTSPLY INTERNATIONAL, INC.**

Of Counsel:
Brian M. Addison
DENTSPLY INTERNATIONAL, INC.
Susquehanna Commerce Center
221 West Philadelphia Street
York, PA 17405

Margaret M. Zwisler
Richard A. Ripley
Kelly A. Clement
Eric J. McCarthy
Douglas S. Morrin
HOWREY SIMON ARNOLD & WHITE, LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 783-0800

Counsel for Defendant-Appellee
DENTSPLY INTERNATIONAL, INC.

Dated: May 13, 2004

**United States Court of Appeals for the Third Circuit**

**Corporate Disclosure Statement and**
**Statement of Financial Interest**

No. __03-4097__

United States of America

v.

Dentsply International, Inc.

**Instructions**

Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest. This information need be provided only if a party has something to report under that section of the LAR.

In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings. If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list. LAR 26.1(c).

The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first. An original and three copies must be filed. A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed. Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

If additional space is needed, please attach a new page.

(Page 1 of 2)

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, _Dentsply International, Inc._
makes the following disclosure:                                   (Name of Party)

      1) For non-governmental corporate parties please list all parent corporations:

          None

      2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

          None

      3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

          None

      4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.


_Margaret M. Zwisler_
(Signature of Counsel or Party)

Dated: _3/19/04_

rev: 12/1993                        (Page 2 of 2)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................iii

STATEMENT OF RELATED CASES ....................................................................1

ISSUES PRESENTED ...........................................................................................1

STATEMENT OF THE CASE ...............................................................................4

    Trial Court Proceedings .................................................................................4

    Trial Court Decision.......................................................................................5

SUMMARY OF ARGUMENT ............................................................................17

ARGUMENT.......................................................................................................18

I.     THE TRIAL COURT CORRECTLY HELD THAT, BY FAILING
       TO MEET THE ELEMENTS OF CLAYTON ACT §3, THE
       GOVERNMENT COULD NOT SATISFY THE PROOF REQUIRED
       UNDER SHERMAN ACT §2........................................................................18

     A.     The Trial Court Committed No Error Because It Independently
           Analyzed The Government's Monopolization Claim Against
           The Evidence At Trial..........................................................................18

     B.     Where Conduct Has No *Probable* Anticompetitive Effect
           Under Clayton Act §3, It Cannot Have An *Actual*
           Anticompetitive Effect Under Sherman Act §2 ..................................19

     C.     By Accepting The §3 Decision, The Government Cannot
           Challenge The §2 Verdict....................................................................23

II.    THE TRIAL COURT CORRECTLY HELD THAT CRITERION 6
       WAS NEITHER PREDATORY NOR ANTICOMPETITIVE ....................24

     A.     The Government Misstates Its Burden In A §2 Monopoly
           Maintenance Claim .............................................................................24

     B.     The Trial Court's Conclusion That Criterion 6 Was Not
           Predatory Was Not Error .....................................................................27

1.  Dentsply's Rivals Have Viable Alternative Methods of Distribution ................................................................. 28

2.  The Trial Court Correctly Found That Criterion 6 Does Not Tie Up Dentsply Dealers ........................................ 36

3.  The Government Failed To Prove That Criterion 6 Reflects Short-Term Economic Sacrifice By Dentsply ........... 38

C.  The Trial Court Correctly Found That Criterion 6 Did Not Have An Actual Adverse Effect On Competition ............................. 41

1.  The Trial Court's Rejection Of Predictions Of Effect In Favor Of Contradictory Real World Evidence Was Not Clear Error ............................................................. 44

2.  The Trial Court Did Not Commit Clear Error When It Found That Criterion 6 Was Not Responsible For Rivals' Market Shares ........................................................ 52

III.  DENTSPLY DOES NOT HAVE MONOPOLY POWER ........................... 56

A.  The Trial Court Applied The Correct Legal Standard ....................... 56

B.  Dentsply Lacks The Power To Exclude Competition From Dental Laboratories ....................................................... 58

1.  The Trial Court's Finding That Criterion 6 Is Not An Entry Barrier To The Artificial Tooth Market Was Not Clear Error ............................................................. 59

2.  Dentsply's Rivals Have The Capacity To Expand Output ...... 63

C.  Dentsply Lacks The Power To Control Prices .................................. 64

CONCLUSION ........................................................................................ 69

## TABLE OF AUTHORITIES

## CASES

*Addamax Corp. v. Open Software Foundation, Inc.,*
  152 F.3d 48 (1st Cir. 1998) ........................................................................ 45

*Advo, Inc. v. Philadelphia Newspapers, Inc.,*
  51 F.3d 1191 (3d Cir. 1995) ....................................................................... 54

*American Motor Inns, Inc. v. Holiday Inns,*
  521 F.2d 1230 (3d Cir. 1975) ..................................................................... 20

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
  472 U.S. 585 (1985) .................................................................................... 39

*Barr Laboratories, Inc. v. Abbott Laboratories,*
  978 F.2d 98 (3d Cir. 1992) ................................................................... *passim*

*Barry Wright Corp. v. ITT Grinnell Corp.,*
  724 F.2d 227 (1st Cir. 1983) ...................................................................... 25

*Borough of Lansdale v. Philadelphia Electric Co.,*
  692 F.2d 307 (3d Cir. 1982) ....................................................................... 24

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,*
  509 U.S. 209 (1993) .................................................................................... 47

*CDC Technologies v. IDEXX Laboratories,*
  186 F.3d 74 (2d Cir. 1999) ................................................................... 29, 42

*Concord Boat Corp. v Brunswick Corp.,*
  207 F.3d 1039 (8th Cir. 2000) ............................................................. 36, 50

*Crossroads Cogeneration Corp. v. Orange & Rockland Utilities,*
  159 F.3d 129 (3d Cir. 1998) ....................................................................... 57

*DiFederico v. Rolm Co.,*
  201 F.3d 200 (3d Cir. 2000) ....................................................................... 24

*Dobrowlsky v. Califano,*
  606 F.2d 403 (3d Cir. 1979)........................................................46

*Eastman Kodak Co. v. Image Technical Services, Inc.,*
  504 U.S. 451 (1993) ..................................................................39

*Fedorczyk v. Caribbean Cruise Lines,*
  82 F.3d 69 (3d Cir. 1996)..........................................................46

*Fleer Corp. v. Topps Chewing Gum,*
  658 F.2d 139 (3d Cir. 1981).......................................................25

*General Electric Co. v. Joiner,*
  522 U.S. 136 (1997) ..................................................................47

*Handicomp Inc. v. United States Golf Ass'n,*
  2000-1 Trade Cas. (CCH) ¶ 72,879 (3d Cir. 2000) ............................57, 58

*Hickey v. A.E. Staley Manufacturing,*
  995 F.2d 1385 (7th Cir. 1993).....................................................67

*Ideal Dairy Farms, Inc. v. John Labatt, Ltd.,*
  90 F.3d 737 (3d Cir. 1996).........................................................67

*International Distribution Centers v. Walsh Trucking Co.,*
  812 F.2d 786 (2d Cir. 1987)........................................................64

*John T. v. Delaware County Intermediate Unit,*
  318 F.3d 545 (3d Cir. 2003)........................................................24

*Laborers' International Union of North America v. Foster*
  *Wheeler Corp.*, 26 F.3d 375 (3d Cir. 1994)..............................................23

*LePage's v. 3M,*
  324 F.3d 141 (3d Cir. 2002), *petition for cert. pending,*
  No. 01-1865 (June 20, 2003)...........................................................*passim*

*Lorain Journal Co. v. United States,*
  342 U.S. 143 (1951) ..................................................................37

*Miller v. Rite Aid Corp.,*
 334 F.3d 335 (3d Cir. 2003)...............................................................24, 56

*Neumann v. Reinforced Earth Co.,*
 786 F.2d 424 (D.C. Cir. 1986) ....................................................................39

*Nordhoff Investments, Inc. v. Zenith Electronics Corp.,*
 258 F.3d 180 (3d Cir. 2001)........................................................................47

*Oahu Gas Service, Inc. v. Pacific Research Inc.,*
 838 F.2d 360 (9th Cir. 1988).......................................................................61

*Omega Environmental v. Gilbarco Inc.,*
 127 F.3d 1157 (9th Cir. 1997)................................................28, 29, 31, 43

*Raymond v. Marks,*
 116 F.3d 466, 1997 WL 345984 (2d Cir. June 24, 1997)........................30

*Reazin v. Blue Cross & Blue Shield,*
 899 F.2d 951 (10th Cir. 1990).....................................................................62

*Rebel Oil Co. v. Atlantic Richfield Co.,*
 51 F.3d 1421 (9th Cir. 1995).......................................................................61

*Roland Machinery Co. v. Dresser Industries,*
 749 F.2d 380 (7th Cir. 1984)................................................................29, 37

*Rosenberger v. Rector & Visitors of University of Virginia,*
 18 F.3d 269 (4th Cir. 1994), *rev'd on other grounds,*
 515 U.S. 819 (1995) ....................................................................................23

*Roy B. Taylor Sales, Inc. v. Hollymatic Corp.,*
 28 F.3d 1379 (5th Cir. 1994).......................................................................29

*Ryco Manufacturing Co. v. Eden Services,*
 823 F.2d 1215 (8th Cir. 1987).....................................................................43

*Scully v. US WATS, Inc.,*
 238 F.3d 497 (3d Cir. 2001)............................................................24, 32, 45

*Seagood Trading Corp. v. Jerrico, Inc.,*
  924 F.2d 1555 (11th Cir. 1991)..........................................................29, 43

*Standard Fashion Co. v. Magrane-Houston Co.,*
  258 U.S. 346 (1922) ...............................................................................20

*Stelwagon Manufacturing Co. v. Tarmac Roofing Systems, Inc.,*
  63 F.3d 1267 (3d Cir. 1995)...................................................................46

*In re TMI Litigation,*
  193 F.3d 613 (3d Cir. 1999)..............................................................47, 50

*Tampa Electric Co. v. Nashville Coal Co.,*
  365 U.S. 320 (1961) .......................................................19, 20, 22, 23, 42

*U.S. Healthcare, Inc. v. Healthsource, Inc.,*
  986 F.2d 589 (1st Cir. 1993) ...........................................................39, 43

*United States v. Brown University,*
  5 F.3d 658 (3d Cir. 1993).......................................................................39

*United States v. E.I. Du Pont de Nemours & Co.,*
  351 U.S. 377 (1956) ...............................................................................56

*United States v. Microsoft,*
  253 F.3d 34 (D.C. Cir.), *cert. denied*, 534 U.S. 952 (2001) .............*passim*

*United States v. Pelullo,*
  964 F.2d 193 (3d Cir. 1992).....................................................................5

*United States v. Visa, U.S.A, Inc.,*
  344 F.3d 229 (2d Cir. 2003)....................................................................42

*United States Steel Corp. v. Occupational Safety & Health
  Review Commission*, 537 F.2d 780 (3d Cir. 1976) ...................................47

*Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko,
  LLP*, 124 S. Ct. 872 (2004) ....................................................................25

*Weiss v. York Hospital,*
   745 F.2d 786 (3d Cir. 1984)........................................................................56

*Western Pacific Fisheries v. S.S. President Grant,*
   730 F.2d 1280 (9th Cir. 1984)..................................................................45

## STATUTES

Clayton Act § 3, 15 U.S.C. § 14 (2002)..................................................*passim*

Sherman Act § 1, 15 U.S.C. § 1 (2002) .................................................*passim*

Sherman Act § 2, 15 U.S.C. § 2 (2002) .................................................*passim*

## STATEMENT OF RELATED CASES

Dentsply agrees with the government's description of *Howard Hess Dental Laboratories, Inc. v. Dentsply*, No. 99-255 (SLR) and *Jersey Dental Laboratories v. Dentsply*, No. 01-267 (SLR).   On February 24, 2004, Dentsply filed its opposition to plaintiffs' petition to this Court to hear their interlocutory appeal. There is a stay of all proceedings in *Lipson v. Dentsply*, No. 01-427 (SLR), a third pending putative class action.

## ISSUES PRESENTED

1. Where a plaintiff accepts a finding that challenged conduct does not have the *probable* effect of lessening competition under Clayton Act §3, does Third Circuit law nevertheless permit the plaintiff to challenge the fact finder's determination that the identical conduct did not have an *actual* adverse effect on competition?  (A112 (Law18-20)).[1]

---

[1]    Relevant portions of the record included in the Joint Appendix are cited as "A", followed by page number and paragraph citations to the trial court's Conclusions of Law ("Law") or Findings of Fact ("FOF").  Trial transcript pages are cited by Appendix page only.  Trial exhibits are cited by exhibit number and the first Appendix page that corresponds to the exhibit.   The government's

2.  Did the trial court commit clear error in finding that Dentsply's dealer policies were not predatory where: (i) rivals can access the market through other avenues ("alternative distribution channels"); (ii) these channels are comparable to Dentsply's dealers; (iii) rivals with access to Dentsply's dealers still choose to do substantial business through these channels; (iv) Dentsply's dealers can replace Dentsply teeth with a rival's product; and (v) the arrangements were not contrary to Dentsply's short-term financial self-interest? (A110-11 (Law12-13), A113 (Law26, 29), A114 (Law35); A55 (FOF40-45), A59 (FOF71-74), A65 (FOF110-11), A68-70 (FOF139-47)).

3.  Did the trial court commit clear error in finding that Criterion 6 did not have an adverse effect on competition in the market when the evidence proved: (i) that it did not prevent rivals from reaching any share of the relevant market; (ii) no reduction in output or quality; (iii) no reduction in innovation by Dentsply or others in the market; (iv) that Dentsply remained the market leader in promotion and marketing; and (v) no artificially high tooth prices in the market?

exhibits are cited as "GX", and Dentsply's exhibits as "DX." Pinpoint citations

3

(A110-11 (Law11-13), A113 (Law26, 29); A53 (FOF18-19), A59 (FOF71), A71-73 (FOF155-68), A82-83 (FOF224-25), A86-87 (FOF244-48), A88-90 (FOF257-68), A90-96 (FOF270-303)).

4. Did the trial court commit clear error in finding that the relevant market lacks substantial entry barriers where: (i) market participants expanded output in the relevant market and possess the capacity for further expansion; (ii) participants have access to all end users using existing or readily convertible systems; (iii) two firms have entered the market using alternative distribution channels; and (iv) Dentsply reacted competitively to the expansion and entry? (A113-14 (Law26, 28-29, 35); A53-54 (FOF27, 31), A55-56 (FOF46-52), A68-70 (FOF136-47), A86-87 (FOF243, 251-52)).

5. Did the trial court commit clear error in finding that Dentsply lacks the power to control prices where: (i) the bulk of Dentsply's product line is priced between its two largest rivals; (ii) Dentsply has reacted to price competition; and (iii) Dentsply's gross profit margins were

are included where applicable.

4

not artificially inflated?  (A113 (Law30); A82-83 (FOF224-25), A84 (FOF233), A86 (FOF243)).

## STATEMENT OF THE CASE

### Trial Court Proceedings

On January 5, 1999, the government filed a complaint against Dentsply challenging Dentsply's policy that dealers who carry Dentsply's "Trubyte" artificial tooth line may not add competing lines of teeth to their product offerings ("Criterion 6" of Dentsply's dealer policy).  The government alleged that Criterion 6 constituted illegal exclusive dealing under Sherman Act §1 and Clayton Act §3 and monopolization under Sherman Act §2.

Chief Judge Sue L. Robinson presided over a four-week trial in 2002.  The court heard 30 live witnesses and received the deposition testimony of another 45 witnesses.  In August 2003, eleven months after closing arguments, the trial court issued a 165-page decision in favor of Dentsply.  The court concluded that Criterion 6 did not foreclose competition from a substantial share of the market for artificial teeth and therefore that the government had failed to prove that Dentsply violated either §1 or §3.  (A110-12 (Law11-17)).  The court also found that

5

Criterion 6 did not violate §2 because the government had failed to prove that Dentsply had monopoly power, that Criterion 6 was predatory or that it had an actual adverse effect on competition. (A113-14 (Law25-35)).

**Trial Court Decision**

The government's statement of facts fails to present the record facts in the light most favorable to Dentsply as the victor at trial;[2] thus, this Court should disregard that statement. Below, Dentsply summarizes the trial court's decision in the light with which this Court must view the extensive trial record. The trial court's analysis, when viewed dispassionately and accurately, embodies a rational evaluation of credible evidence and describes an economically plausible market.

The court found that Dentsply has been a leader and innovator in the United States market for artificial teeth for nearly a century. (A52 (FOF15), A70-73 (FOF148-168)). Dentsply manufactures artificial teeth in the premium, mid-range and economy segments. (A52 (FOF16)). Dentsply sells fourteen different tooth lines that encompass 16,000 different SKUs for teeth in approximately 10,000

---

2    *United States v. Pelullo*, 964 F.2d 193, 197 (3d Cir. 1992).

shade and mould combinations.  (A52-53 (FOF17, 19)).[3]  The court found that no rivals offer product lines of comparable breadth.

The court also found that, throughout its history, Dentsply introduced major advancements in the artificial tooth market.   (A70-71 (FOF148-53), A73 (FOF166-68)).  The court relied on the testimony of Dentsply's Chairman John Miles that "product innovation" has been "one of the most important things" that has allowed Dentsply to "initially develop and ultimately maintain" its market share.  (A70 (FOF148)).  One of Dentsply's most significant innovations was the development of the Portrait tooth in 1995.   (A71-73 (FOF155-165)).   The commercially successful Portrait line offered improved aesthetics and a superior capacity to match the industry standard shade guide.  (A72-73 (FOF163-64)).

The court further found that Dentsply undertakes enormous efforts to generate demand and promote its products at all levels of the market - the dental lab, dentist and patient.  (A90 (FOF269)).  The primary method is through its "dedicated sales force," which calls on dental labs, dentists and dental schools.  (A90-91 (FOF270)).  For years Dentsply has had the market's largest tooth-

---

3     By offering such a variety of shades and moulds, Dentsply is better able to match the parameters included on a dentist's denture prescription.  (A52 (FOF11)).

7

focused sales force and thus calls on the most denture labs. (A90-91 (FOF270-71)).

The court found that Dentsply's sales force concentrates its efforts at the dental labs in order to "pull[]" volume from the dealers. (A90 (FOF269), A91 (FOF 272-273; A1845). One strategy is converting a lab from competitive teeth to Trubyte teeth. (A91 (FOF277)). Dentsply "make[s] a market" for its teeth through a variety of marketing and promotional activities. (A91 (FOF275), A92 (FOF279-81)).

Dentsply encourages dentists to prescribe its teeth (A92-93 (FOF282)), thus pulling sales through the lab and dealer. (A90 (FOF269)). Dentsply has several dentist-focused promotional programs. (A92-93 (FOF282-293)). No rivals have a systematic sales strategy for dentists. (A89-90 (FOF265, 268)). Finally, Dentsply calls on dental schools to ensure that dental students are familiar with Trubyte teeth because "what gets taught gets bought." (A95 (FOF294-299)). Dentsply's activity at dental schools represents a "long-time strategic advantage." (A95 (FOF294-95)). No rivals have a comparable relationship with dental schools. (A87 (FOF248), A89 (FOF263), A89-90 (FOF265)).

8

The court found that the U.S. artificial tooth market is populated by well-financed multinational firms, most of which have been selling artificial teeth in the U.S. for decades, well before Dentsply implemented Criterion 6.

The court considered eight manufacturers "particularly relevant" to the U.S. artificial tooth market. (A52 (FOF14)). Ivoclar Vivadent AG manufactures and sells artificial tooth lines throughout the world. (A53 (FOF23)). In the U.S., it distributes teeth through its wholly-owned subsidiary, Ivoclar Vivadent, Inc. ("Ivoclar"). (A53 (FOF24)). Vita Zahnfabrik ("Vita") is a German manufacturer of artificial teeth. (A54 (FOF33)). Vita distributes its teeth in the U.S. through Vident, its exclusive national distributor. (A54 (FOF33, 36), A67 (FOF129)). Myerson LLC has manufactured and sold teeth in the U.S. since 1917. (A54-55 (FOF37-38)).    Universal Dental Company sells teeth from its Pennsylvania facility. (A55 (FOF45)). American Tooth Industries ("ATI") manufactures and sells a brand of teeth called Justi. (A55 (FOF42)). Two manufacturers - Heraeus Kulzer GmbH, a German company, and Davis Schottlander of England - are recent entrants into the U.S. tooth market. (A55-56 (FOF46-52)).

Unlike most of its rivals, Dentsply has never sold teeth directly. (A1857-58, A2770-71). Currently, Dentsply distributes its teeth through 23 dealers. (A64-65

9

(FOF109)). In February 1993, Dentsply published criteria for dealers carrying its

teeth. (A73-74 (FOF170-71)). Dentsply developed the Dealer Criteria to address

the "numerous inquiries from companies seeking to become" dealers. (A73

(FOF170)). Criterion 6 states that any dealer authorized to carry Trubyte teeth

cannot add a competitive tooth line to its product offerings. (A73 (FOF169)).

Criterion 6 did not preclude dealers from carrying brands of teeth that they carried

prior to implementation of Criterion 6 ("grandfathered brands"). (A64 (FOF175)).

Since its inception, Dentsply has taken steps to enforce its dealer policy. (A76-79

(FOF187-211)).


Criterion 5 requires that companies applying for recognition as a Trubyte

dealer must "submit a written plan which indicates that incremental business will

be gained by Dentsply." (A73-74 (FOF171)). Primarily, applicants are able to

demonstrate incremental sales by their ability to convert existing lab customers

from rival brands to Trubyte teeth. (A2185-86, A1637). Dentsply does not use

more dealers than it needs to distribute effectively. (A69 (FOF141), A74

(FOF179)). Otherwise, dealers would lose the value of their investment and wind

up dividing the artificial tooth market among themselves rather than growing the

market. (A2186). Dentsply has routinely rejected applications for failure to

satisfy this incremental business requirement. (A69 (FOF141); A1639-41).

10

The court found that Dentsply's rivals are not foreclosed from a substantial share of the laboratories in the U.S.  (A57 (FOF61), A59 (FOF71)).  The court found that rivals can access these customers by distributing teeth to labs through several means other than Dentsply dealers.  (A52 (FOF13)).  One way is direct distribution, which the court found, and the government agreed, is a "viable" method of distribution.  (A59 (FOF71)).  At the time of trial, five of the eight "relevant" manufacturers were selling teeth directly to dental labs.  (A53 (FOF27), A55-56 (FOF40, 43, 45, 47)).

Most dental labs prefer to purchase teeth directly from a manufacturer.  (A59 (FOF73-74), A60 (FOF81)).  Many of these labs prefer the "cost savings" attributable to the elimination of a "dealer middleman."  (A59 (FOF73), A60 (FOF81)).  Other labs favor purchasing directly to avoid dealer error and back orders.  (A59 (FOF74)).  Still others appreciate the technical assistance that manufacturers provide.  (*Id.*).

The court found that direct-selling manufacturers are just as capable of selling teeth to dental labs as are dealers.  (A60-63 (FOF82-98)).  For example, because overnight delivery services have made a card of teeth a "very transportable item," tooth manufacturers do not require a network of tooth stocks

11

to sell teeth to labs. (A59-60 (FOF77)). Direct-selling manufacturers, like dealers, can service the tooth needs of labs effectively throughout the U.S. with a limited number of tooth stocks – in many instances, just one. (A53 (FOF28), A60 (FOF78), A69-70 (FOF143-47)). The court said that manufacturers have replicated or could replicate the dealer function. (A60 (FOF81.b)). Manufacturers and dealers offer "one-stop-shopping" for all of a lab's crown and bridge and denture needs. (A61 (FOF84)). Manufacturers manage the accounts receivable, accept tooth returns (except Vita) and offer accurate and reliable overnight delivery. (A61 (FOF86-87), A62-63 (FOF97-98)).

Ivoclar sells artificial teeth directly to dental laboratories from a single tooth-stocking location in Amherst, N.Y. (A53 (FOF28)). Ivoclar has distributed its teeth directly to dental labs since at least 1968 (A53 (FOF27)); it does not use dealers to distribute teeth. (A53 (FOF28)). Ivoclar has sold teeth directly to 3,700 of the estimated 7,000 denture labs. (A54 (FOF31), A57 (FOF58)). Ivoclar acknowledges that selling directly to dental labs is an "effective method of distribution" that provides "some advantages" over dealer distribution. (A63 (FOF99)). This explains why Ivoclar terminated its short-lived experiment in 1989 to sell teeth through a dealer. (A63 (FOF101)). One year later, Ivoclar rejected the opportunity to distribute teeth through Darby Dental, after

12

determining that selling directly was "more profitable" and would "guarantee continuity in distribution methods." (A64 (FOF106)).

In 1996, Dentsply examined whether it too should sell its Trubyte teeth directly to labs. (A65 (FOF112)). Dentsply concluded that the services that dealers provided to labs "certainly [were] replicable." (A66 (FOF118)). At the same time, Dentsply recognized that, in switching to a direct-selling distribution system, Dentsply would have to overcome five significant hurdles, including writing-off $15 million in dealer inventory that the dealers would want to return to Dentsply. (*Id.*). Dentsply, which distributes $800 million a year in other products through these same dealers, also faced a significant risk that dealers would retaliate if Dentsply stopped selling teeth to dealers. (*Id.*). This could include dealers converting lab customers to non-Dentsply dental consumable products. (A66-67 (FOF123)). These risks are unique to Dentsply. Dentsply determined that it was not prepared to go direct in 1996. (A67 (FOF125)). The risks remain for Dentsply today. (A67 (FOF128)).

In addition to selling direct to dental labs, the court found that there are "hundreds" of dental dealers in the U.S. other than Trubyte dealers available to manufacturers. (A69 (FOF140)). These dealers have the capability to serve broad

13

geographic areas and want to add artificial teeth as a product line. (A56 (FOF54), A69 (FOF140), A69-70 (FOF142-47)). Indeed, the court noted that all of Dentsply's rivals except Ivoclar and Heraeus Kulzer use their own dealer networks to reach the market. (A54 (FOF33), A55 (FOF40, 43, 45), A56 (FOF52), A67 (FOF129)). Vita has distributed its teeth exclusively through a single national dealer since at least 1968. (A54 (FOF33), A67 (FOF129)). Schottlander distributes its Enigma teeth through its exclusive national distributor, Leach and Dillon, and Lincoln Dental, a non-Dentsply dealer. (A68 (FOF136-38), A69 (FOF144)). Myerson, Universal and ATI currently use non-Dentsply dealers to distribute teeth. (A68-69 (FOF139)).

Even Dentsply's twenty-three dealers are available to its rivals. (A111 (Law15), A113 (Law29), A114 (Law35)). The trial court found that no contract obligates a dealer to Dentsply. (A111 (Law15); A53 (FOF20), A65 (FOF110)). If Dentsply's dealers take on the teeth of a rival, they can either sell their Dentsply tooth inventory or return it to Dentsply for full credit. (A65 (FOF110)). Thus, "dealers are free to leave Dentsply whenever they choose" and distribute competitive brands of teeth. (A111 (Law15); A65 (FOF110-11)). Half of the eight rival manufacturers - Myerson/Austenal, ATI and Universal – currently distribute teeth through Dentsply's dealers (in addition to selling direct and

14

through their own dealers), and have done so since 1993. (A55 (FOF40, 43), A68-69 (FOF139), A73-74 (FOF170, 175), A109 (FOF367)).

The court concluded that no dealer has left the Dentsply dealer network given Dentsply's competitors' failure to compete effectively (A111 (Law15-16)), and that the level of success of rivals is the product of their own business decisions. (A86-90 (FOF244-268)). For example, the court found that both Ivoclar and Vita's distributor focus their marketing efforts on crowns and bridges, not teeth (A86-87 (FOF244-248)). Neither manufacturer has ever employed a sufficient number of sales representatives dedicated to selling teeth. (A86 (FOF245), A86-87 (FOF247-248)).

The court also found that Vident and Ivoclar have failed to promote teeth. (A88-90 (FOF257-68)). Despite recognizing the need to drive demand for teeth at the dentist level, Ivoclar's few sales representatives do not call on dentists to promote teeth. (A90 (FOF268)). And, from 1992 through late 1995, and 1997 to the present, Vident spent no money to market teeth. (A89 (FOF262)). Vident's system of distributing directly to labs and through a network of sub-dealers also has created difficulties in promoting and selling teeth. (A68 (FOF134), A89 (FOF260)).

15

Finally, throughout most of the relevant period, Vident and Ivoclar produced teeth that use European moulds, which are different than teeth that use American moulds. (A87-88 (FOF249-256)). Ivoclar's President, Mr. Ganley, conceded that the design of Ivoclar's European moulds posed significant obstacles to Ivoclar increasing its share of the U.S. market. (A87 (FOF249)).

For several reasons, the court found that Dentsply lacks the ability to exclude competitors from the dental labs: (i) direct selling to labs is a viable and, in some ways, advantageous method of distribution (A59 (FOF71), A63 (FOF 99)); (ii) Dentsply's rivals can reach the market through their own dealer networks, as well as non-Dentsply dealers (A67 (FOF129), A68-70 (FOF136-47)); (iii) rivals can "steal" a Dentsply dealer (A65 (FOF110-11)); (iv) Dentsply's rivals have failed to gain market share as a result of their own business decisions (A86-90 (FOF244-68)); and (v) Dentsply's conduct did not prevent the entry of two new rivals (A55-56 (FOF46-52)).

The court also found that rivals had actually entered the market despite Criterion 6. Heraeus Kulzer entered the U.S. market in 2000 despite the fact that it was "fully aware" of the functions that tooth dealers perform in the United States, and that it would be unable to obtain distribution through Trubyte dealers. (A56

16

(FOF47)). The court also credited the evidence of Schottlander's entry. (A56 (FOF52), A68 (FOF136)).

The court further found that Criterion 6 did not prevent existing rivals from expanding their output. In January 2002, Ivoclar expanded its tooth offering with two new lines of teeth featuring American moulds. (A87 (FOF251)). Mr. Swartout of Myerson testified that Myerson's Trinidad plant has "the capability of producing three times as many teeth as we do today, without any additional investments in capital." (A1122).

Lastly, the court found that the government failed to prove that Dentsply controls prices. (A113 (Law30)). The court determined that "Dentsply teeth are generally priced between Vident and Ivoclar teeth." (*Id.*; A82-83 (FOF224-25)). The court further found that the government provided no evidence that Dentsply has established a market of supra-competitive pricing. (A113 (Law30)). If anything, Dentsply has reduced the price that laboratories pay for Trubyte teeth in response to the price competition from its competitors. In the early 1990s, Vident and Ivoclar instituted volume discount programs with large laboratory chains and buying groups. (A2390-92, DX60 (A3778)). Dentsply reacted with its own Preferred Laboratory Incentive Program, which offered volume rebates to these

same customers.   (A2391-92).   Dentsply also has increased price rebates in response to the entries of Heraeus Kulzer and Schottlander via Leach and Dillon. (A86 (FOF243)).

## SUMMARY OF ARGUMENT

The government bore the burden to prove by a preponderance of the evidence that Dentsply possessed monopoly power in the market for artificial teeth that it maintained through the announcement and enforcement of Criterion 6. The government did no such thing. Instead, the trial court found that Dentsply is an established, focused and innovating rival whose Criterion 6, while self-interested, is competitively neutral in that it does not deny any rival the ability to access a single end-user.

The trial court's decision reflects a thoughtful analysis of a voluminous trial record using bedrock antitrust jurisprudence. Its numerous, detailed findings are supported by substantial, credible evidence, and this Court must affirm the judgment below.

18

# ARGUMENT

## I.    THE TRIAL COURT CORRECTLY HELD THAT, BY FAILING TO MEET THE ELEMENTS OF CLAYTON ACT §3, THE GOVERNMENT COULD NOT SATISFY THE PROOF REQUIRED UNDER SHERMAN ACT §2

**Standard of Review:**  Dentsply agrees with the government that plenary

review is appropriate. (Br. 21).[4]

### A.    The Trial Court Committed No Error Because It Independently Analyzed The Government's Monopolization Claim Against The Evidence At Trial

The government's first issue on appeal is a curious one.  It challenges as

"squarely at odds with the law of this Circuit" (*id.*) the trial court's observation

that, since "Dentsply is not in violation of §3 of the Clayton Act, Dentsply is not in

violation of §2 of the Sherman Act either."  (A112 (Law20)).  It is a curious

argument that does not advance the government's position because, contrary to the

government's assertion, the trial court separately analyzed Dentsply's conduct

under §2.  (A112-114 (Law21-35)).  Its analysis considered each element of the

government's §2 monopolization claim – whether Dentsply had monopoly power,

_____

[4]    The government's brief will be cited as "Br.", followed by page number.

19

whether Criterion 6 constituted predatory conduct, and whether Criterion 6 caused an actual adverse effect on the tooth market – and, assessing the credibility and weight of the trial evidence, found that the government failed to prove any of these elements. (*Id.*). Thus, even if the trial court's statement on which the government focuses were incorrect, it would be harmless in this case.

## B.     Where Conduct Has No *Probable* Anticompetitive Effect Under Clayton Act §3, It Cannot Have An *Actual* Anticompetitive Effect Under Sherman Act §2

The government's legal argument would have this Court contradict Supreme Court precedent. In *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 335 (1961), the Supreme Court held that, if an exclusive dealing policy "does not fall within the broader proscription of §3 of the Clayton Act it follows that it is not forbidden by those of [§1 and §2 of the Sherman Act]."

In *Tampa Electric*, the Supreme Court reviewed a refusal by the lower court to enforce a requirements contract – under which a public utility purchased all its coal needs from a producer for twenty years – because it violated §3. Reversing the lower court's judgment, the Court explained that an exclusive dealing arrangement "does not violate [Clayton Act §3] unless the court believes it *probable* that performance of the contract will foreclose competition in a

substantial share of the line of commerce affected." 365 U.S. at 327 (emphasis added). The Court held that the contract would not foreclose a substantial volume of coal sales. Most notably for purposes of this appeal, the Court stated that "[it] need not discuss respondents' further contention that the contract also violates §1 and §2 of the Sherman Act,[5] for if it does not fall within the broader proscription of §3 of the Clayton Act, it follows that it is not forbidden by those of the former." *Id.* at 335. This is because the Clayton Act requires a showing that the challenged practice "*may*" substantially lessen competition, but Sherman Act offenses require a finding of *actual* adverse competitive effect. *Standard Fashion Co. v. Magrane-Houston Co.*, 258 U.S. 346, 357 (1922). *Cf. Am. Motor Inns, Inc. v. Holiday Inns*, 521 F.2d 1230, 1250 (3d Cir. 1975) ("[Holiday Inns] would seem to be correct in stating that an exclusive dealing arrangement which satisfies the test of legality set out in the Clayton Act would *a fortiori* be lawful under the less stringent Sherman Act [standards].").

*LePage's, Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) (en banc), *petition for cert. pending*, No. 01-1865 (June 20, 2003)), follows *Tampa Electric*. In

---

5    At trial, coal suppliers also argued that the contract was illegal under Sherman Act §§1-2. 365 U.S. at 321 n.2. The trial court apparently did not reach those claims in light of its decision on Clayton Act §3.

*LePage's*, this Court reviewed a jury verdict regarding defendant 3M's exclusive dealing arrangements and bundled rebate programs, where the jury found for defendant on its §3 and §1 exclusive dealing claims, but against defendant on monopolization and attempted monopolization claims under §2. This Court rejected 3M's argument that the favorable §1 verdict precluded consideration of the *conduct* underlying that claim in assessing the sufficiency of the §2 verdict. 324 F.3d at 157. In a footnote – and citing *Barr Laboratories, Inc. v. Abbott Laboratories*, 978 F.2d 98 (3d Cir. 1992) – this Court explained that the jury's finding for 3M under §3 did not preclude the "application of evidence" of exclusive dealing, together with other predatory conduct, to support the §2 verdict. 324 F.3d at 157 n.10.

In *Barr Labs*, this Court summarily dismissed a §1 claim based on alleged exclusive dealing contracts after rejecting a §3 claim based on those same contracts because the record failed to create a genuine issue of fact that the contracts may have had an anticompetitive effect. This Court stated unequivocally that, if defendant's exclusive dealing contracts "do not infringe upon the stiffer standards of anti-competitiveness under the Clayton Act, they will also be lawful under the less restrictive provisions of the Sherman Act." *Barr Labs.*, 978 F.2d at 110. This Court nevertheless considered the contracts in evaluating the §2 claims,

22

which included alleged predatory conduct beyond the contracts. *Id*. at 101.[6]

The trial court's holding here follows *Tampa Electric*: where evidence fails to show that the effect of the challenged conduct "may be to substantially lessen competition or tend to create a monopoly," 15 U.S.C. §14, it *a fortiori* fails to show an actual adverse effect on competition. Its decision also is consistent with *Barr Labs* and *LePage's*. Unlike both *Barr Labs* and *LePage's*, the only conduct alleged here as predatory is Criterion 6 – the exclusive dealing arrangement – a critical difference that precludes the government from having this Court consider Dentsply's ***conduct*** under §2 notwithstanding the decision with respect to that conduct under §3.

---

6    Finally, *United States v. Microsoft*, 253 F.3d 34 (D.C. Cir. 2001) (en banc), *cert. denied*, 534 U.S. 952 (2001), provides no support for the government's argument. In *Microsoft*, the §1 and §2 claims involved two separate product markets: Operating Systems ("OS") for the §2 monopoly maintenance claim, and Internet browser software on the §1 exclusive dealing and §2 attempted monopolization claims. 253 F.3d at 51, 70, 81. The Court of Appeals affirmed the judgment that Microsoft had unlawfully maintained a monopoly in the OS market, but reversed the judgment that Microsoft had attempted to monopolize the market for browser software through the use of exclusive contracts. Thus, there the failure to show that the conduct had the necessary anticompetitive effect in the ***browser market*** bore no relevance to whether the same conduct had the requisite effect to support the Section 2 claim in the ***OS market***.

23

### C.     By Accepting The §3 Decision, The Government Cannot Challenge The §2 Verdict

The principle announced in *Tampa Electric*, and correctly applied by this Court in *Barr Labs* and by the trial court here, places the government in an inescapable – and ultimately unwinnable – predicament. Having chosen not to attack the trial court's §3 decision in its opening brief, that judgment and the supporting analysis are final and non-appealable.[7]     Thus, just as the *Tampa Electric* Court, having found no §3 violation, had no need to discuss the §§1 and 2 claims, this Court – presented with a final judgment that Dentsply did not violate §3 – need not consider the government's contention that Criterion 6 nonetheless violated §2. *Cf. Rosenberger v. Rector & Visitors of Univ. of Va.*, 18 F.3d 269, 288 (4th Cir. 1994) (noting that where plaintiffs did not contest the lower court's finding of no discriminatory intent on appeal, the court "was constrained to hold that the district court's factual findings on the point are not tainted with clear error"), *rev'd on other grounds*, 515 U.S. 819 (1995).

---

[7]     The government cannot attempt to raise the issue in its reply. *See Laborers' Int'l Union of N. Am. v. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir. 1994).

24

## II.    THE TRIAL COURT CORRECTLY HELD THAT CRITERION 6 WAS NEITHER PREDATORY NOR ANTICOMPETITIVE

**Standard of Review:** To the extent that the government asserts that the trial court used the wrong legal standard, this Court's review is plenary. *John T. v. Del. County Intermediate Unit*, 318 F.3d 545, 552 (3d Cir. 2003). To the extent that the government seeks to displace the trial court's factual findings, the government must demonstrate that those findings are clearly erroneous. *Miller v. Rite Aid Corp.*, 334 F.3d 335, 339 (3d Cir. 2003). Under this standard "'it is the responsibility of an appellate court to accept the ultimate factual determination of the fact-finder unless that determination either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data.'" *DiFederico v. Rolm Co.*, 201 F.3d 200, 208 (3d Cir. 2000); *Scully v. US WATS, Inc.*, 238 F.3d 497, 506 (3d Cir. 2001).

### A.    The Government Misstates Its Burden In A §2 Monopoly Maintenance Claim

The government seriously misstates its burden when it asserts that it proved a §2 monopoly maintenance claim because it demonstrated that Dentsply's

motives for Criterion 6 were, in part, anticompetitive and that Dentsply lacked a

pro-competitive justification for Criterion 6. (Br. 18).

The law imposes a tougher, two-fold burden on the government with respect

to Criterion 6. First, it had to prove that Dentsply engaged in conduct that was

"predatory" or "exclusionary," *i.e.*, that Criterion 6 materially impaired rivals'

ability to constrain Dentsply. *LePage's*, 324 F.3d at 152; *Barry Wright Corp. v.

ITT Grinnell Corp.*, 724 F.2d 227, 230 (1st Cir. 1983). Next, it had to prove that

this "predatory" conduct had an "anticompetitive effect"; *i.e.*, it must harm

competition, not merely impair competitors. *See LePage's*, 324 F.3d at 162; *Fleer

Corp. v. Topps Chewing Gum*, 658 F.2d 139, 154 (3d Cir. 1981) (reversing

decision of lower court on plaintiff's §2 claim in part where defendant's exclusive

licensing agreements "had no effect" on competition). Without proof that

Criterion 6 both materially impaired rivals **and** adversely effected competition, the

government could not establish that Dentsply maintained monopoly. *See Verizon

Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 124 S. Ct. 872,

878-79 (2004); *Borough of Lansdale v. Philadelphia Elec. Co.*, 692 F.2d 307, 311

(3d Cir. 1982).

26

There is an obvious explanation why the government now seeks to lighten its burden by eliding these two discrete elements. At trial, the government's principal evidence to support its allegation that Criterion 6 had an anticompetitive effect on the market was a survey of dental labs commissioned expressly for this case. (A96 (FOF304-05); A674). The survey was supposed to establish that rivals' market shares would increase if they had access to Dentsply's dealers. (A96 (FOF304-05)). Dr. Reitman used the survey in a regression analysis that, he said, proved that prices would drop without Criterion 6.

The court found that the survey lacked requisite guarantees of trustworthiness and was fraught with methodological defects. (A114-15 (Law39); A96-101 (FOF304-330)). Consequently, the court excluded the survey from evidence and struck any expert testimony based on that evidence. (A114-15 (Law39)). The court also found that, even if the survey were admissible, it was so error-ridden that it was entitled to no weight. (*Id.*) The government does not appeal these rulings. Instead, it seeks to turn the legal standard governing a §2 monopoly maintenance claim on its head to substitute for the exclusion of the evidence that it tried to use to prove anticompetitive effect.

27

## B.    The Trial Court's Conclusion That Criterion 6 Was Not Predatory Was Not Error

The trial court correctly concluded that Criterion 6 did not materially impair rivals because: (i) Dentsply's rivals can reach the market through viable, and in some ways advantageous, alternative channels of distribution and (ii) the government failed to prove that Criterion 6 prevented rivals from using Dentsply dealers. (A110-11 (Law11-13), A113-14 (Law26, 29, 35); A55 (FOF40-43), A59 (FOF71-74), A65 (FOF110-11), A67 (FOF129), A68-70 (FOF136-47)).

The government attacks these trial court findings with three meritless arguments: (1) the trial court failed to determine that the alternative channels of distribution are comparable to the "efficient use of common dealers" (Br. 19); (2) the trial court committed clear error in finding that Criterion 6 did not "tie up" Dentsply dealers (Br. 36-38); and (3) the trial court's finding that Criterion 6 lacked a pro-competitive justification demanded a finding that Criterion 6 was "economically illogical" and, given evidence of anticompetitive intent, predatory. (Br. 18, 27-28).

28

### 1.    Dentsply's Rivals Have Viable Alternative Methods of Distribution

It is well-settled that exclusive dealing arrangements with distributors cannot be considered predatory "[i]f competitors can reach the ultimate consumers of the product by employing existing or potential alternative channels of distribution." *Omega Envtl. v. Gilbarco Inc.*, 127 F.3d 1157, 1163 (9th Cir. 1997). In such a situation, the arrangements lack the requisite predatory character because there is no impairment of those rivals. *E.g., id.* at 1163, 1165. The trial court, applying this bedrock principle, found that rivals can and do utilize viable alternative channels of distribution in the form of direct sales to laboratories and non-Dentsply dealers, (A110-11 (Law11-13), A113-14 (Law26, 29, 35); A53-54 (FOF27-28, 33), A55 (FOF40, 43, 45), A56 (FOF47), A59 (FOF71-74), A67-70 (FOF129-47)), and that the government had failed to provide any evidence that dental labs "feel precluded from dealing with other manufacturers." (A110-11 (Law12), citing *LePage's*).

The government accuses the trial court of using an erroneous legal standard. (Br. 18, 32-33). Armed with a dictionary and a parlor-game approach, the government belittles the trial court's factual finding that these alternative channels

29

are "viable." (Br. 33-35). Instead, it argues that the alternative channels of distribution must be at least as effective as the "efficient use of common dealers" (Br. 19, 38) and faults the trial court for supposedly failing to compare the relative efficiencies of the available distribution channels. (Br. 11-13).

First, the government has no legal support for this standard. The law does not require that the alternative means to market be comparable or better. *See CDC Techs. v. IDEXX Labs.*, 186 F.3d 74, 80-81 (2d Cir. 1999); *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1383 (5th Cir. 1994); *Roland Mach. Co. v. Dresser Indus.*, 749 F.2d 380, 394-95 (7th Cir. 1984). For example, in *Gilbarco*, the plaintiffs complained that direct sales, or potential distributors not yet carrying the equipment at issue, were "inadequate substitutes" for the defendant's existing distributors. *Gilbarco*, 127 F.3d at 1163. The plaintiffs argued that "[a]lmost all of the 500 existing distributors" with "proven finances, abilities and customer relationships" were restricted by the defendant's arrangements. *Id.* (citation omitted). The court held that "[t]he short answer is that the antitrust laws were not designed to equip [Gilbarco's rivals] with Gilbarco's legitimate competitive advantage." *Id. See also Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1572-73 (11th Cir. 1991) (fact that defendant's distributor was the best available

30

and provided defendant with a "competitive advantage" not shared by plaintiff was irrelevant).

Next, the government never presented for the trial court's consideration the argument that the "efficient use of common dealers" would be more effective than direct distribution or the use of non-Dentsply dealers. As a result, the government has waived this argument on appeal. *Cf. Raymond v. Marks*, 116 F.3d 466, 1997 WL 345984, at *1 (2d Cir. June 24, 1997) (holding that argument waived where appellants failed to raise issue below since "this Court cannot make new findings based on evidence the trial court did not hear or consider").

Conversely, Dentsply presented substantial evidence, and the court found, that the attributes of direct-selling manufacturers and other dealers are equivalent to the attributes of Dentsply's dealers. (A53 (FOF28), A59-60 (FOF76-78), A61 (FOF84), A62-63 (FOF97-98), A69-70 (FOF143-47)).    The evidence also demonstrated that these channels are effective. For example, through direct sales, Ivoclar accesses 3,000 of 6,000 dental labs nationwide (A54 (FOF31)). The court found that Ivoclar could "readily compete" for the tooth business of the remaining labs by adapting its direct sales efforts with these labs for crown and bridge products and precious metals. (A53-54 (FOF27, 31); DX25 (A5644)). *Compare*

*Gilbarco*, 127 F.3d at 1163. Moreover, the president of Ivoclar, a government witness, admitted that direct sales are an effective method of distribution that provides Ivoclar with "some advantages" over dealer distribution. (A63 (FOF99)).[8] Though Ivoclar twice considered selling through dealers over the last twenty years, the trial court found that the advantages of direct distribution have caused Ivoclar to remain a direct seller. (A63 (FOF99, 101), A64 (FOF106); DX25 (A5644)).

Contemporaneous internal Dentsply business documents confirm the existence of the advantages of selling direct, including an analysis of whether Dentsply should take its tooth business direct and disassemble its dealer network. (A65-67 (FOF112-25)).[9] That analysis concluded that Dentsply was currently not in a position to abandon this channel because of circumstances that its rivals did not face. (A66-67 (FOF118, 123, 128); GX101 (A5332) at DPLY-A037309-10 (A5340-41)). The trial court credited this evidence, finding that direct sales are

---

8    Contrary to the government's characterization of the evidence (Br. 35 n.25), Mr. Ganley attributed Ivoclar's difficulties in selling teeth principally to their design. (A953-54).

9    Those business documents also recognized that Dentsply needed to offer price concessions to labs to counter those advantages. (GX101 (A5332), DX460-A (A6166)).

32

"in some ways, [an] advantageous method of distribution." (A113 (Law26), A114 (Law35); A59 (FOF71-74)).[10]    This finding is confirmed by the court's recognition that all but one lab witness who testified at trial or by deposition preferred to buy teeth directly from a manufacturer (A59 (FOF73)), and the government offered no proof to the contrary. Indeed, the government's expert, Dr. Reitman, concurred that this evidence revealed that direct distribution is a "viable" method of distributing artificial teeth that allows "any artificial teeth manufacturer [to] sell its teeth to any dental laboratory [] in the United States that it wants to." (A59 (FOF71), A1474).

Similarly, the trial court found that non-Dentsply dealers represented an effective alternative to Dentsply's dealers.  "Hundreds" of non-Dentsply dental dealers in the United States are available to and capable of selling rivals' artificial teeth, and many of these dealers "want to add artificial teeth as a product line." (A56 (FOF54), A69 (FOF140)).  Rivals also use their own dealer networks. (A67-69 (FOF129, 136, 139)). Most significantly, Vita has distributed its teeth exclusively through a national dealer since at least 1968, twenty-five years before

---

10    The government's effort to have this Court re-weigh this evidence (Br. 34-38) is improper. *Scully*, 238 F.3d at 506.

the announcement of Criterion 6.  (A54 (FOF33), A67 (FOF129)).  Its current

national distributor, Vident, sells and distributes artificial teeth directly to dental

labs from a single location in California and through a network of sub-dealers.

(A67-68 (FOF131, 133)).  Three of the grandfathered brands currently use non-

Dentsply dealers to supplement their tooth offering through Dentsply dealers.

(A68-69 (FOF139)).  Although the law does not require this level of proof, the

trial court also made findings that demonstrate that these other dealers were

comparable to Dentsply's dealers.  (A67-70 (FOF129-47)).  For example, the

presidents of Vident and Zahn Dental (Dentsply's biggest dealer) agree that their

companies are in many ways very similar to each other.  (A68 (FOF135)).

Finally, the government claims that the trial court applied an overly lenient

and erroneous standard in assessing whether the rivals' use of alternative channels

of distribution impaired their opportunities.  Relying on the D.C. Circuit's

*Microsoft* opinion, the government espouses that the proper standard under §2

asks whether alternative channels "'pose a real threat'" to Dentsply's maintenance

of its alleged monopoly.  (Br. 32, 56, citing *Microsoft*).  According to the

government, the alternative means of distribution do not permit Dentsply's rivals

to "pose a real threat" to Dentsply, and the trial court would have reached that

conclusion had it applied this standard.  The government is wrong on both counts.

34

First, there is no such standard; the government materially misreads *Microsoft*. The D.C. Circuit considered the trial decision in *Microsoft* against the following factual backdrop. The Operating Systems market faced a significant entry barrier called the "application barrier" which the court concluded gave Microsoft monopoly power in that market. Plaintiffs argued that Netscape's Internet browser, if it reached a critical mass of users, could erode that barrier even though browser software was not part of the OS market. *Id.* at 53.

The D.C. Circuit held that trial evidence supported the trial court's finding that Microsoft's conduct with respect to browsers helped "keep usage of Navigator [the browser] below the critical level necessary for Navigator or any other rival to *pose a real threat* to Microsoft's monopoly" in the OS market. 253 F.3d at 71 (emphasis added). The court simply observed that, since the evidence proved that Microsoft's conduct with *respect to browsers* prevented rivals from mounting a "real threat" in the OS market, that evidence certainly was sufficient to support a finding that the conduct harmed competition in the OS market. Integral to this conclusion is that Netscape's browser share needed to reach a minimum level in order to erode the application barrier. *Id.* at 55, 71. That unique theory of recovery is not present here.

35

*Microsoft's* holding on the attempted monopolization claim confirms this interpretation. Although agreeing that the exclusive contracts caused the requisite effect in *the OS market* to support the §2 monopoly maintenance claim, the court found that that same conduct was insufficient as a matter of law to impair rivals in *the browser market* in a manner that provided Microsoft a dangerous probability of acquiring a monopoly in that market. *Id.* at 80-83. Consequently, the standard that the government posits here is not legally cognizable.

Moreover, although this phrase from *Microsoft* is not the applicable standard, the trial court made findings here that alternative channels of distribution in fact possessed that capability, stating, for example, that "direct distribution has the potential ability to deprive Dentsply (or any manufacturer employing dealers) of significant levels of business." (A110-11 (Law12); A59-60 (FOF71, 73, 81), A63 (FOF99-100), A86 (FOF243)). The trial court also found that non-Dentsply dealers have the potential to deprive Dentsply of business. (A67-68 (FOF129, 133, 136-39), A69-70 (FOF145-47)). To argue that this does not equate with rivals using these channels being able to "pose a real threat" to Dentsply is wordplay. The trial court's findings satisfy even the incorrect legal standard that the government urges.

36

## 2. The Trial Court Correctly Found That Criterion 6 Does Not Tie Up Dentsply Dealers

The trial court found that Dentsply dealers are available to Dentsply's rivals notwithstanding Criterion 6, and thus Criterion 6 is not predatory for this independent reason. (A111 (Law15), A113-14 (Law29, 35)). No contract obligates a dealer to continue distributing Dentsply teeth. (A111 (Law15); A53 (FOF20), A65 (FOF110)). Thus, "dealers are free to leave Dentsply whenever they choose" and distribute competitive brands of teeth. (A111 (Law15); A65 (FOF110-11)).

There is no merit to the government's attacks on these findings. First, the government claims that Criterion 6 is improper conduct notwithstanding the potential for rivals to "steal" the dealers away because it prevents *unfettered* access to the dealers. (Br. 37). This is not the law. *See, e.g., Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1063 (8th Cir. 2000) (rejecting plaintiffs' theory that defendant's discounts in exchange for exclusivity created "golden handcuffs" in light of evidence that dealers were free to walk away from

37

Brunswick's discounts at any time); *Roland Mach.*, 749 F.2d at 394-95.[11]  As the trial court correctly concluded: "[t]he important point for purposes of this case is that a dealer could leave at any time if an attractive alternative became available." (A111-12 (Law17), A113 (Law29)).    Moreover, half of the eight rival manufacturers – the "grandfathered brands" – already distribute teeth through Dentsply's dealers. (A55 (FOF40, 43), A109 (FOF367)).

Second, the government erroneously argues that, given Dentsply's strong market position, Criterion 6 forces dealers to remain Dentsply dealers. (Br. 36-38).    On this record, there is no basis for the government's assertion.    The evidence established that, because Dentsply's dealers engage in vigorous intrabrand competition (A58-59 (FOF67-70)), many of Dentsply's dealers have only single digit shares of Trubyte tooth sales in the proximate area of their dealer location, so that, if a dealer dropped Dentsply teeth for the teeth of a rival, it would actually *increase* its share of tooth sales in its local area. (DX1674 (A7014); A60-

---

11    *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951) is inapposite. (Br. 37). *Lorain Journal* involved the exclusion of rivals from end-user customers.

61 (FOF82)).[12] The government tries to rebut this evidence by arguing that no dealer has left Dentsply since it announced Criterion 6. But the trial court found that no dealer had done so because Dentsply's rivals have failed to offer a more attractive tooth at a better profit margin, as was the trial court's right and role as the fact finder. (A111 (Law15-16), A113 (Law31); A58-59 (FOF70)). Finally, the government did not introduce any evidence of a structural impediment that could serve to prevent a dealer from leaving Dentsply. In fact, Dentsply's generous return policy would facilitate a dealer's decision to eliminate its Dentsply inventory and replace it with the teeth of a rival. (A1652-53, A1846-47).

### 3.     The Government Failed To Prove That Criterion 6 Reflects Short-Term Economic Sacrifice By Dentsply

The record also contradicts the government's argument that the trial court was required to infer that Criterion 6 was "exclusionary." (Br. 28-29). Such an inference is not even permissible – much less required – unless the conduct

---

[12]     For example, JB Dental located in California accounts for only 3.1% of all Trubyte sales in that state. (DX1674 (A7014)). Consequently, JB could increase tooth sales by dropping Trubyte teeth for Vita and Ivoclar teeth: JB would trade 3.1% of Trubyte sales in California for approximately a collective 8% share of all artificial teeth sold in California (a level that equates to Vident and Ivoclar's combined market shares). (A84 (FOF239); A2947-49).

39

reflects a short-term sacrifice that makes no economic sense for the defendant. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 608 (1985); *LePage's*, 324 F.3d at 162.

The government's protestations to the contrary, this is a different inquiry than whether Dentsply had a procompetitive justification for Criterion 6 that would outweigh any demonstrated adverse effect on competition. (Br. 11, 27). The question whether a defendant's conduct has a procompetitive justification arises only after a plaintiff has made the *prima facie* case of monopoly power, exclusion and anticompetitive effect. *United States v. Brown Univ.*, 5 F.3d 658, 668 (3d Cir. 1993); *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 596 (1st Cir. 1993). Only if the plaintiff makes that proof does the burden shift to the defendant to show that its restraint brings procompetitive benefits to the market. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 483 (1993); *Brown Univ.*, 5 F.3d at 669. On the other hand, the question whether the court should infer that conduct is predatory is part of the plaintiff's prima facie burden; it focuses on whether Criterion 6 was profit-maximizing for *any* reason besides the expectation that it would either drive competitors out of the market or prevent/delay market entry. *See Neumann v. Reinforced Earth Co.*, 786 F.2d 424, 427 (D.C. Cir. 1986). Since the evidence at trial showed that Criterion 6 was in

40

Dentsply's short-term and long-term economic interest, the inference that the government urges is not permitted and it certainly is not compelled by the trial court's findings that Dentsply had not proved a procompetitive justification for its conduct.

The genesis of Criterion 6 was profit maximization. Dentsply implemented Criteria 5 and 6 after Ivoclar recruited Frink Dental as a dealer in 1987. Frink agreed to help Ivoclar to convert dental labs from Dentsply teeth to Ivoclar teeth. (DX10 (A3770) at 4 (A3773), A868-870). Dentsply had been effective in converting labs itself and replacing their inventory of competitive teeth with Trubyte teeth. (A2179-81; DX1580-C (A6460) at DPLY001884-92 (A6465-73)). As a result, Dentsply recognized that it was vulnerable to such conversions without a policy that precluded them. Dentsply's generous return policy, large dealer inventories, market position and complete reliance on dealer distribution made it uniquely susceptible to the possibility of conversion. Criterion 6 addressed all these vulnerabilities.

The government offered no proof that Criterion 6 represented a short-term sacrifice by Dentsply in any way. There was no evidence that administering the

Dealer Criteria imposed a financial or manpower burden on Dentsply.[13]   There

was no evidence that Criterion 6 compelled Dentsply to forfeit profits or sales in

the short- or long-term.[14]    To the contrary, Criterion 6 was decidedly in

Dentsply's short-term interest.    Further, it was not unnecessarily restrictive;

dealers were free to leave whenever they found an attractive alternative, and

Dentsply permitted dealers to retain all brands that they carried at the time that it

announced Criterion 6.  (A65 (FOF110-11), A74 (FOF175)).

### C.    The Trial Court Correctly Found That Criterion 6 Did Not Have An Actual Adverse Effect On Competition

It is well-settled that an exclusive dealing arrangement cannot cause an

anticompetitive effect unless it forecloses rivals from a substantial share of end-

---

[13]    The government points to the appointment of three dealers in the 1990s
(Jan, Darby and DTS) as "proof" that Dentsply had more dealers than it needed.
(Br. 10-11).  The trial court, however, found that Dentsply did not keep more
dealers than it needed (A69 (FOF141)), and the evidence shows that Dentsply
required each of these dealers to demonstrate the ability to bring incremental
business, as Criterion 5 required.   (A74 (FOF179 (Jan)); A3316-18, A3340
(Darby); A1625-29 (DTS)).

[14]    In light of the substantial record favoring Dentsply, evidence that some
dealers did not like Criterion 6 does not establish that the policy made no
economic sense for Dentsply.  There was no evidence that this reaction from some
dealers translated to dental labs' dissatisfaction with Dentsply; thus it had no
demonstrable economic impact on Dentsply.

42

users in the relevant market.[15]  Thus, where the exclusive arrangement does not

impair the rivals' ability to reach end-users, it can have no anticompetitive effect.

*Tampa Elec.*, 365 U.S. at 327.

The trial court made numerous factual findings that the viability of

alternative channels meant that there was *no* foreclosure.  Again, Dr. Reitman

concurred, stating Dentsply's rivals are "not foreclosed from a substantial share of

[] labs." (A59 (FOF71)).  Notwithstanding, the government wrongly argues that it

need only prove that Criterion 6 had the *tendency* to "harm competition." (Br. 18-

19, 32-34).  This is simply wrong on the law.  *E.g., Tampa Elec.*, 365 U.S. at 327;

*United States v. Visa, U.S.A., Inc.*, 344 F.3d 229, 242 (2d Cir. 2003) ("competition

is not adversely affected if, despite an exclusive dealership agreement,

'competitors can reach the ultimate consumer of the product by employing

existing or potential channels of distribution'") (citations omitted); *CDC Techs.*,

186 F.3d at 80 (holding that "outlet foreclosure" cannot establish adverse effect in

---

[15]    Thus, a quantitative study of the number of outlets covered by the
challenged arrangement, such as Dr. Reitman's, (Br. 33 n.23), is immaterial,
without proof that a substantial share of the end-users is unreachable because of
the conduct.   Moreover, the evidence revealed Dr. Reitman's calculation as
inaccurate (A1472), and the trial court justifiably accorded it no weight.  Dentsply
introduced evidence that established that the so-called "foreclosure rate" was zero,
which the trial court credited.  (A59 (FOF71); A2955-56).

43

the face of undisputed evidence of direct sales and alternative distributors);

*Gilbarco*, 127 F.3d at 1163 (holding there was no adverse effect as a matter of law

where "[c]ompetitors are free to sell directly, to develop alternative distributors, or

to compete for the services of the existing distributors"); *U.S. Healthcare*, 986

F.2d at 596 (holding that the number of doctors tied to the defendant HMO by the

exclusive agreement was "significant," but that there was no anticompetitive effect

since the rivals could easily bid for them, or attract new doctors to its new HMO);

*Seagood*, 924 F.2d at 1572-73 (no anticompetitive effect provable where plaintiff

could attract potential alternative distributors); *Ryko Mfg. Co. v. Eden Servs.*, 823

F.2d 1215, 1233 (8th Cir. 1987) (anticompetitive effect "neither substantial nor

even apparent" in light of the evidence of direct sales and potential alternative

distributors).

The trial court also made numerous factual findings supporting the

conclusion that the government failed to prove that Criterion 6 adversely affected

competition in the artificial tooth market. The trial court found that, during the

pendency of Criterion 6 there was: (i) no reduction in intrabrand competition for

Trubyte teeth among Dentsply dealers (A58 (FOF67, 69)); (ii) no reduction in the

quality of artificial teeth that Dentsply manufactured (A71-73 (FOF155-68)); (iii)

no reduction in output (A53 (FOF18-19)); (iv) Dentsply did not limit its

44

innovation in the market (A71-73 (FOF155-68)); (v) a drop in Dentsply's market share (A86 (FOF243)); (vi) no reduction in consumer choice (A58-59 (FOF70), A61 (FOF85)); (vii) no blocked or delayed entry into the market (A56 (FOF47, 52), A68 (FOF136), A86 (FOF243)); (viii) no artificial suppression in rivals' promotional efforts (A86-87 (FOF244-48), A88-90 (FOF257-68)); and (ix) no artificial increase in the price of teeth. (A82-83 (FOF224-25)). These findings provide substantial support for the trial court's conclusions that Criterion 6 does not adversely affect competition. (A110 (Law11), A114 (Law35)).

On appeal, the government presents a two-pronged argument attacking the trial court's finding that Criterion 6 was competitively neutral. First, the government attacks findings (vii) through (ix) above as being clearly erroneous.[16] Next, it asserts that the trial court applied too strict a causation standard in its effects analysis. (Br. 32-38). Both arguments are meritless.

### 1.   The Trial Court's Rejection Of Predictions Of Effect In Favor Of Contradictory Real World Evidence Was Not Clear Error

Unable to demonstrate that Criterion 6 actually prevented Dentsply's rivals from competing for tooth sales, the government speculates that, without Criterion

6, tooth prices *would* drop, rivals' promotion and competition *would* increase and Dentsply's market share *would* fall. (Br. 19, 38-39). But, after losing a trial on the merits, the government must show this Court that no credible evidence supports the trial court's finding that Criterion 6 did not produce an adverse effect on competition; simply pointing to evidence to the contrary is insufficient. *See Scully*, 238 F.3d at 506. The government sidesteps this obligation by mischaracterizing its evidence of what the world would be like without Criterion 6 as uncontroverted and by complaining that the trial court ignored it.[17] (Br. 15, 38-47). However, what the government describes was neither uncontroverted nor ignored by the trial court. Most of it was not even evidence.

---

[16]   The government does not challenge the validity of findings (i) through (vi).

[17]   The government contends that the trial court ignored this "evidence" because the court did not expressly reject some of these predictions. (Br. 15-16, 39-40). The law imposes no such obligation. *Addamax Corp. v. Open Software Found., Inc.*, 152 F.3d 48, 55 (1st Cir. 1998) (trial court "was not required to respond individually to each evidentiary or factual contention made by the losing side."); *W. Pac. Fisheries v. S.S. President Grant*, 730 F.2d 1280, 1285 (9th Cir. 1984) ("A judge is not required, in making findings, to mention every item of evidence and either adopt it or reject it. We presume that the judge considers all of the evidence, and relies on so much of it as supports the finding and rejects what does not support the finding, unless the judge states otherwise."). Even a cursory view of the trial court's decision reveals that the court reviewed and considered Dr. Reitman's testimony. (A56 (FOF55), A59 (FOF71, 76), A84 (FOF237-39), A96 (FOF305), A102 (FOF337), A103-108 (FOF344-63)).

Foremost is the government expert's opinion that "prices will be lower in the marketplace if Dealer Criterion 6 is removed." (A1315-16). But this statement is governed by this Court's directive that an expert opinion on any issue, let alone an ultimate one, not founded on evidence is inadmissible. *See generally Fedorczyk v. Caribbean Cruise Lines*, 82 F.3d 69, 75 (3d Cir. 1996) (expert's opinion not based on any direct or circumstantial evidence is speculative, without foundation and inadmissible); *Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*, 63 F.3d 1267, 1275 (3d Cir. 1995) (finding that expert's opinions "standing alone … are insufficient to support the finding of actual damage"); *Dobrowlsky v. Califano*, 606 F.2d 403, 410 (3d Cir. 1979) (administrative law judge's finding, when based on an expert's "bare conclusions on th[e] ultimate issue," is "not founded on substantial evidence" and may not be affirmed by a reviewing court).

At trial, when the government asked Dr. Reitman the basis for this prediction, he did not refer to any evidence; he merely stated "the answer is economic analysis . . . . [B]ecause the brands are available through the same network, consumers become more price sensitive in response. And the firms have an *incentive* to give up prices." (A1479 (emphasis added)). Although the government alludes to factual material that Dr. Reitman reviewed, Dr. Reitman

47

never identified the evidence that served as the basis for this prediction.[18]    That

Dr. Reitman says prices would drop does not make it so.  "[N]othing in either

*Daubert* or the Federal Rules of Evidence requires a district court to admit opinion

evidence that is connected to existing data only by the *ipse dixit* of the expert."

*General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997); *In re TMI Litig.*, 193

F.3d 613, 682-83 (3d Cir. 1999).  Because Dr. Reitman's guesswork lacked an

identifiable factual basis, it was entitled to no weight.   *Brooke Group Ltd. v.*

*Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) (holding that

expert testimony could not sustain a jury verdict since the opinion was "not

supported by sufficient facts to validate it in the eyes of the law," and noting that

"[e]xpert testimony is useful as a guide to interpreting market facts, but it is not a

substitute for them.").

---

[18]    Dr. Reitman did rely on the inadmissible and untrustworthy lab survey. *See*
*supra* at 26.   On appeal, the government points to testimony from Dr. Marvel as
confirmation.   (Br. 40).   The trial court considered, but did not rely on Dr.
Marvel's opinion.   Instead, it chose to afford more weight to contradictory "real
world" evidence, which is its right as the fact finder. *See Nordhoff Invs., Inc. v.*
*Zenith Elec. Corp.*, 258 F.3d 180, 191 (3d Cir. 2001) ("[C]ourts have broad
discretion not only to admit expert witnesses, but also to weigh their testimony");
*United States Steel Corp. v. Occupational Safety & Health Review Comm'n*, 537
F.2d 780, 783 (3d Cir. 1976) ("Expert testimony need not be accepted even if
uncontradicted").

48

Moreover, this prediction did not account for substantial contradictory record evidence. When Ivoclar recruited Frink Dental to become an Ivoclar tooth dealer, Ivoclar instituted price increases across all of its tooth lines: Ivoclar recognized that "it would need to share its profit margin with Frink, and thus, in order to maintain profitability Ivoclar needed to increase its prices." (A63 (FOF101a)). In 1997, Vident analyzed the feasibility of adding a large Dentsply dealer as a sub-dealer for Vita teeth. (A64 (FOF107)). Vident expected its profit margin to decrease because of the necessity of giving the dealer a profit margin and volume discounts to provide the necessary support. (A64 (FOF107-08)). As a result, Vident could not decrease the suggested prices on Vita teeth if it added a national sub-dealer. (A64 (FOF108)).

As the trial court observed, Dentsply's internal analysis also bears this out. Dentsply calculated that the removal of dental dealers from the distribution chain would generate a significant cost savings that Dentsply could share with dental labs in the form of lower prices. (A66 (FOF121); GX101 (A5332)). Similarly, one of the principal reasons that virtually all lab witnesses gave for their preference to purchase teeth directly from Dentsply was the expectation that they would receive lower prices. (A60 (FOF81)).

49

Dr. Reitman's prediction is also at odds with the pricing conduct of the grandfathered rival brands sold by Dentsply dealers. (A55 (FOF40, 43), A68-69 (FOF139)). For these brands, a world without Criterion 6 does exist; they have access to the allegedly "preferred" Dentsply dealer network. (A109 (FOF367)). Thus, this is the precise competitive model that the government posits: dealers that sell both Dentsply and rival teeth. Yet the government presented no evidence that price competition between Dentsply and the grandfathered brands differed materially from the competition among Dentsply and its remaining rivals. Austenal raised the suggested lab price of its premium artificial teeth 25% from January 1995 to January 1999. (A1148). The episodic price competition by Myerson in Connecticut and Southern California that the government references is countered by the fact that Dentsply's biggest national dealer, Zahn (A60 (FOF78)), carries Myerson's teeth nationwide. The government did not prove that Myerson competed on price with Dentsply with respect in its sales to Zahn, either in the prices that Myerson charged Zahn or the lab prices that it suggested to Zahn.

Real-world evidence likewise contradicts the government's predictions that rivals' promotion and competition would increase and Dentsply would lose market share without Criterion 6. Again, there is no proof that the grandfathered brands compete any more vigorously with Dentsply. For example, these rivals have not

50

invested in the promotion of teeth. Between 1990-93, Myerson/Austenal used no

outside sales representatives to promote teeth, and in 1994 Austenal used only one

or two representatives to sell all products, including teeth. (A55 (FOF41), A88

(FOF257)). As of 2002, Myerson utilizes only five sales representatives to sell its

products. (A55 (FOF41)). Second, these rivals have not invested in the marketing

of artificial teeth. (A88 (FOF257)).

Dr. Reitman's economic theory does not account for these realities, which

contradict his opinion. This failure presents an independent basis for the trial

court rejecting his prediction. *See, e.g., Concord Boat*, 207 F.3d at 1056-57; *In re

TMI Litig.*, 193 F.3d at 683 (rejecting expert's ultimate conclusions "because they

fly in the face of reality").

Finally, the government's attack on the trial evidence that, without Criterion

6, Dentsply's market share would not fall (A66 (FOF122)) is not correct. (Br. 41-

42). The government claims that two Dentsply executives predicted that Dentsply

51

would lose market share without Criterion 6.[19]  But both witnesses spoke of a loss of market share only at the *dealer* level.  (A2842 ("between the manufacturer and the dealer, yes, I believe some sales of those competitive teeth would occur and that would impact my market position"); A1502 (believing "dealers would have added rival lines of teeth" if Dentsply did not enforce Criterion 6)).  But as the trial court recognized, the relevant inquiry in this case is whether Dentsply would lose market share at the lab level, and Dentsply expected to gain share with laboratories by selling teeth directly to them.  (A66 (FOF122)).  The government's sole proof that rivals' shares would increase without Criterion 6 was, again, the inadmissible survey.  The real world facts, however, established that, even with Criterion 6, Dentsply's unit share of the tooth market has declined due to competition.  (A86 (FOF243)).

---

[19]    The government argues that Christopher Clark made the same prediction. (Br. 41).  But Mr. Clark's prediction flowed from his belief that, if Dentsply dealers carried rival teeth, they would fill lab orders that Dentsply's promotions generated with competitive teeth.  (A2190).  The trial court found, however, that dealers do not engage in such conduct and therefore implicitly rejected the belief underlying this prediction.  (A104 (FOF345)).

52

### 2. The Trial Court Did Not Commit Clear Error When It Found That Criterion 6 Was Not Responsible For Rivals' Market Shares

There is no merit to the government's criticism that the trial court's finding that Criterion 6 was not responsible for its rivals' market shares is "illogical and largely irrelevant." (Br. 44). The finding is grounded in the evidence and effectively undercuts the government's *prima facie* case.

First, the government asserts that the trial court placed too much emphasis on these findings. (Br. 44-47). But at trial the government argued, relying once again on the inadmissible survey, that Criterion 6 adversely affected competition because Vita and Ivoclar would have larger market shares without Criterion 6. (Br. 38-39, 41-42). Lacking any direct, admissible evidence to support this claim, the government instead inferred a causal link between Criterion 6 and those rivals' shares by attempting to depict Vita and Ivoclar as efficient market participants. When the evidence proved otherwise, the trial court rejected the inference that Criterion 6 had any role in those rivals' shares. (A111 (Law16), A113 (Law27); A86-90 (FOF244-68)).

Further, contrary to the government's characterization, the trial court did not find these rivals "incompetent." (Br. 30, 44-45). Incompetence presumes that a

53

rival was *attempting* to compete but persistently failed. The trial court found that these rivals made deliberate business decisions to focus their respective energies on other product lines to the detriment of their tooth lines. (A111 (Law15-16), A113 (Law27, 31); A86-88 (FOF244-48), A88-90 (FOF257-68)). Conveniently, the government now argues that, without access to Dentsply's dealers, it was "perfectly rational" for Dentsply's main rivals "to focus their competitive energies elsewhere." (Br. 47). The government called the senior executives of both Vident and Ivoclar as witnesses. Both had run their respective companies since long before Dentsply implemented Criterion 6. The government did not ask them whether their decisions to emphasize products other than teeth were caused by Criterion 6, and therefore is precluded from engaging in speculation as to that supposed causal relationship. Indeed, as Ivoclar's new tooth line illustrates, when Dentsply's rivals participated in the market, those efforts bore fruit, notwithstanding the existence of Criterion 6.

Finally, there is no merit to the government's skewed view that the trial court's conclusion regarding Criterion 6 is "ultimately implausible and legally unsound." (Br. 28-32). The key to this hyperbole is the government's erroneous assertion that Dentsply's sole purpose for Criterion 6 was to "foreclose competition." (Br. 32). The trial court found that the purpose of Criterion 6 was

to block competitive distribution points. (A80 (FOF216)). The court did not find

that the purpose was to prevent rivals from competing in the market. (A80-81

(FOF216-18)).[20] Unlike the government's mischaracterization, these findings are

consistent with the voluminous evidence that Dentsply was aware that direct-

selling rivals offered labs a service that they desired and that Dentsply – being

structurally unable to provide that service – had to compensate in other

competitive ways. (A92 (FOF279)). Further, as explained above, this desire was

in Dentsply's short-term economic self-interest.

Once this evidence is put in the proper perspective, the rest of the

government's argument cannot be credited. Dentsply's rivals did not mistakenly

believe that they needed the same dealers (Br. 30): Ivoclar professed a preference

for direct sales (A63-64 (FOF99-106)); Vita chose, 24 years before the existence

of Criterion 6, to deal exclusively through a single nationwide dealer (currently

Vident) (A67 (FOF129)); and most of the remaining rivals are grandfathered

brands (A68-69 (FOF139)); no lab testified that it would not buy the rivals' teeth

---

[20]    Notwithstanding, evidence of intent is insufficient in and of itself. *See
Advo, Inc. v. Philadelphia Newspapers, Inc.*, 51 F.3d 1191, 1199 (3d Cir. 1995).
As the trial court observed, however, quoting the government: "'bad' intent alone
does not establish that conduct is anticompetitive where the conduct *appears
objectively incapable of harming competition.*" (A114 (Law35) (emphasis
added)).

55

because Dentsply's dealers did not carry them; and most labs preferred to buy direct because of the observable cost savings. (A59-60 (FOF72-73, 81)).

Thus, a dispassionate perspective of the court's conclusions presents the following world:

1.   a declining market with annual sales of less than $50 million, representing a small fraction of the market participants' respective total annual business;

2.   where selling direct to the end-user is comparable to, and in some ways better than, distributing through dealers;

3.   where Dentsply uses less than 10% of the available dental products dealers to distribute its teeth;

4.   where Criterion 6 involved no short-term sacrifice by Dentsply;

5.   where Dentsply continued to be the market leader in innovation and promotion through the application of Criterion 6;

6.   where participants' respective product lines each had advantages and disadvantages over the other;

56

7.      where rivals made deliberate decisions regarding their sales, promotion and design strategies that prevented them from fully exploiting their respective distribution systems; and

8.      where no evidence exists that Criterion 6 artificially raised prices, reduced output, delayed entry or restricted consumer choice.

It is this world upon which the trial court's reasoned decision is founded.

## III.     DENTSPLY DOES NOT HAVE MONOPOLY POWER

**Standard of Review:**  This Court must review the trial court's finding that Dentsply lacks monopoly power in the market for artificial teeth for clear error. (A113 (Law25-31); A59 (FOF71-74), A656 (FOF110-11), A82-83 (Law224-25)). *Miller*, 334 F.3d at 339; *Weiss v. York Hosp.*, 745 F.2d 786, 827 (3d Cir. 1984).

### A.     The Trial Court Applied The Correct Legal Standard

The threshold to any §2 monopolization claim is proof that the defendant possesses monopoly power, which "is the power to control prices or exclude competition." *United States v. E.I. Du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). As the trial court correctly held, and the government concedes on appeal (Br. 49), the "inquiry does not end with proof of high market share. The DOJ

57

must also prove Dentsply has the power to control price or exclude competition."
(A112-13 (Law24)). *See, e.g., Handicomp, Inc. v. United States Golf Ass'n*, 2000-
1 Trade Cas. (CCH) ¶72,879, at 87,539 (3d Cir. 2000) (evidence of 75% of the
market "alone is not enough to provide monopoly power, because we must
determine whether [the defendant] excluded competition"); *Crossroads
Cogeneration Corp. v. Orange & Rockland Utils.*, 159 F.3d 129, 141 (3d Cir.
1998).

Applying this unquestioned legal standard, the trial court correctly
determined that the government "ha[d] failed to prove that Dentsply's actions have
been or could be successful in preventing "new or potential competitors from
gaining a foothold in the market." (A114 (Law35), *quoting LePage's*). The court
also found that the government provided no evidence that Dentsply has
established a market of supra-competitive pricing. (A113 (Law30); *see supra* at
16-17 and *infra* at 64-68). These findings enjoy substantial support from credible
evidence.

58

## B.    Dentsply Lacks The Power To Exclude Competition From Dental Laboratories

In order to demonstrate the ability to exclude competition, "[t]he plaintiff must show that new rivals are barred from entering the market and show that existing competitors lack the capacity to expand their output." *Handicomp*, 2000-1 Trade Cas. at 87,539 (citations omitted).  In *Handicomp*, this Court concluded that there were no barriers to entry in the handicap data processing market. *Id*. at 87,540.  "Absent this *sine qua non*," this Court held, "there is no violation of the Sherman Act." *Id*.; *e.g., Barr Labs.*, 978 F.2d at 113-14 (no §2 violation as a matter of law where record lacked evidence of any significant entry barriers).

Here, like the plaintiffs in *Handicomp* and *Barr Labs*, the government failed to establish that there are any significant entry barriers to the artificial tooth market.    (A113 (Law28-29); A56 (FOF46-52), A68 (FOF136-38), A86 (FOF243)).  The government also failed to prove that Dentsply's existing rivals lack the capacity to expand their output. (A54 (FOF31), A87 (FOF251-52), A88 (FOF254)).

59

### 1.     The Trial Court's Finding That Criterion 6 Is Not An Entry Barrier To The Artificial Tooth Market Was Not Clear Error

At trial, the government argued that Criterion 6 blocked the entry of competitors into the artificial tooth market.[21]   The court disagreed, finding that Criterion 6 itself does not constitute a barrier to entry because viable, alternative means to access the U.S. tooth market exist.  (A113 (Law29)).  Rivals can reach the laboratories through several distribution channels.  (*See supra* at 10-13, 28-33).  In addition, Dentsply's rivals have the potential to "steal" a Dentsply dealer by offering a superior product at a lower price.  (*See supra* at 13-14, 36-39).

The record here is similar to the record that this Court faced in *Barr Labs*. There, defendant Abbott had exclusive dealing arrangements with reputedly the "most powerful and most price-sensitive buyers in the market."  978 F.2d at 103. But these arrangements left rival drug manufacturers with two other channels through which to distribute their products:   (1) direct sales to independent pharmacies; and (2) sales to wholesalers who resell to pharmacies.   Although Abbott's contracts tied up, in some fashion, ten of the largest warehouse chain drugstores, this Court found that undisputed evidence that six new manufacturers

60

entered the market through these alternative channels precluded a finding that
significant barriers barred entry to the market; this obviously included Abbott's
arrangements. *Id.* at 103-04, 114-15. Similarly, in *Microsoft*, Microsoft had "tied-
up" the two "most efficient channels" for distributing browser software.
Notwithstanding, the court found no evidence of barriers to entry in the browser
market and reversed the trial court's attempted monopolization verdict. 253 F.3d
at 70, 82-84.    In this case, given the availability of alternative channels of
distribution, Criterion 6 cannot, as matter of law, constitute an entry barrier.

The trial court's finding that Criterion 6 is not a significant barrier to the
market is grounded on two recent entrants. (A55-56 (FOF46-52)).  Heraeus
Kulzer has manufactured and sold teeth in Europe since the 1960s.    (A55
(FOF46)).  However, European tooth moulds and shades differ materially from
those preferred in America. (A51 (FOF4), A87 (FOF249, 251)). Heraeus Kulzer
thus developed a tooth line based on U.S. preferences and entered the U.S. in
2000.  (A55-56 (FOF46)).  In just two years, Heraeus Kulzer has achieved $1.2
million in sales, placed over 100 tooth consignments with dental laboratories, and
now has approximately 800 different lab customers for its JelDent teeth. (A56

---

21    The government did not argue that the market had structural barriers that

61

(FOF49-51)). Heraeus Kulzer continues to expand its tooth offerings, introducing

a new line of teeth in February 2002. (A55-56 (FOF46)). Another manufacturer,

Schottlander, began to sell Enigma teeth in the U.S. in January 2001. (A56

(FOF52), A68 (FOF136)). In 2002, Leach & Dillon anticipated growing sales of

Enigma teeth by at least seven-fold by the end of the year. (A3292-94). And

Lincoln's sales of Enigma teeth have doubled in two years. (A68 (FOF138)).

The government asserts that these entries are immaterial because, in the

government's opinion, they are not "competitively significant." (Br. 47, 56-59).

The government's dismissal of these entries is wrong on the law and the evidence.

The absolute size of an entry is not dispositive, particularly where the entry affects

the defendant. *Barr Labs.*, 978 F.2d at 114 ("continued entry of competition,

albeit with small initial market share shown on this record, indicates that Abbott's

position is subject to significant potential erosion.").[22]  As the trial court found,

---

prevented entry.

[22]     The cases that the government cites are all procedurally distinct and thus
inapposite. *See Rebel Oil Co. v. Atl. Richfield Co.,* 51 F.3d 1421, 1442 (9th Cir.
1995) (viewing the evidence in the light most favorable to plaintiff, expert's
affidavit regarding "significant" entry barriers was sufficient to create a genuine
issue for trial on issue of market power, despite evidence of entry of "two small
rivals"); *Oahu Gas Serv., Inc. v. Pac. Res. Inc.,* 838 F.2d 360, 367 (9th Cir. 1988)
(viewing the evidence in the light most favorable to plaintiff, a trier-of-fact

62

relying on *LePage's*, the government failed to prove that Dentsply's actions have been or could be successful in preventing new or potential competitors from gaining a foothold in the market. 324 F.3d at 159.

Here, the evidence demonstrated significant growth of these entrants in the past two years. Dr. Reitman estimated Heraeus Kulzer's market share to be almost half of Vita's share, and Vita has been in the market for over 30 years. (A67 (FOF129), A84 (FOF239)). Additionally, between 2000 and 2001, Dentsply's unit share of the market declined 4.2% in part due to the entries of Heraeus Kulzer and Schottlander. (A86 (FOF243)). The uncontroverted evidence shows that Dentsply offered price concessions to laboratory customers in response to its lost sales to these new rivals. (A86 (FOF243); *compare* DX1213 (A3981) *with* DX101 (A3783)). The court's reliance on this evidence to support a finding that Criterion 6 did not bar entry was not clear error.[23]

---

reasonably could find that the evidence of two entrants did not negate the inference of high entry barriers); *Reazin v. Blue Cross & Blue Shield*, 899 F.2d 951, 969-71 (10th Cir. 1990) (upholding jury's verdict on plaintiff's §2 claim based in part on testimony that defendant's only real competition would come from alternative delivery systems, a channel the defendant had inhibited hospitals from pursuing and which gave defendant control over pricing).

[23]   Thus, the government's mischaracterizations of Odipal and "Ortholux" teeth (Br. 55-56) amounts to no more than an effort to re-argue the evidence. The

63

## 2.   Dentsply's Rivals Have The Capacity To Expand Output

Existing tooth rivals also have expanded their positions in the tooth market, or have the capacity to do so.   Ivoclar, despite having a direct-sales only distribution system, has invested substantial sums in new tooth lines.   In January 2002, Ivoclar expanded its tooth offering with two new lines of teeth that feature American moulds.   (A87 (FOF251)).   These new lines compete directly with Dentsply's premium teeth and dental laboratories have received them well.   (A87 (FOF251-52)).   In the first year alone, Ivoclar projected that its sales of these two lines would increase its market share by 10%.   (A87 (FOF252)).   Ivoclar has plans for further, immediate expansion; it intends to introduce a line of "Dentsply Knock-off" teeth into the U.S. market and a line of teeth that better match the industry standard shade guide.   (A88 (FOF254)).   Dr. Reitman agreed that Criterion 6 has not restrained Ivoclar's efforts to expand its product line. (A1381).

---

government did not produce any evidence that dental labs cannot purchase these teeth.   To the contrary, Uhler Dental Supply, Inc. sells Odilux and Ortolux teeth. http://www.uhlerdental.com.   In addition, Unidesa Odi exports dental pieces to the United States.   http://www.unidesa-udi.com.   Ortholux is a curing light manufactured by 3M, not a brand of teeth.

64

Mr. Swartout of Myerson testified that Myerson's Trinidad plant has "the capability of producing three times as many teeth as we do today, without any additional investments in capital." (A1122). There is no evidence that Myerson could not expand output to accommodate an increase in demand if Dentsply charged supra-competitive prices.

The government is silent on this evidence, which forms an independent basis to defeat a claim of monopoly power. *See Int'l Distribution Ctrs. v. Walsh Trucking Co.*, 812 F.2d 786, 792 (2d Cir. 1987) (entry into market by one new competitor and expansion into market by several existing competitors sufficient to find lack of barrier to entry) (*cited approvingly in Barr Labs.*, 978 F.2d at 113).

## C.    Dentsply Lacks The Power To Control Prices

The trial court determined that the government "failed to prove that Dentsply controls prices" because "Dentsply teeth are generally priced between Vident and Ivoclar teeth." (A113 (Law30); A82 (FOF224)). The evidence showed that since its introduction in 1996, Dentsply has priced its Portrait line midway between Vita's and Ivoclar's premium tooth lines. (A82 (FOF224)). Since 1992, Dentsply has priced its Bioform tooth line at or below Vita's and Ivoclar's hardened plastic teeth. (A82-83 (FOF225)). The evidence established

65

that Vita, not Dentsply, had the highest tooth prices. (DX399 (A3916) at 26 (A3941)).[24]

Dentsply also has effectively reduced the price that laboratories pay for Trubyte teeth in response to the price competition from its competitors, thus refuting the government's representation to the contrary. (Br. 58-59). In the early 1990s, Vident and Ivoclar instituted discount programs with large lab customers. (A2390-92, DX60 (A3778). Dentsply reacted with its own program, which offered volume rebates to these same customers. (A2391-92). As described above, Dentsply also has increased price rebates in response to the entries of Heraeus Kulzer and Schottlander in 2000. (A86 (FOF243)).

The government challenges the court's finding on Dentsply's lack of price control in four ways. Each attack requires reassessing credibility and reassigning weight, a task that the standard of review forbids. The first attack employs

---

[24]    The government introduced no evidence at trial comparing the prices in the market's economy segment. It relies entirely on the testimony of Dr. Marvel to argue that "Dentsply charges a premium substantially higher than its rivals" on economy teeth. (Br. 5, citing A103 (FOF343(b))). But Dr. Marvel merely stated that he "believe[s] [Dentsply has] somewhat of a premium for the economy teeth, but it's difficult to get the direct price information" from rivals in this case. (A3059-60).

66

selective recall: the government argues that Dentsply has created a "price umbrella" under which rivals set their prices. (Br. 53). This argument relies completely on the recollection of a former Dentsply Product Manager. (*Id.*). Mr. Turner's recollection is refuted by contemporaneous price lists. (DX511-13 (A3952, A3957, A3958)).[25]   Significantly, the government did not establish through any of the rivals that it presented as witnesses that those rivals price under Dentsply's purported price umbrella. The government also did not establish a downward demand curve that is indicative of an umbrella, *i.e.*, that the rivals could not generate an incremental sale by reducing their prices. In fact, the evidence established the opposite. (A82-83 (FOF224-25); A2902).

Next, the government attempts some sleight of hand, claiming that the pricing comparison is "incomplete and insufficient." (Br. 51). As the plaintiff, the government bore the burden of proof on Dentsply's ability to control prices, and

---

[25]    The government also relies on Mr. Turner to prove that "Dentsply has not set its own prices by referencing the prices of competitors." (Br. 49, citing to A83 (FOF226)). The court made no such finding. (A83 (FOF228)). In actuality, Mr. Turner stated that Dentsply "looked at everyone's prices . . . to be aware what the marketplace was doing." (A83 (FOF228)). Dentsply also consulted the consumer price index for medical and dental materials. (A83 (FOF227)). This evidence is materially different than that in the *Microsoft* case. *Compare Microsoft*, 253 F.3d at 58.

any incompleteness inures to its detriment. *See, e.g., Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 749-50 (3d Cir. 1996); *Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1391 n.3 (7th Cir. 1993). Second, the government focuses on prices to dealers, but the only relevant pricing is what the end-user labs paid for the teeth. Dentsply's suggested prices to labs were lower than those of it rivals throughout the relevant time period.[26] The government's price chart (Br. 52, n.34) is meaningless. The relevant price is the lab price, not what the dealer pays. Further, the government's complaint about Dentsply using its MSRP inures to the government's benefit; there was no evidence that teeth are sold over MSRP, although there was evidence that labs paid less than MSRP. (A58-59 (FOF67, 70)). Any Dentsply sale below MSRP would widen the gap between Vita's lab prices and Dentsply's lab prices.

Third, the government asserts that the trial court committed clear error in finding that the government did not show Dentsply's margins "to be high relative

---

[26]    Dr. Marvel did not testify, as the government represents, that the pricing charts are "remotely useful." (Br. 52). Rather, he testified that the "only prices that we have that are even remotely useful" are the various retail prices. (A2903). The government ignores Dr. Marvel's testimony that the prices of Ivoclar and Vident teeth "have marched up above the equivalent Dentsply prices time and time again" and have "popped holes" in the alleged Dentsply price umbrella. (A2902).

68

to any other tooth manufacturer." (A113 (Law30)). But the government did not introduce evidence of the gross profit margins of any manufacturer except Myerson.[27]   As a manufacturer with access to Dentsply's dealers, that margin could not have been affected by Criterion 6, but could well be the result of Myerson's under-utilized plant. Finally, the government offers nothing to rebut the evidence supporting the trial court's finding that high margins "are expected in a market with substantial pre-sale promotion" such as the artificial tooth market. (A84 (FOF233)). In short, the trial court's finding that the government did not show Dentsply's margins to be higher than its rivals' margins is brutally accurate.

---

[27]    Vident's margin is immaterial since it is a reseller, not a manufacturer.

69

## CONCLUSION

No matter how the government seeks to spin it, its appeal asks this Court to abandon a thoughtful, 165-page decision and substitute that judgment with this Court's own assessment of a four-week trial record. That offends the deference that this Circuit affords to finders of fact. Each of the factual findings enjoys the support of substantial, credible evidence, and the trial court's legal analysis is flawless. As a consequence, the judgment of the trial court should be affirmed.

Dated:  May 13, 2004                    Respectfully submitted,

Of Counsel:                             Margaret M. Zwisler
                                        Richard A. Ripley
Brian M. Addison                        Kelly A. Clement
DENTSPLY INTERNATIONAL, INC.            Eric J. McCarthy
Susquehanna Commerce Center             Douglas S. Morrin
221 West Philadelphia Street            HOWREY SIMON ARNOLD & WHITE, LLP
York, PA 17405                          1299 Pennsylvania Avenue, N.W.
                                        Washington, D.C.  20004
                                        (202) 783-0800

                                        Counsel for Defendant-Appellee
                                        DENTSPLY INTERNATIONAL, INC.

# CERTIFICATION OF BAR MEMBERSHIP

I certify that I am a member in good standing of the Bar of the United States Court of Appeals for the Third Circuit.

Dated: May 13, 2004

_____

Margaret M. Zwisler
Howrey Simon Arnold & White, LLP
1299 Pennsylvania Ave., NW
Washington, DC   20004

Counsel for Defendant-Appellee
DENTSPLY INTERNATIONAL, INC.

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because the brief contains 13,994 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2000 in 14-point Times New Roman font.

Dated: May 13, 2004

_____

Eric J. McCarthy
Howrey Simon Arnold & White, LLP
1299 Pennsylvania Ave., NW
Washington, DC  20004

Counsel for Defendant-Appellee
DENTSPLY INTERNATIONAL, INC.

## CERTIFICATE OF SERVICE

I hereby certify that two true and correct copies of the foregoing *Brief of Defendant-Appellee Dentsply International, Inc.* were served this 13th day of May, 2004, via courier and electronic mail upon:

>           Adam D. Hirsh
>           U.S. Department of Justice
>           Antitrust Division
>           601 D Street, NW, #10535
>           Washington, DC  20530-0001
>
>           *Attorneys for Plaintiff-Appellant United States of America*

I also hereby certify that a true and correct copy of the foregoing *Brief of Defendant-Appellee Dentsply International, Inc.* was mailed this 13th day of May, 2004, via Federal Express to the Clerk of this Court.

>           _____
>           Eric J. McCarthy